## ASPERGER CARAHER LLC

**ATTORNEYS AT LAW**

Jeffrey J. Asperger
Direct: 312/240-0795
Email: jasperger@aspcar.com

May 11, 2004

The Honorable Benson E. Legg
United States District Court
for the District of Maryland
Third Floor, Room 340
101 W. Lombard Street
Baltimore, MD 21201

        Re:    In the Matter of the Complaint of
                  Eternity Shipping, Ltd., et al,
                  For Exoneration from or Limitation of Liability
                  Civil Action No.: L-01-CV-0250

Dear Judge Legg:

I have examined the letter sent to you on May 5, 2004, from Mr. Clyne. I want to address any misapprehensions that may exist regarding Tate & Lyle's position on the fact discovery deadline set by Your Honor.

Tate & Lyle is in compliance with discovery requests and Rule 30(b)(6) notices, and has produced, on reasonable notice, every witness requested by the other parties. ABS and the Limitation Plaintiffs have examined over a dozen witnesses, generating thousands of pages of testimony, regarding the details of T&L's claim. In fact, a number of witnesses have been produced more than once for deposition. Invoices, spread sheets, accounting statements, our expert's file and supporting details in the thousands of pages documenting all of the expenses associated directly or indirectly with having to discharge cargo at Chesapeake Bulk Stevedores have all been produced.

The Rule 30(b)(6) notice quoted in Mr. Clyne's letter refers to "costs associated with discharging raw sugar at Chesapeake Bulk Stevedores..." Mr. FitzGibbon, T&L's Process Manager, was but one of the witnesses presented in response to this notice and he was examined extensively on two separate occasions a year apart, over a total of three days, generating 586 pages of transcript. Mr. FitzGibbon explained in detail about the need to transfer vessels to CBS, about the around the clock trucking of the raw sugar from CBS to Domino, about the need for Domino to increase security because of the truck traffic, about the cost incurred to reconfigure the raw sugar shed to accommodate the trucking operation, about the host of other logistical problems created by the loss of the crane, as well as the substantial increase in damages Domino would have sustained had the plant run out of raw sugar inventory. While he testified that Robinson was responsible for

**ASPERGER CARAHER LLC**

The Honorable Benson E. Legg
May 11, 2004
Page 2

negotiating the details of the arrangement with CBS, FitzGibbon said he was familiar with the arrangement, the cost and the day-to-day operations. On January 23 and 24, 2003, he testified:

> Q. Okay. Do you know now, generally, what the terms of the arrangement were with Chesapeake Bulk Stevedores in terms of manning and cost, and so forth.
>
> A. Yes.
>
> Q. What were they?
>
> A. The, and I'll qualify this by saying you have to get the details from Jeff Robinson, but, in general, the cost of the discharge ended up costing us around $11.80 a ton delivered. And the details of it, you'd better ask Jeff Robinson exactly how they arrived at that number.
>
> Q. $11.80 a ton delivered to the sugar–
>
> A. Raw sugar shed.

(FitzGibbon depo, 1/23/03, p. 119, attached)

\* \* \*

> Q. And physically how was that arranged at Chesapeake Bulk Stevedores, do you know?
>
> A. Chesapeake Bulk Stevedores' system is that they have two piers and they used cranes to discharge directly into dump trucks, they had an army of dump trucks running the sugar from there over to here, where we would weigh the cargo in on the truck and that's how we would determine the weight delivered. And the trucks would do a circuit back and forth until the ship was finished discharging.

\* \* \*

> Q. But you were the one who decided which vessels would be discharged there and which vessels could be discharged here; is that correct?
>
> A. Yes.

(FitzGibbon, 1/23/03, p. 120, attached)

**ASPERGER CARAHER LLC**

The Honorable Benson E. Legg
May 11, 2004
Page 3

Attorney Saville of Hill Rivkins asked if Robinson was in Baltimore. FitzGibbon responded, "He's two steps down the hall." If he were such a critical witness, Robinson could have been produced in January of 2003, while all the parties were present. No request was made at that time, nor was any notice for Robinson's deposition issued until well over a year following this testimony.

Mr. FitzGibbon was produced again on February 10, 2004 to respond to additional questions concerning damages. Mr. Clyne inquired:

> Q. Okay. Other than negotiating the contract with Chesapeake that you described to us last time – –
>
> A. Yes.
>
> Q. – – did Mr. Robinson play any other role with respect to this incident whatsoever?
>
> A. No, he – – he was involved with the setting up of the contract with Chesapeake, but on a day-to-day basis, he wasn't involved with that.
>
> Q. Okay. Was there a written contract with Chesapeake?
>
> A. I don't know.
>
> Q. Well you were involved in gathering certain of the extra expenses associated with the discharge of Chesapeake, correct?
>
> A. Yes.
>
> (FitzGibbon, 2/10/04, pp. 394-395)

FitzGibbon was the witness with the most knowledge regarding "costs associated with discharging raw sugar at Chesapeake Bulk Stevedores." If counsel felt Mr. Robinson was an indispensable witness, why wasn't a notice served so that he could have been produced in early February when the parties were all in Baltimore for the follow up depositions of FitzGibbon and Pleiss? Since it appears to be the only matter for which the deposition is being sought, T&L is willing to stipulate to the details of the agreement with CBS. As for Mr. Traven, he is a forensic accountant who was identified at the inception of this lawsuit as T&L's damages expert. His file has already been voluntarily produced (apparently no good deed goes unpunished), and he will be presented for deposition during the expert phase of the case.

**ASPERGER CARAHER LLC**

The Honorable Benson E. Legg
May 11, 2004
Page 4

The first and only notices for the depositions of Robinson and Traven were not issued until after the close of business on April 27, 2004, and scheduled for May 4, 2004, only five business days later and one day before the fact discovery deadline. There was no communication between counsel for ABS and Limitation Plaintiffs, and other key counsel who are located across the country, about availability on May 4. In fact, the undersigned was out of the country during the time the notices were issued and first spoke with counsel for ABS on May 5, after returning to the U.S. Under these circumstances, such short notice to take the deposition of an expert out of sequence and a witness who had been disclosed early in the litigation does not comply with the general or expert discovery provisions of Rule 26, the reasonable notice requirement of Rule 30(b)(1), or with the spirit of this court's discovery deadline, which T&L understood required fact discovery to be completed by May 5, not simply noticed by that date.

T&L would be prejudiced if Mr. Robinson's deposition were allowed at this late date, and if its expert, Mr. Traven, would have to be presented twice. As for Mr. Robinson, it is unknown when the witness and all counsel could be available, and the undersigned is engaged until the end of June with back to back trials. Contrary to what was stated in ABS' May 5 letter, allowing these depositions would unfairly and unilaterally constrict the time in which T&L has to prepare its expert disclosures. In addition to the considerable inconvenience, having to produce a witness at this late date who could easily have been produced in connection with other witnesses would result in substantial additional expense to T&L. Finally, no reasonable explanation has been offered by ABS or the Limitation Plaintiffs as to why Mr. Robinson, who was never a critical witness to either party until the eve of the discovery deadline, was not timely noticed.

We would welcome the opportunity to address the Court on these issues. This letter shall also serve as our follow up notice to ABS that they have failed to respond to T&L's supplemental written discovery served on January 6, 2004. We would appreciate prompt responses so we can avoid the necessity of having to burden Your Honor with that discovery issue.

In closing, I would like to note that all counsel of record have worked well together and have generally cooperated throughout this litigation. We have been able, for the most part, to work through our disagreements, and we want to maintain that relationship. However, prosecuting this case has been very expensive for T&L and we feel strongly that this Court's May deadline for **the completion** of fact discovery should be binding on all parties. We respectfully suggest that it is time to move on to the expert discovery phase so that this matter can be set for trial.

Respectfully,

Jeffrey J. Asperger

JJA:jg
Enclosures