IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE COMPLAINT      *
OF ETERNITY SHIPPING, LTD. AND
EUROCARRIERS, S.A., FOR EXONERATION   *     CIVIL ACTION
FROM OR LIMITATION OF LIABILITY          NO. L01CV0250
                                    *

\*     \*     \*     \*     \*     \*     \*

                                    *

TATE & LYLE NORTH AMERICAN
SUGARS, INC.,
                                    *

       Claimant and Third-Party Plaintiff      *

       v.                                       *

AMERICAN BUREAU OF SHIPPING      *

Third-Party Defendant                      *
\*     \*     \*     \*     \*     \*     \*     *

**MEMORANDUM IN SUPPORT OF**
**AMERICAN BUREAU OF SHIPPING'S MOTION FOR SUMMARY JUDGMENT**

      Third-Party Defendant, American Bureau of Shipping ("ABS"), by its attorneys, Robert

G. Clyne and James A. Saville, Jr. of Hill Rivkins & Hayden LLP, and James M. Bartlett, III of

Semmes Bowen & Semmes, P.C., submits this Memorandum in Support of its Motion for

Summary Judgment with respect to the claims of Third-Party Plaintiff, Tate & Lyle North

American Sugars, Inc. ("Tate & Lyle") and Third-Party Plaintiff, Josephina Gonzales

("Gonzales") (collectively "Third-Party Plaintiffs") and states as follows:

**PRELIMINARY STATEMENT**

      On July 29, 2000, while crane no. 4 of the M/V Leon I was being operated by the ship's

bosun in clear violation of the Shipboard Operations Manual and in excess of its safe working

parameters, the luffing wire of crane no. 4 parted. With the resulting collapse of crane no. 4, two seamen died and one of the Tate & Lyle shoreside cranes unloading the M/V Leon I's cargo of bulk sugar was damaged. Approximately six (6) months prior to the casualty, ABS performed a survey of the cranes aboard the M/V Leon I and issued a cargo gear certificate.

Although litigation ensued almost immediately against the owners and operators of the M/V Leon I, litigation was not commenced against ABS by Third-Party Plaintiffs until May 2002 (almost two years later).

Remarkably, the vast majority of facts are not in dispute. Accordingly, ABS respectfully submits that summary judgment in its favor is warranted as a matter of law because the undisputed facts do not support a claim of negligence or negligent misrepresentation. Specifically, a legal duty is lacking in these circumstances, no material facts to support a breach have been established and the remoteness of the allegedly deficient survey to the casualty is clearly demonstrated; accordingly, summary judgment is appropriate with respect to the negligence cause of action.

ABS further submits that Third-Party Plaintiffs' second and third causes of action based on third-party beneficiary and breach of warranty of workmanlike service also fail as a matter of law.

## STATEMENT OF THE CASE

On August 3, 2000, Tate & Lyle, through its attorneys, filed suit against the M/V LEON

I, *in rem*, Eternity Shipping Ltd. ("ESL"), the owners of the vessel, and Eurocarriers, S.A. ("Eurocarriers"), the managers, and promptly arrested the vessel pursuant to Supplemental Rule C of the Federal Rules of Civil Procedure. (hereinafter the "Tate & Lyle action"). That same day, in consideration of releasing the vessel from arrest, ESL's insurers posted a $6,500,000 letter of undertaking in favor of Tate & Lyle.

Thereafter, on January 29, 2001, ESL and Eurocarriers (hereinafter "Limitation Plaintiffs") filed a Complaint for Exoneration from or Limitation of Liability pursuant to 46 USC App. §§ 181-189. ("Limitation Complaint" or, generally, "Limitation Proceeding") (Exhibit E). The Limitation Complaint sought, *inter alia*, an Order authorizing plaintiffs to file an *Ad Interim* Stipulation for Value and a concurcus of claims to be filed pursuant to Supplemental Rule F(4). On January 29, 2001, this Court signed a Restraining Order and Order For Issuance of Notice That Claims Be Filed and granted Limitation Plaintiffs' request for an *Ad Interim* Stipulation for Value of $5,334,062.00 plus 6% interest per annum.

Notwithstanding the Limitation Proceeding and the Court's Restraining Order, on February 6, 2001, Gonzales filed an action against the M/V Leon I, *in rem*, Tate & Lyle, Eurocarriers and Bright Maritime. (Case No. L-01-327). By further Order dated April 14, 2003, this action was stayed and restrained. Both Tate & Lyle and Gonzales filed claims in the Limitation Proceeding.

Nearly two years after the casualty, on May 10, 2002, Tate & Lyle commenced a third-party action against ABS alleging negligence, third-party beneficiary and breach of warranty of

workmanlike service causes of action and seeking the same quantum of damages as claimed in the Limitation Proceeding. (Exhibit A). On that same day, Gonzales also filed a third-party complaint with identical causes of action against ABS in the Limitation Proceeding and filed an Amended Complaint in the separate proceeding (Case No. L-01-327) seeking $1,500,000.00 in damages from ABS. (Exhibit B). The separate proceeding has been stayed by this Court.

## STATEMENT OF UNDISPUTED FACTS

The following facts are undisputed:

**A.    Jurisdiction:**

1. In their third-party complaints, both Tate & Lyle and Gonzales invoked the admiralty jurisdiction of this Court. (Exhibit A, ¶ 1, Exhibit B, ¶ 1).

**B.    The Parties:**

2. Tate & Lyle is a domestic corporation engaged in the business of refining and selling sugar. (Exhibit A, ¶2 ).

3. Gonzales is an individual residing in the Philippines and the mother of Juan Gonzales, Jr., a crewmember aboard the M/V Leon I who died on July 29, 2000. (Exhibit B, ¶¶ 2, 5).

4. ABS is a domestic, not for profit corporation engaged in classification and certification related services. (Exhibit C, ¶3, Exhibit D, ¶3).

5. ESL is a business entity organized and existing by virtue of the laws of Malta, and was, at all

material times, the registered owner of the M/V Leon I. (Exhibit E, ¶ 1).

6. Eurocarriers is a business entity organized and existing by virtue of the laws of Liberia and, at all material times, was the sole and exclusive manager and operator of the M/V Leon I (Exhibit E, ¶ 2).

**C.    The Role of ABS:**

7. ABS is a not-for-profit corporation enacted by a special act of the New York State Legislature in 1862. ABS is one of a number of classification societies that are full members of the International Association of Classification Societies. (Exhibit F, ¶2).

8. Classification societies are organizations that establish and apply technical standards in relation to the design, construction and survey of marine related facilities including ships and offshore structures in order to verify compliance with standards published by the classification societies. (Exhibit F, ¶3).

9. ABS establishes technical standards through the issuance of various "Rules", "Guides" and other publications. (Exhibit F, ¶4).

10. ABS applies these technical standards or "Rules" through technical reviews of drawings, plans and specifications and through periodic surveys of the vessel during the course of construction and while the vessel is in service. (Exhibit F, ¶4).

11. In addition to the traditional classification activity described above, classifications societies, including ABS, as well as other qualified organizations perform certification services with respect to, among other things, marine related equipment such as cargo gear. (Exhibit F, ¶5).

12. Cargo gear is the general rubric used to describe shipboard cranes, wire ropes, shackles, blocks, swivels and other related gear. (Exhibit F, ¶5).

13. In July 1999, the ABS publication applicable to the survey and certification of shipboard cranes was the 1991 Guide for Certification of Cranes (hereinafter the "1991 Guide"). (Exhibit F, ¶6; Exhibit G, pp.42-43, Exhibit G-5).

14. In addition to the 1991 Guide, ABS surveyors are provided with internal ABS documentation to assist and guide surveyors in the performance of cargo gear surveys. (Exhibit F, ¶6; Exhibit G, pp. 43-44).

15. As outlined in paragraph 1.3 of the 1991 Guide entitled "Certification:"

> The Certification process consists of a) the development of Rules, Guides, standards and other criteria for the design and construction of cranes, b) the review of design and periodic survey during and after construction to verify compliance with such Rules, Guides, standards or other criteria, and c) the issuance of certificates when such compliance has been verified. (Exhibit G-5, ¶1.3).

16. ABS makes the following representation as to certification in paragraph 1.7 of the 1991 Guide:

## 1.7    Representations as to Certification

Certification is a representation by the Bureau as to the fitness of the crane for a particular use or service in accordance with its Rules, Guides and standards. The Rules, Guides and standards of the American Bureau of Shipping are not meant as a substitute for the independent judgement of professional designers, naval architects, marine engineers, owners, operators, masters and crews, nor as a substitute for the quality control procedures of builders, steel makers, suppliers, manufacturers and sellers of marine materials, machinery or equipment.

The Bureau represents solely to the manufacturer, vessel Owner or client of the Bureau that when certifying it will use due diligence in the development of Rules, Guides and standards and in using normally applied testing standards, procedures and techniques as called for by the Rules, Guides, standards or other criteria of the Bureau for the purpose of issuing and maintaining certification. The Bureau further represents to the manufacturer, vessel Owner or other client of the Bureau that its certificates and reports evidence compliance only with one or more of the Rules, Guides, standards or other criteria of the Bureau in accordance with the terms of such certificate or report. Under no circumstances whatsoever are these representations to be deemed to relate to any third party. (Exhibit G- 5, ¶1.7).

17. It is the obligation of the owner/operator of the vessel to supply and maintain the wire ropes associated with the ship's cranes and to maintain wire rope certificates pertaining thereto. In this regard paragraph 1.29 of the 1991 Guide provides:

**1.29 Loading, Handling and Securing**

This Guide is published on the understanding that responsibility for control of Safe Working Loads, for proper crane handling during lifting and setting loads, for avoidance of improper weight distributions while lifting a load, for proper securing of the crane on the vessel or unit, for proper maintenance of the crane, and for proper handling and stability of the vessel or unit during operation of the crane, does not rest upon the Bureau.
(Exhibit F, ¶7; Exhibit G-5, ¶1.29).

**D.     The Crane Retrofitting at the Da Dong Shipyard in China:**

18. The M/V Leon I was originally a gearless bulk carrier (i.e., not outfitted with cranes). To increase the vessel's market value and facilitate more opportunities to carry cargoes, Eurocarriers looked to retrofit the M/V Leon I with cranes. (Exhibit H, pp. 93-94).

19. As the M/V Yannis K was a geared bulk carrier under the management of Eurocarriers in 1999, Eurocarriers made a decision to remove the cranes from the M/V Yannis K and retrofit them on the M/V Leon I. (Exhibit H, p. 13, 15).

20. On May 10, 1999, Rousalis Cargo Gear Services proof tested all four cranes on the M/V Yannis K and issued a certificate of test and examination certifying that all four cranes withstood a proof load test of 30 tons "without injury or permanent deformation." (Exhibit H, pp. 22-23, Exhibit H-2).

21. Later that summer, Stoyan Terziev, a superintendent engineer at Eurocarriers responsible for the M/V Yannis K, attended onboard the M/V Yannis K in Dubai to supervise the removal of the cranes from the vessel. Among other things, Mr. Terziev inspected the wire ropes to determine if replacement wire ropes should be ordered. (Exhibit I, pp. 38, 40).

22. As part of the process of removing the cranes from the M/V Yannis K, the wire ropes were uncoiled from the drums and laid out on deck. Mr. Terziev personally inspected all eight wire ropes while laid out on deck. (Exhibit I, pp. 40, 43).

23. Mr. Terziev found all the wire ropes to be in good condition and found no pre-existing damage or flattening on any of the wires. (Exhibit I, pp. 40-41, 43).

24. After inspection, the wire ropes were greased, coiled on two meter spools and transported onboard the M/V Leon I to the Da Dong shipyard for installation in November/December 1999. (Exhibit I, p. 39 ).

25. The cranes originally installed onboard the M/V Yannis K and retrofitted on board the M/V Leon I, were manufactured by Ishikawajima-Harima Heavy Industries Co. Ltd. ("IHI) in 1972. The cranes are powered by three electric motors: one for hoisting, one for slewing (turning) and one for luffing. (Exhibit H, p. 14, Exhibit H-5).

26. IHI issued an Instruction Manual and "Finished-Plan" for the deck cranes installed onboard the M/V LEON I and, at all material times, those documents were in the possession of Eurocarriers. (Exhibit H, pp. 46, 51, Exhibits H-6, H-7).

27. In November/December 1999, following the installation of the four deck cranes onboard the M/V Leon I at the Da Dong Shipyard, the ABS attending surveyor, Roy Graham performed, in accordance with the 1991 Guide, an Annual Cargo Gear Survey and a Retesting Cargo Gear Survey for the four cranes which had been installed onboard the vessel. (Exhibit G, pp. 60-62, Exhibit G-11).

28. With respect to the survey of wire rope, the 1991 Guide provides:

**7.11    Inspection of Wire Rope**

All running wire ropes are to be visually inspected at each Annual and Retesting Survey.  The crane owner or operator is to examine the wire rope, including end connections, at frequent intervals between surveys.

Wire rope is not to be used if in any length of ten diameters, the total number of visible broken wires exceeds 5 percent of the total number of wires, if there is more than one broken wire immediately adjacent to an end fitting, if the broken wires are concentrated in one area or one strand, or if the rope shows signs of excessive wear, corrosion, flattening, kinks, separation of the strands or wires, core failures or other defect which renders it unfit for use. (Exhibit G-5, ¶7.11).

29. Prior to installation onboard the M/V Leon I, the wire ropes were uncoiled and laid out on the ground at which time Mr. Graham inspected the entire length of each of the wire rope.  (Exhibit G, pp. 113-115).

30. As the ropes were laid out on the ground rather than being coiled on a drum, Mr. Graham found the entire length of the rope to be much more accessible than he had encountered on prior cargo gear surveys. (Exhibit G, p. 114).

31. Following his inspection, Mr. Graham found no problems with or damage to the wire ropes. (Exhibit G, p. 114-115).

32. Separate from Mr. Graham's inspection, Mr. Terziev, the superintendent engineer attending the M/V Leon I on behalf of Eurocarriers, again inspected all the wire ropes while they were laid out at the Da Dong Shipyard. (Exhibit I, pp. 57-58).

33. Based on his inspection, Mr. Terziev found the condition of all the wire ropes to be

satisfactory. (Exhibit I, pp. 57-58).

34. Mr. Terziev testified that Mr. Graham performed a very thorough survey. (Exhibit I, p. 53).

35. Each of the M/V LEON I's cranes is equipped with safety devices called limit switches. (Exhibit H-6; Exhibit I, p. 60).

36. One of the functions of a limit switch is to prevent improper operation of the crane at dangerous angles. (Exhibit H-6; Exhibit M, pp. 61-62).

37. If the limit switch is properly functioning and set, the crane jib (boom) should cut out at a maximum angle of 78°. (Exhibit H-5)  In other words the limit switch is designed to prevent the boom from being raised close to the vertical position.

38. During the operational test of the cranes at the Da Dong Shipyard, Mr. Terziev tested the limit switches and verified that they were properly set. (Exhibit I, pp. 59-61)

39. During the operational test of the cranes at the Da Dong Shipyard, Mr. Graham witnessed the testing of the limit switches and verified that they were properly set.  (Exhibit G, pp. 116-117).

40. It is not necessary to suspend a load from the crane in order to properly test the limit switches. (Exhibit G, p. 109).

41.  At the time the limit switches were tested and verified at the Da Dong shipyard, Mr. Terziev reported to the Eurocarriers office that at the maximum upper limit, the crane could not reach the aft two meters of the hold.  According to Mr. Terziev, this limitation was purely an operational concern for Eurocarriers and not a concern for ABS.  (Exhibit I,  pp. 33-34, 147).

42.  Following the operational test of the cranes, a proof load test was performed on each crane. All four cranes passed the proof load test by hoisting, lowering, slewing and suspending a 25 ton weight for five minutes.  (Exhibit G, pp. 105-108; Exhibit I, pp. 62-64).

43. Mr. Graham performed the Annual and Retesting Surveys on the four deck cranes onboard the M/V Leon I in accordance with the 1991 Guide. (Exhibit G, pp. 60-62, Exhibit G-11).

44. Upon satisfactory completion of the Annual Cargo Gear Survey, Mr. Graham issued a CHG-3 certificate.  (Exhibit G, pp. 60-61, Exhibit G-11).

45. Upon satisfactory completion of the Retesting Cargo Gear Survey, Mr. Graham issued a CHG-7 certificate.  (Exhibit G, pp. 60-61, Exhibit G-11).

## The M/V LEON I IN SERVICE

46. According to Mr. Kekridis, the then Technical Manager of Eurocarriers, regular maintenance and inspection of the cranes was an important aspect of safety and it was mandatory Eurocarriers policy that prior to each and every cargo operation, that the wires and cranes be inspected, a

report be made to Eurocarriers and a notation entered in the log book. (Exhibit H, pp. 78, 92, 158-59).

47. Between December 1999, the time the vessel left the Da Dong shipyard, and July 2000, the date of the casualty, the ship's cargo gear and associated wire rope were used frequently for lifting equipment. In fact, based on the statement of facts for the cargo operations at the port of Pulupandan, Philippines, the cranes were engaged in near continuous twenty four hour a day loading operations from at least January 29, through February 14, 2000. (Exhibit J, pp. 44-48, Exhibit J-3).

48. During this period Eurocarriers did or should have inspected the wire ropes and limit switches on one or more occasions and performed maintenance with respect to same. (Exhibit K, p. 229, Exhibit K-23, §4.06 Exhibit H, pp. 92, 158-159; Exhibit I, pp. 66-67).

49. The M/V Leon I Shipboard Operating Manual ("SOM") at §4.06 provides:

> 1.1    The following procedures are provided to ensure the safe and effective handling of vessel's cargo gear.
> . . .
> 3.1.7   Prior to starting cranes/derricks, ensure that ventilation for the crane's motors is open to prevent overheating and the motors are to be protected if dusty cargo is handled.
> - Ensure that all wire ropes remain firmly attached to the crane drums and are properly oiled.
> - The limit switches are to be tested, to be in good working order and engineers to be called if any adjustment is required.
> - Ensure that all parts of cranes/derricks inspected for damage and properly fastened.
> - Ensure that all wires, sheave, swivels, chains, hooks are in good order,
>
> (Exhibit K-23).

50. The IHI Instruction Manual states:

> Accidents occurring from snapped wire ropes account for the majority of crane accidents along with hook trouble. It is important that utmost care is taken in daily lubrication, check and handling of wire ropes.
> (Exhibit H, pp. 146-47, Exhibit H-6).

51. In March 2000, while the M/V Leon I was at Crockett, California, Eurocarriers superintendent engineer Thomas Tampathanis attended onboard the vessel. During his time onboard the vessel and based upon his inspection, Mr. Tampathanis completed an Attendance Report which, among others, noted there were no wire ropes in need of replacement and that the "Cargo wires are still in good working order." (Exhibit J, pp. 42-43, Exhibit J-2).

## THE CASUALTY

52. On July 29, 2000 the M/V LEON I was at the Tate & Lyle pier in Baltimore discharging raw sugar utilizing the Tate & Lyle shoreside gantry cranes. (Exhibit A, ¶ 5).

53. At the same time and in the same hold where discharge operations were taking place, two (2) crew members, Mr. Juan Gonzales and Mr. Joselito Burgos, were hoisted aloft in a work basket and engaged in scraping sugar from the aft coaming of hatch 6A. (Exhibit B, ¶5; Exhibit L).

54. The M/V Leon I SOM prohibited the hoisting of men aloft in this manner. In particular, §6.05, entitled "Working Aloft" provided, in relevant part:

> 3.1.8   It is not recommended to raise men in Bosuns Chair. If necessary only do so by hand. Never raise men using power winch.
> (Exhibit K-3, pp. 34-35, §6.05; Exhibit Q, pp. 136-143).

14

55. At the time the men were suspended in the workbasket, crane no. 4 was being operated by the bosun, Mr. Roland Balita. (Exhibit L).

56. According to the statement of Bosun Balita, the work basket was touching the aft hatch coaming just before the accident. (Exhibit L).

57. At the time the men were chipping sugar off the aft hatch coaming, the boom of crane no. 4 was in a near vertical position. (Exhibit I, pp. 32-33).

58. In order to get the workbasket in a position to allow the hoisted crewmembers access to the aft hatch coaming of hatch 6A, the jib needed to be a near vertical position; far in excess of the maximum upper limit for which the cranes were designed. (Exhibit I, p. 35; Exhibit J, p. 64).

59. The IHI Instruction Manual states:

> In the case of jib cranes, where the lifting position of the hook on operation radius are changed by derricking motion, the maximum load at the specific radius according to the Specification must be observed. Overturn, collapse and damage by overloading and excessive radius operation in the case of small cranes are indeed frequent and special care should be taken.
>
> To lift load beyond the limit of lift will cause the load to strike against the lifting mechanism, either damaging the structure, *or causing the wire rope to snap or the load to fall, which will endanger the lives of the people at work*. (Exhibit H-6).

60. With respect to safety devices, the IHI Instruction Manual further states:

> 1-2. <u>Safety Devices</u>
>
> It is not unusual to see people disconnect the limit switch from the hoisting mechanism when the lift is short, or to turn off luffing limit switch in trying

15

to increase the area of operation or to disengage the luffing limit switch
entirely because it is difficult to adjust it.   These have been causes of
accidents in many cranes.  These have even caused operators and co-workers
to lose their lives.
(Exhibit H-6).

61. Both the IHI Manual and the Shipboard Operations Manual mandate periodic testing of the

limit switches. (Exhibit H-6; Exhibit K-23).

62. At approximately 0907 on July 29, the luffing wire on crane no. 4 parted, causing the boom

to suddenly fall and, as a result, the work basket carrying the two crew members came into

contact with the forward coaming of hatch No. 6.A. and the jib fell onto the horizontal boom of

the Tate & Lyle gantry crane. (Exhibits B, E).

63. The physical evidence shows "stopper" marks on the jib indicating that the crane jib came

into contact with the physical stoppers on the crane house. (Exhibit I, pp. 32-33).

64. Eurocarriers plainly admits that adequate safety precautions were not undertaken by the crew

in operating the No. 4 crane at the time of the casualty. Mr. Kekridis testified that the bosun

committed two serious violations. First, the bosun violated the SOM by using the crane to

suspend men in the workbasket and, second, in further violation of the SOM and IHI Instruction

Manual , the bosun operated the crane in excess of its design parameters. (Exhibit H, pp. 172-

174; Exhibit I, p. 35).

65. There is no evidence of a pre-existing defect in the luffing wire of crane no. 4 that Mr.

Graham failed to detect at the time of his survey.  Tate & Lyle's expert, Mr. Kevin Hislop, could not point to any admissible evidence that there was a pre-existing defect in the area of the failure of the luffing wire of crane no. 4. (Exhibit N, pp.124-125).

66. Mr. Hislop testified that it would not be possible to state whether or not such pre-existing damage was present at the time of Mr. Graham's survey. (Exhibit N, pp. 162-163).

67. A section of the wire rope located within five feet of the point at which the luffing wire parted was removed and a destructive test was conducted by I&I Sling, Inc., a qualified independent testing facility.  The test of the wire rope established that the luffing wire near the break area met the manufacturer's stated breaking strength. (Exhibit O, pp. 34-35, 43-45, Exhibit O-1; Exhibit N-20).

68. There is no evidence that Juan Gonzales relied upon the ABS cargo gear certificate and his mother/representative had never heard of ABS.  (Exhibit P, pp. 55-58).

## ARGUMENT

Third-Party Plaintiffs have correctly invoked the admiralty jurisdiction of this Court, as it is well established that the services provided by classification societies are uniquely maritime in nature and, therefore, within the realm of the admiralty jurisdiction of the federal courts. *See Sundance Cruise Corp. v. American Bureau of Shipping*, 7 F.3d 1077 (2d Cir. 1993). Nonetheless, for sound legal, policy and practical reasons rooted in the sacrosanct non-delegable duty of shipowners to provide a seaworthy vessel, Third-Party Plaintiffs cannot recover against

ABS. The courts have strictly and narrowly limited the liability of classification societies to its

shipowning clients and third parties. Likewise, the courts have also rejected attempts to extend a

warranty of workmanlike performance to the services provided by classification societies and it

is clear that, in the present case, there is no support for a finding that the Third-Party Plaintiffs

qualify as third-party beneficiaries to any agreement between ABS and any other party. In view

of the foregoing and as set forth herein, ABS submits that Third-Party Plaintiffs' complaints,

which assert three identical causes of action in negligence, third-party beneficiary and breach of

warranty of workmanlike performance, should be dismissed as a matter of law.


## POINT I

### BASED ON THE UNDISPUTED FACTS ABS CANNOT BE HELD LIABLE ON A NEGLIGENCE OR NEGLIGENT MISREPRESENTATION THEORY AS A MATTER OF LAW


### A. Summary Judgment Cannot Be Avoided By Resort to Speculation

Summary judgment "shall be rendered forthwith if the complaint and answer,

depositions, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986).


The moving party has the burden of showing that no genuine dispute of material fact

exists. If the moving party satisfies this requirement, the burden shifts to the non-moving party

to present facts that would be admissible in evidence that there is a genuine dispute of material

fact preventing the entry of summary judgment. "A mere scintilla of evidence is not enough to

create a fact issue; there must be evidence on which a jury might rely." *Barwick v. Celotex Corporation*, 736 F.2d 946, 958 (4th Cir. 1984). If the non-moving party cannot meet this requirement, then the moving party is entitled to summary judgment as a matter of law. *Id.* Importantly, mere speculation or conjecture is not adequate to satisfy the burden of the non-moving party. *Ennis v. National Association of Business and Educational Radio Incorporated*, 53 F.3d 55, 62 (4th Cir. 1995); *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). ("Genuineness means that the evidence must create a fair doubt; wholly speculative assertions will not suffice.").

## B. Classification Societies Have Been Held Liable Under The General Maritime Law Only In The Rarest Of Circumstances

Though there is no case precedent in the Fourth Circuit, the general maritime law with respect to the liability of classification societies has been well developed by the federal courts over the course of a number of years. The seminal case addressing the duties of classification societies is *Great American Insurance Company v. Bureau Veritas*, 338 F. Supp. 999 (S.D.N.Y. 1971) *aff'd* 478 F.2d 235 (2d Cir. 1973).

In *Great American*, following the sinking of the Liberty ship M/V Tradeways II, the vessel owners as well as the subrogated underwriters of the owners and charterers, brought suit against Bureau Veritas ("B.V."), the classification society which surveyed and classed the vessel prior to her last voyage. *Great American*, 338 F. Supp. at 1002. Finding that the plaintiffs failed to prove causation, the court dismissed the plaintiffs' claims as the evidence did not support the allegation that the vessel sank due to the failure of wasted frames surveyed by the classification

society prior to the voyage. *Id* at 1008. The court, however, went further in analyzing the duties and the scope of liability of classification societies. *Id.* at 1009 ("Even upon findings that Tradeways II was unseaworthy upon departing Antwerp, that the unseaworthy conditions or one of them caused the sinking and the defendant knew or should have known of these conditions, plaintiffs would still face great difficulties in recovering against Bureau Veritas").

In considering a classification societies' duties to its client under tort law, the court in *Great American* noted that by undertaking to survey and class a vessel, a classification society such as B.V. undertook two duties: (1) the duty to survey and classify the vessel in accordance with the society's rules and standards and (2) the duty to exercise due care in detecting defects and notifying the owner thereof. *Id.* at 1011-12. As the court correctly noted, a breach of the first duty could not, however, be a basis for recovery for the shipowners, charterers and their subrogated underwriters, since this would undermine the traditional and well-founded doctrine imposing on the vessel's owner the non-delegable duty to exercise due diligence to maintain its vessel in a seaworthy condition. *Great American*, 338 F. Supp. at 1012. In so noting, the court recognized the unfairness and undesirability of placing ultimate responsibility for seaworthiness on a class society having minimal and only episodic contact with a vessel, while permitting the vessel owner, who possesses the most familiarity with the vessel, to escape or transfer its responsibility. *Id.* The imposition of such a liability would effectively render the classification society an insurer of any classed vessel, which is clearly not commensurate with the contact or control a class society has over a vessel or with the fees it charges. *Id.*

In connection with the second duty owed by a classification society (i.e. to use due care

to detect discoverable defects and notify the owner thereof), the *Great American* court concluded that a classification society should be charged in law with the reasonable duty of detecting all perceptible defects of the vessel encountered during the survey and notifying the owner and/or charterer thereof. *Id.* at 1013.    However, a lingering question remained due to the lack of a causal connection between the failure to detect and a given loss.  ("The society rarely, if ever, would create hazards or defects by its functions and activities"). *Id.* at 1015.

Nearly twenty years later, in *Sundance Cruises Corporation v. The American Bureau of Shipping*, 799 F. Supp. 363 (S.D.N.Y. 1992) *aff'd*, 7 F.3d 1077 (2d Cir. 1993), the Second Circuit had the opportunity to further refine the narrow duty owed by classification societies.  In *Sundance*, the sinking of a converted ferry resulted in claims by the vessel owner in contract and tort alleging that in carrying out its contractual duties of surveying and issuing class and statutory certificates, the classification society had failed to detect and advise owners that the watertight integrity required of the vessel was compromised by holes in one of its bulkheads and by the absence of valves in its sanitary or "grey-water" piping system. *Sundance*, 7 F.3d at 1079.

Squarely facing the "question of whether a classification society that issues a classification certificate is liable to the person who hires it for all of the consequences of defects not found by the certifier," the Second Circuit held that a classification society was not so liable. *Id.* at 1084.  Citing with approval the rationale of the *Great American* decision, the *Sundance* court also based its decision on sound policy considerations, namely: (1) the "great disparity" between the fee charged by the classification society ($85,000) and the damages sought by the vessel owner ($264,000,000) evidenced that the parties did not intend that the classification

society cover the risk of such liability and (2) the shipowner has the ultimate responsibility and control of the vessel as well as the non-delegable duty to furnish a seaworthy ship.  *Id.*  Put simply, the Second Circuit expressed its view "that a shipowner is not entitled to rely on a classification certificate as a guarantee to the owner that the vessel is soundly constructed." *Id.*

The courts in both *Great American* and *Sundance* expressed concern that recognition of a tort cause of action on behalf of an owner against a class society for negligence in surveying and classing a vessel in accordance with its rules and regulations would undermine the centuries old maritime doctrine which imposes on the shipowner the non-delegable duty to use due diligence to maintain a seaworthy vessel.  In other words, permitting a tort cause of action by the owner against class for failure to survey in accordance with its rules would permit the owner to elude its responsibility for unseaworthiness and would unfairly impose absolute liability on the classification society, a result out of proportion to the time the classification society spends aboard the vessel or the amount it is paid for its services. *Great American*, 338 F. Supp. at 1012.

As aptly stated in *Sundance*:

> Sundance may not create a condition of unseaworthiness, exercising all control over the reconstruction and servicing of the vessel and then burden a classification society with liability that is several hundred times that of the fee for the classification contract.
> *Sundance*, 7 F.3d at 1085.

Courts have extended the sound reasoning of *Sundance* and *Great American* to claims of third-parties as well. *See Cargill Incorporated v. Bureau Veritas*, 902 F. Supp. 49 (S.D.N.Y. 1995).

In *Cargill*, the court pointedly remarked:

> ... To deem a classification society as a warrantor of a vessel's
> seaworthiness would create a liability which is not commensurate
> with a classification society's *limited control* over a vessel, the
> *intent* of the parties, the *fees charged* for classification or the
> services performed. *See, Great American*, 338 F. Supp. at 1012.
> The same rationale compels the conclusion that by classifying a
> vessel, a classification society is also not liable as an insurer of a
> vessel's seaworthiness to third-party [cargo] owners, such as
> plaintiffs.
> *Id.* at 52.

To be sure, classification societies are not immune from liability. Yet, the few cases in which a classification society has been held liable, the courts have applied a rigorous analysis to determine whether there was actual reliance upon the survey or certificate issued by the classification society. For example, in *Somerelf v. American Bureau of Shipping*, 704 F. Supp. 59 (D.N.J. 1989), the classification society (ABS) was held responsible for negligent misrepresentation with respect to the issuance of an incorrect tonnage certificate. There, the classification society was found to be actively at fault because of its miscalculation of tonnages and erroneous issuance of Suez Canal tonnage certificates for certain vessels which were certificates specifically prepared for, inter alia, assessing toll charges for the canal. *Id.* at 451.

In contrast, a third-party claim for negligent misrepresentation was dismissed because of a lack of reliance. In *Cargill Incorporated v. Bureau Veritas*, 902 F. Supp. 49 (S.D.N.Y. 1995), third-party cargo interests claiming to have been injured by relying on a ship's classification certificates, alleged that Bureau Veritas negligently misrepresented the condition of the vessel by failing to revoke the vessel's classification. *Id.* at 52. Holding that the plaintiff could not establish actual reliance on BV's classification of the vessel, the court dismissed the negligent misrepresentation claim. *Id.* at 54. *See also, Carbotrade S.p.A. v. Bureau Veritas*, 99 F.3d 1999

(2d Cir. 1996) (Third-party cargo owner could not sustain a cause of action for negligent misrepresentation due to lack of causation under Greek law).

More recently, the Fifth Circuit Court of Appeals in *Otto Candies LLC v. NKK Corp.*, 346 F.3d 530 (5th Cir. 2003), further addressed the question of liability of classification societies in the context of negligent misrepresentation claims.  The Court pointed out:

> ...we emphasize that a claim for negligent misrepresentation in connection with the work of maritime classification societies should be strictly and carefully limited.  The societies' surveys and certificate system are essential to maintaining the safety of maritime commerce, yet their activities should not derogate from shipowners' and charterers' nondelegable duty to maintain seaworthy vessels.  Imposition of undue liability on classification societies could be harmful in several ways...
>
> *   *   *
>
> ... "[t]he Restatement expressly limits liability to a select group of nonclients who the misinformer *actually knows* will receive inaccurate information...."  *First Nat'l Bank of Commerce v. Monco Agency Inc.*, 911 F.2d 1053, 1061 (5th Cir. 1990) (emphasis added).  The fact that it was merely possible or foreseeable that a nonclient of the information supplier would rely on the information is insufficient.  *Scottish Heritable Trust, PLC*, 81 F.3d at 612; *First Nat'l Bank of Commerce*, 911 F.2d at 1059-60.
>
> *Id.* at 535.

After stating that even parties that customarily rely on certain information are not entitled to bring a §552 claim unless the information supplier knew at the time it supplied the information that it was for their benefit and guidance, the Fifth Circuit squarely held in *Otto Candies*:

> ...we reject any implication that classification societies can be liable for negligent misrepresentation to parties, including without limitation seamen, longshoremen, passengers, cargo owners, and charterers that may rely upon a survey or class certificate, absent <u>actual</u> knowledge by the classification society that the certificate or survey report was being provided for the guidance and benefit of the party.
> *Id.* at 537.

As the evolution of the case law demonstrates, the basis for a classification society's liability is carefully and purposefully circumscribed in view of the limited involvement which the classification society has with a vessel which it classes together with the non delegable duty of an owner to provide a seaworthy vessel.

In view of the Fifth Circuit's holding in *Otto Candies* and the Second Circuit's in *Sundance*, and further considering the other cases that have addressed classification society liability, it seems that the proper cause of action is negligent misrepresentation rather than negligence as plead by the Third-Party Plaintiffs.[1] Under the general maritime law, the elements of a claim for negligent misrepresentation pursuant to §552 of the Restatement (Torts) Second against a classification society are:[2]

1)   at the plaintiff's request information was supplied for their guidance.

2)   defendant failed to use reasonable care in supplying the information.

3)   defendant knew that the plaintiff would rely on the information for a particular purpose.

4)   plaintiff suffered pecuniary loss based on such reliance.

---

[1] The gravamen of the claim against ABS is that it failed to detect and report certain alleged defects such that the cargo gear certificate was improperly issued. This is precisely the circumstance envisioned in Restatement (Torts) Second §552 involving negligent misrepresentation.

[2] Essentially, these same elements comprise a negligent misrepresentation claim in this Circuit. See *Herbert v. Saffell*, 877 F.2d 267 (4th Cir. 1989).

*See Otto Candies*, 346 F.3d at 534; *Sundance*, 7 F.3d at 381.[3]

**C.      Whether A Negligence Or Negligent Misrepresentation Theory Applies, ABS Owed No Duty To The Third-Party Defendants**

Regardless of whether Third-Party Plaintiffs' claims are couched in terms of negligence or, more properly, negligent misrepresentation, they have the burden of establishing, in the first instance, that ABS owed them a duty. More particularly, with respect to a claim for negligent misrepresentation, Third-Party Plaintiffs must demonstrate that they were members of a limited group of persons for whose benefit ABS intended to issue the cargo gear certificates or that ABS knew that the Limitation Plaintiffs were going to provide the cargo gear certificates to these Third-Party Plaintiffs. *See Otto Candies*, 346 F.3d at 535. "The fact that it was merely possible

---

[3]  These are based on §552 which states:

    §552.  Information Negligently Supplied for the Guidance of Others

        (1)      One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

        (2)      Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

            (a)  by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

            (b)  through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

        (3)      The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

or foreseeable that a nonclient [i.e. Third-Party Plaintiffs] of the information supplier[ABS] would rely on the information is insufficient" because liability is limited to a select group of nonclients who the misinformer actually knows will receive inaccurate information. *Id.*    The issue of whether ABS owed Third-Party Plaintiffs a duty is a question of law, *see Semler v. Psychiatric Institute of Washington*, 538 F.2d 121, 124 (4th Cir. 1976) and, in the present case, ABS submits that Third-Party Plaintiffs have not met their burden.


Like Bureau Veritas in *Cargill, supra*, ABS publishes rules and guides which specifically limit the group of people to whom the representation regarding the crane certifications are made. The 1991 Guide clearly provides at ¶1.7:

> **1.7    Representations as to Certifications**
>
> The Bureau represents solely to the manufacturer, vessel Owner or client of the Bureau that when certifying it will use due diligence in the development of Rules, Guides and standards and in using normally applied testing standards, procedures and techniques as called for by the Rules, Guides, standards or other criteria of the Bureau for the purpose of issuing and maintaining certification. The Bureau further represents to the manufacturer, vessel Owner or other client of the Bureau that its certificates and reports evidence compliance only with one or more of the Rules, Guides, standards or other criteria of the Bureau in accordance with the terms of such certificate or report.    Under no circumstances whatsoever are these representations to be deemed to relate to any third party.

Not only do these specific terms limit the individuals to whom ABS owes a duty, but the clearly undisputed facts of the matter demonstrate that ABS did not owe the Third-Party Plaintiffs a duty in these circumstances.

After two years of discovery, Third-Party Plaintiffs have not established that they were among the limited group of people who ABS *actually* knew would be supplied the cargo gear certificate and would rely on the information contained therein. This makes sense as the cargo gear certificates at issue addressed the fitness of equipment to load and discharge cargo - not hoist men aloft (which, notably, was in violation of Eurocarriers' own Shipboard Operations Manual) in an extreme manner which disregarded the crane's safety devices. (See Kekridis Dep. pp. 172-174. As Mr. Gonzales was not even supposed to be hoisted aloft, it defies logic to say that ABS, based on the undisputed circumstances of this case, "actually knew" that Gonzales was an intended member of the limited protected class in these circumstances.[4] That is not to say, in the present case, that Gonzales is left without a remedy. To the contrary third-party defendants' remedy clearly and solely rests with limitation plaintiffs who plainly admit that crane No. 4 was operated in an unsafe manner and have provided security and a multi million dollar limitation fund to cover these claims and others.

With respect to Tate & Lyle, it bears emphasis that the M/V LEON I's cargo gear was not being operated by Tate & Lyle or even being utilized for discharge operations at the time of the casualty. Obviously, a closer question regarding the issue of whether Tate & Lyle was a member of the protected class would be presented if Tate & Lyle was using the ship's gear to discharge cargo. However, it was not. Tate & Lyle was using and relying on its own cranes and equipment and proceeded to discharge cargo in the same hold that Eurocarriers was unsafely operating the ship's gear. Like the case of Gonzales, there is no evidence that ABS had actual knowledge of this circumstance or whether Tate & Lyle was a party that intended to rely on the

---

[4] Indeed, the record is devoid of any evidence that ABS actually knew that the certificate would be relied upon by Gonzales. There has not been any evidence forthcoming from ABS on this point and Gonzales' mother, Josephina Gonzales, testified that she had never heard of ABS. (Exhibit P, pp. 56-58).

cargo gear certificate when not utilizing the cargo gear. It would strain credibility to say that these activities were foreseeable to ABS and that it owed a duty to thirty-party plaintiffs to prevent this casualty given the number of safety violations that occurred. Accordingly, Tate & Lyle's remedy, if any, lies with limitation plaintiffs as well.

Consequently, it is clear that, under the existing case law and the facts of this case, ABS did not owe Third-Party Plaintiffs any duty and, therefore, ABS respectfully submits that it entitled to summary judgment dismissing the complaints of Third-Party Plaintiffs.

## D.  Third-Party Defendants Cannot Establish A Breach Because There Is No Evidence Of A Pre-Existing Defect That ABS Failed To Detect

Distilled to its essence, Third-Party Plaintiffs' claim is that the wire rope that parted was defective and, the attending surveyor, Roy Graham, failed to discover these defects during his survey at the Da Dong Shipyard in November/December 1999. However, Third-Party Plaintiffs have come forward with no admissible evidence to establish that a pre-existing defect was present even at the time of the casualty—much less at the time of the Mr. Graham's survey over six months prior to the casualty. To the contrary, all of the evidence adduced to date points to the fact that the luffing wire for crane No. 4 was thoroughly inspected and found to be satisfactory before installation aboard the M/V Leon I.

Mr. Terziev, a former superintendent engineer at Eurocarriers responsible for the retrofitting of the cranes from the time of their removal from the M/V Yannis K to their installation onboard the M/V Leon I, testified that he inspected the wire ropes on two separate

occasions prior to the time they were installed onboard the M/V Leon I[5]. First, Mr. Terziev explained that after the wire ropes were removed from the M/V Yannis K, they were laid out on deck at which time he inspected all eight wire ropes and found them to be in good condition. (Exhibit I, pp. 40-43). Second, once the wire ropes arrived at the Da Dong Shipyard, they were uncoiled and again laid out on the deck at which time Mr. Terziev re-inspected and once again found the condition of the wire ropes to be satisfactory. (Exhibit I, pp. 57-58).

Prior to their installation at the Da Dong Shipyard, Mr. Graham also inspected all eight wire ropes as they were laid out on the deck and found the condition of the wire ropes to be satisfactory. (Exhibit G, pp. 113-115). Indeed, Mr. Graham indicated that he had better accessibility to the wire rope during his survey because it was detached from the cargo gear and laid out on the ground. *Id.* Furthermore, the undisputed testimony of both Mr. Graham and Mr. Terziev also establishes that the cranes' safety devices, i.e., the limit switches, were properly set and operational at the time of Mr. Graham's survey. (Exhibit G, pp. 116-117; Exhibit I, pp. 59-61).

In addition, in March 2000, while the M/V Leon I was at Crockett, California, Eurocarriers superintendent engineer Thomas Tampathanis attended onboard the vessel. During his time onboard the vessel and based upon his inspection, Mr. Tampathanis completed an Attendance Report which, among others, noted there were no wire ropes in need of replacement and that the "Cargo wires are still in good working order." (Exhibit J, pp. 42-43, Exhibit J-2).

---

[5] In May 1999, all four cranes and wire ropes were inspected by Rousalis Cargo Gear Services and found to be in good order. (Exhibit I, pp. 22-23, Exhibit I-2)

These undisputed facts demonstrate that Mr. Graham performed the Annual Cargo Gear Survey and Retesting Cargo Gear Survey properly and in accordance with the 1991 Guide and there were no defects in the wire rope, limit switches or general operation of the gear associated with crane no. 4.[6]  The independent inspections of Mr. Terziev at the Da Dong Shipyard and Mr. Tampathanis buttress such a conclusion.

Third-Party Plaintiffs have not offered any admissible evidence to support their claims that Mr. Graham's surveys were in violation of the 1991 Guide or that there was a defect in the wire rope which Mr. Graham failed to detect.  While Gonzales has not presented any expert testimony with respect to the alleged wrongdoing of ABS, even Tate & Lyle's own expert, Kevin Hislop, testified that it would not be possible to state whether or not pre-existing damage was present at the time of Mr. Graham's survey. (Exhibit N, pp. 162-163).  Any attempt by Mr. Hislop to argue that there was a pre-existing defect that Mr. Graham failed to detect during his surveys at the Da Dong Shipyard would be pure speculation which is insufficient to create a genuine issue of material fact. *See Ennis v. National Association of Business and Educational Radio Incorporated*, 53 F.3d 55, 62 (4th Cir. 1995); *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985).  In view of the three (3) separate inspections at three (3) separate times by two (2) different people and the complete absence of any evidence to the contrary, the allegations by Third-Party Plaintiffs are specious.  For the foregoing reasons, ABS submits Third-Party Plaintiffs have not established a breach of any duty by ABS and, therefore, it is entitled to summary judgment.

---

[6]Interestingly, one would expect that if the allegations of Third-Party Plaintiffs regarding Mr. Graham's failure to detect a defect in the rope had any merit that the Limitation Plaintiffs would have filed suit or, at least, a claim against ABS.

**E.  The Third-Party Complaints Fail Because Causation Cannot Be Established Due To
The Remoteness Of Casualty To Graham's Surveys.**

Even if this Court were to find that ABS owed Third-Party Plaintiff a duty and that ABS

violated this duty, in view of the undisputed facts, it is irrefutable that Third-Party Plaintiffs

cannot establish that any act of ABS was the proximate cause of the collapse of the no. 4 crane.

Indeed, the number of undisputed events that occurred between the time of Mr. Graham's

surveys in November/December 1999 and the casualty on July 29, 2000 eliminates any potential

causal link.

Between December 1999, the time the vessel left the Da Dong shipyard, and July 29,

2000, the date of the casualty, the ship's cargo gear and associated wire rope were used

frequently for lifting equipment.  Aside from lifting equipment in and out of the holds, the

undisputed testimony establishes that at the port of Pulupandan, Philippines, the cranes were

engaged in near continuous twenty four hour a day loading operations from at least January 29,

through February 14, 2000.  (Exhibit J, pp 44-48, Exhibit J-3).  According to Mr. Kekridis, the

then Technical Manager of Eurocarriers, it was mandatory Eurocarriers policy that prior to each

and every cargo operation, that the wires and cranes be inspected, a report be made to

Eurocarriers and a notation entered in the log book. (Exhibit H, pp. 78, 92, 158-59).  In this

regard, the M/V Leon I Shipboard Operating Manual ("SOM") at §4.06 provides:

> 1.1    The following procedures are provided to ensure the safe and effective handling
> of vessel's cargo gear.
> . . .
> 3.1.7  Prior to starting cranes/derricks, ensure that ventilation for the crane's motors is
> open to prevent overheating and the motors are to be protected if dusty cargo is handled.
> - Ensure that all wire ropes remain firmly attached to the crane drums and are
> properly oiled.
> - The limit switches are to be tested, to be in good working order and engineers to
> be called if any adjustment is required.

- Ensure that all parts of cranes/derricks inspected for damage and properly fastened.
- Ensure that all wires, sheave, swivels, chains, hooks are in good order,

(Exhibit K-23).

In view of the foregoing, the wire ropes, limit switches and other gear associated with crane no. 4 would have or should have been inspected by the ship's crew on a number of occasions after the vessel left the Da Dong Shipyard.  (Exhibit K, p. 229, Exhibit K-3, §4.06; Exhibit H, pp. 92, 158-159; Exhibit I, pp. 66-67).  All the foregoing cargo operations occurred without incident.  During this same time period, Eurocarriers had the obligation to inspect, *inter alia,* the safety devices and the wire ropes as per its own procedures.

Thus, no matter what type of survey Graham may have conducted, the inescapable fact is that Eurocarriers had an independent obligation to inspect the cargo gear including the safety devices and wire ropes during the approximate six (6) month time period when the vessel was in service between the date of Graham's survey and the casualty.  According to the available maintenance records, they did so.  This is, yet, more unrebutted evidence that cargo gear was not defective.  Plainly, the use of the cargo gear in the six (6) month period for handling cargo and moving equipment and the periodic inspections further separates any potential causal link between the survey and the casualty.

Equally important, all of the evidence points to the fact at the time of the casualty, the bosun was operating crane No. 4 in violation of both the Shipboard Operations Manual and the safety precautions set forth in the crane manufacturer's instruction manual.  (Exhibit H, pp. 172-174).  Indeed, the IHI Instruction Manual specifically covers the point that overriding, or

disengaging the limit switch has caused many accidents and has cost "operators and co-workers" to lose their lives. (Exhibit H-6). The bosun did not heed these warnings and it was the bosun's actions which were the proximate cause of the casualty. These acts by the bosun break the causal link between any act or omission by ABS over six months earlier and, as Third-Party Plaintiffs cannot establish causation, their claims whether couched as negligence or negligent misrepresentation fail as a matter of law.

## POINT II

### TATE & LYLE AND GONZALES ARE NOT THIRD-PARTY BENEFICIARIES OF ANY AGREEMENT BETWEEN ABS AND OWNERS

In their second causes of action both Tate & Lyle and Gonzales claim they are the third party beneficiaries of the agreements between Eurocarriers and ABS for the services provided by ABS in connection with the cargo gear surveys performed by Mr. Graham. (Exhibits A, B). However, in two years of discovery, neither Tate & Lyle nor Gonzales have adduced any evidence that demonstrates that ABS and Eurocarriers intended to confer a benefit on Tate & Lyle and Gonzales in their agreement with respect to the cargo gear surveys. Therefore, ABS submits that Third-Party Plaintiffs' claims as third-party beneficiaries must fail as a matter of law.

Both Tate & Lyle's and Gonzales' claims against ABS are governed by the general federal maritime law which recognizes third-party beneficiaries to maritime contracts. *See Atlantic & Gulf Stevedores, Inc. v. Revelle Shipping Agency, Inc.*, 750 F.2d 457, 459 n.2 (5th Cir. 1985) (discussing third-party beneficiary claims in the context of general maritime law); *Ignazio*

*Messina & C.S.P.A. v. Ocean Repair Service Co.*, 1993 WL 427443 (S.D.N.Y. 1993).[7]
However, under the general maritime law, in order to qualify as a third-party beneficiary, Tate &
Lyle and Gonzales must establish that the agreement of the contracting parties [ABS and
Eurocarriers] clearly intended to benefit them. *Atlantic & Gulf Stevedores*, 750 F.2d at 459. It is
not enough that the contract may operate to their benefit. *See Cargill Int'l S.A. v. M/T Dybenko*,
991 F.2d 1012, 1019 (2d Cir. 1993).

In the present case, it is undisputed that neither Tate & Lyle nor Gonzales has met their
burden of demonstrating third-party beneficiary status, no less made any showing that either
ABS or Eurocarriers clearly intended to benefit either one of them. In fact, the exact opposite is
true. Specifically, the terms of the ABS invoice for services rendered to Eurocarriers in
connection with the cargo gear surveys specifically disclaims any intention to confer a benefit on
a party other than the parties to the agreement. It states:

> 3. RESPONSIBILITY AND LIABILITY
> . . .
> It is understood and agreed that nothing expressed herein is intended or shall be construed
> to give any person, firm or corporation, other than the signatories hereto, any right,
> remedy or claim hereunder or  under any provisions herein contained, all of the
> provisions hereof are for the sole and exclusive of the parties hereto.
> (Exhibit F, ¶9).

In addition, §1.7 of the 1991 Guide demonstrates this same intention by stating, ". . .
Under no circumstances whatsoever are these representations to be deemed to relate to any third
party." (Exhibit G-5, ¶1.7).

---

[7] As maritime jurisdiction has been invoked by both Tate & Lyle and Gonzales, the claims against ABS are
governed by the general maritime law. *See Sundance*, 7 F.3d at 1079. Accordingly, although it is not clear from
their third party complaints, to the extent Tate & Lyle and Gonzales third party beneficiary causes of action are
based on state law, they must be dismissed. *See Ignazio Messina & C.S.P.A. v. Ocean repair Service Co.*, 1993 WL
427443 (S.D.N.Y. 1993) (granting defendant's motion for summary judgment on third-party beneficiary claims
based on state law).

As there is absolutely no evidence in the record that demonstrates that the agreement between ABS or Eurocarriers intended to benefit either Tate & Lyle or Gonzales or that by entering into the agreement ABS and Eurocarriers intended to benefit either Tate & Lyle or Gonzales, Tate & Lyle and Gonzales cannot claim to be third-party beneficiaries of the agreement between ABS and Eurocarriers. Therefore, ABS respectfully submits that third-party plaintiffs' second causes of action must be dismissed as a matter of law.

## POINT III

### THE WARRANTY OF WORKMANLIKE PERFORMANCE DOES NOT EXTEND TO THE SERVICES PROVIDED BY CLASSIFCATION SOCIETIES

In an attempt to further expand the limited responsibility which classification societies owe to their client shipowners and, the even narrower duty owed third parties, in their third causes of action, third-party plaintiffs assert that ABS owed them a duty of workmanlike performance and that ABS breached this, heretofore non-existent duty. However, for sound policy and practical reasons, it is well established that the warranty of workmanlike performance does not extend to the services provided by classification societies. Therefore, Tate & Lyle and Gonzales' third causes of action should be dismissed as a matter of law.

The genesis of the warranty of workmanlike performance can be traced to the Supreme Court's decision in *Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124 (1956). In *Ryan*, a longshoreman suffered an injury during the off loading of cargo which had been improperly stowed by Ryan Stevedoring Company. The injured stevedore filed suit against the

36

shipowner, who, after removing the action to federal court, impleaded Ryan Stevedoring, the party whom improperly loaded the cargo. *Id.* at 127. Following a jury trial, judgment was entered against the shipowner and in favor of the longshoreman. *Id.*  Although the trial court dismissed Pan-Atlantic's indemnity action against the stevedores, that decision was reversed on appeal and judgment was entered in favor of the shipowner. *Id.*  In affirming the judgment in favor of Pan-Atlantic, the Supreme Court held that where a contractor undertakes to provide a service, implicit in the contract is a warranty that the service will be provided in a workmanlike manner. *Id.* at 133.   While this warranty has been expanded into other areas, courts, for good reason, have refused to extend this warranty to the services performed by classification societies. *See Sundance Cruises Corp. v. American Bureau of Shipping*, 799 F. Supp. 363 (S.D.N.Y. 1992) *aff'd* 7 F.3d 1077 (2d Cir. 1993); *Somerelf v. American Bureau of Shipping*, 704 F. Supp. 59 (D.N.J. 1989); *Great American In. Co. v. Bureau Veritas*, 338 F. Supp. 999 (S.D.N.Y. 1972) *aff'd* 478 F.2d 235 (2d Cir. 1973).

In *Great American*, discussed above, plaintiffs argued that B.V. performed the surveys which it had undertaken negligently and in breach of its warranty of workmanlike performance. *Id.* at 1005. Although the Court found that plaintiffs had failed to satisfy its burden of proof, it rejected plaintiffs' attempt to thrust a warranty of workmanlike performance on B.V. The Court concluded:

> Notwithstanding the foregoing, I concluded that no theories based on the *Ryan* doctrine can help plaintiffs recover here, principally because, as already discussed, the burden of insuring the seaworthiness of a vessel must ultimately rest upon the shipowner or charterer unless there is a good reason to shift this burden to another party. Presumably, one of the reasons that the Supreme Court decided in *Ryan* to shift the responsibility for the unseaworthy condition to the stevedore was the fact that the owner had little or no direct immediate control over the stevedore or its services there provided. (citations omitted). Recognizing this rationale, I note that the services and activities of a

classification society differ markedly from those provided by a stevedore, carpenter, ship's cleaner and the like. *While an owner may have little or no direct control of the activities of a classification society aboard ship, the society rarely, if ever, would create hazards or defects by its functions and activities.* (emphasis added). Moreover, unlike a stevedore or similar service contractors, a classification society is functionally incapable of repairing or rectifying defects or hazards caused by others. Virtually all a society can do is observe and report to the owner whatever its inspections reveal   In light of these distinctions, to rule that a shipowner or operator can evade or pass off its historic primary duty to furnish a seaworthy vessel by strict application of the *Ryan* doctrine to a classification society, in my judgment, would work an unsound and unfair dilution of that legal duty.
*Id.* at 1015

The Court reached a similar conclusion in *Sundance*. In *Sundance*, following the grounding and sinking of the M/V SUNDANCER the shipowner, despite running the ship aground, brought suit against the American Bureau of Shipping on various theories, including, the allegation that ABS breached the implied warranty of workmanlike performance in issuing relevant class related certificates. *Id.* at 363.  In refusing to extend the warranty of workmanlike performance to the services provided by the American Bureau of Shipping, the Court approvingly cited *Great American*, and held that plaintiff's claims against ABS under the *Ryan* doctrine fail as a matter of law. *Id.* at 384.

The Courts' holdings in both *Great American* and *Sundance* are well founded in both logic and common sense in view of the classification societies' limited role.  Indeed, to hold the classification society liable for a breach of workmanlike performance would improperly place classification societies in the position of an insurer of the vessel which it surveys and classifies as the scope of the service which classification societies provide would require that the warranty cover any unseaworthy condition which might arises onboard the ship.  Such a result would erode away the centuries old non-delegable duty of a shipowner to provide a seaworthy vessel.

38

Moreover, the imposition of such liability is entirely disproportionate to the fees charged by the classification societies for the services provided.    In the present case, not only is there an absolute lack of evidence that there was a defect in the wire rope or limit switches at the Da Dong Shipyard, but the owners had the non-delegable duty to ensure that the wire ropes, limit switches and the remainder of the cranes were properly maintained and operated in a safe manner.    ABS had no contact with the cranes from the time the M/V Leon I left the Da Dong Shipyard and had no control over the manner in which they were operated. In view of the foregoing, ABS submits, and indeed the courts have recognized, that the warranty of workmanlike performance does not extend to the services provided by classification societies and, therefore, third-party plaintiffs' third cause of action must fail as a matter of law.

## CONCLUSION

For the reasons set forth herein, ABS respectfully submits that it is entitled to summary judgment dismissing the third-party complaints of Third-Party Plaintiffs Tate & Lyle North American Sugars, Inc. and Josephina Gonzales.

Dated:  New York, New York
          October 6, 2004

Robert G. Clyne
Federal Bar No. 81037

James A. Saville
Federal Bar No. 81036
Hill Rivkins & Hayden LLP
45 Broadway, Suite 1500
New York, New York 10006
(212) 669-0600 Telephone
(212) 669-0698 Facsimile

James W. Bartlett, III
Federal Bar No. 00017
Semmes, Bowen & Semmes, P.C.
250 West Pratt Street
Baltimore, Maryland  21201-2423
(410) 539-5040  Telephone
(410) 539-5223  Facsimile

Attorneys for American Bureau of Shipping