IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| IN THE MATTER OF<br>THE COMPLAINT OF | * | |
| ETERNITY SHIPPING, LTD. AND<br>EUROCARRIERS, S.A. | * | Civil Action No.: L01CV0250 |
| FOR EXONERATION FROM OR<br>LIMITATION OF LIABILITY | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MOTION OF CLAIMANT TATE & LYLE NORTH AMERICAN SUGARS, INC. FOR SANCTIONS FOR SPOLIATION OF EVIDENCE AND FOR FRCP 37(c) SANCTIONS FOR FAILURE TO DISCLOSE

NOW COMES Claimant, TATE & LYLE NORTH AMERICAN SUGARS, INC., by and through its attorneys, ASPERGER CARAHER LLC, and respectfully requests that this Court enter an order granting sanctions against Limitation Plaintiffs, Eternity Shipping, Ltd. and Eurocarriers, S.A., and Defendant, American Bureau of Shipping, for spoliation of evidence in this matter, and for sanctions pursuant to FRCP 37(c) for failure to disclose, as described in detail in the Memorandum in Support of this Motion, which is attached hereto and incorporated herein.

ASPERGER CARAHER LLC

_____/s/_____
Jeffrey J. Asperger

Jeffrey J. Asperger
ASPERGER CARAHER LLC
303 East Wacker Drive, Suite 1000
Chicago, Illinois 60601
(312) 856-9901

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| IN THE MATTER OF | * | |
| THE COMPLAINT OF | | |
| ETERNITY SHIPPING, LTD. AND | * | Civil Action No.: L01CV0250 |
| EUROCARRIERS, S.A. | | |
| FOR EXONERATION FROM OR | * | |
| LIMITATION OF LIABILITY | | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OF CLAIMANT TATE & LYLE
NORTH AMERICAN SUGAR, INC. IN SUPPORT OF ITS MOTION
FOR SANCTIONS FOR SPOLIATION OF EVIDENCE AND FOR
FRCP 37(c) SANCTIONS FOR FAILURE TO DISCLOSE**

NOW COMES Claimant, TATE & LYLE NORTH AMERICAN SUGARS, INC. (hereinafter, "Tate & Lyle" or Domino), by and through its attorneys, ASPERGER CARAHER LLC, and for its Memorandum in Support of the Motion for Sanctions for Spoliation of Evidence and for FRCP 37(c) Sanctions for Failure to Disclose, states as follows:

**Factual Background**

On July 29, 2000, the vessel M/V Leon I, owned and managed by Limitation Plaintiffs, Eternity Shipping, Ltd ("ESL") and Eurocarriers, S.A.("EC") (collectively "ESL/EC" or Limitation Plaintiffs), was discharging bulk sugar at Tate & Lyle's Domino Sugar refinery on Baltimore's Inner Harbor. Domino's twin shoreside gantry cranes were being used for the discharge operation. As discharge was proceeding in hatch 6, the Leon I crew began using ship's crane #4 to clean caked sugar from the aft coaming of adjacent hatch 6A. Two of the ship's crew were suspended over

1

hatch 6A in a work basket chipping sugar from the portside aft coaming when the luffing wire rope of crane #4 suddenly failed and parted, resulting in the collapse of the jib of crane #4 and the deaths of two Leon I crew. During its collapse, the #4 crane jib struck Domino's crane #2, causing its boom to collapse into hatch #6, resulting in Tate & Lyle sustaining over $12 million in property damage and business income loss.

The Leon I had been designed and was being operated by ESL/EC as a gearless bulk carrier until the end of 1999. At that time, ESL/EC salvaged nearly 30-year old cranes from a vessel being scrapped for proposed refit onto the Leon I. Substantial structural modifications were necessary to accommodate the cranes. At the request of ESL/EC, ABS reviewed the proposed refit and issued a technical letter approving the cranes for installation on the Leon I. The refit was performed at a shipyard in China. ABS surveyor Graham surveyed the cranes and related gear and supervised installation during the time the vessel was in the shipyard. He testified that he specifically inspected the cranes and their machinery and wires while the cranes were dismantled in the yard, and that the cranes were operationally tested before the vessel went back into service in 2000. Certificates for the cranes and their machinery were issued by ABS in December 1999 before the refitted Leon I sailed.

Following the July 29, 2000 casualty and the official investigation by the United States Coast Guard ("USCG"), the luffing wire rope from crane #4 was released to and has been in the possession and control of ESL/EC. Tate & Lyle was notified by ESL/EC at the time that they would preserve the wire rope at the premises of one of their consultants, Chesapeake Engineering & Design, in Annapolis.

Tate & Lyle had the Leon I arrested following this incident and filed this lawsuit in August 2000. ESL/EC filed a limitation action in September 2000 and ABS was joined in the action in May 2002. After several extensions, fact discovery closed on May 5, 2004, and expert disclosures were exchanged by all parties on or before July 12, 2004.

The expert reports disclosed by ABS experts Willem Schoonmade (marine consultant) and Don Sayenga (wire rope expert) in July of 2004 contained oblique references to an inspection of the wire rope that had been conducted by ESL/EC and ABS in October of 2003. No details were provided in the reports and neither Tate & Lyle nor its counsel were ever given notice of this inspection. No inspection procedure or protocol has ever been produced which provided notice to the interested parties, before or after the inspection, that the inspection would involve alteration of the physical condition and appearance of the wire rope, or that a piece of the wire rope would be physically cut and removed from the critical break area.

During the approximately seven months following the inspection and before the close of discovery, there was no disclosure to Tate & Lyle (or any other parties to this lawsuit) that the inspection, alteration and removal of a piece of the evidence had occurred. As a result, Tate & Lyle had no opportunity to object to the inspection or the alteration of the evidence, and no opportunity to be present with its own experts to observe what was being done and whether appropriate procedures were being followed to preserve the condition of the evidence. In fact, Tate & Lyle never learned of any of these events until after discovery had closed and its experts' reports and opinions had been disclosed.

The specific details of what had occurred did not begin to be revealed until cross examination of ESL/EC's expert Carl Cederstav in his August 2004 deposition, nearly a year after the spoliation

occurred. It was only then that ESL/EC's attorney, Eric Veit, confirmed that no notice of the inspection had been provided to Tate & Lyle:

| | |
|---|---|
| Mr. Asperger: | Was there a Rule 34 request to perform that? |
| Mr. Veit: | As to the manner of the request, I don't recall exactly. We can go back and check that. |
| Mr. Asperger: | And no notice was given to Tate & Lyle; is that correct, sir? |
| Mr. Veit: | As far as I know, that's correct. |

(Exhibit A, C. Cederstav deposition excerpt, August 11, 2004, p. 201, l. 5-13.)

In their recent depositions, ABS experts Willem Schoonmade and Don Sayenga confirmed that both had been present at the October 2003 inspection, and that the taking of measurements and alteration of the condition and appearance of the wire rope, including the removal of lubricant, and cutting away a strand at the critical break site, had occurred while counsel and experts for ABS and ESL/EC were present. Only a few photographs were taken during the inspection, and they do not memorialize what occurred. No records were made to precisely document where lubricant had been removed, measurements taken or other alterations of the physical condition and appearance had occurred, either deliberately or through handling.

Following the extensive investigation into the July 29, 2000 incident aboard the M/V Leon I, the USCG issued its comprehensive April 16, 2001 Marine Casualty Investigation Report. The USCG investigation concluded that three "unsafe conditions" allowed the casualty to occur, the first of which was "the luffing wire on crane #4 had was (sic) damaged and weakened prior to the casualty." (Exhibit B, excerpt of USCG Marine Casualty Investigation Report, Narrative Supplement, 5.) During its investigation, the USCG also measured the diameter of the rope and

found it did not meet the crane manufacturers' specifications for use on this crane. During nearly four years of discovery, no evidence has been offered by any party that contradicts the findings and conclusions of the USCG that the wire rope on crane #4 was the wrong size and that failure of the wire rope occurred due to weakening from preexisting damage.

It was not until the depositions of ABS and ESL/EC experts were taken nearly a year after the previously undisclosed inspection that Tate & Lyle first learned details regarding all the parties and experts present, as well as what was physically done with the evidence in Tate & Lyle's absence. Tate & Lyle was surprised to learn, for the first time, that these experts were going to challenge the physical observations by the USCG that there was preexisting damage to the wire rope, and that it was not the proper diameter for use with this crane. The observations and diameter measurements taken by these experts, who were working in concert, directly contradict those observations and measurements made by the USCG and other disinterested parties immediately following the incident. The activities which occurred at the 2003 inspection form the basis of key opinion testimony directly addressing Tate & Lyle's claims:

> "The wire rope I examined on October 8, 2003 was for the most part in relatively good condition, and was lubricated properly. ... I was able to conclude the failure of the wire rope most probably was *not* the result of any kind of recognizable progressive deterioration in ordinary service prior to the accident, and that the accident was *not* likely to have been caused by any of the conventional factors, including gross physical damage ..."

(Exhibit C, Report of Don Sayenga, July 1, 2004, Conclusion 1 (emphasis in original).) Mr. Sayenga confirmed this opinion in his deposition:

> Mr. Asperger:    Did you read the Coast Guard's findings that there was preexisting damage to the wire rope at the area of the break?

5

| | |
|---|---|
| Mr. Sayenga: | I immediately noted that. |
| Mr. Asperger: | And what did you do about it? |
| Mr. Sayenga: | I immediately in my own mind rejected the idea. |

(Exhibit D, D. Sayenga deposition excerpt, August 31, 2004, pp. 294-296.) Similarly, ABS expert Willem Schoonmade opined in his report:

> "Breaking of the luffing wire of Leon I number 4 crane occurred due to an overload during operating conditions that were far beyond its design conditions. *Most probably a shock load was the final cause of its failure.*"

(Exhibit E, excerpt of Willem Schoonmade report, July 2004, 4. Probable Cause of Accident, Opinion 8 (emphasis added).) Mr. Schoonmade also confirmed these opinions at his deposition.

At the expert depositions, Tate & Lyle asked for details of what had transpired at the inspection. It was then Tate & Lyle first learned that the wire rope had been uncoiled, manipulated, lubrication removed and a wire strand cut off.[1] Tate & Lyle also learned that ABS and ESL/EC experts had taken measurements of the diameter of the wire rope at the 2003 inspection, and that these measurements did not match those taken by the U.S. Coast Guard shortly after the incident, nor those that were subsequently taken by Tate & Lyle. As Tate & Lyle was not present when ABS and ESL/EC took these measurements, it cannot determine whether the measurements were properly taken at critical locations.

Prior to disclosure of the October 2003 inspection, Tate & Lyle had had no reason to retain a wire rope expert, but did so after it learned of the inspection. ESL/EC reluctantly allowed

---

[1] Although Tate & Lyle first learned of the inspection via ABS expert reports in July 2004, the details were not known until the expert depositions which concluded at the end of August 2004. This motion and memorandum are timely filed, as the transcripts of those depositions were only recently completed.

inspection of the wire rope on August 24, 2004, during the time Tate & Lyle was taking depositions of ABS and ESL/EC's disclosed experts. However, scheduling problems limited the time Tate & Lyle had to examine the rope, as well as the opportunity and ability to prepare for the depositions of these key experts, which commenced that same day. Tate & Lyle was not allowed to inspect the rope until after its liability expert's deposition had already been completed. Although ABS and ESL/EC deprived Tate & Lyle of the right to be present during the inspection, they have now requested a supplemental deposition of Tate & Lyle's liability expert and also wish to depose Tate & Lyle's wire rope consultant.

### ESL/EC Improperly Claimed Privilege as to the Reports and Findings of Surveyor Heiner Popp, Even Though Information Popp Developed Had Been Disclosed to ABS and Was Relied Upon by ABS and ESL/EC Experts in Forming Their Opinions

In Limitation Plaintiffs' Answers to Tate & Lyle's First Set of Interrogatories, ESL/EC stated that they had retained Captain Heiner Popp as a marine surveyor to investigate the M/V Leon I July 2000 incident on their behalf, and claimed Captain Popp's information and reports were not subject to discovery based on attorney-client and attorney work-product privileges. (Exhibit F, Limitation Plaintiffs' Answer to Tate & Lyle Interrogatory No. 13, May 5, 2004.) At no time did ESL/EC supplement or otherwise alter their asserted privileges as to Captain Popp.

At the August 2004 expert depositions, counsel for Tate & Lyle learned that Captain Heiner Popp had not only been aboard the M/V Leon I on the date of the occurrence as a representative of Limitation Plaintiffs, (Exhibit G, W. Schoonmade deposition excerpt, August 26, 2004, pp. 117-118), but Captain Popp had also attended the October 2003 wire rope inspection (Exhibit D, D. Sayenga deposition excerpt at p. 208), and was therefore at least a fact witness. The reports and information developed by Captain Popp, which ESL/EC had withheld from Tate & Lyle, had in fact

been provided to ABS and ESL/EC experts during discovery. Limitation Plaintiffs' expert Carl Cederstav testified at his deposition that he had relied upon the reports and information in formulating his opinions. (Exhibit A, C. Cederstav deposition excerpt at pp. 238-240.)

Tate & Lyle has been prejudiced by Limitation Plaintiffs' failure to withdraw their privilege claims and amend their discovery responses. If the required disclosures had been made, Tate & Lyle would have been entitled to the information developed by Captain Popp would have deposed him before the close of fact discovery. ABS also had an obligation under the rules to disclose Heiner Popp where its experts clearly collaborated with Popp and considered the information he developed in formulating their opinions. (Exhibit A, C. Cederstav deposition excerpt at pp. 199-200.) Discovery is not a game of hide and seek and ABS is not without responsibility or fault here. Adherence to the rules of discovery are the principal means by which trials are rendered "less a game of blindman's bluff and more a fair contest of the basic issues and facts disclosed to the fullest practicable extent." *Averbach v. Rival Mfg. Co.*, 879 F.2d 1196, 1201 (3rd Cir. 1989), citing to *United States v. Procter & Gamble Co.*, 356 U.S. 677, 682, 78 S. Ct. 983, 986 (1958). The failure to disclose Heiner Popp and his information was a wilful violation of the basic rules of discovery by both Limitation Plaintiffs and ABS, and the prejudice to Tate & Lyle as a result of this conduct is undeniable.

**Tate & Lyle Has Been Prejudiced by the Spoliation of Evidence Which Occurred During the October 2003 Inspection**

Spoliation of evidence is defined as destroying, significantly altering, or failing to preserve property for another's use as evidence in pending or foreseeable litigation. *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2nd Cir. 1999). Here, ABS expert Don Sayenga testified at his

deposition that he removed lubrication from unidentified and unidentifiable sections of the wire rope in various locations, that measurements of the diameter of the wire rope were taken at a number of unidentifiable locations, and that a strand of the wire at the critical break site was physically cut away and removed. (Exhibit D., D. Sayenga deposition excerpt at pp. 310-312.)  Other experts present have also confirmed that handling, measurement and alteration of the evidence occurred at locations that ABS and ESL/EC cannot now specifically document, and that there was physical alteration and destruction of the wire at the critical break site.

Federal district courts possess the inherent power to sanction parties for alteration or destruction of evidence. *Schmid v. Milwaukee Electric Tool Corp.*, 13 F.3d 76, 78 (3rd Cir. 1994) (internal citations omitted). When determining the appropriate sanction against a party for spoliation of evidence, two factors usually carry the most weight: 1) the degree of culpability of the party who destroyed or altered the evidence; and 2) the degree of actual prejudice to the other party. *(Schmid, supra)*. It is significant that, even if discovery were still open, Tate & Lyle has forever been deprived of the opportunity and right to be present to observe the inspection and handling of the evidence by ABS and ESL/EC.  As a result, Tate & Lyle has been prejudiced in its ability to address these matters at deposition and trial.

ABS and ESL/EC worked together in planning their inspection, which involved a number of their experts, alleged consultants such as Heiner Popp, and attorneys.  This was a substantial undertaking requiring considerable planning and coordination.  A number of the attorneys and experts traveled great distances, some from abroad, in order to coordinate their activities and their opinions in a concerted effort to defeat Tate & Lyle's claims.

9

In light of all of this detailed planning, and the vast individual and collective litigation experience shared by the involved attorneys and their experts, it simply cannot be suggested with any veracity that these parties inadvertently overlooked the Federal Rules or failed to recognize their obligation to provide timely notice to other parties before conducting any physical inspection of evidence, particularly where the evidence is being handled extensively, significantly altered, and in fact material was physically cut away from a critical location and removed.

The condition of the wire rope at the time it failed is critical to both ABS and ESL/EC in the defense of the claims pending against them. The degree of collaboration and willfulness in failing to provide notice, and then effectively concealing their activities until after the close of discovery, is underscored by the extensive collaboration of counsel and their experts, as well as the obvious corroboration evidenced by the similarity and consistency of the opinions and testimony offered by both parties on this key issue. Under the circumstances presented, it would be nothing short of disingenuous for these parties and their experts to contend that their failure to disclose was not wilful.

The culpability of both ESL/EC and ABS in failing to disclose their self-serving handling of the evidence is beyond dispute. This conduct and the concealment from Tate & Lyle until after expiration of the discovery deadlines and after experts had been disclosed is an important factor in determining the proper remedy. Bad faith is not required to establish requisite intent, it is sufficient to show that the party knew the evidence was relevant to some issue at trial and the party's willful conduct resulted in loss, alteration or destruction of the evidence. *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995).

The degree of prejudice to Tate & Lyle must be measured not only by the actual physical alteration of the evidence as well as Tate & Lyle's inability to have its own experts present, the deliberate failure to disclose until after expiration of the extended deadlines for completion of discovery substantially increases the prejudice to Tate & Lyle. Tate & Lyle is not only prejudiced by its inability to observe the condition of the wire rope before it was altered by these parties, its ability to analyze the wire rope to assess how long the damage was present prior to the July 2000 incident has been compromised. ABS and Limitation Plaintiffs have made the presence of preexisting damage and violation of the crane manufacturer's recommendations critical issues in the case. Tate & Lyle has been prevented from presenting important evidence regarding the critical issue of the adequacy of the ABS inspection in the shipyard. Tate & Lyle is equally prejudiced in its ability to address the issue of maintenance of the crane by ESL/EC — which goes directly to the heart of ESL/EC's limitation claim. In summary, the spoliation and discovery abuses have materially limited Tate & Lyle's right to present evidence which would refute newly asserted theories propounded by ESL/EC and ABS regarding adequacy of inspection, certification, maintenance and pre-existing damage involving crane #4 and its related machinery.

### The Only Appropriate Remedy is the Barring of Expert Testimony or Other Evidence Regarding the Condition of the Wire Rope and the Adequacy of Inspections and Maintenance.

A district court has the discretion to pursue a wide range of responses [to destruction of evidence] both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct. *See, Vodusek*, 71 F.3d at 156. The facts and circumstances here are compelling. There was a complete disregard for the rudimentary rules of discovery and a clear and conscious collaboration by ABS and Limitation Plaintiffs to examine critical evidence to their

advantage without notice to Tate & Lyle or any other parties. During that cooperative examination, the condition of evidence now relied upon by these parties and their experts to defeat Tate & Lyle's claims against them was significantly and irreversibly altered. This sanctionable conduct was then deliberately concealed by ABS and Limitation Plaintiffs for nearly a year — until after the close of discovery— so that Tate & Lyle would be unable to respond.

The sanction assessed against a party for spoliation of evidence should be "molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *West*, 167 F.3d at 779. Tate & Lyle submits that the only remedy here, at this late stage of the lawsuit, is the barring of expert testimony or other evidence regarding the adequacy of inspections and maintenance of the cargo gear. In particular, Limitation Plaintiffs and ABS should be barred from presenting any evidence or argument regarding the condition of the wire rope at the time of the incident, the presence of preexisting damage and/or any information developed by Captain Heiner Popp. The failure of Limitation Plaintiffs and ABS to disclose the true nature and extent of Captain Heiner Popp's activities, and the failure to disclose his reports and materials while providing those to their own experts, by way of a claim of privilege or otherwise, is contrary to the word and spirit of the rules of discovery. Simply reopening discovery would not adequately address the prophylactic, punitive and remedial rationales underlying the spoliation doctrine, nor would such a remedy adequately sanction the patent discovery abuses and deliberate concealment of sanctionable conduct which occurred here.

WHEREFORE, Tate & Lyle respectfully requests that this Court enter and order barring Eternity Shipping, Ltd., Eurocarriers, S.A., or American Bureau of Shipping, from presenting evidence or testimony at trial regarding the adequacy of inspection and maintenance of the cargo gear, as well as the condition of the wire rope and/or the presence of preexisting damage. In addition, Tate & Lyle requests that this Court bar the use by ABS and/or Limitation Plaintiffs of any information or material developed by Captain Heiner Popp.

>Respectfully submitted,
>ASPERGER CARAHER LLC
>
>_____/s/_____
>Jeffrey J. Asperger

Jeffrey J. Asperger
ASPERGER CARAHER LLC
303 East Wacker Drive, Suite 1000
Chicago, Illinois 60601
(312) 856-9901

13

## CERTIFICATE OF SERVICE

I, Jeffrey J. Asperger, do hereby certify that a true and correct copy of the above and foregoing document was served via em-mail notification from the District Court and in the the manner indicated upon:

Bernard S. Sevel, Esq.
ARNOLD, SEVEL & GAY, P.A.
The B&O Building, Suite 560
2 N. Charles Street
Baltimore, Maryland 21201
*Attorneys for Claimant Robert J. Cantey
and Claimant William Langeville*

W. Charles Bailey, Jr., Esq.
SIMMS SHOWERS LLP
20 South Charles Street, Suite 702
Baltimore, Maryland 21201
*Attorneys for Claimant Josefina Gonzales*

James D. Skeen, Esq.
WRIGHT, CONSTABLE & SKEEN, L.L.P.
One Charles Center, 16th Floor
100 North Charles Street
Baltimore, Maryland 21201
*Attorneys for Claimant Robert J. Cantey,
William Langeville and
Tate & Lyle North American Sugars, Inc.*

M. Hamilton Whitman, Jr.
Eric M. Veit
Charles Diorio
OBER, KALER, GRIMES & SHRIVER
120 East Baltimore Street
Baltimore, MD 21202-1643
*Attorneys for Eternity Shipping*

Francis J. Gorman, P.C.
GORMAN & WILLIAMS
2 North Charles Street
Baltimore, Maryland 21201-3754
*Attorneys for
Louis Dreyfus Sugar Company*

James W. Bartlett, III, Esq.
Alexander M. Giles
SEMMES, BOWEN, & SEMMES, P.C.
250 West Pratt Street, 16th Floor
Baltimore, MD 21201-2423
*Attorneys for American Bureau of Shipping*

R. Blake Brunkenhoefer, Esq.
BRUNKENHOFER & REYNA, P.C.
1770 Tower II
555 N. Carancahua
Corpus Christi, Texas 78478
*Attorneys for Claimant Josefina Gonzales*

Robert G. Clyne, Esq.
James A. Saville
HILL, RIVKINS & HAYDEN LLP
45 Broadway, Suite 1500
New York, New York 10006
*Attorneys for American Bureau of Shipping*

in accordance with all applicable provisions of the Federal Rules of Civil Procedure, on this 12th day of October, 2004.

/s/
Jeffrey J. Asperger