1 (Pages 1 to 4)

---

**Page 1**

1        V O L U M E   1
2        IN THE UNITED STATES DISTRICT COURT
3        FOR THE DISTRICT OF MARYLAND - NORTHERN DIVISION
4        -------------------------------x
5        IN THE MATTER OF THE COMPLAINT OF x
6        ETERNITY SHIPPING, LTD. AND      x
7        EUROCARRIERS, S.A., FOR          x
8        EXONERATION FROM OR LIMITATION   x  Case No. L01-250
9        OF LIABILITY                     x
10       -------------------------------x
11       TATE & LYLE NORTH AMERICAN       x
12       SUGARS, INC.,                    x
13       Claimant & Third-Party Plaintiff x
14       v.                               x
15       AMERICAN BUREAU OF SHIPPING,     x
16       Third-Party Defendant            x
17       -------------------------------x
18          DEPOSITION OF CARL A. CEDERSTAV
19       Baltimore, Maryland - Wednesday, August 11, 2004
20                 9:40 A.M.
21       Job No. 1-39306, Pages 1 - 207
22       Reported by:  Sharon D. Livingston, CSR-RPR

---

**Page 2**

1        Deposition of Carl A. Cederstav, Volume 1,
2    held at the offices of:
3
4        OBER KALER, P.C.
5        120 East Baltimore Street
6        Baltimore, Maryland 21202
7        (410) 347-7339
8
9        Pursuant to Notice, before Sharon D.
10   Livingston, Registered Professional Reporter and
11   Notary Public of the State of Maryland.
12
13
14
15
16
17
18
19
20
21
22

---

**Page 3**

1           A P P E A R A N C E S
2
3
4    ON BEHALF OF THE LIMITATION PLAINTIFFS
5    ETERNITY SHIPPING, LTD. AND EUROCARRIERS, S.A.:
6        M. HAMILTON WHITMAN, JR., ESQUIRE
7        ERIC M. VEIT, ESQUIRE
8        OBER KALER, P.C.
9        120 East Baltimore Street
10       Baltimore, Maryland 21202
11       (410) 347-7339
12
13
14   ON BEHALF OF CLAIMANT AND THIRD-PARTY PLAINTIFF:
15       JEFFREY J. ASPERGER, ESQUIRE
16       ASPERGER CARAHER, LLC
17       Three Illinois Center
18       303 East Wacker Drive, Suite 1000
19       Chicago, Illinois 60601
20       (312) 856-9901
21
22

---

**Page 4**

1       A P P E A R A N C E S   C O N T I N U E D
2
3
4    ON BEHALF OF THE THIRD-PARTY DEFENDANT:
5        ROBERT G. CLYNE, ESQUIRE
6        HILL, RIVKINS & HAYDEN, LLP
7        45 Broadway, Suite 1500
8        New York, New York 10006-3739
9        (212) 669-0600
10
11
12   Also Present:  Kevin Hislop
13
14
15
16
17
18
19
20
21
22

---

50 (Pages 197 to 200)

197

1  Q   And I presume that if you had seen this
2  event that you just described, you would have made
3  note of it, correct?
4  A   Uh-huh.
5  Q   So may I presume that in looking at the
6  surveillance videotape, you never saw the jib brought
7  up to the point where the jib flexed and put pressure
8  on the wire?
9  A   No.  We talk about flexing on a boom like
10  that.  Do you think that you, on a jib links like
11  that, would pick up a two-inch flexing at the top?
12  Q   I don't know, sir.  I'm not the expert.
13  You are.
14  A   That's not possible.  Well, I'm not an
15  expert on videotapes, right?  But when I talk about
16  bending a boom of that dimension and have it flex
17  back -- because it flexes, right? -- two inch is a
18  tremendous force on the wire when it comes back.
19  Q   What evidence do you have that that
20  occurred?
21  A   I wasn't there.  I haven't seen it.  You
22  have heard my explanation now why I have arrived at

198

1  this conclusion.  For me this is the only conclusion.
2  Q   Okay.  I understand.  Thank you.  If this
3  was common practice on the Leon I to hoist the basket
4  for this purpose, you would agree, would you not,
5  that it's likely that Captain Escatron observed that
6  on some occasion?
7  A   Yeah, I would think so.  I mean he were the
8  chief officer.  Captains do not show very much.
9  Q   Do you have evidence that the ropes removed
10  at Dubai, the luffing wires removed at Dubai, were
11  replaced on the same exact cranes after the retrofit
12  in China?
13  A   No.  I would be very, very astonished if
14  they were not.
15  Q   Is there a set length for these wires?
16  A   135 meters, if I recall right, from the
17  certificate.
18  Q   Did you measure this one to see how long it
19  was?
20  A   You can't measure this one anymore.  I mean
21  it's strained, it's broken.
22  Q   Let me ask you in your examination of this

199

1  wire -- and would you pull your report out with your
2  photographs that show the examination of the wire at
3  Chesapeake?
4  A   There are no photographs taken by me.
5  Q   Who took the photographs?
6  A   Heiner Popp has taken photographs.  They
7  are in his report.  So are the measurements.
8  Q   And you're depicted in at least one of
9  those photographs, correct, sir?
10  A   I've compared those photographs with what I
11  assume in reality and based my opinion on the last.
12  MR. WHITMAN:  I don't think that was the
13  question.  Listen to the question.
14  MR. ASPERGER:  If you don't understand
15  something, just ask.  Let's mark this.
16  (Cederstav Deposition Exhibit 3 was marked
17  for identification and retained by counsel.)
18  BY MR. ASPERGER:
19  Q   I'm showing you Exhibit 3.  This is Heiner
20  Popp's report to which you were referring, correct,
21  sir?
22  A   Yeah.  He has two reports though.  I don't

200

1  know if you've picked the right one.  This is the one
2  which he did of the wire.
3  Q   While you were present?
4  A   I was not present.
5  Q   You were not present for this?
6  A   No.
7  Q   Where is the one that he did of the wire
8  when you examined it at Chesapeake?
9  A   You have misunderstood this.  They had a
10  survey of that wire with Captain Popp.  I was not
11  present.
12  Q   Let me start again.  What was done at
13  Chesapeake when you were present and examined the
14  wire?  First of all, who all was present?
15  A   Eric Veit and myself.
16  Q   And Mr. Dolan?
17  A   No.  Mr. Carson?
18  MR. VEIT:  Can I clarify?
19  MR. ASPERGER:  Thank you.  That would be
20  helpful.
21  MR. VEIT:  The Captain Popp report you're
22  referring to, as you can see on the date, is dated

Case 1:01-cv-00250 Document 79-2 Filed 10/12/2004 Page 3 of 8
DEPOSITION OF CARL A. CEDERSTAV VOLUME 4
CONDUCTED ON WEDNESDAY, AUGUST 11, 2004

51 (Pages 201 to 204)

201
1  October 2003. Captain Popp and myself were there to
2  essentially monitor the survey done by the ABS folks,
3  so to speak, at their request at that time, October
4  2003. Mr. Cederstav was not present that day at all.
5      MR. ASPERGER: Was there a Rule 34 request
6  to perform that?
7      MR. VEIT: As to the manner of the request,
8  I don't recall exactly. We can go back and check
9  that.
10     MR. ASPERGER: And no notice was given to
11  Tate & Lyle; is that correct, sir?
12     MR. WHITMAN: As far as I know, that's
13  correct.
14  BY MR. ASPERGER:
15     Q   So there have been examinations of this
16  wire where it's been manipulated or rolled out on
17  several occasions since the incident, correct, sir,
18  that you're aware of?
19     A   No. Because at that survey when Heiner
20  Popp was there, part of it was rolled out, and the
21  damaged area was examined. When I was up -- and I
22  think everybody understands when they see the wire --

202
1  we cut up the plastic which it's covered with, and
2  it's inside a dry room, and I examined the breakage
3  area, which could be done on pallets. So in
4  connection with that first survey, the length of the
5  wire from the socket attached to the cabin was
6  measured in feet. That is now located on top of the
7  two pallets up there.
8      Q   Thank you. I want to know who was present,
9  and were any photographs taken?
10     A   I did not take any photographs.
11     Q   Did anyone take any photographs?
12     A   No.
13     Q   Did you document what you did?
14     A   Not more than I have written in my report
15  saying that I've had the opportunity to see it.
16     Q   So you have not stated anywhere in writing
17  specifically what you did with the wire when you
18  examined it?
19     A   No. That's right.
20     MR. ASPERGER: We have to leave. Thank you
21  very much, sir.
22     THE WITNESS: Have a good flight.

203
1      THE REPORTER: We're suspending?
2      MR. WHITMAN: Right.
3      MR. VEIT: Can I just add quickly on the
4  record for further clarification? Because I don't
5  think you asked this. Mr. Cederstav saw the cable
6  and the wire the one and only time. This was about a
7  month or two ago.
8      THE WITNESS: That's right.
9      MR. VEIT: There was a gentleman there at
10  Chesapeake who you'll meet whenever we go there named
11  Cliff Dean, who was present on both instances, and he
12  very well likely is somebody to be deposed as to the
13  conditions of storage so to speak.
14     MR. ASPERGER: Well, I can tell you right
15  now I'd like to know who examined the wire and on
16  what occasions and what was done.
17     MR. WHITMAN: We're suspending.
18     (Whereupon, the deposition of Carl A.
19  Cederstav was suspended at 3:45 P.M.)
20
21      .
22

204
1      (Whereupon, this Acknowledgement of
2  Deponent is included in the event that, at the
3  conclusion of the deposition, the witness elects to
4  read and sign the transcript.)
5      ACKNOWLEDGEMENT OF DEPONENT
6      I, Carl A. Cederstav, do hereby acknowledge
7  that I have read and examined the foregoing
8  testimony, and the same is a true, correct and
9  complete transcription of the testimony given by me,
10  and any corrections appear on the attached Errata
11  Sheet signed by me.
12
13  _____    _____
14      (DATE)             (SIGNATURE)
15
16
17
18
19
20
21
22

52 (Pages 205 to 207)

205

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2        I, Sharon D. Livingston, Registered

3    Professional Reporter, the officer before whom the

4    foregoing proceedings were taken, do hereby certify

5    that the foregoing transcript is a true and correct

6    record of the proceedings; that said proceedings were

7    taken by me stenographically and thereafter reduced

8    to typewriting under my supervision; and that I am

9    neither counsel for, related to, nor employed by any

10   of the parties to this case and have no interest,

11   financial or otherwise, in its outcome.

12       IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed by notarial seal this 18th day of

14   August 2004.

15   My commission expires:

16   July 1, 2005

17

18   _____

19   NOTARY PUBLIC IN AND FOR THE

20   STATE OF MARYLAND

21

22

206

1        E R R A T A   S H E E T

2    IN RE:  Tate & Lyle v. American Bureau of Shipping

3    RETURN BY: _____

4    PAGE    LINE    CORRECTION AND REASON

5    ____    ____    _____

6    ____    ____    _____

7    ____    ____    _____

8    ____    ____    _____

9    ____    ____    _____

10   ____    ____    _____

11   ____    ____    _____

12   ____    ____    _____

13   ____    ____    _____

14   ____    ____    _____

15   ____    ____    _____

16   ____    ____    _____

17   ____    ____    _____

18   ____    ____    _____

19   ____    ____    _____

20   ____    ____    _____

21   _____

22   (DATE)          (SIGNATURE)

207

1        E R R A T A   S H E E T   C O N T I N U E D

2    IN RE:  Tate & Lyle v. American Bureau of Shipping

3    RETURN BY: _____

4    PAGE    LINE    CORRECTION AND REASON

5    ____    ____    _____

6    ____    ____    _____

7    ____    ____    _____

8    ____    ____    _____

9    ____    ____    _____

10   ____    ____    _____

11   ____    ____    _____

12   ____    ____    _____

13   ____    ____    _____

14   ____    ____    _____

15   ____    ____    _____

16   ____    ____    _____

17   ____    ____    _____

18   ____    ____    _____

19   ____    ____    _____

20   ____    ____    _____

21   _____

22   (DATE)          (SIGNATURE)

1 (Pages 208 to 211)

208
1          V O L U M E 2
2      IN THE UNITED STATES DISTRICT COURT
3          FOR THE DISTRICT OF MARYLAND
4             (Northern Division)
5   IN THE MATTER OF          *
6   THE COMPLAINT OF          *
7   ETERNITY SHIPPING, LTD. AND * Civil Action No.
8   EUROCARRIERS, S.A.        * L01CV0250
9   FOR EXONERATION FROM OR    *
10  LIMITATION OF LIABILITY    *
11            -----------
12      Continued Deposition of CARL A. CEDERSTAV
13            Baltimore, Maryland
14            Tuesday, August 24, 2004
15                2:34 p.m.
16  Job No.: 1-40662
17  Pages: 208 - 295
18  Reported By: Dawn M. Hart, Notary Public, RPR/RMR
19
20
21
22

209
1
2      Continued deposition of Carl A. Cederstav, held
3   at the law offices of:
4          Ober, Kaler, Grimes & Shriver
5          120 East Baltimore Street, 9th Floor
6          Baltimore, Maryland 21202
7          (410) 685-1120
8
9
10      Pursuant to Notice, before Dawn M. Hart,
11   RPR/RMR and Notary Public in and for the State of
12   Maryland.
13
14
15
16
17
18
19
20
21
22

210
1          A P P E A R A N C E S
2   ON BEHALF OF TATE & LYLE:
3      JEFFREY J. ASPERGER, ESQUIRE
4      ASPERGER CARAHER, LLC
5      Three Illinois Center
6      303 East Wacker Drive, Suite 1000
7      Chicago, Illinois 60601
8      (312) 856-9901
9
10  ON BEHALF OF THE LIMITATION PLAINTIFFS:
11      M. HAMILTON WHITMAN, JR., ESQUIRE
12      ERIC M. VEIT, ESQUIRE
13      OBER, KALER, GRIMES & SHRIVER
14      120 East Baltimore Street, 8th Floor
15      Baltimore, Maryland 21202
16      (410) 685-1120
17
18
19
20
21
22

211
1      A P P E A R A N C E S   C O N T I N U E D
2   ON BEHALF OF AMERICAN BUREAU OF SHIPPING:
3      ROBERT G. CLYNE, ESQUIRE
4      JAMES A. SAVILLE, JR., ESQUIRE
5      HILL, RIVKINS & HAYDEN, LLP
6      45 Broadway, Suite 1500
7      New York, New York 10006-3739
8      (212) 669-0600
9
10
11
12
13  ALSO PRESENT: Kevin Hislop
14          James Dolan
15
16
17
18
19
20
21
22

Case 1:01-cv-00250-BEL   Document 79-2   Filed 10/12/2004   Page 6 of 8
DEPOSITION OF CARL A. CEDERSTAV - VOLUME 2
CONDUCTED ON TUESDAY, AUGUST 24, 2004

8 (Pages 236 to 239)

236

1       MR. WHITMAN: -- that is inappropriate.
2       MR. ASPERGER: With all due respect, I
3  haven't rehashed anything, but sometimes you have to
4  ask questions to get into other areas, so please
5  permit me this latitude. If I continue to rehash,
6  then make an objection.
7       MR. WHITMAN: I'm sure you'll hear me.
8       MR. ASPERGER: I'd like the question reread
9  to the witness and I would like it retyped at this
10  point in the transcript.
11      (Record read as follows:
12      Q   And I just want you to be specific about
13  what limitations there were and why -- in terms of
14  access to the machinery room and why such a task would
15  be cumbersome.)
16      A   Yep, I will answer that.
17          If I were to override a limit switch and I,
18  I had to choose between going into that space using a
19  screwdriver to get the limit switch movable, move it
20  to the side, have to go back and feel it and test that
21  it comes back to the right position, and my other
22  choice was to take a piece of cable and go up in the

237

1  crane cabin, take down the panels and cross two
2  terminals, I would choose the latter solution because
3  it's much easier.
4  BY MR. ASPERGER:
5      Q   And that's your personal opinion, correct?
6      A   That's my personal opinion, yes.
7      Q   And that presumes that somebody on one
8  occasion wanted to bypass the limit switch?
9      A   My assumption is that somebody bypassed that
10  limit switch by crossing these two terminals.
11      Q   I understand that's your assumption.
12      A   Right.
13      Q   And I believe we covered this before, but I
14  want to make certain that I have your answer
15  correctly.
16      A   Right.
17      Q   You can't tell us when that might have been
18  done?
19      A   No.
20      Q   And you have no evidence whatsoever other
21  than your assumption that it was done?
22      A   I'm not so sure about that.

238

1      Q   Then tell us what your evidence is because
2  that's a different answer than what you gave last
3  time.
4      A   Because if you look at Heiner Popp's report,
5  it says that the limit switch has passed, or the block
6  or traveler has passed the point where the limit
7  switch is engaged.
8      Q   Explain.
9      A   Do you need any material to explain this?
10      MR. WHITMAN: You're asking him to explain
11  the significance of that observation?
12      MR. ASPERGER: Yes.
13      A   It means that if you disengage, so to say,
14  up in the crane, you connect these two terminals,
15  right, well, the traveler down in the machinery room
16  doesn't know about that. So when you run the
17  machinery, the block is going to pass that point where
18  the first contact is established, right, and travel a
19  bit longer.
20      Q   And so you're relying upon Heiner Popp's
21  observation that the block traveled beyond that
22  point?

239

1      A   Yes.
2      Q   What documentation do you have that
3  establishes that? Do you have photographs?
4      A   No.
5      Q   (Examining photographs.)
6      A   It's a verbal report from Heiner Popp where
7  it's -- which is available here.
8      Q   Okay. No photographs showing that --
9      A   No.
10      Q   -- that you've looked at?
11      A   I don't think that any of the photographs
12  are good enough to show that.
13      Q   And what would you be looking for in a
14  photograph if it could show that?
15      A   I would look -- I would look upon the roller
16  on the limit switch and the position on that, on the
17  block.
18      Q   And so you would see, then, what, in this
19  instance? What do you believe Heiner Popp saw?
20      A   I think he saw that that roller had passed
21  the highest point on the slanted area of the block and
22  gone a little bit further.

Case 1:01-cv-00250-BEL   Document 79-2   Filed 10/12/2004   Page 7 of 8
DEPOSITION OF CARL A. CEDERSTAV - VOLUME 4
CONDUCTED ON TUESDAY, AUGUST 24, 2004

9 (Pages 240 to 243)

240

1    Q    And that could only have occurred, in your
2    opinion, if someone had bypassed the limit switch?
3    A    That's correct.
4    Q    Could not have occurred in the course of
5    this incident --
6    A    No.
7    Q    -- by anyone else touching it after the
8    incident?
9    A    No.
10   Q    Not a chance of any of those --
11   A    No.
12   Q    -- options?
13        And then other than your reliance upon
14   Heiner Popp's statement for which there is no
15   supporting documentation, you have no other evidence
16   that someone intentionally, on this occasion only,
17   bypassed the limit switch?
18   A    No.
19   Q    Did you find in the course of all of your
20   analysis and examination any evidence that the limit
21   switch may have been bypassed or not properly set on
22   prior occasions?

241

1    A    No.
2    Q    What would you be looking for?
3    A    You have to quantify that last question.
4    Q    If you wanted to eliminate whether or not --
5    if you wanted to eliminate the possibility that the
6    limit switch had been either set in the wrong setting
7    previously --
8    A    Right.
9    Q    Let's take that one first. If you want to
10   eliminate that the limit switch had been incorrectly
11   set, what would you be looking at to make that
12   determination? What evidence would you look for?
13   A    Well, we talked about that the last time.
14   Q    Yes, we did.
15   A    That the distance between the limit switch
16   decides the difference in angle between the low limit
17   and the high limit switch. And there is no fixed
18   point for the lower limit switch. That can be zero,
19   can be adjusted by cutting loose the chain.
20       Now, what I do know, though, is that the
21   limit switch as it was when this investigation was
22   performed is the same as it was when we looked upon

242

1    the limit switch early this year.
2    Q    Explain that.
3    A    Well, if you now rely on the photos which
4    were taken and you use as a reference one side of the
5    limit switch and you draw a line parallel to that side
6    up to the threads of the hoisting bar, you calculate
7    the threads to the left of that line which is a fixed,
8    that bar is fixed, you will find that it's the same
9    amount of threads to the left of that line on the two
10   photos.
11   Q    If you looked at a photograph, correct?
12   A    That's correct.
13   Q    Now, you had me a bit confused because in
14   the course of your transcript, on more than one
15   occasion at your last deposition you said you never
16   rely upon photographs because it's too difficult to
17   tell precisely what's going on.
18       MR. WHITMAN:  Objection to the form of the
19   question. Objection. The testimony was specific with
20   regard to the condition of the wire rope.
21   A    I don't think that anyone has any difficulty
22   to calculate the amount of threads on that bar from

243

1    these photos we have here.
2    Q    Would you show me in the photos that you
3    relied upon, illustrate for me what it is that you --
4        MR. WHITMAN:  Which photos?
5    Q    -- referencing?
6    A    I want to have the photos you had here this
7    morning, which I gave you, and the photo by our
8    electrician, right?
9        MR. ASPERGER:  Is that marked as an exhibit?
10       MR. WHITMAN:  Not so far as I know.
11       MR. ASPERGER:  Well, let's get both photos
12   before you testify.
13       MR. WHITMAN:  Before you talk about it, what
14   else would you like in the way of photographs?
15       THE WITNESS:  I want to have the photographs
16   taken by our electrician which were attended -- which
17   were copied last time from the CD.
18       MR. WHITMAN:  Okay. Were they exhibits in
19   the Hislop deposition, do you recall?
20       THE WITNESS:  No. No. They were taken out
21   from the, from the CD which refers to the electrician
22   Kalenberg.

22 (Pages 292 to 295)

292

1    ACKNOWLEDGMENT OF DEPONENT
2       I, Carl A. Cederstav, do hereby acknowledge that
3    I have read and examined the foregoing testimony, and
4    the same is a true, correct and complete transcription
5    of the testimony given by me, and any corrections
6    appear on the attached Errata sheet signed by me.
7
8
9    _____  _____
10     (DATE)              (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

293

1    CERTIFICATE OF SHORTHAND REPORTER/NOTARY PUBLIC
2       I, Dawn M. Hart, Registered Professional
3    Reporter, the officer before whom the foregoing
4    proceedings were taken, do hereby certify that the
5    foregoing transcript is a true and correct record of
6    the proceedings; that said proceedings were taken by
7    me stenographically and thereafter reduced to
8    typewriting under my supervision; and that I am
9    neither counsel for, related to, nor employed by any
10   of the parties to this case and have no interest,
11   financial or otherwise, in its outcome.
12      IN WITNESS WHEREOF, I have hereunto set my hand
13   and affixed my notarial seal this 28th day of August
14   2004.
15   My Commission Expires:
16   January 1, 2005
17
18
19   _____
20   NOTARY PUBLIC IN AND FOR THE
21   STATE OF MARYLAND
22

294

1       E R R A T A   S H E E T
2    IN RE: Eternity Shipping, Ltd., etc.
3    PAGE   LINE   CORRECTION AND REASON
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   _____  _____
22     (Date)        (Signature)

295

1       E R R A T A   S H E E T
2    IN RE: Eternity Shipping, Ltd., etc.
3    PAGE   LINE   CORRECTION AND REASON
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   _____  _____
22     (Date)        (Signature)