IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF ETERNITY SHIPPING, LTD. AND EUROCARRIERS, S.A., FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CIVIL ACTION NO. L01CV0250 |
| * * * * * * * | |
| TATE & LYLE NORTH AMERICAN SUGARS, INC., | |
| Claimant and Third-Party Plaintiff | |
| v. | |
| AMERICAN BUREAU OF SHIPPING | |
| Third-Party Defendant | |

**MEMORANDUM OF THIRD-PARTY DEFENDANT AMERICAN BUREAU OF SHIPPING IN OPPOSITION TO TATE & LYLE'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE AND FOR FRCP 37 (c) <u>SANCTIONS FOR FAILURE TO DISCLOSE</u>**

Third-Party Defendant, American Bureau of Shipping ("ABS"), by its attorneys, Robert G. Clyne and James A. Saville, Jr., of Hill Rivkins & Hayden LLP and James M. Bartlett, III, of Semmes, Bowen & Semmes, P.C., submits this Memorandum in Opposition to Tate & Lyle's Motion for Sanctions for Spoliation of Evidence and for FRCP 37 (c) Sanctions for Failure to Disclose.

Tate & Lyle's spoliation motion is long on accusations but short on accuracy. The truth of the matter is that the ABS rule 34 request for inspection of the luffing wire was made *with notice to all parties*. The reason for the request for inspection was that ABS was impleaded into the litigation as an afterthought almost two (2) years after the casualty; consequently, it did not have the same opportunity to contemporaneously inspect the wire rope as did Tate & Lyle and Eurocarriers. While Eurocarriers should have advised Tate & Lyle that the wire rope was being produced for inspection in October, 2003, ABS should not be held responsible for what amounts to a harmless and unintentional oversight. On this score no prejudice whatsoever has or can be demonstrated since the wire rope has been fully preserved, was inspected by Tate & Lyle after the ABS inspection and remains available for any further inspection or testing prior to or at trial for that matter.

Tate & Lyle's allegations relating to the so-called "collaboration" between Eurocarriers and ABS are baffling. Where Tate & Lyle got the notion that ABS had access to Heiner Popp's information and/or report before Tate & Lyle had such access is certainly unknown to ABS. As addressed herein, no ABS expert ever spoke with Heiner Popp about this case and no expert report produced by ABS relied upon any information from him. To the contrary ABS received the Heiner Popp survey report at the very same time that Tate & Lyle received it – immediately before the deposition of Eurocarriers liability expert (Mr. Carl Cedarstav) which was long after the ABS expert reports were produced.

The Tate & Lyle spoliation motion is inaccurate, misleading and grossly exaggerated such that the Court is urged to deny it in all respects.

2

a. **Background Facts:**

As acknowledged by Tate & Lyle at page 3 of its motion, ABS was joined in the present action in May 2002, almost two (2) years after the casualty. Although not reported to the Court in its motion, Tate & Lyle was present and represented by counsel during the Coast Guard casualty investigation through Mr. Asperger's law firm.[1]

On April 25, 2003, ABS served its discovery requests including a request to inspect the wire rope with notice to all parties. A copy of Third-Party Defendant's Request For Production of Documents to Limitation Plaintiffs is attached as Exhibit 1 and the specific request to inspect the luffing wire is found at request no. 18. Eurocarriers produced the luffing wire which was being held in storage at Chesapeake Engineering in Annapolis, Maryland on October 8, 2003. Unfortunately, counsel for Tate & Lyle was not advised of the ABS inspection. During the inspection, Mr. Heiner Popp, a surveyor apparently retained by Eurocarriers at the time of the casualty, was present. However, as the affirmation of Mr. Donald Sayenga (ABS wire rope expert) attached as Exhibit 2 attests and the undersigned counsel (Robert G. Clyne) can confirm, no exchange of information took place between Mr. Popp and ABS' counsel or experts.

As reported by Mr. Sayenga, concerning the ABS inspection, the luffing wire was stretched out and a small amount of external lubricant was removed from certain locations of the luffing wire *away from the break area* (Exhibits 2, 2A). This was done merely to determine the

---

[1] ABS was never placed on notice with respect the casualty until the third-party action was filed. At Eurocarrier's request ABS did attend the M/V LEON I following the casualty but not to investigate the cause, rather only to perform a routine damage survey for purposes of assessing the vessel's post-casualty classification status and recommending repairs. In addition almost two months after the casualty the Coast Guard investigating officer interviewed the ABS surveyor (Mr. Roy Graham) who attended the vessel at a Chinese shipyard approximately six (6) months before the casualty via telephone. ABS' in-house counsel was on the phone call as well.

underlying condition of the wire rope and did not physically alter the wire rope's overall condition. A small, single wire from the multi-strand wire rope was cut by Mr. Sayenga for possible later testing (Exhibit 2, 2A). However, no further testing took place and the single wire was made available to Tate & Lyle's counsel at the deposition (Exhibit 2). Furthermore, the ABS inspection was photographed and these photographs were produced to counsel. A copy of these photographs are attached as Exhibit 2B. In particular, the cut of the single wire was documented and photographed (Exhibit 2B, photo nos. 26 and 27) and the cut wire was produced at Mr. Sayenga's deposition and marked as an exhibit (Exhibit 2).

Following the ABS inspection and during expert disclosure, Tate & Lyle retained Mr. Michael Parnell, a wire rope consultant well known to Mr. Sayenga, to perform a similar inspection. According to Mr. Sayenga, Mr. Parnell removed much more lubricant than Mr. Sayenga did during his own inspection. (Exhibit 2).

On September 2, 2004, Mr. Whitman from Ober Kaler on behalf of Eurocarriers forwarded a letter to counsel for Tate & Lyle inquiring as to whether Tate & Lyle intended to submit an expert report from Mr. Parnell and to proffer him for deposition. A copy of the September 2 letter is attached as Exhibit 3. The September 2 letter went unanswered.

**THE ABS INSPECTION WAS NECESSARY BECAUSE ABS WAS NOT PRESENT OR REPRESENTED BY COUNSEL DURING THE POST-CASUALTY INVESTIGATIONS AND THE U.S. COAST GUARD REPORT IS STATUTORILY INADMISSABLE**

The reason for the ABS inspection was because ABS, unlike Tate & Lyle and Eurocarriers, had no opportunity to participate in any post-casualty investigation or to inspect the wire rope during the two year period prior to being impleaded. Moreover, ABS could not rely on the Coast Guard investigative report because, as explained below, these reports are statutorily inadmissible in civil proceedings.

1.   **Coast Guard Report**

Prior to 1996 Coast Guard marine casualty investigation reports and other governmental accident reports had limited admissibility in civil proceedings. *See Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988). The reason the Courts have historically struggled with the admissibility of investigative reports such as Coast Guard reports - especially opinions and conclusions associated with such reports - is because the Coast Guard's primary mission is safety, not fixing civil liability. There have also been traditional concerns regarding qualifications of investigating officers, bias, lack of participation of certain parties in the investigation and the like. *See e.g. Huber v. United States*, 838 F. 2d 398 (9th Cir. 1988).

In any case, the Coast Guard Authorization Act of 1996 contained an unmistakable provision:

> 1.  **§ 6308. Information barred in legal proceedings**
>
> (a)  Notwithstanding any other provision of law, no part of a report of a marine casualty investigation conducted under section 6301 of this title, including findings of fact, opinions, recommendations, deliberations, or conclusions, shall be admissible as evidence or subject to discovery in any civil or administrative proceedings, other than an administrative proceeding initiated by the United States.

46 U.S.C.A. § 6308.[2]

---

[2]  A section 6301 report is generated when the Coast Guard, having been notified of a marine casualty, investigates

Thus, it is beyond dispute that U.S. Coast Guard marine casualty investigation reports are inadmissible in civil legal proceedings. See *Nicholas v. M/V MAYA*, 949 F.Supp. 391, 397 (f.n. 1) (D.S.C., 1996); *In The Matter of the Complaint of Danos & Carole*, 278 F.Supp. 2d 783, 784-5 (E.D. La. 2003).

Although Tate & Lyle is certainly aware of this statutory prohibition, it persists in placing the Coast Guard report before the Court both in its summary judgment motion versus Gonzales and herein. The professed surprise outlined on page 5 of the instant motion that the parties "were going to challenge the physical observations by the USCG" is most perplexing since there are no grounds to rely on this statutorily inadmissible evidence.[3]

### 2. Heiner Popp

On pages 7-8 of its motion, Tate & Lyle makes the bewildering statement that "The reports and information developed by Captain Popp, which ESL/EC had withheld from Tate & Lyle, had in fact been provided to ABS' experts during discovery." Nothing could be further from the truth. ABS received Mr. Popp's survey report at the very same time as Tate & Lyle, just prior to the deposition of Mr. Carl Cederstav – Eurocarrier's liability expert. This is confirmed in the deposition of Willem Schoonmade (ABS' crane expert) at pgs. 44-45 (Exhibit 4):

> Q. Anything else that you requested?
> A. Yes, there is a – the report of Mr. Heiner Popp, the initial report I requested and that seemed to be some kind of – seemed to be kind

---

the incident such as occurred in this case. 46 USCA § 6301; 46 CFR §§ 4.07-1 to 4.07-55.

[3] ABS submits that Tate & Lyle's actions in submitting the U.S. Coast Guard findings when statutorily prohibited is a blatant attempt to prejudice ABS' pending summary judgment motion. Nonetheless, even the inadmissible Coast Guard opinions do not affect ABS' fundamental point that no material issue of fact exists regarding the condition of the wire rope at the time of the ABS survey; therefore, summary judgment is proper.

           of privileged information.
Q.    Privileged information?
A.    That's what I understand.
Q.    So it was not provided to you?
A.    I have not seen yet Mr. Heiner Popp's report.
        MR. CLYNE: For the record, I think Mr. Popp's report was produced with the expert reports.
        MR. WHITMAN: It was produced either with or shortly before or after, I forget which now.
A.    Well, I've requested for it in the very early stage.
Q.    All right.
        MR. WHITMAN: It was produced recently.
Q.    In any event, you do not recall having seen it yet?
A.    I have not seen it yet.

That Mr. Cedarstav may have testified at his deposition that he relied upon the Popp report in forming his opinions has nothing to do with ABS.

    In a further conclusory leap, Tate & Lyle contends at page 8 that "ABS also had an obligation under the rules to disclose Heiner Popp where its experts clearly collaborated with Popp and considered information he developed in formulating their opinions" and again cites to Mr. Cedarstav's testimony. But Mr. Cedarstav never testified that ABS was privy to any information from Heiner Popp before Popp's report was produced to Tate & Lyle. No ABS expert had any substantive conversation with Mr. Popp regarding this case and his report was not provided to us any earlier that it was provided to Tate & Lyle nor did any ABS experts rely on anything that Heiner Popp said, did or wrote. If Tate & Lyle's counsel had bothered to review Schoonmade's transcript and questioned the other ABS experts on this issue, he would have known as much and some of the present motion practice might have been avoided.

    Tate & Lyle's "collaboration" argument is as bizarre as it is fictitious.

7

**TATE & LYLE'S SPOLIATION MOTION MUST
FAIL BECAUSE NO PREJUDICE WHATSOEVER
HAS OR CAN BE DEMONSTRATED SINCE
THE WIRE ROPE HAS NOT BEEN LOST,
<u>DESTROYED OR SIGNIFICANTLY ALTERED</u>**

Citing to a Second Circuit case, *West v. Goodyear Tire & Rubber Co.*, 167 F. 3d 776, 779 (2nd Cir. 1999), Tate & Lyle puts forward a definition of spoliation as "destroying, significantly altering or failing to preserve property for another's use as evidence in pending or foreseeable litigation." Yet, the wire rope at issue was not lost, destroyed or significantly altered.

As documented in Mr. Sayenga's report at page 2: "At several places, *other than the point of failure*, I also removed exterior lubricant to be able to better assess the condition of the wires." (Exhibit 2A). Sayenga confirmed this point in his affirmation (Exhibit 2). Thus, the break area was not affected. Notwithstanding Tate & Lyle's exaggerated description, the single wire that was cut was documented and photographed (Exhibit 2B). No testing was performed to the snippit and it remained in the custody of Mr. Sayenga from October 8, 2003 until the date of his deposition. Both the snipped wire and all of the photographs of the October 8 inspection were produced and available to Tate & Lyle at the time of the expert depositions.

Tate & Lyle has not identified with any specificity *how* these actions have prejudiced its investigation and any potential testing that it might want to perform in the future. Indeed, Tate & Lyle, unlike ABS, was present and represented by counsel immediately following the casualty. Moreover, Tate & Lyle had every opportunity to supplement its expert reports or provide an additional report. In fact counsel for Eurocarriers inquired via correspondence dated September 2, 2004 if that was Tate & Lyle's intention but no response was forthcoming from Tate & Lyle.

(Exhibit 3).

There is no prejudice here because the evidence has not been lost or destroyed. Tate & Lyle's lament that it "has forever been deprived of the opportunity and right to be present to observe the inspection and handling of the evidence by ABS and ESL/EC" doesn't meet any reasonable test for spoliation. What actually has Tate & Lyle been deprived of? The wire rope has and continues to be available any time for its inspection, measurement and testing. Indeed, the wire rope will likely be present in the courtroom at trial and joint measurements can be made at agreed upon locations (if that is Tate & Lyle's concern) so that there is no dispute and the Court will be in a position to verify the measurements.

Unsurprisingly, Tate & Lyle did not cite to the district of Maryland case entitled *Tucker v. Ohtsu Tire & Co., Ltd.*, 49 F.Supp.2d 456 (D. Md.1999). In that product liability action against the tire manufacturer, the manufacturer sought to exclude plaintiff's amended expert report. In denying the request for exclusion, Magistrate Judge Grimm held that the expert's removal of one of the exposed steel cords from the allegedly defective tire did not result in wholesale destruction of the evidence since the testing performed on the card did not destroy it and, *inter alia*, there were photographs of the removed piece. As such, the expert's actions "did not result in the type of wholesale destruction of evidence which so troubled the Fourth Circuit in *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148 (4th Cir. 1995)." *Id.* at 463.

The actions here don't even come close to those in *Tucker*. A small amount of lubricant away from the break area was removed in order to view the underlying wire. Unlike in Tucker where the removed part was relied upon by plaintiff's expert in providing amended opinions, no

9

such thing happened here. The single snipped wire was never tested and was subsequently made available to Tate & Lyle. There has been no unfair advantage obtained by ABS especially since Tate & Lyle retained a wire rope expert and performed its own inspection subsequent to the October 8 inspection.

Undeterred by its utter failure to demonstrate how it was prejudiced, Tate & Lyle doesn't merely seek to limit or preclude testimony regarding the ABS inspection; rather, it would like the Court to essentially bar all expert testimony from ABS regarding the adequacy of its *pre-casualty* surveys and evidence regarding the maintenance of the cargo gear. This overreaching request is wholly unjustified.

## RULE 37 (c) SANCTIONS ARE UNWARRANTED AND INAPPROPRIATE

In its motion Tate & Lyle requests FRCP 37 (c) sanctions. However, FRCP 37 (c) is a preclusion sanction to address a party's failure to comply with the mandatory disclosure requirements of Rule 26 (a) or 26 (e)(1) or its failure to amend prior responses under FRCP 26 (e)(2). (Matthew Bender, 3d ed.), *Moore's Federal Practice*, 37.60 [i]. Here, full disclosure was made during the expert phase of discovery. Thus, a request for Rule 37 (c) sanctions is misplaced.

Sanctions associated with spoliation motions are within the discretion of the Court and each case is assessed based on its own facts and the prejudice experienced. *Vodusek*, 71 F.3d at 155. Although Tate & Lyle should have been invited to the ABS inspection, there was no willful intention to exclude any party and there is no unfair advantage or harm that has resulted.

## CONCLUSION

ABS respectfully requests that Tate & Lyle's spoliation motion be denied in all respects.

Dated: New York, New York
November 8, 2004

                                                                /s/
Robert G. Clyne
Federal Bar No. 81037

                                              /s/
James A. Saville
Federal Bar No. 81036
Hill Rivkins & Hayden LLP
45 Broadway, Suite 1500
New York, New York 10006
(212) 669-0600 Telephone
(212) 669-0698 Facsimile

and

James W. Bartlett, III
Federal Bar No. 00017
Semmes, Bowen & Semmes, P.C.
250 West Pratt Street
Baltimore, Maryland 21201-2423
(410) 539-5040 Telephone
(410) 539-5223 Facsimile

Attorneys for American Bureau of Shipping

28005\Pleadings-Discovery\BRIEF.doc