IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| IN THE MATTER OF | * | |
| THE COMPLAINT OF | | |
| ETERNITY SHIPPING, LTD. AND | * | CIVIL ACTION NO. |
| EUROCARRIERS, S.A. | | |
| FOR EXONERATION FROM OR | * | L-01-CV-0250 |
| LIMITATION OF LIABILITY | | |

\*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OF LIMITATION PLAINTIFFS IN OPPOSITION TO MOTION OF TATE & LYLE NORTH AMERICAN SUGARS, INC. FOR SANCTIONS, AND REQUEST FOR HEARING

Eternity Shipping, Ltd. and Eurocarriers, S.A., Limitation Plaintiffs herein (hereinafter "Eurocarriers"), by M. Hamilton Whitman, Jr., Carla N. Bailey, and Ober, Kaler, Grimes & Shriver, their attorneys, file this memorandum in opposition to the Motion of Claimant Tate & Lyle North American Sugars, Inc. ("Tate & Lyle") for sanctions concerning alleged spoliation and failure to disclose.

Tate & Lyle's Motion is a transparent attempt to jockey for tactical advantage, and its hyperbolic allegations of improprieties on the part of Eurocarriers and ABS are vastly overblown. Tate & Lyle is attempting to raise matters of discovery to the level of sanctions, when those matters should instead be resolved among the parties without the necessity of Court intervention. Tate & Lyle has demonstrated and can demonstrate no actual prejudice from the dealings of which it complains, and the sanctions which it seeks are entirely uncalled for. Tate & Lyle's Motion should be denied.

Tate & Lyle's Motion and Memorandum are also inappropriate and in violation of the Local Rules of this Court. Tate & Lyle has failed to submit the necessary Local Rule 104.7 certificate, and Tate & Lyle has included material (both as quotations in, and as an exhibit to, the Memorandum) that is prohibited, by statute, from being submitted to the finder of fact. Eurocarriers requests, therefore, that the matter be referred to a Magistrate Judge for consideration in order to avoid corruption of the trial process.

## I. STATEMENT OF THE CASE

The "Factual Background" laid out by Tate & Lyle veers largely into argumentation, to which Eurocarriers will respond in the sections below. The actual background of the accident itself, the posture of the case, and the history of custody of the wire rope are briefly described as follows:

### A. The Accident

As recited by Tate & Lyle, on July 29, 2000 the M/V LEON I was discharging bulk sugar at Tate & Lyle's Domino Sugar Refinery on Baltimore's Inner Harbor. Domino's two shore-side gantry cranes were being used for the discharge operation, while the ship's cranes had been used from time-to-time on earlier days for hoisting Domino's front-end loaders in and out of the ship's holds. On the morning in question, Domino's No. 2 crane was operating in the forward end of the ship's hold No. 6, while the ship's crew were using the ship's No. 4 crane to suspend two crewmen in a basket at the after end of hold No. 6, to scrape cargo residue from the hatch coaming.

Suddenly, the wire rope from which the boom of No. 4 crane was suspended (the "luffing" wire) broke, resulting in the collapse of the boom (or "jib") of crane No. 4. The

2

boom of the No. 4 crane landed on the boom of Domino's shore-side crane No. 2, causing the collapse of the shore-side crane's boom into hold No. 6. The two crewmen working in the basket suspended from the ship's crane were killed.

The cranes on the LEON I had been retrofitted onto that ship less than one year before the accident. The cranes were taken from an operating vessel under common management with the LEON I, were inspected upon removal and during installation, and were certified by the American Bureau of Shipping. The cranes were operated aboard the LEON I from time-to-time during the first six months of the year 2000. The record in discovery reflects that there had been minor maintenance issues typical of older electrical equipment, but that there was no prior incident which would have foretold the catastrophic failure in Baltimore.

Various entities immediately commenced investigations into the occurrence of the accident. Baltimore City Police, Baltimore City Fire Department and Maryland Occupational Safety and Health Administration all attended briefly on board. The United States Coast Guard initiated a comprehensive informal investigation and acted as the lead investigator for the government of Malta, as the vessel was Maltese flag.

Tate & Lyle and Eurocarriers also immediately reacted. Tate & Lyle convened its own internal investigation. Tate & Lyle and/or its insurers promptly retained counsel, who first attended on board the LEON I within a day after the accident. A representative of Reading Crane Company attended on board the vessel in company with counsel for Tate & Lyle and participated in certain aspects of the Coast Guard's investigation.

3

Eurocarriers and their insurers retained counsel, who first attended on board the ship on the day of the casualty. Counsel for Eurocarriers retained a marine surveyor, Captain Heiner Popp, to assist in counsel's investigation. Captain Popp attended on board and participated in certain aspects of the Coast Guard investigation. Counsel for Eurocarriers also retained Chesapeake Engineering & Design, a forensic engineering company, who also attended on board and assisted in counsel's investigation.

The results of the Coast Guard investigation were reported in a Marine Casualty Investigation Report (the "Coast Guard Report") dated April 16, 2001. Among the exhibits to the Coast Guard Report are a large number of photographs which were taken by Captain Popp and which were provided to the Coast Guard by counsel for Eurocarriers, at the Coast Guard's request.

Copies of the Coast Guard Report were obtained by various parties to the litigation pursuant to Freedom of Information Act Requests and have been exchanged among the parties, and the report has been the subject of much scrutiny by the parties and their experts. Nevertheless, it is well established that the findings of fact, opinions and conclusions obtained in the Coast Guard Report are not admissible as evidence, 46 U.S.C. § 6308, although photographs or similar matters which merely illustrate relevant physical conditions are not excluded by the statute and are admissible at trial. See In re Danos & Curole Marine Contractors, Inc., 278 F. Supp. 2d 783, 785 (E.D. La. 2003).

## B. Posture Of The Litigation

Promptly after the accident, Tate & Lyle filed suit in this Court to arrest the LEON I pursuant to the Supplemental Rules for Certain Admiralty and Marine Proceedings.

4

The ship was released after the posting of security in that action. Contrary to the customary procedure in such cases, Tate & Lyle did not seek to take the depositions of members of the crew of the LEON I immediately after Tate & Lyle filed suit, while the LEON I remained in Baltimore. An independent action was later filed on behalf of Josefina Gonzales, claiming damages arising out of the death of her son Juan Gonzales, one of the LEON I's crewmen who were killed in the accident.

Both of these actions were stayed by the filing of Eurocarriers' Complaint for Exoneration from or Limitation of Liability pursuant to the Shipowner's Limitation of Liability Act, 46 U.S.C. § 181 et seq. Tate & Lyle and Mrs. Gonzales filed claims in this limitation proceeding. Claims were also filed by Louis Dreyfus, as owner of a portion of the cargo of sugar which remained on board the LEON I after the accident, and by William Langeville and Robert Cantey, two workers at the Domino terminal who claimed to have suffered injuries as a result of the accident. Third-Party Complaints have been filed against the American Bureau of Shipping ("ABS") by Gonzales and by Tate & Lyle, alleging that negligence on the part of ABS contributed to cause the casualty.

The nominal plaintiffs in this limitation action do not bear the customary burden of proof. A limitation of liability action is a two-step procedure. The claimants actually bear the initial burden of proof to show fault on the part of Eurocarriers and to show that the fault of Eurocarriers caused or contributed to cause the accident. In order to limit its liability, it is then up to Eurocarriers to come forward to show that any fault on its part which contributed to cause the accident was "without the privity or knowledge" of Eurocarriers. 46 U.S.C. § 183; Empressa Lineas Maritimas Argentinas S.A. v. United

States, 730 F.2d 153, 155, 1984 AMC 1968, 1970 (4th Cir. 1984); In re MARINE SULPHUR QUEEN, 460 F.2d 89, 1972 AMC 1122 (2d Cir. 1972). Consistent with that burden, this Court's Local Admiralty Rule (f)(2), entitled "Order of Proof at Trial," provides that the claimants shall put on their proof first. Trial of the liability and limitation aspects of the action will be to the Court, and not to a jury.

Discovery has been both extensive and prolonged. Discovery of Eurocarriers has included production of documents from Greece and the taking of depositions of numerous former and current Eurocarriers personnel in Greece in May, 2003. Discovery of claimant Gonzales has included a video conference deposition at which Mrs. Gonzales testified from a location in the Philippines in response to questions from counsel on the video conference in Texas, Illinois, New York and Maryland. One former member of the crew of the LEON I was deposed by telephone conference and videotaped while testifying in Poland. Although Tate & Lyle's crane was rebuilt and placed into service within approximately one year after the accident, Tate & Lyle was not able to complete production of its documentation with regard to its damages for another three years. Indeed, within the last week counsel for Tate & Lyle have produced further documents with regard to Tate & Lyle's damages.

The Court has been flexible in allowing time for discovery. To accommodate production by Tate & Lyle of its damage documentation and in response to the exigencies of discovery overseas, including difficulties in locating and obtaining depositions of foreign nationals, the deadline for completion of discovery was extended a number of times by the Court. The Court's most recent schedule is embodied in a Memorandum to

6

Counsel dated February 20, 2004. This Memorandum calls for completion of factual

discovery on May 5, 2004, completion of expert discovery on September 7, 2004, and

submission of dispositive motions by October 6, 2004. To further allow for the

possibility that obtaining complete factual discovery might continue to be prolonged, the

Memorandum provides that the occurrence of certain depositions after the factual

discovery deadline will not alter the discovery and dispositive motion deadlines.

The case has been set for mediation before Judge Bredar on January 26, 2005. No

trial date has been set.

### C. Custody And Inspection Of The Wire Rope

The luffing wire rope itself is a steel wire rope approximately one inch in diameter

and was originally about four hundred feet long. The wire rope is made up of six strands

twisted around a fiber core. Each strand is itself made of multiple individual wires

twisted together to form a strand.

Prior to the departure of the LEON I from Baltimore in early August of 2000, the

luffing wire was removed from the ship, with the agreement of the Coast Guard. The

wire rope was taken into custody by Chesapeake Engineering & Design ("CED") at the

request of Eurocarriers and has remained in the custody of CED ever since. Attached

hereto as Exhibit A is the Affidavit of Clifford M. Dean, a senior research associate at

CED, in which Mr. Dean recites the history of the wire rope since it was taken into

custody by CED.

As described by Mr. Dean, a sample of the wire rope was removed for testing

under the supervision of the Coast Guard in October of 2000. Since then, the wire rope

has been viewed on three occasions. On October 8, 2003, the wire rope was laid out for inspection by experts retained by counsel for ABS. These experts removed a very small area of grease in order to view the wire strands underneath, but used no chemical or spray degreaser. At the end of this inspection, one of the ABS experts snipped a six-inch exemplar of a single wire strand, and Captain Popp, who attended the inspection to monitor it on behalf of Eurocarriers, took a control sample. It is the understanding of Eurocarriers that the intent of the ABS expert in taking this exemplar was to have it available if it became necessary to determine the composition of the steel which made up the wire rope. The wire rope expert for ABS, Mr. Donald Sayenga, produced the exemplar at his deposition in August of 2004.

The second occasion on which the wire rope was viewed was in June of 2004, when one of the experts for Eurocarriers viewed the wire rope in storage, without removing it from the pallets and without disrupting the storage of the wire rope.

The third occasion on which the wire rope was viewed was on August 24, 2004, when the wire rope expert appointed by Tate & Lyle, Mike Parnell, attended to inspect the wire rope. As Mr. Dean states, the wire rope was uncoiled, laid out and made available for inspection by Mr. Parnell just as it had been earlier for the experts for ABS. The Tate & Lyle expert, however, brought in several cans of degreaser that he used to remove grease from various portions of the wire rope. Mr. Dean arranged for additional degreaser to be procured, which Tate & Lyle's expert used to remove more grease and to complete his inspection. Tate & Lyle's expert was permitted complete access to the wire rope, and no limits were placed on the amount of time which the Tate & Lyle expert

could devote to inspecting the wire rope.  According to Mr. Dean, the Tate & Lyle expert "appeared to be satisfied that he was able to accomplish everything he needed to do when he was complete." (Dean Affidavit, Exhibit A, ¶ 16.)

## II.  THERE HAS BEEN NO SPOLIATION WITH REGARD TO THE WIRE ROPE

Tate & Lyle seeks sanctions for alleged spoliation.  In this case, however, there has been no spoliation, and there are no grounds for sanctions.

It is settled in the Fourth Circuit that the federal law of spoliation applies to cases in this Court, because the power to sanction for spoliation derives from the inherent power of the court, not substantive law.  The twin purposes of a spoliation sanction are "leveling the evidentiary playing field" and sanctioning improper conduct.  Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995).  The application of the spoliation doctrine "must take into account the blameworthiness of the offending party and the prejudice suffered by the opposing party."  Hartford Ins. Co. of the Midwest v. Am. Auto. Sprinkler Sys., Inc., 23 F. Supp. 2d 623, 626 (D. Md. 1998), quoting Anderson v. Nat'l R.R. Passenger Corp., 866 F. Supp. 937, 945 (E.D. Va. 1994), aff'd, 74 F.3d 1230 (4th Cir. 1996).  The spoliation doctrine is designed "to respond to circumstances in which a party fails to present, loses or destroys evidence."  Hartford, 23 F.2d at 626.

In this case neither Eurocarriers nor ABS has lost, destroyed or failed to present any evidence.  There has been no blameworthy conduct by Eurocarriers or ABS, and no actual prejudice to Tate & Lyle, and the "evidentiary playing field" is already level. Moreover, Tate & Lyle's late designation of a rope expert was caused by its own

misunderstanding of the law applicable to the Coast Guard Report, and not by any actions of Eurocarriers or ABS. Consequently, no sanction should be imposed on Eurocarriers or ABS.

A. Underline There Has Been No Prejudice To Tate & Lyle.

Tate & Lyle's expert, Mike Parnell, was accorded absolutely full and unfettered access to the wire rope on August 24, 2004. (See Dean Affidavit, Exhibit A, ¶ 16.) Moreover, Mr. Parnell himself is the only person who has materially modified the condition of the wire rope. Mr. Sayenga, the expert for ABS, removed only a very small portion of the grease in order better to see the underlying wire rope. The expert for Tate & Lyle, by contrast, used multiple cans of spray degreaser to remove extensive amounts of the grease which preserved the condition of the wire rope. (Dean Affidavit, Exhibit A, ¶ 16). While Mr. Sayenga did remove a small portion of one single strand of the wire at the time of his inspection, that strand has been kept in his custody, has been made an exhibit to his deposition, and was fully available to Mr. Parnell at the time that he examined the wire rope.

While Tate & Lyle may have been inconvenienced slightly by the fact that its expert examined the wire rope at a time different from the examination conducted by the expert for ABS, it is significant that Tate & Lyle has been unable to point out any actual prejudice that it has suffered. Tate & Lyle's Memorandum contains generalized protestations by counsel that Tate & Lyle has suffered prejudice, but nothing more. Tate & Lyle has provided absolutely no representation by its expert, Mr. Parnell, that his opportunity to examine and inspect the wire rope was in any way inadequate, or that any

prior manipulation of the wire rope as it was examined and inspected by the expert for ABS in any way prevented Mr. Parnell from forming conclusions as to the condition of the wire rope or the causation of the accident.

The case of Anderson v. Nat'l R.R. Passenger Corp., 866 F. Supp. 937 (E.D. Va. 1994) is similar. Anderson was an action filed by plaintiff passengers against defendant railroads to recover for injuries sustained when a train derailed. Anderson, 866 F. Supp. At 937. The defendants removed an allegedly defective track switch and began bulldozing the track before plaintiffs' counsel visited the track and was able to inspect the switch. Id. at 937. The court found that the defendants' conduct was imprudent, but it held that the record did not establish spoliation and refused to award sanctions. Id.

The Anderson court found it significant that the plaintiffs adduced no evidence from their expert, or from any other source, that testing the switch after the alleged spoliation would not have been possible. Id. Similarly, under the circumstances of this case, there has not even been a prima facie showing that Mr. Parnell, the expert for Tate & Lyle, was handicapped in his inspection of the wire rope. The manipulation of the wire rope at the time of the inspection in October 2003 simply did not materially change the condition of the wire rope or foreclose Tate & Lyle from its own expert inspection. There has been no spoliation, and no sanctions should be awarded.

B. There Has Been No Blameworthy Conduct By Eurocarriers or ABS.

Prudency might have called for Tate & Lyle to be included in the October, 2003 examination of the wire rope by experts for ABS, but Eurocarriers has never sought to conceal the wire rope or its condition from Tate & Lyle.

11

Eurocarriers' response to Tate & Lyle's Rule 34 request to inspect the ship, the crane and the luffing wire stated in part: "The luffing wire … is in the possession of Chesapeake Engineering and Design and can be produced at a mutually convenient time and date." Tate & Lyle followed up to inspect the ship and the crane while the LEON I was in port in Louisiana in January of 2004, but Tate & Lyle did not ask to inspect the wire rope until August of 2004.

Moreover, it was Tate & Lyle's own misunderstanding of the law governing the Coast Guard Report, not any action by Eurocarriers, that caused Tate & Lyle to fail to retain a wire rope expert earlier. Tate & Lyle maintains in its Memorandum that it had no reason to retain a wire rope expert until it learned that an expert for ABS had inspected the wire rope. (Tate & Lyle Memorandum, at 6). Tate & Lyle points to certain conclusions reached by the Coast Guard in its Marine Casualty Investigation Report and argues that until it received the expert reports of Mr. Sayenga and Mr. Schoonmade, "no evidence ha[d] been offered by any party that contradicts the finding and conclusions of the USCG." (Tate & Lyle Memorandum, at 5).

The clear implication of Tate & Lyle's arguments is that Tate & Lyle intended to offer into evidence at trial certain findings and conclusions of the Coast Guard Report to support an argument that the condition of the wire rope contributed to cause the accident. Such use of the Coast Guard Report is, of course, absolutely forbidden by the statute which prohibits the report of the Coast Guard Marine Investigation from being admissible as evidence in a civil proceeding. The plain language of the statute precludes the admission of the report as evidence. "Notwithstanding any other provision of law, no

part of a report of a marine casualty investigation conducted under Section 6301 of this title, including findings of fact, opinions, recommendations, deliberations, or conclusions, shall be admissible as evidence or subject to discovery in any civil or administrative proceeding . . . ." 46 U.S.C. § 6308.

Thus, Tate & Lyle was laboring under a distinct misapprehension if it believed that it could use the Coast Guard Report as evidence at trial. It was this error, not anything done by Eurocarriers or by ABS, which led Tate & Lyle to fail to retain Mr. Parnell at an earlier stage of the proceeding. Unfortunately, Tate & Lyle has compounded its error by presenting to the Court, as part of its Memorandum, actual extracts and quotations from the Coast Guard Report. Most egregious is that Exhibit B to Tate & Lyle's Memorandum comprises two pages copied from the Coast Guard Report, with sections headed "Comments & Conclusions" and "Recommendations." Eurocarriers is at a loss to understand how Tate & Lyle could submit this material to the Court, in the face of the clear prohibition of the statute, without providing notice in advance that its Motion should be referred to a Magistrate Judge and should not be considered by the finder of fact.

   C. The Appropriate Resolution Of The Dispute Is For Tate & Lyle's
     Expert To Produce His Report And Be Deposed.

Tate & Lyle has retained Mr. Parnell as its own wire rope expert. Mr. Parnell traveled to Baltimore before the conclusion of expert discovery and examined the wire rope. Tate & Lyle has not produced any report by Mr. Parnell, perhaps because

production of a report would be tantamount to an admission that Tate & Lyle has not been prejudiced.

There is no actual tactical disadvantage to Tate & Lyle, because Tate & Lyle can obtain and produce a report containing the opinions of its own wire rope expert.[1] Eurocarriers has encouraged Tate & Lyle to provide such a report and to produce its expert for deposition, most recently in a letter of September 2, 2004 to counsel for Tate & Lyle (copy attached as Exhibit B). Tate & Lyle chose, instead, to file its unfounded Motion, supported by inadmissible evidence.

The sanctions requested by Tate & Lyle would be a vast overreaction, and would immeasurably prejudice Eurocarriers and ABS in this case. Although Tate & Lyle bears the burden of proof as to how the accident occurred, an important aspect of the defense by Eurocarriers and ABS will be to show that the wire rope was in good condition and that no preexisting defect existed in the wire rope which contributed to cause the accident. The request by Tate & Lyle that the Court bar Eurocarriers and ABS "from presenting evidence or testimony at trial regarding the adequacy of inspection and maintenance of the cargo gear, as well as the condition of the wire rope and/or the presence of pre-existing damage" (Tate & Lyle Memorandum, at 13) is therefore remarkably overreaching. Nothing in Tate & Lyle's motion papers supports any argument that testimony and evidence concerning inspection and maintenance activities and procedures should be excluded; those issues are simply not part of the dispute which

---

[1] There is in fact some advantage gained by Tate & Lyle, which has the burden of proof and which should have produced its report first. Instead, Tate & Lyle's expert has had the benefit of studying the reports of the defense experts, as well as the transcripts of their depositions, before offering his own opinion.

Tate & Lyle has chosen to generate.  In addition, to bar testimony regarding the condition of the wire rope and the presence or absence of preexisting damage could amount to imposing case-dispositive  sanctions, which are appropriate only in a truly flagrant case. See Cole v. Keller Indus., Inc., 132 F.3d 1044, 1047 (4th Cir. 1998); Wilson v. Volkswagen of Am., Inc., 561 F.2d 594, 503 (4th Cir. 1977); cert. denied, 424 U.S. 1020 (1978).

This case falls far short of being flagrant, on either side, and this Court's opinion in Potomac Elec. Power Co. v. Elec. Motor Supply, Inc., 192 F.R.D. 511 (D. Md. 2000) is illustrative of the appropriate disposition of Tate & Lyle's Motion.  That case involved a challenge to the Court's extension of a scheduling order to allow the late designation of an expert witness, including an argument that the expert's opinion should be excluded on grounds of spoliation.

The Potomac Electric opinion notes that courts have been reluctant to exclude expert testimony in the absence of intentional or bad faith destruction of evidence. Potomac, 192 F.R.D. at 515.  In this case of the LEON I, as noted above, there has been no destruction of evidence, and no bad faith or intentional wrongful conduct on the part of any party.  Any spoliation sanction in this case would be unnecessary, but the sanction of exclusion of testimony would be particularly inappropriate.

The Court in Potomac Electric had granted the extension on the ground that the failure to designate had been inadvertent.  In this case Tate & Lyle's failure to nominate an expert as to the wire rope was not inadvertent, but instead arose from a misunderstanding or misapplication of the law governing admissibility of the Coast

15

Guard report. Nevertheless, an extension of the expert discovery schedule in this case would not be clearly erroneous. "Although adherence to scheduling orders is important, it is more important that a party not suffer on account of an attorney's inattention, at least where there is no prejudice to the other side that cannot be cured." Potomac, 192 F.R.D. at 512. There is no dispositive motion pending upon which Tate & Lyle's expert's opinion would have any bearing, and there is no imminent trial date or other schedule milestone which would cause undue inconvenience to the parties. Permitting Tate & Lyle to come forward with its own expert on the wire rope, therefore, would be the appropriate resolution of this issue.

III.    NO SANCTION IS CALLED FOR WITH REGARD TO THE
        REPORTS OF CAPTAIN POPP

As indicated above at Section I.A., Captain Heiner Popp is a (now retired) marine surveyor who was engaged by counsel for Eurocarriers to assist in counsel's investigation of the accident. Counsel also engaged Chesapeake Engineering and Design, and CED personnel also attended and assisted in the investigation. All of this was disclosed in Eurocarrier's Answers to Interrogatories, and all of this was known to counsel for Tate & Lyle within days after the accident.

As a consultant to Eurocarriers, Captain Popp prepared reports of certain aspects of his participation in the investigation. These reports were originally withheld from discovery on the basis of work product. During expert discovery, however, one of the experts for Eurocarriers, Carl Cederstav, was given access to these reports. When this became apparent, Captain Popp's reports were produced to all parties as part of the

material upon which Mr. Cederstav had relied in performing his analysis and preparing his report. These reports were provided to counsel for all parties shortly before the taking of expert depositions began.

This case, therefore, presents the mirror image of this Court's opinion in Musselman v. Phillips, 176 F.R.D. 194 (D. Md. 1997). In that case, a party sought to withhold materials which had been provided to its expert who had been retained to testify at trial. In this case, Eurocarriers has produced to all parties the reports of Captain Popp, waiving any work-product privilege that might have existed. Counsel for Tate & Lyle, in fact, has already cross-examined Mr. Cederstav concerning the Popp reports. Tate & Lyle simply suffered no prejudice with regard to the production of the Popp reports.

Moreover, Tate & Lyle's implication that it was not aware that Captain Popp was "at least a fact witness" (Tate & Lyle Memorandum, at 7) clearly does not hold water. Captain Popp was mentioned in the Coast Guard Report as being one of the people who entered the crane to examine its controls prior to the arrival of the Coast Guard investigator. Moreover, Captain Popp was on board the LEON I, as described in Eurocarriers' Answer to Interrogatories, at the same time that counsel for Tate & Lyle were in attendance, and Captain Popp attended at least one of the informal meetings at which Eurocarriers and Tate & Lyle met to exchange information. Tate & Lyle simply never asked for or served notice for a deposition of Captain Popp as to facts he might have observed. The requirements of Rule 26(a) were not violated with regard to Captain Popp, and no Rule 37(c) sanction is called for.

IV. CONCLUSION

As Eurocarriers has demonstrated above, there has been no destruction of evidence, no blameworthy conduct by Eurocarriers or ABS, and no prejudice to Tate & Lyle. The matters of which Tate & Lyle complains (just like Tate & Lyle's own late production of documents and its failure to understand the reach of the statute prohibiting use of the Coast Guard Report) are a reminder that the discovery process may not be perfect in 20-20 hindsight. While such an observation may be particularly true in this case, in which discovery has been conducted on three continents over a period of more than three and a half years, nothing in this case amounts to sanctionable conduct, and Tate & Lyle's Motion should be denied in all respects.

**REQUEST FOR HEARING**

Eurocarriers requests a hearing on the Motion for Sanctions filed by Tate & Lyle.

_____/s/_____
M. Hamilton Whitman, Jr., Trial Bar No.: 00373
Carla N. Bailey, Trial Bar No.: 26367
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 E. Baltimore Street
Baltimore, Maryland 21202
(410) 685-1120

Attorneys for Eternity Shipping, Ltd. and
Eurocarriers, S.A.