IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

IN THE MATTER OF                    *
THE COMPLAINT OF
ETERNITY SHIPPING, LTD. AND         *        Civil Action No.: L01CV0250
EUROCARRIERS, S.A.
FOR EXONERATION FROM OR             *
LIMITATION OF LIABILITY
                                    *

*    *    *    *    *    *    *    *    *    *    *    *    *

## CLAIMANT-JOSEFINA GONZALES' OPPOSITION TO
## LIMITATION PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

NOW COMES Claimant-Josefina Gonzales ("Claimant"), appearing by and through her

attorneys-of-record, R. Blake Brunkenhoefer of Brunkenhoefer & Associates, P.C. and W. Charles

Bailey, Jr. of Simms Showers, L.L.P., and makes and files this her Opposition to the Motion for

Summary Judgment and attendant Memorandum filed by Eternity Shipping, Ltd. and Eurocarriers,

S.A. ("Limitation Plaintiffs") with respect to Claimant's First Amended Claim for Damages.

## I.
## FACTUAL & PROCEDURAL BACKGROUND

**A.    Claimant's Summary**

On July 29, 2000, the M.V. LEON I (hereinafter, the "vessel") was berthed at the Domino's

Sugar pier in Baltimore, Maryland discharging bulk raw sugar. A crew member of the vessel was

operating one of the vessel's cranes to maneuver two other crew members – one of whom was Juan

Gonzales, Jr. ("decedent" or "Claimant's deceased son") – who were in a personnel basket and

engaged in the task of scraping sugar off the vessel's hatch coaming. During this operation, a cable

on the vessel's crane parted, causing the boom to fall on the Domino's Sugar gantry crane which was

extended over the open hatch. As a consequence, the two crew members in the personnel basket

sustained fatal injuries when they were whipped against the open hatch cover and other structures (i.e., opposite the end of the open hatch they had previously been working), some shoreside personnel were injured, and the Domino's Sugar facility sustained massive damage to its shore crane and other equipment.

_____On or about January 29, 2001, the instant "limitation action" was filed by Eternity Shipping, Ltd. and Eurocarriers, S.A., whereby Limitation Plaintiffs advised of their intention to seek limitation of or exoneration from liability relative to the damages resulting from the failure of their crane. Appropriately, and notwithstanding the fact that Claimant had already filed a separate suit for damages with the Honorable District Court, Claimant submitted her claim for damages in the instant limitation action.

Claimant avers that her deceased son is entitled to the rights and protections afforded seamen under American law, particularly the "Jones Act" and the general maritime law, and such rights are readily discernible upon the available evidence.

Then, on or about May 8, 2003 (i.e., some 27 months after Limitation Plaintiffs filed their limitation action and nearly 3 full years following the events in question), Limitation Plaintiffs filed a self-styled "Praecipe" whereby Claimant was purportedly advised of Limitation Plaintiffs' intention to raise issues of foreign law in connection with the claims arising out of the death of Claimant's son. The so-called "Praecipe" did not identify which laws Limitation Plaintiffs sought to apply, the parties and/or claims to which such laws apply, or how the application of such laws is relevant to this cause. It alluded (vaguely) to the fact that, at some point in time, Limitation Plaintiffs would seek to apply foreign law to Claimant and her claims, such that her "Jones Act" and general maritime claims may be affected thereby.

After careful analysis of the arguments and authorities of all Parties concerned, the Court issued its Order of September 10, 2004 (and related Memorandum Opinion of September 13, 2004), thereby striking Limitation Plaintiffs' "Praecipe."

Limitation Plaintiffs then filed their Motion for Summary Judgment with respect to the claims of Claimant-Gonzales ("Motion for Summary Judgment" or "Motion"), and Claimant now responds to same.

**B.**     **Claimant's Response to Limitation Plaintiffs' Recitation of "Undisputed Facts"**

Claimant does not significantly dispute ¶¶1-2, I. "Undisputed Facts." See, *Limitation Plaintiffs' Memorandum*. To the extent Limitation Plaintiffs' assertion of facts herein seeks to support or establish grounds for the summary judgment sought by Limitation Plaintiffs against the interests of Claimant, Claimant respectfully denies the factual allegations.

At ¶3, I. "Undisputed Facts," Claimant disputes the assertion that "the No. 4 crane aboard the vessel collapsed while assisting with the discharge of the vessel's cargo." *Id.*. In fact, Claimant-Gonzales' son, Juan Gonzales, was killed while scraping sugar from the hatch coaming of the vessel's cargo hold. This was a vessel maintenance operation which did not have to be performed as and when it was, as it was not essential to the discharge of the vessel's cargo. Indeed, the sugar residue on the hatch coaming could have been washed off at a later date and time, especially as the vessel was not loading new product in the Port of Baltimore for carriage to another port.

Claimant does not otherwise significantly dispute the remainder of ¶3, I. "Undisputed Facts." *Id.*. To the extent Limitation Plaintiffs' assertion of facts herein seeks to support or establish grounds for the summary judgment sought by Limitation Plaintiffs against the interests of Claimant, Claimant respectfully denies the factual allegations.

Claimant does not significantly dispute ¶4, I. "Undisputed Facts." *Id..* To the extent Limitation Plaintiffs' assertion of facts herein seeks to support or establish grounds for the summary judgment sought by Limitation Plaintiffs against the interests of Claimant, Claimant respectfully denies the factual allegations.

At ¶5, I. "Undisputed Facts," Claimant disputes the assertion that the claim she filed in the Philippines was "for damages arising out of the accident in Baltimore." *Id..* In fact, as Limitation Plaintiffs have themselves identified in ¶4, I. "Undisputed Facts," Claimant was merely seeking "payment of death benefits provided under the Standard Contract of Employment." *Id..* Thus, to the extent that Limitation Plaintiffs propose to say that Claimant was seeking the same damages in both forums, rather than (1) the "worker's compensation-like" contractual damages prescribed under Filipino law and (2) personal injury damages in the United States, Claimant respectfully denies this factual allegation.

Claimant does not significantly dispute the remainder of ¶5, I. "Undisputed Facts." *Id.* To the extent Limitation Plaintiffs' assertion of facts herein seeks to support or establish grounds for the summary judgment sought by Limitation Plaintiffs against the interests of Claimant, Claimant respectfully denies the factual allegations.

At ¶6, I. "Undisputed Facts," Claimant disputes the assertion that "her claim in this Court could only be maintained in the limitation action." *Id..* Substantively, Claimant can maintain her damage claims separate and apart from the instant limitation action. In other words, she is not in the courts of the United States simply because this limitation action was filed. However, in accordance with this Court's procedural requirements, Claimant's separate action has been stayed and she has prosecuted her damage claims in the context of this limitation proceeding.

Claimant does not significantly dispute the remainder of ¶6, I. "Undisputed Facts." *Id.* To the extent Limitation Plaintiffs' assertion of facts herein seeks to support or establish grounds for the summary judgment sought by Limitation Plaintiffs against the interests of Claimant, Claimant respectfully denies the factual allegations.

Claimant does not significantly dispute ¶¶7-8, I. "Undisputed Facts." *Id..* To the extent Limitation Plaintiffs' assertion of facts herein seeks to support or establish grounds for the summary judgment sought by Limitation Plaintiffs against the interests of Claimant, Claimant respectfully denies the factual allegations.

At ¶9, I. "Undisputed Facts," Claimant disputes the assertion that "[d]espite having recovered in the Philippines for the death of her son, Mrs. Gonzales continues to pursue this present action." *Id..* As previously indicated, Claimant's filing in the Philippines was merely a demand for payment of "worker's compensation-like" death benefits provided under the Standard Contract of Employment. Limitation Plaintiffs assert that the Filipino action has exhausted Claimant's rights as concerns the violent and wholly-avoidable death of her son in the territorial waters of the United States. That is the crux of the instant Motion for Summary Judgment. However, as shall be seen hereinbelow, Limitation Plaintiffs are simply wrong.

Moreover, at ¶9, I. "Undisputed Facts," with respect to the assertion that Claimant has somehow misled Limitation Plaintiffs or concealed information regarding the monies paid to her in connection with the death of her son, Claimant would respectfully point out that it has been virtually impossible for her attorneys to communicate with her in the Philippines, the United States government's post-"9/11" security concerns have for years prevented Claimant from actively participating in her case, Limitation Plaintiffs know – perhaps better than anyone, as they paid the

judgment entered in the Philippines – how much money was paid to Claimant as a result of the Filipino proceedings, and Limitation Plaintiffs received Claimant's sworn testimony on the subject prior to their filing of their Motion for Summary Judgment. This assertion is nothing more than an attempt to cast the elderly mother of a dead man in a false or negative light when, in fact, she and her attorneys have done all they could reasonably do to protect, preserve and prosecute this serious matter, while, as shall be seen hereinbelow, Limitation Plaintiffs come before this Court with comparatively "unclean hands" (e.g., Limitation Plaintiffs' negligence, if not callous disregard for safety, killed the decedent; Limitation Plaintiffs did not timely pay what was owed to the decedent's elderly, dependent mother under Filipino law, and when they could not extort a general release from Claimant, Limitation Plaintiffs proceeded to engage in protracted litigation of her contractual death benefits; at the end of the litigation which they prompted in the Philippines, when Limitation Plaintiffs lost their "exclusivity of Filipino law" argument, the Limitation Plaintiffs had the gall to take up this Court's time and resources to demand that principles of "comity" require this Court to do precisely the opposite of what "comity" actually dictates under the Filipino law of this case; etc.).

Claimant does not significantly dispute the remainder of ¶9, I. "Undisputed Facts." *Id.* To the extent Limitation Plaintiffs' assertion of facts herein seeks to support or establish grounds for the summary judgment sought by Limitation Plaintiffs against the interests of Claimant, Claimant respectfully denies the factual allegations.

Finally, at ¶10, I. "Undisputed Facts," Claimant disputes the assertion that the Limitation Plaintiffs' May 8, 2003 Praecipe provided "notice under the Federal Rules of Civil Procedure, Rule 44.1, of their intention to raise issues concerning the law of the Republic of the Philippines applicable to the employment of Juan Gonzales and to his employment contract." *Id.*. As the

6

Court's September 10, 2004 Order and September 13, 2004 Memorandum Opinion indicate, Limitation Plaintiffs most certainly <u>did not</u> provide such notice and, as a result, the so-called "Praecipe" was stricken. Issues of Filipino law might ordinarily be relevant to the Court's consideration of Limitation Plaintiffs' Motion for Summary Judgment, and, as seen hereinbelow, Claimant responds to such arguments without taking anything for granted (including the Court's prior ruling). However, Limitation Plaintiffs have not satisfied the procedural requirements of this Court in this regard and, thus, Limitation Plaintiffs should not be permitted to defend Claimant's allegations by resort to foreign law of which due notice was not provided.

Claimant does not significantly dispute the remainder of ¶10, I. "Undisputed Facts." *Id.* To the extent Limitation Plaintiffs' assertion of facts herein seeks to support or establish grounds for the summary judgment sought by Limitation Plaintiffs against the interests of Claimant, Claimant respectfully denies the factual allegations.

**C.    Key Facts Precluding Summary Judgment**

If the Court refuses to consider the possible impact of Filipino law, i.e., given the fact that Limitation Plaintiffs' "Praecipe" has been stricken and Claimant has not received appropriate notice of Limitation Plaintiffs' intentions with respect to the possible application of Filipino law, then the only disputed fact which precludes summary judgment is the variety of damages available to Claimant under American law.

If the Court permits itself to consider Filipino law, which Claimant contends is unfair and inappropriate given the Limitation Plaintiffs' actions in this regard and the Court's prior Order with respect to this issue, then the disputed facts which prelude summary judgment as to Claimant's claims against Limitation Plaintiffs are:

1.    Whether Claimant can recover on her damages claim now pending before this Court when she has already received a payment of contractual death benefits in the Philippines; and,

2.    The variety of damages available to Claimant under American law.

Out of an abundance of caution, Claimant will address both issues, thereby showing that her claims before this Court are viable and that she is entitled to all damages available to a deceased seaman and his surviving family members under governing (statutory and common) maritime law.

## II.
## FED. R. EVID. 201

In the interest of economy and efficiency, Claimant respectfully requests the Court take notice of the existence and contents of its file, such that it will not be necessary to reproduce previously-filed materials as attachments hereto.[1]  *Fed. R. Evid. 201.*

## III.
## SUMMARY JUDGMENT STANDARDS

A motion for summary judgment requires the court to assess whether a genuine issue of material fact exists by reviewing the evidence in the light most favorable to the party opposing the motion.  *Inst. for Shipboard Educ. v. Cigna Worldwide Ins. Co.*, 22 F.3d 414, 418 (2nd Cir. 1994), citing to *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510 (1986).  Federal Rule of Civil Procedure 56(c) provides for summary judgment of a claim when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FRCP 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552

---

[1] Though perhaps unnecessary, Claimant has attached copies of all referenced exhibits as a courtesy.

8

(1986).

Summary judgment is appropriate only when the non-moving party has failed to set forth any facts that go to an essential element of the claim. *King v. Crossland Savings Bank*, 111 F.3d 251, 259 (2nd Cir. 1997). If there is sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party, summary judgment is improper. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248 & 251, 106 S. Ct. 2505 (1986). In evaluating the sufficiency of the Claimant's evidence, this Court must proceed cautiously. *Brady v. Colchester*, 863 F.2d 205 (2nd Cir. 1988). If reasonable minds could differ as to the import of the evidence, and "if . . . there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *In re Japanese Elec. Prods. Antitrust Litigation*, 723 F.2d 238 (3d Cir. 1983), *rev'd on other grounds sub nom*. Finally, summary judgment is inappropriate if an issue depends upon the credibility of witnesses, because such credibility can best be determined after the trier of fact observes the witnesses' demeanor. *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).

## IV.
## DO "PRINCIPLES OF COMITY" ACTUALLY REQUIRE – OR EVEN PERMIT – DISMISSAL OF MRS. GONZALES' CLAIMS?

**A.    <u>Response in Brief</u>**

The issue is not whether this Court should recognize the foreign judgment issued by the Republic of the Philippines National Labor Relations Commission ("NLRC"). Clearly, this Court should. However, the issue is whether the judgment entered in the Philippines precludes Claimant from pursuing her pending claims before this Court.

Declaring "comity" is simply Limitation Plaintiffs attempt to frighten this Court into

9

believing, at the outset, that any decision other than the outright dismissal of Claimant's claims is somehow detrimental to our country's desire to maintain peaceful relations with the Filipino authorities. As shall be seen herein, the Philippines have spoken in this case and it is their considered opinion that, upon consideration of its own interests, the United States should afford Claimant and her dead son whatever rights and remedies it deems appropriate.

Limitation Plaintiffs rely upon a number of cases which merely stand for the proposition that foreign judgments should be enforced. None of the cited cases are instructive where, as here, the foreign judgment involved different claims and causes of action.

For example, Limitation Plaintiffs cite *Zorgias v. S.S. Hellenic Star, et al.*, 487 F.2d 519 (5th Cir.1974) for the proposition that a settlement agreement approved by a Greek court was a binding judgment to which *res judicata* applied. See, *Motion for Summary Judgment,* p. 9. The District Court for the Eastern District of Louisiana had declared that

> "Thus, as between the suits in Greece and the present action, there is identity of the tort complained of, and of the parties to the litigation. This Court owes comity to a validly entered judgment of a foreign court where the proceedings were fair and regular, and where that foreign court was an appropriate forum to adjudicate the dispute presented to it."

*Id.* at p. 10, quoting *Zorgias v. S.S. Hellenic Star, et al.*, 370 F.Supp. 591, 592 (E.D.La.1972).[2]

A review of the District Court's opinion in *Zorgias* shows little detail regarding the underlying facts, though we may presume that the causes of action were identical in both cases and the seaman had the opportunity to litigate the full panoply of his rights and remedies in the Greek

---

[2] Respectfully, Limitation Plaintiffs have erred in attributing this language to the Fifth Circuit Court of Appeals when, in fact, it is a district court opinion.

court in which he executed the compromise settlement agreement. *Id.* Such is not the case here and, thus, *Zorgias* is neither illustrative nor determinative.

The other case relied upon by Limitation Plaintiffs involves not a seaman, but rather two commercial litigants. See, *Motion for Summary Judgment*, p. 10-11, citing *Rapture Shipping Ltd. v. Allround Fuel Trading B.V., et al.*, 2004 AMC 796 (S.D.N.Y.2004). As the claims made the basis of this lawsuit are predicated upon the fact that decedent was a seaman at the time of his death, this commercial action cited by Limitation Plaintiffs captures neither the spirit nor the law applicable to the instant proceedings.

From these cases, Limitation Plaintiffs would have the Court determine that, under "principles of comity," this Court must dismiss Claimant's claims and hold her receipt of but $51,000.00 in the Philippines as a bar to her recovery in the United States.

In examining Limitation Plaintiffs' motion, and their reliance upon the cited opinions, it appears two things have occurred:

1.    Limitation Plaintiffs place undue emphasis on the boilerplate language of Claimant's standard, Jones Act pleadings; and,

2.    Limitation Plaintiffs misconstrue what was resolved in the Philippines, and what remains to be resolved by this Court.

## B.    The purportedly "contractual" basis of Claimant's lawsuit

With respect to the first issue, as a matter of maritime convention, the standard language of any decent seaman's petition includes the following:

"On or about [date], [seaman] was aboard the [vessel] in the course and scope of his employment by and for the vessel and its legal owner and/or operator, [Defendant(s) or Petitioner(s)], having previously been engaged by contract of employment to serve as a member of the crew of said vessel."

11

See, e.g., *Claimant's Claim for Damages*, ¶1; EXHIBIT 1 *(Affidavit of R. Blake Brunkenhoefer).*

It is axiomatic that many, if not most, seaman work around the world without a contract. Fishermen, most offshore workers, bargemen, many "blue water" mariners, etc. all work as seamen – and, in American jurisprudence, are afforded the rights of seamen based upon the facts of their employment – notwithstanding their having no written agreement so declaring their status. Thus, this language in Claimant's pleadings is merely traditional "boilerplate" used to describe the vessel's and employer's obligations to the seaman (e.g., the vessel has a quasi-contractual obligation to the seaman, which translates into the "unseaworthiness" claim under general maritime law; the employer has contractual obligations – whether or not formally expressed – with respect to the payment of wages, etc.). *Id..*

Limitation Plaintiffs attempt to rely upon Claimant's attorney's use of the word "contract" to somehow bolster their argument that, as all issues pertaining to the contract between Limitation Plaintiffs and the deceased have been resolved in the Philippines, the Claimant's damages claims in the United States have been resolved as well. Nothing could be further from the truth. *Id.*

Limitation Plaintiffs declare "[t]hat employment contract, of course, is the basis for the claim by Mrs. Gonzales that Juan Gonzales was a Jones Act seaman, as well as the basis for the legal proceedings which Mrs. Gonzales has already pursued to a judgment in the Philippines." *Motion for Summary Judgment*, p. 11. Actually, determining whether a particular maritime worker is a seaman is a factual determination conditioned upon the employee's work rather than the employer's (or any else's) intended or stated occupation of the employee, see, *Chandris v. Latsis*, 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995).

The words on the "contract" are meaningless – to Claimant and this Court – when it comes

to determining whether or not Claimant's deceased son was a seaman at the time of his death, and, thus, entitled to the rights and benefits of American statutory and common law. The "contract" is only relevant to the Filipino authorities' determination of the measure of contractual benefits <u>they</u> could ensure were provided to Claimant. Thus, the contract is most emphatically <u>not</u> the basis for both the Filipino and the present American proceedings.[3]

## C.    <u>The "real" issue</u>

In an effort to narrow the issues, Claimant declares her agreement to the following facts:

1.    The claim for contractual benefits filed by Mrs. Gonzales in the Philippines <u>did</u> arise out of the same death to the same son as is the basis of the claims now pending before this Court.

2.    Claimant did receive $51,000.00 from the Limitation Plaintiffs at the conclusion of the Filipino proceedings.

As previously stated, the only real issue is whether the resolution of the Filipino administrative action before the National Labor Relations Commission extinguished Claimant's right to pursue extra-contractual damages against Limitation Plaintiffs in the United States.

## D.    <u>What was actually resolved in the Philippines?</u> [4]

---

[3] QUERY: If the deceased had been declared a seaman on the contract, but was factually <u>not</u> a seaman at the time of his death, would the Limitation Plaintiffs argue that the deceased was not a seaman, regardless of what the contract stated? Of course they would.

One wonders why a plain reading of Supreme Court precedent does not appear to suffice for the Limitation Plaintiffs. However, rather than suppose sinister motives for the argument, Claimant would simply characterize Limitation Plaintiffs' misplaced reliance on an irrelevant word in her pleadings as "creative lawyering."

[4] Claimant apologizes in advance for the poor quality of many of the following exhibits. However, as indicated by the fax transmittal messages at the top of each page, these exhibits were sent to Claimant's attorney by Limitation Plaintiffs via facsimile (i.e., from the hotel in Greece where depositions in this case were then being conducted), after Petitioners had themselves received the materials via fax transmission, and after the documents had been transmitted to their original recipients via facsimile. <u>See</u>, EXHIBIT 2 (*05/26/03 "telefax message" cover sheet from the Divani Apollon Palace & Spa, from Tony Whitman to Blake Brunkenhoefer*).

On November 17, 2000, attorneys representing the Claimant before the Filipino authorities – and not in connection with the claims now before this Court – forwarded a demand letter to the Manila-based agency which had, at the request of one or more of the Limitation Plaintiffs, secured the decedent's presence and service aboard the vessel in question. See, EXHIBIT 3 (*11/17/00 letter from Von Lovel D. Bedona to Bright Maritime Corporation*). Claimant's attorney in the Philippines, Von Lovel D. Bedona, simply demanded payment of the contractual death benefits provided under the "Standard Employment Contract" for Filipino seafarers, which amount totaled but US $51,000.00. *Id..* This letter was then forwarded on to the relevant P & I Club representative, see, EXHIBIT 4 (*12/21/00 letter from Bright Maritime Corporation to the Law Offices of Del Rosario & Del Rosario*) & EXHIBIT 5 (*12/22/00 letter from Bright Maritime Corporation to Von Lovel D. Bedona*), as well as the insurance and claims department of Petitioner-Eurocarriers, S.A.. See, EXHIBIT 6 (*12/21/00 "telefax message" from CrewCare, Inc. [proposed successor-in-interest to Bright Maritime Corporation] to Eurocarriers, S.A.*).

Claimant's demand was refused, and an action was then initiated with the Philippines NLRC. See, EXHIBIT 7 (*"Decision"*).[5]

The case proceeded before Executive Labor Arbiter Oscar S. Uy who found, in amongst other respects, that:

1.    Josefina Gonzales ("Complainant" in the Filipino action) contended that she was entitled to US $51,000.00 under the compensation schedule set out in the Standard Employment

_____

[5] The marks made on EXHIBIT 7, including the "underlining," existed prior to Limitation Plaintiffs' delivery of this document to Claimant's attorney in the instant federal action. Claimant and her attorneys do not know how, when, why or by whom these marks were made.

Contract for Filipino seafarers. *Id.* at p. 2-3.

2.    The ship's owners and agents ("Respondents" in the Filipino action) had offered US $60,000.00, but, in exchange for the additional compensation, they wanted Complainant to execute a general waiver and quitclaim in their favor. *Id.* at p. 3.

3.    When Complainant refused to "waive her rights to initiate any possible legal action against persons or corporations who might be held liable for the death of her son based on laws of foreign countries, the payment of compensation benefits offered by respondents was withheld and/or withdrawn." *Id.* at p. 4.

4.    Complainant argued that her entitlement to the compensation benefits set forth in the Standard Employment Contract was unambiguous and not subject to any other terms or conditions, such as requiring her to execute a general waiver and quitclaim before receiving the scheduled benefits. *Id.* at p. 4-5.

5.    When Complainant refused to accept the US $60,000.00 offer, Respondents were willing "to negotiate further regarding the amount that would be acceptable to both parties." *Id.* at p. 6. More specifically, Respondents came to Complainant on September 25, 2000 and offered US $60,000.00 and, when she refused to accept the money on the terms required, Respondents requested a counter-offer. *Id.* at p. 7.

6.    Respondents contended that, after US $50,000.00 was paid to Complainant (i.e., the $1,000.00 burial expense having already been timely paid to the decedent's designated allottee, his sister), Complainant was "no longer entitled to further compensation for the death of her son, in accordance with the policy against double recovery, multiplicity of suits and forum shopping and that complainant's simultaneous filing of a suit abroad and in the

Philippines violates the prohibition against double recovery/compensation; that all of complainant's claims against respondents, including her claim for damages, should be brought before the NLRC, in accordance with the express provision of the Migrant Workers and Overseas Filipino Act of 1995 . . . ." *Id.* at p. 9.

7.   Respondents argued that, contrary to the Complainant's assertions, the NLRC had exclusive jurisdiction, vested specifically by the Migrant Workers Act, over all claims that Mrs. Gonzales has against the Respondents, whether they be "contractual" or for damages. *Id.* at p. 14.  Respondents further argued that "complainant is entitled only to the death benefits provided in the POEA contract, which is a form of liquidated damages designed to serve as payment, in totality, including those for damages, and to nothing more.  Its very nature thus prevents the parties to the contract from making any additional claims over and above those provided in said contract." *Id.*.  Finally, Respondents urged that they had "repeatedly offered the payment of the death benefits of US $50,000.00 in exchange for a complete and full release in favor of the respondents, which was refused by complainant in the mistaken belief that she can make additional claims for damages and tort, as the death benefits of US $50,000.00 is the total amount that the complainant is . . . legally entitled to, inclusive of damages." *Id.* at p. 14-15.

Thus, Limitation Plaintiffs/Respondents, appearing by and through their designated attorneys, argued to the NLRC and its duly-appointed arbitrator precisely that which they are now urging to this Court: That is, Claimant/Complainant was precluded from pursuing her claims in the United States because Filipino law provided the exclusive remedy and that remedy was limited to the contractual death benefits set forth in the Standard Employment Contract for Filipino seafarers.  See, *Id.* at p.

16

6-15.

8.    The Executive Labor Arbiter found that the Respondents' offer of US $60,000.00 was US $10,000.00 over and above that due to Complainant (i.e., the $1,000.00 burial expense having already been timely paid to the decedent's designated allottee, his sister). *Id.* at p. 16.

9.    The ruling of the Executive Labor Arbiter continued as follows:

> "The offer of the extra US $10,000.00 was not fostered by pure benevolence on the part of the respondent, although at first glance it would seem so, for it was offered with strings attached. The additional amount was an enticement to complainant to execute a general waiver and quitclaim in favor of respondents. And when she refused to do so, payment of compensation benefits was totally withheld or withdrawn from her.
>
> Payment of compensation benefits for the death of a seaman is not subject to any terms or conditions. [citations omitted]
>
> This ruling can be applied corollarily to the instant case. More so, where the death of an able-bodied seaman occurred while in the performance of his duties or functions, caused by an accident which could have been avoided or averted if there was proper maintenance and supervision of respondents' vessel.
>
> Complainant's entitlement to the compensation benefits vested and accrued upon the death of her son. The amount of US $50,000.00 should have been immediately and unconditionally released to her. But such was not the case. In spite of the repeated demands, respondents remained adamant in their refusal. Complainant had no other recourse but to file the instant case for the collection of said compensation benefits.
>
> Respondents are now crying foul, charging complainant of having violated the provisions against forum shopping, double recovery/compensation, and multiplicity of suits.
>
> Prior to the enactment of The Migrant Workers and Overseas Filipino Act of 1995, all money claims arising out of employer-employee relationship by virtue of any law or contract involving Filipino workers for overseas deployment were lodged before the

Philippine Overseas Employment Administration (POEA). Upon its effectivity on 15 July 1995, all unresolved money claims pending before the POEA were referred to the NLRC for disposition. Thus the proviso, 'notwithstanding any provision of law to the contrary, the Labor Arbiters of the National Labor Relations Commission (NLRC) shall have the original and exclusive jurisdiction to hear and decide all claims arising out of employer-employee relationship or by virtue of any law or contract involving Filipino workers for overseas deployment including claims for actual, moral, exemplary and other forms of damages, subject to the rules and procedures of the NLRC.' This provision is found in Section X, Chapter II of the Migrant Workers and Overseas Filipinos Act of 1995 which is on ILLEGAL RECRUITMENT. Thus, the complaint filed by the deceased seaman's mother, for torts and damages in foreign jurisdiction is not proscribed by the provision relied upon by respondents. . . . All that the complainant is asking for is the payment of compensation benefits as the compulsory heir of the deceased seaman that is withheld from her by respondents." *Id.* at p. 16-20.

10.     In its ruling of August 30, 2001, the NLRC Arbitrator then ordered the Respondents to pay

Complainant US $50,000.00, plus attorney's fees. *Id.* at p. 20.

Rather than pay the death benefits due and owing to Claimant/Complainant, the Limitation

Plaintiffs/Respondents appealed the arbitrator's ruling. See, EXHIBIT 8 (*"Decision"*).

In *Gonzales v. Bright Maritime Corporation, et al.*, the Fourth Division of the National Labor

Relations Committee of the Republic of the Philippines issued its appellate decision in this case.

In holding that the Complainant-beneficiary of the deceased Filipino seaman could yet maintain a

tort action in this United States District Court though she was also attempting to collect contractual

death benefits under the NLRC, the *Gonzales* panel declared:

"Assuming that complainant would receive the amount of US $50,000.00 necessarily she is barred from instituting a separate legal action here in our country based on the same incident because of our law against double recourse from a single wrong (Art. 2177, Civil Code). If however, the separate legal action is instituted in the foreign country as it is now, we are not in a position to hold that

18

complainant is barred thereby.

. . .

> We agree that under RA 8042 [a/k/a., the "Migrant Workers'
> and Overseas Filipinos' Act of 1995"], the NLRC has original and
> exclusive jurisdiction over claims arising out of employer-employee
> relationship or contract involving overseas Filipino workers.
> However, as in any other Philippine laws, the conferment of
> jurisdiction to a particular court, body or tribunal is in relation to the
> other courts, bodies or tribunals in the Philippines. To say that the
> same is intended to bind foreign courts is, to our mind, an act of
> interference or usurpation. Hence, we are also not in a position to say
> that the foreign court is barred from taking cognizance of the second
> suit."

*Gonzales v. Bright Maritime Corporation, et al.*, NLRC Case No. V-000036-2001/SRAB Case No.

OFW(M)01-03-0014, p.2-3 (Fourth Division of the National Labor Relations Committee of the

Republic of the Philippines). See, Exhibit 8 at p. 2-3.

In other words, the Republic of the Philippines has determined that Filipino workers'

compensation law would limit the seaman's recovery to the stated contractual death benefits.[6]

However, the Filipino appellate court further determined that the law of the Philippines does not bar

this Court from providing Claimant with a tort remedy.

The Limitation Plaintiffs filed the instant limitation action with this Honorable District Court.

Then they "tried to pull a fast one" by having the NLRC of the Philippines rule on the seaman's

death claims.[7]  However, much to the Limitation Plaintiffs' chagrin, the Philippines have ruled

---

[6] Of course, American maritime law has no such prohibition: Since the decedent was a seaman, the payment of workers' compensation benefits is not a bar to a tort recovery as the shipowner merely receives a credit against its "maintenance and cure" obligations; the shipowners' payment of maintenance does not offset its obligations with respect to payment of damages for lost wages; etc.. See, e.g., *Freeman v. Norfolk & Western Railway Co.*, 596 F.2d 1205, 1207, 1980 AMC 1366 (4th Cir.1979).

[7] QUERY: What else would it have been? Why else did the shipowner seek a general release, unless it knew it was otherwise exposed to Claimant's tort claims in the United States? If they only owed $51,000.00 under the clear rules of the NLRC, why did Limitation Plaintiffs ask Claimant for a counter-offer when she refused their September 25, 2000 offer of $60,000.00 in exchange for a release? Why would the Limitation Plaintiffs

against them and, indeed, declared that the United States can apply its law to provide this deceased seaman with a tort remedy.

As the issue has been resolved by the forum from which Limitation Plaintiffs originally sought relief, the doctrine or *res judicata* should be applied to preclude Limitation Plaintiffs from relitigating the issue in this American Court. Interestingly, it would seem that principles of "comity" mandate this result.

**E.     The Republic of the Philippines *Cannot* Resolve Claimant's Tort Claims** [8]

Limitation Plaintiffs declare that Philippines' NLRC provides an adequate forum for the resolution of Claimant's tort claims. *Motion for Summary Judgment*, p. 12. In fact, the Philippine Supreme Court has affirmatively stated that the country's labor arbitrators have no jurisdiction over tort claims such as those at issue in this case. Therefore, if her claims are not permitted to proceed before this Court, Claimant would effectively be denied <u>any</u> forum in which to air her Jones Act claims. Such a result runs afoul of the long-standing rule that arbitration clauses may not strip parties of their substantive rights.

The Supreme Court has made clear that an arbitration clause that takes away a party's substantive statutory rights may not be enforced. "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,

<u>negotiate</u> when the contractual benefits due and owing were known, from the moment of Juan Gonzales' death, unless Limitation Plaintiffs knew they could legally be made to pay more money?

[8] With respect to many, if not most, of the arguments and authorities contained hereinunder, Claimant wishes to acknowledge her reliance upon the fine work of Jeffrey Robert White, Esq. (Center for Constitutional Litigation, P.C.) and Kate Gordon, Esq. (Trial Lawyers for Public Justice).

473 U.S. 614, 628, 105 S. Ct. 3346, 87 L. Ed.2d 444 (1985). In *Mitsubishi*, the Court considered whether antitrust claims under the Sherman Act were subject to arbitration. The Court upheld the arbitration of statutory claims, so long as "the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum." *Id.* at 637; *see also Gilmer v Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28, 111 S. Ct. 1647, 114 L. Ed. 2d 26 (1991) (quoting *Mitsubishi*). Because there was no evidence that the chosen arbitral forum (the Japan Commercial Arbitration Association) would ignore the statutory provisions of the Sherman Antitrust Act, and because U.S. courts would have a later opportunity to review the arbitrator's decision to make sure that the Act was not ignored, the Court in *Mitsubishi* upheld the arbitration clause. *Id.* at 637-39.

However, had it been clear that the Japanese arbitration forum would not allow for arguments under the Sherman Act, the *Mitsubishi* Court would certainly have struck that clause down. "[I]n the event the choice of forum and choice of law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." *Id.* at 637, n.19 (emphasis added); see also, *Vimar Seguros y Reaseguros v. M/V Sky Reefer*, 515 U.S. 528, 540, 115 S. Ct. 2322, 132 L. E. 462 (1995) (holding in a case involving an arbitration clause contained in a bill of lading that "were there no subsequent opportunity for review [of the arbitrator's award]," and were the Court persuaded by petitioners' argument that the arbitration clause would effectively waive petitioners' rights under the Carriage of Goods by Sea Act (COGSA), the Court would not hesitate in striking down the agreement).

More recently, in *Green Tree Financial Corp. v. Randolph,* 531 U.S. 79, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000), the Court emphasized again that an arbitration clause would be unenforceable

if the procedures in the chosen arbitral forum would have the effect of precluding a litigant from "effectively vindicating her federal statutory rights." *Id.* at 90. In that case, the Court determined that Ms. Randolph, a mobile home purchaser, had not provided the Court with an adequate record to show that the fees that she would likely face in arbitration were so high that she would be effectively prevented from bringing her claims at all. *Id.* at 90-91. However, the Court made clear that if the "'risk' that Randolph would be saddled with prohibitive costs" were <u>not</u> speculative, the Court would invalidate the clause. *Id.* at 91.

A number of federal and state courts have, in fact, invalidated arbitration clauses where it was clear that the terms of the clause would actually prohibit a party from going forward with his or her claims. One district court recently struck down an arbitration clause in a long distance telephone contract that banned class actions. The court found that it would not make economic sense for most consumers to bring individual small-value claims against the telephone company, and thus that the class action ban effectively operated as an unlawful exculpatory clause. *Ting v. AT&T*, 182 F. Supp. 2d 902, 917 (N.D. Cal. 2002), *aff'd in relevant part*, 319 F.3d 1126 (9th Cir. 2003), *cert. denied*, 2003 WL 1988529 (Oct. 6, 2003) ("Thus, the prohibition on class action litigation functions as an effective deterrent to litigating many types of claims involving rates, services or billing practices and, ultimately, would serve to shield AT&T from liability even in cases where it has violated the law."); <u>see also</u>, *West Virginia ex rel. Dunlap v. Berger*, 567 S.E.2d 265, 278-79 (W.Va. 2002) ("[I]n the contracts of adhesion that are so commonly involved in consumer and employment transactions, permitting the proponent of such a contract to include a provision that prevents an aggrieved party from pursuing class action relief would go a long way toward allowing those who commit illegal activity to go unpunished, undeterred, and unaccountable."); *Powertel, Inc. v. Bexley*, 743 So.2d 570,

576 (Fla. Dist. Ct. App. 1999) ("By requiring arbitration of all claims, Powertel has precluded the possibility that a group of its customers might join together to seek relief that would be impractical for any of them to obtain alone.").

*Mitsubishi*, *Gilmer*, *Vimar Seguros*, *Randolph*, and their progeny all stand for the same basic point: Where an arbitration clause actually prohibits a party from effectively vindicating its rights – when the clause actually acts as a waiver of those rights – the clause must be struck down.

Furthermore, arbitration must not only be accessible to the parties, it also must offer substantially the same relief as would be available to those parties in court. As the U.S. Court of Appeals for the Sixth Circuit has held:

> [E]ven if arbitration is generally a suitable forum for resolving a particular statutory claim, the specific arbitral forum provided under an arbitration agreement must nevertheless allow for the effective vindication of that claim. Otherwise, arbitration of the claim conflicts with the statute's purpose of both providing individual relief and generally deterring unlawful conduct through the enforcement of its provisions.

*Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 313 (6th Cir. 2000); see also, *Ting v. AT&T*, 319 F.3d 1126 (9th Cir. 2003) (holding that "parties that agree to arbitrate statutory claims still are entitled to basic procedural and remedial protections so that they can effectively realize their statutory rights," and therefore invalidating an arbitration agreement that barred class actions, required consumers to split the high costs of arbitration with the company, and required consumers to keep the results of arbitration confidential); *Graham Oil Co. v. ARCO Products Co.*, 43 F.3d 1244, 1247-48 (9th Cir. 1994) (invalidating an arbitration agreement that required a claimant to forfeit rights and benefits guaranteed by the Petroleum Marketing Practices Act, including imposing a limit on the recovery of punitive damages and attorneys' fees and a one-year statute of limitations).

23

Taken together, these cases stand for a simple and powerful proposition: Courts should not compel mandatory arbitration unless the arbitrator has the power to provide a claimant with all of the relief to which he or she is entitled. In the instant case, the arbitrator has no such power. Under the argument advanced by Limitation Plaintiffs herein, Claimant is compelled to arbitrate all her claims before labor arbitrators in the Philippines – a forum that has, according to the Philippine Supreme Court, no jurisdiction to hear those claims. Thus there is no possible way that the seamen's rights can be vindicated through arbitration in that forum.

Petitioners here have brought, *inter alia*, tort claims under the Jones Act, 46 U.S.C. App. § 688 (2000). Under Limitation Plaintiffs' interpretation of the relevant employment contract, these claims must be submitted to labor arbitration in the Philippines.

The problem is that labor arbitrators in the Philippines do not have the jurisdiction to hear tort claims. The Philippine Supreme Court recently clarified that the jurisdiction of labor arbitrators in the Philippines is limited, under Philippine Labor Code Article 217, to disputes "arising from employer-employee relations." The labor arbitrators' jurisdiction does not include disputes arising from a "quasi delict," or tort. *Tolosa v. National Labor Relations Commission*, G.R. No. 149578, April 10, 2003. In *Tolosa*, the Court upheld the National Labor Relations Commission's dismissal, for lack of jurisdiction, of a seaman's widow's claim for damages and lost earnings after her husband died in the course of duty on board his employer's vessel. The Court held that these claims arose not from the "employee-employer relation," but from "a different source of obligation, such as a tort." Therefore, the Court held, the labor arbitrators had no jurisdiction over the claims.

The Philippine Supreme Court has previously made an identical finding in a case where the only alleged negligence was on the part of an employer. In *Ocheda v. Court of Appeals*, G.R. No.

24

85517, October 16, 1992, the Philippine Supreme Court was faced with the question of whether the courts or labor arbitrators had jurisdiction over an action for damages arising from an employer's negligence, which resulted in the death of an employee. The employee, Mr. Santos, was employed as a painter by a sub-contracting company. While painting the wall of an elevator shaft, Santos called to the worker operating the elevator to bring the elevator down to the first floor. The worker mistakenly brought the elevator to the top floor instead. Santos lost his balance, fell, and was pinned between the shaft and the elevator. He died soon after he was freed from the shaft. *Ocheda* at 631.

The Philippine Supreme Court upheld the trial court's finding that the accident had been the fault of the employer, the owner of the sub-contracting company, since he had ordered Santos to paint the elevator shaft while standing on the top of the elevator. The principal contractor was also found liable, since that company was "in full control of the building" at the time of the accident. *Ocheda* at 634.

The Court then held that there was no jurisdiction for labor arbitrators to hear this case, since the case did not arise out of an "employee-employer relationship" and therefore was not included in the category of cases for which labor arbitrators have jurisdiction under Article 217 of the Labor Code. Instead, the Court found that "the source of the obligation upon which the private respondents' cause of action is based is a quasi-delict or tort." *Ocheda* at 642. Further clarifying the distinction, the court pointed out that "[i]t would have been entirely different if the claim for damages arose out of, for instance, the illegal dismissal of Eduardo, in which case the Labor Arbiter would have exclusive jurisdiction thereon." *Id.*

*Ocheda* makes clear that the difference between claims arising out of an "employer-employee relationship" – over which labor arbitrators have jurisdiction – and claims arising out of a quasi-

delict – over which the courts have jurisdiction – is not tied to the existence of an employee-employer relationship between the plaintiff and the defendant in a particular case. Instead, the difference is in the nature of the claims and the damages sought. Employment claims, such as wrongful termination, arise out of the employer-employee relationship and are under the jurisdiction of the arbitrators. Tort claims, even if they arise out of the alleged negligence of an employer, are outside the arbitrators' jurisdiction. This helps to explain the *Tolosa* court's finding, in support of its jurisdictional holding, that damages for "loss of earning capacity . . . [is] not to be equated with wages, overtime compensation or separation pay, and other labor benefits that are generally cognized in labor disputes," but instead is "a relief or claim resulting from a quasi delict or a similar cause within the realm of civil law."

In the instant case, Claimant's claims clearly fall under the heading of "quasi delict" or tort, as it is understood by the Philippine Supreme Court in *Ocheda* and *Tolosa*. The claims are based on the alleged negligence of an employer, which resulted in the death or disability of seamen working for that employer. Claimant seeks damages under the Jones Act for, among other things, her son's pre-death pain and suffering, her own loss of household services, etc.. Both the nature of the claims and the nature of the damages point to the fact that this case falls outside the jurisdiction of labor arbitration in the Philippines. Interpreting the arbitration clause as suggested by Limitation Plaintiffs will therefore result in Claimant falling into a black hole, unable to find *any* forum in which to air her claims.

This is exactly the kind of "prospective waiver" of rights that the Supreme Court in *Mitsubishi* and *Vimar Seguros*, would have had "little hesitation in condemning as against public policy." *Mitsubishi*, 473 U.S. at 637; *Vimar-Seguros*, 515 U.S. at 540. This Court should do the

same.

## V.
## PUBLIC POLICY CONSIDERATIONS
## FAVORING AN AMERICAN FORUM FOR CLAIMANT [9]

**A.     Substantial U.S. Interest**

Limitation Plaintiffs contend that "recognition of the Philippine decision would not be contrary or prejudicial to U.S. interests." *Motion for Summary Judgment*, p. 13.

In one sense, Claimant could not agree more. Indeed, the interests of the United States would not be prejudiced by this Court's decision to provide Claimant with extra-contractual damages permitted under American law, and not yet decided by the Filipino authorities (who, as we have seen, cannot provide such remedies).

In another sense, Limitation Plaintiffs vastly underestimate the impact of this event and its significance to the United States. The circumstances causing Mr. Gonzales' death also:

1.     killed another man (i.e., Joselito Burgos);

2.     injured American dockworkers (e.g., Robert Cantey, William Langeville, etc.);

3.     damaged or destroyed millions of dollars of American property (i.e, Domino's Sugar facility); and,

4.     prompted a massive, time-consuming and expensive response and investigation by American law enforcement officers, medical personnel, and relevant investigative authorities and agencies (e.g., Baltimore Police Department, Baltimore Fire Department, Baltimore EMS, Baltimore Medical Examiner, Maryland OSHA, United States OSHA, Unites States Coast

---

[9] With respect to many, if not most, of the arguments and authorities contained hereinunder, Claimant wishes to acknowledge her reliance upon the fine work of Jeffrey Robert White, Esq. (Center for Constitutional Litigation, P.C.) and Kate Gordon, Esq. (Trial Lawyers for Public Justice).

Guard, etc.).

Thus, it is clear that the events in question were significant and related to the operation of the Port of Baltimore, and affected the peace and dignity of the Port and its personnel.

Although the events made the basis of this lawsuit have had wide-ranging ramifications, including a vast economic and social impact on the geographic region in which it occurred, let us examine the singular aspect of "crane safety" to appreciate how American law is implicated in this case:

The law of Maryland and of the United States is concerned with the safety and security of its citizens and those lawfully within its boundaries. One of the ways the State of Maryland and the federal government protect these people and their property is by regulating crane safety. This is why the United States Coast Guard inspects vessels, and the cranes thereon, upon a vessel's entry to U.S. waters. The ship's crane at issue was being operated in the United States at the time of this accident. Therefore, the laws of the U.S. are implicated in determining whether the crane was being operated in violation of American law. As indicated by the pleadings on file, the crane in issue was being operated in violation of U.S. law, and this Court has an interest in making sure American laws are applied properly to common law and statutory violations committed by Limitation Plaintiffs herein. This is the only way to ensure that foreign ships do not injure of kill American citizens or those individuals lawfully within our borders. So, in this example and elsewhere, Limitation Plaintiffs are wrong: Complete deference to the Filipino authorities, even if they actually suggested this Court should stand down (which they did not), would prejudice the interests of the United States.

**B.**     **Protection of Merchant Mariners: Congress and the Courts Have Historically Given Special Protection to the Causes of Action of Seamen as Wards of the Admiralty Who Have Little Bargaining Power In Their Contracts of Employment.**

28

From America's earliest days as a maritime nation to the present, U.S. courts have accorded special solicitude to seamen as "wards of the admiralty," affording judicial relief from harsh and oppressive provisions in their contracts of employment. These courts had a pragmatic appreciation for the vastly unequal bargaining positions of seamen and vessel owners. Seamen also became wards of the Congress with the enactment of the Jones Act, which guarantees seamen an action at law with the right to trial by jury for claims of injury or death due to employer negligence.

"Why," Judge Jerome Frank asked, even during the 19th Century, when fealty to the principle of liberty of contract was strongest, were "sailors [] accorded unique treatment" by American courts? *Hume v. Moore-McCormack Lines*, 121 F.2d 336, 341 (2d Cir. 1941). For most workers, he noted, common-law courts insisted that a contract provision releasing the employer from legal obligations, "must be enforced against the employee strictly according to its terms, no matter how harsh or unusual." *Id.* at 337.

> Most 19th century judges would have thought that to hold otherwise would be to interfere, inconceivably, with liberty of contract. But in that same period, the admiralty courts utilized a different rule; they guarded, with special solicitude, the rights of seamen in such dealings with their employers.

*Id.* Judge Frank, writing for a distinguished panel of the Second Circuit, stated, "courts had made realistic appraisals of the inability of the individual seaman to cope effectively with his employer in bargaining." *Id.* at 342.

When Justice Story famously declared that seamen "are emphatically the wards of the admiralty" in *Harden v. Gordon*, 11 F. Cas. 480, 485 (C.C.D. Me. 1823) (No. 6047), he took note that seamen faced not only the harsh perils of the sea, but also abuse at the hands of overreaching employers. Consequently, "though not technically incapable of entering into a valid contract, they

29

are treated in the same manner as courts of equity are accustomed to treat young heirs . . ." *Id.* at 485.

*Compare Hutchinson v. Coombs,* 12 F. Cas. 1083, 1086 (D. Me. 1825) (No. 6955) ("Every maritime nation has a deep interest in the protection and preservation of its seamen . . . The policy of the United States, in this respect, is very distinctly marked [and reflects] the parental solicitude of the government for the preservation and protection of the seamen of the country.").

This solicitude led judges to hold open the courthouse doors to seamen seeking relief from oppressive contracts with their employers. As Judge Ashur Ware explained,

> They are parties who do not stand, in making their contracts, on even ground. Merchants are shrewd, careful, familiar with the forms of business, watchful and far-sighted in providing for their own interests; while seamen are ignorant, improvident, and necessitous, . . . wholly unable to defend their rights against the superior knowledge, sagacity, and wealth of their employers. They are therefore wisely, upon principles of public policy, as well as private justice, placed under the protection of the law.

*The David Pratt*, 7 F. Cas. 22, 24 (D. Me. 1839) (No. 3597). Seamen must be able to turn to the courts because they are "too much in the power of the owners to be able to negotiate with them on equal terms. If the owners choose to make use of that power to drive a hard bargain, and compel seamen to a settlement on unjust terms, both public policy and private justice require that such settlements should be open to a re-examination." *Id.* at 25.

In 1920, Congress acted to make seamen also wards of the Congress. Section 33 of the Merchant Marine Act of 1920, 41 Stat. 1007, commonly called the Jones Act, provides:

> Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply.

46 U.S.C. App. § 688.

The statute confers upon seamen a substantive right to "an action for damages at law, with the right of trial by jury." Congress intended that right to be "part and parcel" of the substantive remedy, not merely a rule of procedure. *Dice v. Akron, Canton & Youngstown R. Co.,* 342 U.S. 359, 363, 72 S. Ct. 312, 96 L. Ed. 398 (1952).

The Supreme Court has consistently emphasized that the public policy animating the Jones Act requires its liberal application as "remedial, for the benefit and protection of seamen who are peculiarly the wards of admiralty." *The Arizona v. Anelich,* 298 U.S. 110, 123, 56 S. Ct. 707, 80 L. Ed. 1075 (1936). This special status disallows "the application of rules of the common law which would affect [seamen] harshly." *Socony-Vacuum Oil Co. v. Smith,* 305 U.S. 424, 431, 59 S. Ct. 262, 305 U.S. 424, 83 L. Ed. 265 (1939).

The Supreme Court has continued to maintain that seamen are to be accorded "a special solicitude" by the courts, *Moragne v. States Marine Lines,* 398 U.S. 375, 387, 90 S. Ct. 1772, 26 L. Ed.2d 339 (1970). The Court recently reaffirmed Justice Story's declaration that seamen are "emphatically the wards of the admiralty" and that Congress' purpose in the Jones Act was to provide "heightened legal protections" to seamen not available to other workers. *Chandris,* 515 U.S. at 354, 115 S. Ct. 2172, 132 L. Ed.2d 314 (1995).

This Court, faced with arbitration provisions imposed on a Jones Act seaman, should accord great weight to the nearly 180 years of public policy, expressed in judicial decisions and legislation, to open the courthouse doors to seamen and provide relief from oppressive contracts.

**C.    International Arbitration Agreements and Forum Selection Clauses In the Employment Contracts of Seamen Are Void and Unenforceable As Violative of Public Policy.**

The strong public policy favoring access to the courts for Jones Act seamen applies to

international arbitration agreements. Such agreements are specialized forum-selection provisions, which the Supreme Court has deemed presumptively valid, unless they contravene a strong public policy. The Supreme Court expressly stated that contracts restricting the rights of rail workers or seamen under the FELA or the Jones Act are examples of provisions that are void as against public policy.

The arbitration provisions in this case are also void and unenforceable because, if interpreted as Limitation Plaintiffs would suggest, they leave Claimant without any remedy at all for her tort claims against the vessel owner. If enforced as suggested, the contract provisions would relegate Claimant to presenting her claims to civil arbitrators in the Philippines. The Philippine Supreme Court, however, has made clear that the jurisdiction of civil arbitrators is limited to disputes arising from the employer-employee relationship, and does not extend to tort claims. Enforcement of the arbitration clause would effectively send Claimant into a black hole, preventing her from any possibility of vindicating her rights under federal statute.

In the *Sabocuhan* case, the District Court for the Southern District of Texas "reluctantly held the forum selection clause at issue enforceable, even though do so appeared contrary to public policy" because the Court felt bound to do so by the much-criticized decision in *Marinechance Shipping Ltd. v. Sebastian*, 143 F.3d 216 (5th Cir.1998), cert. denied, 525 U.S. 1055 (1998). *McPhail v. Oceaneering Int'l, Inc.*, 170 F.Supp.2d 718 at fn. 4 (S.D.Tex.2001), ref., *Sabocuhan v. Geco-Prakla*, 78 F.Supp.2d 603 (S.D.Tex.1999). However, the venerated maritime jurist, Judge Samuel B. Kent noted:

> "Were this Court at liberty to decide the issue, it would unhesitatingly
> hold unenforceable the kind of maritime forum-selection clauses at
> issue in this case [POEA contract]. It is axiomatic that seamen are

wards of the Admiralty court.

This court finds it truly shameful that the Unites States, the greatest and most prosperous nation on the face of the earth, would deny an injured seaman a remedy within its court system. This refusal is all the more appalling when the seaman is injured in the course of conveying goods right to the very shores of this nation. These seamen often labor aboard dilapidated vessels in deplorably dangerous working conditions, and yet at considerable risk to life and limb they assist in bringing products to this country which inure to the benefit of all United States citizens. Denying an injured seaman a United States forum is utterly contrary to the beneficent attitude towards seamen that has for centuries characterized the Admiralty courts of the English speaking world."

*Sabocuhan*, 78 F.Supp.2d at 606-07 (S.D.Tex.1999).

The strong public policy to preserve the seaman's access to the courts applies to international arbitration agreements. The Supreme Court has laid out a well-lighted path for courts addressing this issue.

"An agreement to arbitrate before a specified tribunal," the Court has observed, "is, in effect, a specialized kind of forum-selection clause." *Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 519, 531 94 S. Ct. 2449, 41 L. Ed.2d 270, (1974). Courts historically "have declined to enforce such clauses on the ground that they were 'contrary to public policy.'" *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 9, 92 S. Ct. 1907, 32 L. Ed.2d 513 (1972).

Nowhere was judicial disfavor stronger than with respect to forum-selection agreements with railroad workers and, therefore, seamen. The Court in *Boyd v. Grand Trunk Western Railroad Co.,* 338 U.S. 263, 70 S. Ct. 26, 94 L. Ed. 55 (1949), held void and unenforceable an agreement in which an injured railroad worker agreed to bring suit only in the county or district where the injury occurred or where the worker resided. The Court looked to Section 5 of Federal Employers Liability Act,

which states: "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void." 45 U.S.C. § 55 (1988). Stating that "Congress wanted § 5 to have the full effect that its comprehensive phraseology implies," the Court upheld the employee's "right to bring suit in any eligible forum" declared the forum-selection agreement void. *Id*. at 265.

Significantly, the forum-selection contract in *Boyd* was far less a restriction on the worker's rights than the arbitration provisions at issue in this case. The *Boyd* contract provision limited the worker's choice of forum, but did not deprive him of the right to bring an action at law nor the right to a trial by jury. The arbitration provision at issue here, if interpreted to exclude Claimant's right to proceed in this forum, would deprive Claimant of far greater substantive rights and is therefore even more clearly violative of public policy.

The Supreme Court modified its view of forum-selection clauses in *Bremen, supra,* recognizing that the U.S. "cannot have trade and commerce in world markets and international waters exclusively on our terms." 407 U.S. at 8-9. The Court announced that forum-selection agreements should be deemed "prima facie valid," *id.* at 10, and enforceable, at least where the provision was "a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power". *Id*. at 12. *See also Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 111 S. Ct. 1522, 113 L. Ed.2d 622 (1991) (upholding a cruise passenger ticket provision that disputes "shall be litigated, if at all, in and before a Court located in the State of Florida").

The Court in both *Bremen* and *Carnival Cruise* found that plaintiffs, whose claims were

34

under general maritime law, had not made a sufficient showing that the provisions involved were unreasonable. However, the Court expressly stated that such provisions <u>would</u> remain void as against public policy, as held in *Boyd*, with respect to the claims of railroad workers under the FELA and seamen under the Jones Act:

> A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision. *See, e.g., Boyd v. Grand Trunk W.R. Co.,* 338 U.S. 263, 70 S. Ct. 26, 94 L. Ed. 55 (1949).

*Bremen*, 407 U.S. at 15.

The Supreme Court of Alaska recently followed the Supreme Court's guidance in *Boyd* and *Bremen* and invalidated the forum selection clause in a seaman's employment contract "because it violates Nunez's right to sue under the Jones Act in any eligible forum." *Nunez v. America Seafoods,* 52 P.3d 720, 721 (Alaska 2002).

This Court should follow the path set down by the Supreme Court.

**D.** **The Convention on the Recognition and Enforcement of Arbitral Awards Makes Provision for Courts to Refuse to Enforce Arbitration Agreements that Violate Strong Public Policy.**

There is no conflict between the protection of seamen and the enforcement of international arbitration agreements.

In 1970, Congress ratified the Convention on the Recognition and Enforcement of Foreign Arbitral Awards [the Convention]. See 21 U.S.T. 2517, T.I.A.S. 6997, reprinted following 9 U.S.C.A. § 201 (West Supp.1991).

Article II(3) of the Convention requires that:

> The court of a Contracting State, when seized of an action in a matter

35

> in respect to which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, <u>unless it finds that the said agreement is null and void</u>, inoperative or incapable of being performed.

(emphasis added).

It is well-settled that contracts that contravene important public policies are deemed null and void. See 17A Am. Jur. 2d Contracts § 257 (2003) ("As a general rule, agreements or contracts against public policy are illegal and void. An agreement or contract made in violation of established public policy is not binding and will not be enforced."); Restatement of Contracts (Second) §§178, 179 (unenforceability of agreements based on public policy manifested in legislation and judicial decisions); *Id.* at §774, comment b (Agreements "in violation of public policy are commonly held to be entirely void and so not contracts at all.").  <u>See</u> also, *In re Smith*, 926 F.2d 1027, 1029 (11th Cir. 1991) (contracts "are void against public policy . . . if they directly contravene a state or federal statute or policy.").

Article II(3) is consistent with Article V(2)(b) of the Convention, which provides that the court may refuse to recognize and enforce an arbitral award where "recognition or enforcement of the award would be contrary to the public policy of that country."

Under Article III(3) of the Convention, "an agreement to arbitrate is null and void . . . when it contravenes fundamental policies of the forum nation." <u>See</u>, *Antco Shipping Co. Ltd. v. Sidermar, S.A.,* 417 F. Supp. 207, 216 (S.D.N.Y. 1976) (holding that the public policy defense to enforcement of arbitral awards under Article V(2)(b) of the Convention "applies with equal force to considerations, within the context of enforcement of the arbitration agreement itself, of whether the contract in question is 'null and void' under Article II(3) of the Convention."); *cf. Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 531, 94 S. Ct. 2449, 41 L. Ed. 2d 270 (1974) (the delegates to the

Convention "contemplated that a court may decline to enforce an agreement which offends its law or public policy.") (Douglas, J., dissenting).

To the extent that the Convention can be argued to have any applicability to the instant proceedings (which it has not), Claimant has shown that the strong public policy favoring a seaman's access to court and an action at law satisfies the public policy exception of the Convention.

## VI.
## SUMMARY OF "COMITY" RESPONSE

Though the Philippines would acknowledge her right to pursue a tort action elsewhere, the Philippines itself has no other remedies available to Claimant. However, the Philippines have determined that this Court can supplement the Filipino contractual benefits.

The findings of the Filipino tribunal should end the discussion, whether in deference to the Filipino law of this case or by acknowledging that the equities most certainly do not warrant further consideration of the Limitation Plaintiffs' argument. However, Limitation Plaintiffs want this Court to give them a "second bite" of an apple from which they did not deserve an initial taste.

Limitation Plaintiffs' correctly assert that the Republic of the Philippines has afforded Claimant with a full and fair hearing of her claims . . . as far as Filipino law is concerned. Similarly, Limitation Plaintiffs have been afforded a full and fair hearing of their arguments concerning the exclusivity of the remedies available to Claimant. As shown hereinabove, Limitation Plaintiffs have already been told by the Filipino authorities that they are wrong, and yet Limitation Plaintiffs continue to ignore precisely the tribunal which Limitation Plaintiffs demand this Court to respect. And respect for the declarations of the foreign forum is the underpinning of the "comity" so often described by Limitation Plaintiffs in their Motion for Summary Judgment.

It was patently wrong for the Limitation Plaintiffs to try, in the first instance, to get <u>any</u> ruling from the Philippines when it is clear that the United States has the most substantial connection to the events in question and it is in the United States' best interest to adjudicate the liability of those who ply our waters, damage our property, and injure or kill those lawfully within our borders.  Now that they have failed in their attempt to usurp the authority of this Court, Limitation Plaintiffs should not be heard to complain when the Court provides the relief to which Claimant and her son are so deserving.

## VII.
## WHAT DAMAGES ARE AVAILABLE TO CLAIMANT? [10]

In assessing maritime personal injury and death damages, there are several factors to be examined: Is this a seaman or a non-seafarer?  Are we dealing with a death or an injury claim?  If death resulted, where did the death occur (i.e., territorial waters or "on the high seas")?  How did the decedent perish (i.e., in a helicopter on his way to a platform, on a vessel, etc.)?  Etc..

Here, we know that Claimant's son was a seaman killed aboard a vessel in the territorial waters of the United States.  Thus, we should be able to identify the damages available to Claimant, both individually and as representative of the estate of her son.

Limitation Plaintiffs correctly cite *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) as the current starting point for analyzing damages where a seaman has been killed.  However, an expansive reading of *Miles*, which is clearly suggested by Limitation Plaintiffs, is neither appropriate

---

[10] With respect to many of the arguments and authorities contained hereinunder, Claimant wishes to acknowledge her reliance upon "Fatal Injuries at Sea and in Territorial Waters: The New Regime," Hon. Eldon E. Fallon, United States District Court, Eastern District of Louisiana, *presented at* The University of Texas Law School's 10th Annual Admiralty & Maritime Law Seminar (2001).

nor determinative.

In *Miles*, the mother of a deceased seaman attempted to recover damages under the general maritime law for the death of her son. To resolve the issue before it, the *Miles* Court adopted the logic of *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618 (1978) which states that

> "Congress has spoken directly to the question of recoverable damages on the high seas, and 'when it does speak directly to a question, the courts are not free to "supplement" Congress' answer so thoroughly that the Act becomes meaningless.'"

*Miles*, 498 U.S. at 31 (quoting *Higginbotham*, 436 U.S. at 625). The Court found that Congress had already spoken for deaths on the high seas in the Death on the High Seas Act (46 U.S.C. §761, *et seq*., a/k/a "DOHSA"). Similarly, the Court found that "by incorporating FELA unaltered into the Jones Act [which provides a negligence action against a seaman's employer], Congress must have intended to incorporate the pecuniary limitation on damages as well." *Id.* at 32. Even though the claim arose from a judicially created cause of action in general maritime law (e.g., an "unseaworthiness" claim against a vessel owner), the Court refused to allow recovery for loss of society because it could not "sanction more expansive remedies in a judicially created cause of action in which liability is without fault than Congress has allowed in cases of death resulting from negligence." *Id.*.

In short, *Miles* held that there is no recovery for loss of society in a general maritime action for the wrongful death of a Jones Act seaman. See, *Id.* at 33.

The *Miles* case involved defendants in addition to decedent's Jones Act employer. Thus, the Court's ruling precludes loss of society damages for a seaman's dependents regardless of whether the defendant is a Jones Act employer or someone else. *Id.* at 31. The Court justified this ruling by

saying that "[t]oday we restore a uniform rule applicable to all actions for the wrongful death of a seaman, whether under DOHSA, the Jones Act, or general maritime law." *Id.*

However, Congress, in the 2000 amendment, has spoken to expand the damages recoverable under DOHSA to include nonpecuniary damages limited to loss of care, comfort, and companionship, albeit, to deaths caused by commercial aviation accidents. While the amendments to DOHSA may not affect the Court's ruling in *Miles* with regard to nonaviation accidents, the analysis supporting the rule seems weakened by the fact that Congress did not intend to limit recovery to pecuniary damages alone as reflected in the amendments. In fact, the amendments strengthen Justice Marshall's vehement dissent in *Higginbotham* in which he states that "Congress was principally concerned, not with limiting recovery, but with ensuring that those suing under DOHSA were able to recover at least their pecuniary loss." *Higginbotham*, 436 U.S. at 629 (Marshall, J. dissenting). Moreover, it now appears that the survivors of a Jones Act seaman who dies in a commercial aviation accident 12 nautical miles beyond a state's shore could recover nonpecuniary damages allowable under DOHSA as amended. Thus, Congress has eviscerated the *Miles* Court's uniform rule to all actions for the wrongful death of a seaman in the stroke of a pen.

On the second issue raised in *Miles*, the Court held that FELA's survival provision incorporated into the Jones Act limits recovery to losses suffered during the decedent's lifetime, and declined to address the issue of whether a general maritime right of survival exists. Moreover, the Court extended this Jones Act rule to the general maritime law for the death of a seaman. *Miles*, 498 U.S. at 36. Consequently, the loss of decedent's future earnings is not recoverable.

In sum, the dependents of a seaman may recover pecuniary damages which include funeral expenses, loss of support (i.e., all the financial contributions that the decedent would have made to

his dependents but for his death), and loss of services (i.e., the monetary value of the services the deceased would have provided around the home to his beneficiaries but for his death). See, *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 584 (1974). Additionally, damages under the Jones Act survival action include recovery for the decedent's pre-death pain and suffering (see, e.g., 45 U.S.C. §59; *Greene v. Vantage S.S. Corp.*, 466 F.2d 159, 1972 AMC 2187 (4th Cir.1972)) and, if applicable, any medical expenses incurred or wages lost, prior to his death.

However, in light of Congress' amendments to DOHSA, the Court's attempt to establish a uniform rule for the wrongful death of a seaman has been undermined. On its face, DOHSA now appears to permit the recovery of nonpecuniary damages if the seaman is killed in a commercial aviation accident on the "high seas." Thus, under the original logic of *Miles* and its expressed interest in "uniformity," there is no reason to believe that the death of a seaman on a vessel should be treated any differently.

As the Limitation Plaintiffs have indicated, the Fourth Circuit has not addressed whether other non-pecuniary damages are available against third-parties other than the seaman's employer and the shipowner. See, *Motion for Summary Judgment*, p. 17, fn. 11. Claimant contends that, if we are to take the *Miles* Court at its word, then there is no reason to interpret any limitations contained therein to apply to any but the identified damage elements (i.e., loss of consortium and loss of future earnings).

In *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 1970 AMC 967 (1970), the Supreme Court recognized a common law cause of action for wrongful death, and allowed recovery of damages by the personal representative of the deceased. The Fourth Circuit Court of Appeals has since held that, whether the cause is predicated on negligence or unseaworthiness, the dependents

41

of the deceased have a general maritime cause of action against non-employer tortfeasors. *Garris v. Norfolk Shipbuilding and Drydock Corp.*, 210 F.3d 209, 2000 AMC 1084 (4th Cir.2000).

Four years after *Miles*, the Supreme Court declared that "[T]he judiciary has traditionally taken the lead in formulating flexible and fair remedies in the law maritime." *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 207, 1994 AMC 1521 (1994). Thus, there is a continued tension between those who favor the "deference to Congress" view and those who yet believe admiralty courts have a crucial role in the protection of maritime interests, especially that protected class of workers known as "seamen."

Around the country, courts of the same judicial district cannot even agree as to the breadth of *Miles*, even as concerns the most "extreme" of damage elements: punitive damages. For example, some courts of the Eastern District of Louisiana believe *Miles* should be read to expunge punitive damages from maritime law. See, *In re Diamond B Marine Services, Inc.*, 2000 WL 222847 at *2-3 (E.D.La. 2000). Other courts believe *Miles* should be limited to seamen's actions against their employers. See, *Maritrans Operating Partners v. Diana T. M/V*, 1999 WL 144458 at *7 (E.D.La. 1999); see also, *Liner v. Dravo Basic Materials Co.*, 2000 WL 1693678 at *4-5 (E.D.La. 2000); *Moore v. Motor Vessel Angela*, 2001 WL 803743 at *8 n. 1 (E.D.La. 2001).

But the disagreement is not confined to Louisiana's Eastern District. The Southern District of New York has determined that the general maritime law allows cruise ship passengers (who contracted Legionnaire's disease in a spa) to seek punitive damages from the ship and the maker of the spa. *In re Horizon Cruises Litigation*, 101 F.Supp.2d 204, 210-214 (S.D.N.Y. 2000).

In short: With respect to Limitation Plaintiffs, it may be said that Claimant's recovery is limited to pecuniary losses, coupled with compensation for the pre-death pain and suffering

experienced by her son. However, a review of *Miles* in light of the recent amendments to DOHSA would seem to expand Claimant's damages to include non-pecuniary losses (i.e., as now reflected in DOHSA). With respect to the remaining parties in this case (i.e., American Bureau of Shipping and Tate & Lyle), *Miles* merely limits Claimants damages on the elements referenced therein, <u>if</u> *Miles* still limits non-pecuniary damages at all. Since *Miles* referenced the Jones Act's statutory damages scheme, and as Claimant's damages against non-employer parties are to be determined under the general maritime law action recognized in *Moragne* and *Garris*, there is no basis for further extending *Miles* to limit Claimant's damages against non-employer parties. The cases cited by Limitation Plaintiffs to the contrary represent a few examples of a view not widely shared in this country, and certainly not made the law of the Fourth Circuit.

Given Congress' most recent pronouncements (i.e., amending DOHSA), it seems reasonable to believe that the *Miles* Court would not – and, indeed, could not – rule as it did if the law in 1990 was as it is today. This District Court should follow *Miles*, not by mere reference to the holding, but deciding the damages available to Claimant based upon Congress' present vision of recoverable damages in cases involving maritime death.

## <u>PRAYER</u>

WHEREFORE, Claimant-Gonzales respectfully requests that the Court deny the relief requested by Limitation Plaintiffs herein, and in all respects deny summary judgment.

Respectfully submitted,


_____/s/_____
R. Blake Brunkenhoefer (S.D.Tex. #15559)*
BRUNKENHOEFER & ASSOCIATES, P.C.
1770 Tower II
555 N. Carancahua
Corpus Christi, Texas 78478
(361) 888-6655
Fax (361) 888-5855
bbrunk@gulfattorneys.com
(* Admitted Pro Hac Vice)


_____/s/_____
W. Charles Bailey, Jr. (#23580)
SIMMS SHOWERS, LLP
Suite 702
20 South Charles Street
Baltimore, Maryland 21201
(410) 783-5795
Fax (410) 783-1368
wcbailey@simmsshowers.com

## CERTIFICATE OF SERVICE

I, R. Blake Brunkenhoefer, do hereby certify that a true and correct copy of the above and

foregoing document was served via e-mail notification from the District Court upon:

M. Hamilton Whitman, Jr.
OBER, KALER, GRIMES
& SHRIVER, P.C.
120 E. Baltimore Street
Baltimore, MD 21202
**(VIA CM/RRR)**

James D. Skeen
WRIGHT, CONSTABLE
& SKEEN, L.L.P.
1 Charles Center, 16th Floor
100 N. Charles Street
Baltimore, MD 21201
**(VIA CM/RRR)**

Jeffrey J. Asperger
Erin Walz
ASPERGER CARAHER, L.L.C.
Three Illinois Center
303 East Wacker Drive, Suite 1000
Chicago, Illinois 60601
**(VIA CM/RRR)**

Bernard J. Sevel
ARNOLD, SEVEL & GAY, P.A.
Two N. Charles Street, Suite 560
Baltimore, MD 21201
**(VIA CM/RRR)**

Robert G. Clyne
HILL, RIVKINS & HAYDEN, L.L.P.
45 Broadway, Suite 1500
New York, NY 10006-3739
**(VIA CM/RRR)**

James W. Bartlett, III
SEMMES, BOWEN & SEMMES
250 W. Pratt Street, 16th Floor
Baltimore, MD 21201-2423
**(VIA CM/RRR)**

Francis J. Gorman
GORMAN & WILLIAMS
Two N. Charles Street, Suite 750
Baltimore, MD 21201
**(VIA CM/RRR)**

W. Charles Bailey, Jr.
SIMMS SHOWERS, L.L.P.
20 S. Charles St., Suite 702
Baltimore, MD 21201-3291
**(VIA CM/RRR)**

in accordance with all applicable provisions of the Federal Rules of Civil Procedure, on this the 8th

day of November, 2004. I further certify that a complete copy of the exhibits referenced in said

document was served upon these individuals via certified mail within 24 hours of the electronic

filing of the principal document.

/s/
R. Blake Brunkenhoefer

45

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| IN THE MATTER OF | * | |
| THE COMPLAINT OF | | |
| ETERNITY SHIPPING, LTD. AND | * | Civil Action No.: L01CV0250 |
| EUROCARRIERS, S.A. | | |
| FOR EXONERATION FROM OR | * | |
| LIMITATION OF LIABILITY | | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*\*

## **ORDER**

_____Upon consideration of the Motion for Summary Judgment on the First Amended Claim for

Damages of Josefina Gonzales ("Claimant-Gonzales"), filed by Eternity Shipping, Ltd. and

Eurocarriers, S.A. ("Limitation Plaintiffs"), and Claimant-Gonzales' opposition thereto, it is hereby:

ORDERED that Limitation Plaintiff's Motion is in all respects DENIED.


Date:_____
_____Hon. Benson E. Legg, *District Judge*
UNITED STATES DISTRICT COURT,
DISTRICT OF MARYLAND,
NORTHERN DIVISION