IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| IN THE MATTER OF | * | |
| THE COMPLAINT OF | | |
| ETERNITY SHIPPING, LTD. AND | * | Civil Action No.: L01CV0250 |
| EUROCARRIERS, S.A. | | |
| FOR EXONERATION FROM OR | * | |
| LIMITATION OF LIABILITY | | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### CLAIMANT TATE & LYLE NORTH AMERICAN SUGARS, INC.'s AMENDED MEMORANDUM IN SUPPORT OF ITS FRCP 56 MOTION FOR SUMMARY JUDGMENT AS TO CLAIMANT JOSEFINA GONZALEZ

NOW COMES Claimant, TATE & LYLE NORTH AMERICAN SUGARS, INC. (hereinafter, "Tate & Lyle" or "Domino"), by and through its attorneys, ASPERGER ASSOCIATES LLC, and for its Amended Memorandum in Support of its FRCP 56 Motion for Summary Judgment as to Claimant Josefina Gonzalez, Individually and as Personal Representative of the Estate and Beneficiaries of Juan Gonzalez, Jr., Deceased ("Gonzalez"), respectfully states as follows:

### Facts and Background

On July 29, 2000, the vessel M/V Leon I, owned and managed by Limitations Plaintiffs Eternity Shipping, Ltd ("ESL") and Eurocarriers, S.A. ("EC") (collectively "ESL/EC") was discharging bulk sugar at Tate & Lyle's Domino Sugar refinery on Baltimore's Inner Harbor. Domino's twin shoreside gantry cranes were being used for the discharge operation. As discharge was proceeding in hatch 6, the Leon I crew had began using the ship's crane #4 to hoist the crew in order to clean caked sugar from the aft coaming of adjacent hatch 6A. Two of the ship's crew, one of whom was Plaintiff's decedent Juan Gonzalez, Jr., were suspended over hatch 6A in a work basket chipping sugar from the portside aft coaming when the luffing wire

rope of crane #4 suddenly failed and parted, resulting in the collapse of the jib of crane #4 and

deaths of Juan Gonzalez and his fellow crew member. During its collapse, the #4 crane jib

struck Domino's crane #2, causing its boom to collapse into hatch #6, resulting in Tate & Lyle

sustaining over $12 million in property damage and business income loss.

Tate & Lyle had the Leon I arrested following the incident and filed suit in August 2000.

Eternity Shipping, Ltd. and Eurocarriers, S.A. filed a limitation action in September 2000. The

American Bureau of Shipping ("ABS") was joined in the case in May 2002. In April 2001,

Claimant Josefina Gonzalez filed her Claim for Damages, and in May 2002 filed her First

Amended Original Complaint. Fact discovery in this case closed on May 5, 2004, and expert

discovery closed on September 7, 2004.

**Summary Judgment Standards Under FRCP 56**

Federal Rule of Civil Procedure 56(c) allows for summary judgment of a claim when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits

if any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." FRCP 56(c). A motion for summary judgment requires

the court to assess whether a genuine issue of material fact exists by reviewing the evidence in

the light most favorable to the party opposing the motion. *Inst. For Shipboard Educ. V. Cigna*

*Worldwide Ins. Co.,* 22 F.3d 414, 418 (2nd Cir. 1994), citing to *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 249, 106 S. Ct. 205, 2510 (1986).

There can be no genuine issue of material fact unless there is sufficient evidence favoring

the nonmoving party for a jury to return a verdict for that party. *Inst. For Shipboard Educ.*, 22

F.3d at 418. The moving party bears the initial burden of demonstrating the absence of any

genuine factual issues. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Once the moving party meets its burden, the non-moving party is obligated to produce probative evidence supporting its view that a genuine factual dispute exists. To do so successfully, the non-moving party "must demonstrate more than some metaphysical doubt as to the material facts ...it must come forward with specific facts showing that there is a genuine issue for trial." *Aslanidis v. U.S Lines, Inc.*, 7 F.3d 1067, 1072 (2nd Cir. 1993), citing to *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587, 106 S. Ct. 1348, 1356 (1986).

## There is No Evidence of Any Negligence on the Part of Tate & Lyle. There is, in Fact, No Evidence Causally Linking Tate & Lyle in Any Way to the Casualty

To sustain a claim for negligence against Tate & Lyle, the estate must show that Tate & Lyle owed decedent a cognizable duty of care, that Tate & Lyle breached that duty, and that Gonzalez suffered damages as a proximate result of that breach. *See Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2nd Cir. 1995).

There is no dispute that the death of decedent was precipitated by failure of the ship's crane #4 luffing wire rope during the vessel's hatch cleaning operation. The estate has not and cannot produce evidence that Tate & Lyle had any cognizable duty relating in any way to the work being performed by Gonzalez. Moreover, no casual connection between Tate & Lyle and the failure of the luffing wire on crane #4 has been or can be shown. The undisputed facts establish that Gonzalez was neither employed by Tate & Lyle, nor was performing work on its behalf or under its direction at the time of his death. Gonzalez was on board the Leon I when the crane #4 luffing wire failed. Tate & Lyle neither owned nor controlled the vessel or its crane. Tate & Lyle was not responsible for the maintenance of the vessel or its cargo gear. Tate & Lyle

3

had no authority or control over the vessel's onboard operations, including the work the crew was performing at the time of the incident. There is no conduct on the part of Tate & Lyle which in any way proximately caused or contributed to the failure of the luffing wire on crane #4. At all pertinent times, the environment and the actions surrounding the death of Mr. Gonzalez were solely within his control and the control of the Limitation Plaintiffs not Tate & Lyle.

Various parties and entities conducted investigations into the cause of the crane collapse and casualties, and numerous experts have written reports and been deposed in this case. Marine expert Kevin Hislop, retained by Tate & Lyle, opined that significant damage and corrosion of the luffing wire rope for crane #4 existed prior to the July 2000 casualty, and resulted in the failure of the rope. (Report of Kevin Hislop, Exhibit A, Opinion 1). Mr. Hislop also opined that the upper limit safety switch did not operate properly, and the cranes as retrofitted on the M/V Leon I prevented the crane operator from viewing the positional angle of the jib. (Exhibit A, Opinions 4 and 9.)

Gonzalez has offered no evidence from any source to contradict the findings of Kevin Hislop. Gonzalez has not identified any facts or evidence which could in any way causally link Tate & Lyle with the failure of the luffing wire on crane #4. Gonzalez did not disclose any expert witness to offer any opinions that might somehow causally connect the casualty to Tate & Lyle.

Summary judgment is appropriate when the non-moving party has failed to set forth any facts that go to an essential element of the claim. *King v. Crossland Savings Bank*, 111 F.3d 251, 259 (2nd Cir. 1997). Gonzalez cannot produce any evidence to establish the existence of a duty or a breach, and cannot produce of causation which might be attributable to Tate & Lyle.

Therefore, essential elements of the claim cannot be met.

**Conclusion**

While questions of negligence are generally reserved for the fact finder, summary judgment is proper when the facts are undisputed and only one conclusion may reasonably be drawn from them; negligence then becomes a matter of law. *Flying Diamond Corp. v. Pennaluna & Co., Inc.*, 586 F.2d 707, 713 (9th Cir. 1978). The only conclusion that can be drawn from the evidence in this case is that Juan Gonzalez, Jr. died as a result of the negligence of the other Defendants, not Tate & Lyle. Therefore, this Court can and should decide as a matter of law that Gonzalez does not have a claim for negligence against Tate & Lyle.

WHEREFORE, Tate & Lyle respectfully requests that this Court grant its Motion for Summary Judgment and dismiss with prejudice the claim of Josefina Gonzalez, Individually and as Personal Representative of the Estate and Beneficiaries of Juan Gonzalez, Jr., Deceased, against Tate & Lyle.

ASPERGER ASSOCIATES LLC.

_____/s/_____
Jeffrey J. Asperger

Jeffrey J. Asperger
ASPERGER ASSOCIATES LLC
303 East Wacker Drive, Suite 1000
Chicago, Illinois 60601
(312) 856-9901

5

## CERTIFICATE OF SERVICE

I, Jeffrey J. Asperger, do hereby certify that a true and correct copy of the above and foregoing document was served via em-mail notification from the District Court and in the manner indicated upon:

Bernard S. Sevel, Esq.
ARNOLD, SEVEL & GAY, P.A.
The B&O Building, Suite 560
2 N. Charles Street
Baltimore, Maryland 21201
*Attorneys for Claimant Robert J. Cantey
and Claimant William Langeville*

W. Charles Bailey, Jr., Esq.
SIMMS SHOWERS LLP
20 South Charles Street, Suite 702
Baltimore, Maryland 21201
*Attorneys for Claimant Josefina Gonzales*

James D. Skeen, Esq.
WRIGHT, CONSTABLE & SKEEN, L.L.P.
One Charles Center, 16th Floor
100 North Charles Street
Baltimore, Maryland 21201
*Attorneys for Claimant Robert J. Cantey,
William Langeville and
Tate & Lyle North American Sugars, Inc.*

M. Hamilton Whitman, Jr.
Eric M. Veit
Charles Diorio
OBER, KALER, GRIMES & SHRIVER
120 East Baltimore Street
Baltimore, MD 21202-1643
*Attorneys for Eternity Shipping*

Francis J. Gorman, P.C.
GORMAN & WILLIAMS
2 North Charles Street
Baltimore, Maryland 21201-3754
*Attorneys for
Louis Dreyfus Sugar Company*

James W. Bartlett, III, Esq.
Alexander M. Giles
SEMMES, BOWEN, & SEMMES, P.C.
250 West Pratt Street, 16th Floor
Baltimore, MD 21201-2423
*Attorneys for American Bureau of Shipping*

R. Blake Brunkenhoefer, Esq.
BRUNKENHOFER & REYNA, P.C.
1770 Tower II
555 N. Carancahua
Corpus Christi, Texas 78478
*Attorneys for Claimant Josefina Gonzales*

Robert G. Clyne, Esq.
James A. Saville
HILL, RIVKINS & HAYDEN LLP
45 Broadway, Suite 1500
New York, New York 10006
*Attorneys for American Bureau of Shipping*

in accordance with all applicable provisions of the Federal Rules of Civil Procedure, on this 7th day of January, 2005.

_____/s/_____
Jeffrey J. Asperger



MARINE & ENGINEERING CONSULTANTS

London Offshore Consultants, Inc.
Flamingo Falls Professional Center, Suite 338,
1851 NW 125th Avenue, Pembroke Pines
Florida 33028, USA
Telephone: 954 430-5778  Fax: 954 436-6562
Email: florida@locamericas.com  www.loc-group.com

## TATE & LYLE vs. M.V. "LEON 1"et al

Your Ref: 6509-1206

Our Ref: LOCF/6068/KPH

## OPINION No. 1:

It is the opinion of the undersigned that material defects, in the form of damaged and/or corroded and/or separated wire rope strands, existed within the luffing wire for crane No. 4 at the time of departure of the vessel from the dry dock in China. The existence of these defects was not adequately addressed at that time or during the time leading up to the date of the occurrence, and it is the opinion of the undersigned that the existence of these defects caused and/or contributed to the final failure of the luffing wire of crane No. 4 on the 29th July 2000.

## BASIS OF OPINION No. 1

1. The satisfactory condition of the deck crane wires was not properly determined at the time of retrofit and survey during the dry-docking and repair period in Shanghai, China, in November and December 1999. The attending surveyor to the American Bureau of Shipping, Mr. Roy Graham, stated in his deposition that he conducted an external visual examination of the wires. He did not follow the recognized and correct procedure, normally conducted in the field by Class Surveyors examining the condition of the internal multi-strand rope, in accordance with the guidance given to Class Surveyors when conducting a thorough Survey of cranes.



EXHIBIT

A

London Offshore Consultants, Inc.
"Leon 1" for Asperger & Carraher

Our Ref: LOCF/6068/KPH
9th June 2004

2. During the course of the investigation into the cause of the accident, Mr. Graham was given the opportunity on three different occasions to describe his inspection procedure of the wires. His omission of a description of his findings of his internal examination of the crane wires leads me to conclude that this procedure was not carried out in accordance with the guidance given to Class Surveyors when conducting a thorough Survey of cranes. The crane wires had been totally removed from the cranes and laid out in the shipyard. As such the wires were in a "relaxed" position, thereby presenting an ideal opportunity for a thorough internal inspection

3.  In the course of a telephone interview on the 19th November 2003, the ship's electrician, Mr. Warlinski, stated that the use of the cranes was primarily for hoisting men aloft to conduct hatch coaming cleaning and not for cargo work.  Based upon the evidence developed, it appears that the wire had damage at the time of the retrofit in China, and that such a condition was not corrected prior to the incident.

4. In one of his depositions, Mr. Roy Graham stated that he noted some "flattening" of the wires during his examination in China.  Since he prepared no documentation of which wires had sustained such damage and which cranes received those wires, it is likely that the luffing wire of crane No. 4 exhibited damage at the time of the retrofit in China.

5. By visual examination of the photographic images of the failed luffing wire of crane No. 4, taken subsequent to the casualty on 29th July 2000, it is evident to the undersigned that there were damaged wire strands in areas separate from the point of failure. This clearly demonstrates the existence of damage prior to failure and the lack of wire lubricant on the surfaces of the internal wire strands is evidence of lack of proper inspection and maintenance by the ship's personnel.

6. During the course of the investigation subsequent to the incident, the Master was unable to provide certification for the crane wires until such time as the arrival of Mr. Patapis on behalf of Eternity Shipping and Eurocarriers. It is the opinion of the

London Offshore Consultants, Inc.
"Leon 1" for Asperger & Carraher

Our Ref: LOCF/6068/KPH
9th June 2004

undersigned that the crane wire certificates were not on the vessel at the time of the incident and, contrary to the statements made by Mr. Graham, no evidence has been produced that they were available for review at the time of the retrofit in China.

London Offshore Consultants, Inc.
"Leon 1" for Asperger & Carraher

Our Ref: LOCF/6068/KPH
9th June 2004

## OPIINION No. 2:

A significant factor that contributed to the failure of the luffing wire of crane No. 4 was lack of proper maintenance to the deck cranes in their entirety, in accordance with the manufacturer's recommendations contained in the IHI instruction manual, a copy of which was found on board at the time of the investigation subsequent to the incident. It is the opinion of the undersigned that proper preventive and corrective maintenance of the deck cranes and their associated equipment was not conducted by the ship's staff during the period from the time the vessel disembarked the repair facility in China up until the time of the incident.  The vessel's owners/managers failed to adopt and employ a routine planned maintenance and/or condition-based maintenance schedule, and failed to provide necessary parts for proper maintenance and operation of the cranes.

## BASIS OF OPINION No. 2:

1. During the course of a telephone interview conducted on the 19th November 2003, the ship's electrician, Mr. Warlinski, stated that, in his opinion, the deck cranes were in a "bad" condition when he joined the vessel in January 2000 to commence his term of contract, and that this condition was never corrected or improved up to the date of the incident.

2. During the course of the telephone interview conducted on the 19th November 2003, Mr. Warlinski stated that, during the period of his contract from January 2000 up until the date of the incident, the cranes were the subject of constant malfunction and attempted repairs. The problems described by the ship's electrician include:

λ The No. 4 crane jib should have had three levels, but it skipped over the middle speed level, passing from the first speed level to the third speed level.

λ There was a lack of necessary spare parts for the crane onboard the vessel.  One result of this was that parts were taken from one crane to repair another, in an attempt to keep the cranes operational.

λ There was a problem with the brake on crane No. 4.

4

London Offshore Consultants. Inc.  
"Leon 1" for Asperger & Carraher

Our Ref: LOCF/6068/KPH  
9th June 2004

3. During the course of the telephone interview conducted on the 19th November 2003, Mr. Warlinski stated that he had repeatedly notified the vessel's Chief Engineer of the problems associated with the deck cranes, the lack of necessary spare parts on board and the insufficient quantity of spare crane parts placed on order, particularly to electrical contacts.

London Offshore Consultants, Inc.
"Leon 1" for Asperger & Carraher

Our Ref: LOCF/6068/KPH
9th June 2004

## OPINION No. 3:

It is the opinion of the undersigned that the failure of No. 4 crane luffing wire could have been prevented if the vessel owners had acted in a diligent manner by gainfully seeking the guidance, expertise and supervision of a technical representative of the crane manufacturer during the period of retrofit in China, as was recommended by the manufacturer in its instruction manual.

## BASIS OF OPINION No. 3:

1. By the admission of the representative for the vessel's owners/managers, the decision to remove the deck cranes from the "Yannis K" and retrofit them to the "Leon 1" was driven by economic reasons. Additionally, he stated that the retrofit would make the "Leon 1" more attractive to charterers by transforming the vessel from a "gearless" to a "geared" vessel, i.e., one with deck cranes.

2. The IHI manual, which was onboard, clearly recommends that services of a qualified IHI technician should be used when any work is to be performed on the cranes. The vessel's owners/managers chose to ignore this recommendation during the retrofit, installation and testing of cranes, including No. 4, in China, as well as any work performed after the vessel disembarked China up until the date of the incident.

London Offshore Consultants. Inc.
"Leon 1" for Asperger & Carraher

Our Ref: LOCF/6068/KPH
9th June 2004

## OPINION No. 4:

A factor that contributed to the failure of No. 4 deck crane luffing wire was the inability of the safety limit switch to operate properly. This switch prevents the jib from exceeding the crane manufacturer's maximum recommended raised position of 78°. It is the opinion of the undersigned that the failure of the luffing wire may have been prevented by the vessel's owners/managers having in place a policy requiring function testing of the crane's safety devices prior to raising the two men aloft. The vessel's owners/managers failed to provide proper supervision and training on crane operation before permitting Bosun Balita, who had just begun duty on the Leon I, to commence operation.

## BASIS OF OPINION No. 4:

1. The Code of Safe Working Practices for Merchant Seamen, issued by the Maritime Coastguard Agency, clearly states the following in Chapter 21 paragraph 21.2.4:

> "The operator should check safety devices fitted to lifting appliances before work starts and at regular interval thereafter to ensure that they are working properly".

2. In a telephone interview conducted on the 19th November 2003, the ship's electrician, Mr. Warlinski, stated that the safety devices of the deck crane No. 4 were not tested before work commenced on the morning of the 29th July 2000 and no policy for the testing of the safety devices prior to commencing work had been adopted on board.

## OPINION No. 5:

The setting of the upper limit safety switch allowed the operator to raise the jib to an unsafe operating position beyond that intended by the manufacturer, and this improper setting existed on crane No. 4 before Bosun Balita commenced crane operations on 29th July 2000.

## BASIS OF OPINION No. 5:

1.   The vessel's owners/managers failed to have in place a policy requiring function testing of the crane's safety devices prior to raising the two men aloft.

2.   The vessel's owners/managers had no policy in place to secure or restrict access to or tampering with electrical connections and limit switches on No. 4 crane, and access to these critical safety devices was open and unrestricted prior to and at the time of the incident.

3.   The interviews and testimony of Electrician Warlinski reveal that he was responsible for maintenance and/or repairs of the cranes on behalf of the vessel's owners/managers.

4.   There is no evidence in the statement of Bosun Balita, taken by a representative of the vessel's owners/managers on board following the incident, that he adjusted or in any way tampered with the limit switch or electrical contacts or connections for No. 4 crane prior to commencement of operations on 29th July 2000.

5.   There is no evidence Bosun Balita was specifically trained or tested, or that he was informed of the operating defects/limitations of No. 4 crane, before he was instructed to commence operation on the day of the incident.

## OPINION No. 6:

The practice of raising men aloft in a dedicated workbasket was a normal working procedure adopted by the vessel's owners/managers.

## BASIS OF OPINION No. 6:

1. During the course of his deposition, Mr. Patapis stated that a workbasket had been provided to the vessel for the purpose of hoisting crewmembers aloft using the deck cranes for the purpose of gaining access to the hatch coamings for cleaning operations.

2. Since a workbasket had been provided to the vessel and had been routinely in use, it is a reasonable conclusion that working aloft activities employing the deck cranes were conducted by the vessel to the full knowledge and approval of the vessel's owners/managers.

3. In a telephone interview conducted on the 17th November 2003, the vessel's Master stated that it was common practice to raise men aloft in a dedicated workbasket using the ship's deck cranes for the purpose of cleaning hatch internal coamings of the residue of cargoes.

4. In a telephone interview conducted on the 19th November 2003, the vessel's Electrician stated that it was common practice to raise men aloft in a dedicated workbasket using the ship's deck cranes for the purpose of cleaning hatch internal coamings of the residue of cargoes.

London Offshore Consultants, Inc.
"Leon 1" for Asperger & Carraher

Our Ref: LOCF/6068/KPH
9th June 2004

## OPINION No. 7:

It is the opinion of the undersigned that that the failure of the luffing wire could have been prevented if correct and proper supervision of the crane No. 4 operation and maneuvering of the workbasket had been maintained.

## BASIS OF OPINION No. 7:

1. It is evident by examination by the undersigned of the images recorded in the video surveillance footage taken during the morning of 29th July 2000, that no continued supervision of the crane No. 4 operation and maneuvering of the workbasket was taking place.

2. The Code of Safe Working Practices for Merchant Seamen, issued by the Maritime Coastguard Agency clearly states the following in Chapter 21, paragraph 21.2.11, with respect to the supervision of crane operations:

> "Where the operator of the lifting appliance does not have a clear view of the whole of the path of travel of any load carried by that appliance, appropriate precautions should be taken to prevent danger. Generally this requirement should be met by the employment of a competent and properly trained signaler designated to give instructions to the operator. A signaler includes any person who gives directional instructions to an operator while they are moving a load, whether by manual signals, by radio or otherwise."

3. A supervisor should have taken up a position in full view of the crane operator and the workbasket. This would define the position of the supervisor as being on the port side main deck outboard of cargo hatch No. 6A. Review of the surveillance video does not place any person in this position at all times during the hoisting and cleaning operations.

10

London Offshore Consultants, Inc.
"Leon 1" for Asperger & Carraher

Our Ref: LOCF/6068/KPH
9th June 2004

4. During the course of an interview subsequent to the incident, the ship's bosun, who had been operating the deck crane No. 4 and was at the controls of deck crane No. 4 at the time of the incident, stated that he had to stand up in the crane cab in order to look down and see the men in the workbasket. It is reasonable to conclude, therefore, that the workbasket was in such a position in relation to the hatch coaming that the operator had to detach his crane control position in order to make visual contact with the "load" upon his hook assembly. This action clearly illustrates that on the morning of the 29th July 2000, the vessel's owners/managers and ship's officers failed to provide to the crane operator the advice and instruction of a supervisor/signaler for directional instructions.

5. In his signed handwritten statement, the ship's bosun, Mr. Balita, stated "those men told me to slack the runner of the crane". Customary and proper procedures for crane operation would necessitate a supervisor who would give specific operational orders to the crane operator and not by the men in the workbasket.

11

London Offshore Consultants, Inc.
"Leon 1" for Asperger & Carraher

Our Ref: LOCF/6068/KPH
9th June 2004

## OPINION No. 8:

It is the opinion of the undersigned that failure of crane No. 4 luffing wire occurred between 09:24:58 hours and 09:26:31 hours on the morning of 29th July 2000, using the time indicated on the Domino Sugar terminal surveillance video, as a result of the operator attempting to raise the jib whilst slewing the crane to a position of approximately 45° to the ship's centerline. It is also the opinion of the undersigned that the jib had reached the limit of movement and, by operating the hoist lever further in order to get the workbasket closer to the aft internal edge of the hatch coaming, the stresses imposed upon the wire in way of the first sheave after the luffing drum contributed to failure.

## BASIS OF OPINION No. 8:

1. In the video surveillance footage taken during the morning of 29th July 2000 it is evident that between 09:24:58 hours and 09:26:31 hours the deck crane No. 4 was slewed to a position of approximately 45° to the ship's centerline whilst the jib was at the maximum raised position and most probably resting on the stop blocks.

2. In the USCG Marine Casualty Investigation Report, dated 16th April 2001, paragraph 25 states that the crane tower mechanical stops had left visible marks on the jib of crane No. 4. This is confirmed by the photographs.

3. During the attendance of the undersigned to the "Leon 1" at the Harvest States Myrtle Grove Facility, Louisiana, on 8th February 2004, No. 4 deck crane was operated to positions comparable to those depicted in the surveillance video with the jib upper limit safety switch having been disconnected by the ship's electrician. Physical measurement and observation of the position of the crane hook assembly in relation to the hatch coaming was consistent with the position of the jib and wire in the surveillance video from the Domino Facility on 29th July 2000.

12

London Offshore Consultants, Inc.
"Leon 1" for Asperger & Carraher

Our Ref: LOCF/6068/KPH
9th June 2004

## OPINION No. 9:

It is the opinion of the undersigned that, with the crane No. 4 jib in a position hard up against the mechanical stops, the crane operator would not have been able to see the positional angle of the jib.

## BASIS OF OPINION No. 9:

1. During the attendance of the undersigned to the "Leon 1" at the Harvest States Myrtle Grove Facility, Louisiana, on 8th February 2004, No. 4 deck crane was operated to positions comparable to those depicted in the surveillance video with the jib upper limit safety switch having been disconnected by the ship's electrician. The undersigned did enter into the operator's cab at that time and the jib angle indicator was obscured from view by the cab side structure.

13

London Offshore Consultants, Inc.
"Leon 1" for Asperger & Carraher

Our Ref: LOCF/6068/KPH
9th June 2004

## OPINION No. 10:

It is the opinion of the undersigned that the deck cranes, taken from the scrapped vessel "Yannis K' and installed on the "Leon 1" in China in November and December 1999, were unsuitable due to the significant difference in ship construction and were, therefore, unfit for the purposes to which they were put.

## BASIS OF OPINION No. 10:

1. The "Yannis K' and the "Leon 1" were not identical (sister) ships and the deck crane support tower pedestal construction, particularly on No. 4 crane, had to be significantly modified to fit on the "Leon 1" due to the smaller distance between the forward and aft edges of the cargo hatch coamings.

2. The problems experienced by the ship's electrician in the maintenance of the deck cranes, as described in his telephone interview conducted on the 19th November 2003, were directly related to the fact that the vessel was significantly devoid of spare parts necessary for the safe and efficient operation of the cranes.

3. In an e-mail sent by the vessel to the vessel's owners/managers, dated 18th February 2000, two months after the vessel left the repair facility in China, it is quite evident that the vessel was in need of spare parts and crane motor repair work in order to maintain safe and efficient operation of the cranes.  Based on the documentation produced by the vessel's owners/managers, interviews and testimony of the electrician and master that requests for spare parts were not honored by the vessel's owners/managers, and proper maintenance and upkeep of the cranes was not performed between the time the vessel left China and the incident on 29th July 2000.

14

London Offshore Consultants, Inc.
"Leon 1" for Asperger & Carraher

Our Ref: LOCF/6068/KPH
9th June 2004

## OPINION No. 11:

In issuing a certificate and endorsing the ship's cargo gear register on the 20th December 1999, it is the opinion of the undersigned that the attending surveyor for ABS, Mr. Roy Graham, had no basis for attesting to the satisfactory condition and the suitability of the deck cranes.

## BASIS OF OPINION No. 11:

1. The problems experienced by the ship's electrician in the maintenance of the deck cranes, as described in his telephone interview conducted on the 19th November 2003, were directly related to the fact that the vessel was significantly devoid of spare parts for the safe and efficient operation of the cranes. In this respect, proper maintenance of the cranes was impossible and, therefore, the validity of the certificate is questionable.

2. It is a Class requirement that certified loads, or alternatively, loads accompanied by a certified load cell, are used in the proof load testing of cranes. In his deposition, Mr. Roy Graham stated that a concrete block, alleged to be of a weight equal to that of the required proof load, was used in the repair facility in China in December 1999.

3. By his own admission, Mr. Roy Graham has stated that the full and proper operation of the cranes under proof load test was not carried out at the request of the owner's attending representative for fear of damaging the cranes.

4. Based on the documentation and testimony available, the undersigned would question whether Mr. Graham was authorized or qualified by ABS to conduct cargo gear surveys.

Kevin P. Hislop
For and on behalf of London Offshore Consultants, Inc.
14th June 2004