IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| IN THE MATTER OF <br> THE COMPLAINT OF <br> ETERNITY SHIPPING, LTD. AND <br> EUROCARRIERS, S.A. <br> FOR EXONERATION FROM OR <br> LIMITATION OF LIABILITY | * <br><br> *    Civil Action No.: L01CV0250 <br><br> * <br><br> * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## THIRD-PARTY PLAINTIFFS' AMENDED RESPONSE TO AMERICAN BUREAU OF SHIPPING'S MOTION FOR SUMMARY JUDGMENT

NOW COME the Third-Party Plaintiffs, TATE & LYLE NORTH AMERICAN SUGARS, INC. ("Tate & Lyle") and Josefina Gonzalez, Individually and as Personal Representative of the Estate and Beneficiaries of Juan Gonzalez, Jr., Deceased ("Gonzalez), by and through their attorneys, ASPERGER ASSOCIATES LLC, and BRUNKENHOEFER & ASSOCIATES, P.C., and respond to American Bureau of Shipping's ("ABS") Motion for Summary Judgment and Memorandum in support thereof ("ABS Memo") as set forth herein.

### Introduction

The Third-Party Plaintiffs have alleged causes of action against ABS for negligence, breach of warranty of workmanlike performance and third-party beneficiary. Summary judgment is not appropriate on any of the three counts against ABS, as there are genuine issues of material fact in dispute on each.

ABS had a duty to the Third-Party Plaintiffs to perform its inspections and surveys of the M/V Leon I in a non-negligent fashion, and its failure to abide by that duty was a proximate cause

of the injuries and damages sustained by the Third-Party Plaintiffs. Third-Party Plaintiffs were the intended and foreseeable third-party beneficiaries to the contract between ABS and Limitation Plaintiffs Eternity Shipping Ltd. ("ESL") and Eurocarriers, S.A. ("EC") (collectively "ESL/EC"). ABS breached the warranty of workmanlike performance inherent in its contract with ESL/EC, and that breach was also a proximate cause of the injuries and damages sustained by the Third-Party Plaintiffs.

It is the burden of ABS to demonstrate the absence of any genuine factual issues, and they have failed to meet their burden. *See Celotex v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552 (1986). The evidence set forth in this memorandum, and all inferences that can be drawn from that evidence, preclude summary judgment for ABS.

## Statement of Facts

1.  At the relevant times of 1999 and 2000, the M/V Leon I was owned, operated, managed and/or otherwise controlled by Limitation Plaintiffs Eternity Shipping Ltd. and Eurocarriers, S.A.. (Exhibit A[1], ¶¶ 1-2.)

2.  The M/V Leon I was originally a gearless bulk carrier. Eurocarriers decided to retrofit the M/V Leon I with cranes salvaged from another vessel it was scrapping, the M/V Yannis K, so as to increase the market value of the M/V Leon I. (Exhibit B, pp. 13, 93-94)

3.  ABS was contracted by ESL/EC to provide technical guidance and approval of the plans and design specifications for the installation and modification of the cranes being retrofitted

---

[1] Exhibits A-J to this Response Memorandum previously were filed with the Court as an attachment to Third-Party Plaintiffs' Original Response to American Bureau of Shipping's Motion for Summary Judgment, which was filed November 8, 2004. Only Exhibits K and L are being filed with this Amended Response.

2

onto the M/V Leon I. The plans and specifications were submitted by ESL/EC to the ABS technical division in Piraeus, Greece, commonly referred to as "ABS Piraeus." Representatives of EC had several meetings with ABS technical staff, who made a series of corrections and recommendations regarding the design and installation of the scrapped cranes aboard the M/V Leon I. (Exhibit B, pp. 29-30, 38-41.)

    4.    Extensive modifications of the crane foundational structures was required, as the M/V Yannis K and the M/V Leon I were not identical. In order to install the cranes, the deck crane support tower pedestals had to be modified to fit the M/V Leon I, which had a smaller distance between the forward and aft edges of the cargo hatch coamings. (Exhibit C, Opinion 9, Basis 1.)

    5.    Crane #4 on the M/V Leon I, as modified and approved by ABS for the retrofit, had an insufficient minimum radius for the hook to reach all of the hatch, which necessitated the practice of hoisting crewmen aloft to reach those sections of the hatch the hook could not reach. (Exhibit D, pp. 304-305; Exhibit C, Bases for Opinion 6.)

    6.    ABS Piraeus determined that because the cranes were certified by ABS when on the M/V Yannis K, they qualified as "existing cargo gear" for purposes of inspection and testing when retrofitted on the M/V Leon I. (Exhibit E, pp. 18, 73-76.)

    7.    As "existing cargo gear" under ABS guidelines, ESL/EC were not required to submit to ABS drawings of the crane's mechanics or structural mechanisms above the pedestals as altered for retrofitting on the M/V Leon I. (Exhibit E, pp. 73-76.)

    8.    ABS was also retained by ESL/EC to perform all necessary inspections and surveys of the installation of the old cranes on the M/V Leon I. In November and December 1999, ABS Surveyor Roy Graham attended the M/V Leon I at the Da Dong Shipyard in China to conduct an

3

Annual Cargo Gear Survey and a Retesting Cargo Gear Survey of the four cranes retrofitted aboard the vessel. (Exhibit B, pp. 43-44; Exhibit E, pp. 17-18, 52-53.)

9. ABS certified the cranes for installation on the vessel, and Mr. Graham oversaw the installation. After installation and operational and load testing, the cranes were certified for use. Mr. Graham claims he also inspected the unsheaved wire ropes for the cranes and certified the wire ropes as undamaged and acceptable for safe use in the operation of the vessel. (Exhibit E, pp. 18, 24, 71-72.)

10. Mr. Graham's survey of the retrofitted cranes installed on the M/V Leon I did not disclose that the cranes did not allow the crane operator a clear, reliable and visual indication of the jib angle at all angles of operation, nor did it verify the setting of all safety and limiting devices on the cranes in accordance with the crane manufacturer's recommendations. (Exhibit C, Opinion. 9; Group Exhibit F.)

11. Mr. Graham's survey did not assess or note that the retrofitted cranes, as approved by ABS, restricted the cranes' jibs from reaching all areas of the hatches. (Exhibit G, pp. 217-218.)

12. In the course of his survey and inspection, Mr. Graham did not discover or note that the luffing wire rope for crane #4 was flattened, corroded, and otherwise damaged. (Group Exhibit F; Exhibit K, pp. 133-134.)

13. Mr. Graham took no measurements of the wire ropes, and did not discover nor disclose in his survey and inspection reports that the wire rope for crane #4 failed to comply with the diameter recommended by the crane manufacturer for use on these cranes, or that the diameter of the wire rope reinstalled on crane #4 was different from the diameter of the wire ropes reinstalled on the other three cranes. (Group Exhibit F.)

14. Mr. Graham noted flattening of the wire rope but did not indicate where on the luffing wire rope that flattening was located, and did not take any further action to assess or address the flattening, and he made no recommendations to the ship's owners. (Exhibit E.)

15. On July 29, 2000, the M/V Leon I was discharging bulk sugar at Tate & Lyle's Domino Sugar refinery on Baltimore's Inner Harbor. (Exhibit A, ¶ 6.)

16. Domino's twin shoreside gantry cranes were being used for the discharge operation. As discharge was proceeding in hatch 6, the M/V Leon I crew began using the ship's crane #4 to clean caked sugar from the aft coaming of adjacent hatch 6A. (ABS Memo ¶52, ABS Exhibit A.)

17. Two of the ship's crew, one of whom was Gonzalez' decedent, Juan Gonzalez, Jr., were suspended over hatch 6A in a work basket chipping sugar from the portside aft coaming when the luffing wire rope of crane #4 suddenly failed and parted, resulting in the collapse of the jib of crane #4 and the deaths of Juan Gonzalez and a fellow crew member. During its collapse, the #4 crane jib struck Domino's crane #2, causing its boom to collapse into adjacent hatch #6, resulting in Tate & Lyle sustaining over $12 million in property damage and business income loss. (ABS Memo ¶53, ABS Exhibit B; Exhibit I.)

18. There is no evidence that the crane #4 wire rope was replaced between its installation in the Da Dong shipyard in November/December 1999 and the incident and deaths in July 2000. The wire rope inspected by Mr. Graham at the Da Dong shipyard in 1999 is the same wire rope that subsequently failed.

19. At the time of the July 2000 incident, the crew were unable to produce the wire rope certificate for the luffing wire of crane #4. (Exhibit C, Opinion 1, Basis 6.)

20.     When the luffing wire rope certificate for crane #4 was subsequently produced by the Limitation Plaintiffs, it revealed that the #4 luffing wire diameter was not that recommended by the crane manufacturer, and was of a different diameter than the luffing wires on the other three cranes. (Exhibit C, Opinion 1, Basis 6; Exhibit K, pp. 131-132.)

21.     Prior to the July 2000 casualties, the jib angle indicator on crane #4 was inoperable. Upon inspection immediately following the July 2000 incident, it was discovered that the limit switch for the maximum jib angle on crane #4 was in a position that made it physically impossible to adjust it further inboard, unlike the limit switches for the other cranes on the M/V Leon I. (Exhibit K, pp. 163-164.)

22.     The ABS surveyed the M/V Leon I following the July 2000 incident and required that the luffing wire ropes for cranes #1 - 3 be tested or renewed, and that all safety limit devices be tested. (Exhibit L.)

Third-Party Plaintiffs do not dispute the facts set forth by ABS in paragraphs 1-17 of the ABS Memo. To the extent that paragraphs 18-68 state facts derived from reliable sources, those are also not disputed. However, to the extent that paragraphs 18-68 are tailored and biased toward ABS' interpretation of evidence, Third-Party Plaintiffs rely upon their own Statement of Facts, above.

### Summary Judgment Standards Under FRCP 56

A motion for summary judgment requires the court to assess whether a genuine issue of material fact exists by reviewing the evidence in the light most favorable to the party opposing the motion. *Inst. for Shipboard Educ. v. Cigna Worldwide Ins. Co.*, 22 F.3d 414, 418 (2nd Cir. 1994), citing to *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2510 (1986). Federal

Rule of Civil Procedure 56(c) provides for summary judgment of a claim when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c).

Summary judgment is appropriate only when the non-moving party has failed to set forth any facts that go to an essential element of the claim. *King v. Crossland Sav. Bank*, 111 F.3d 251, 259 (2nd Cir. 1997). The question is whether there is sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party. *Anderson,* 477 U.S. at 251, 106 S. Ct. at 2512. In evaluating the sufficiency of the Third-Party Plaintiffs' evidence in support of its claims against ABS, this Court "must proceed cautiously." *Brady v. Colchester*, 863 F.2d 205, 211 (2nd Cir. 1988). If reasonable minds could differ as to the import of the evidence, and "if . . . there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 258 (3rd Cir. 1983), *rev'd on other grounds sub nom.*

### Genuine Issues of Material Fact

There are numerous issues of material fact which preclude summary judgment for ABS. In addition to the factual discrepancies set forth in the Statement of Facts, above, witness credibility is an issue in this case. ABS relies heavily upon the deposition testimony of its surveyor, Roy Graham, to substantiate the facts it believes are in its favor. However, Mr. Graham's credibility is at issue. In his statement to the Coast Guard two months after the July 2000 incident, Mr. Graham recalled few specifics of his survey of the M/V Leon I. As to the wire ropes on the retrofitted cranes, Graham vaguely recalled:

> "The wires were ... inspected as they were laid out on the ground during most of this process ... I looked at them as much as I ... could, I didn't look at them with a magnifying glass from one end to the other, but I ... generally inspected them from one end to the other."

(Statement of Roy Graham, September 25, 2000, Exhibit J.)

Nearly two years later at his deposition, Mr. Graham's memory had remarkably improved:

> "I saw the wire ropes – I saw some of the wire ropes when they were being installed on the cranes and got another look at them then, and then after completion of all the wire rope installations, when I did a general inspection of the drums and the machinery rooms of the cranes, and the pullies and the shivs and all that, I did complete another survey of the working gear and got another look at the wires again. ... No defects were noted."

(Exhibit E, pp. 115-116.)

Summary judgment is inappropriate if an issue depends upon the credibility of witnesses, because such credibility can best be determined after the trier of fact observes the witnesses' demeanor. *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979). As Mr. Graham's credibility goes directly to the heart of ABS' liability to the Third-Party Plaintiffs, it raises genuine issues of fact which preclude summary judgment.

Contrary to ABS' title for this section of its Memorandum, most of the "Undisputed Facts" are disputed and/or incomplete. Of the 68 paragraphs of "Undisputed Facts," 30 are derived from testimony of ABS employees or ABS internal documents. For nine of the statements, ABS relies upon the Affirmation of Joseph C.A. Fortin, ABS Assistant Chief Surveyor. (*See* ABS Memo, ¶¶ 7-14, 17.) Although undoubtedly knowledgeable on the subject of ABS and the surveys it conducts, Mr. Fortin is not the appropriate fact finder to decide the duties and obligations of the parties to this lawsuit, contrary to many of the statements in his affidavit. However helpful it may be for ABS to

have its own surveyor make conclusive statements, it does not raise them to the status of "undisputed facts."

ABS also bases its facts on its own internal documents and guidelines, which it creates to govern the surveys it conducts. (*See, e.g.,* ABS Memo, ¶13, 15-17, 43-45.) Inherently self-serving, these documents and guidelines are a source of information in this litigation, but are neither "undisputed" nor credible legal conclusions.

### ABS is Liable to Third-Party Plaintiffs for Negligence

Tate & Lyle alleges three counts against ABS in its complaint: negligence, breach of warranty of workmanlike performance, and third-party beneficiary. There is **no** claim for negligent misrepresentation. In a negligent misrepresentation claim, a necessary element is plaintiff's reliance upon inaccurate information supplied by the defendant. ABS spends a large part of its memorandum arguing that Tate & Lyle cannot satisfy the reliance element of a negligent misrepresentation claim. (*See* ABS Memo, pp. 19-29.) As Tate & Lyle **has not** made a claim for negligent misrepresentation, this entire argument by ABS is rhetorical.

The elements of negligence in Maryland are in line with general negligence principles. On a claim of negligence, a plaintiff must prove that: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the breach by the defendant was the actual and proximate cause of a demonstrable injury suffered by the plaintiff. *Prof'l Communications, Inc. v. Contract Freighters, Inc.*, 171 F. Supp. 2d 546, 552 (D. Md. 2001). In admiralty, a duty of care arises if the injury is foreseeable from the alleged negligent action. *Commercial Union Ins. v. Bohemia River Assoc.*, 855 F. Supp. 802, 806 (D. Md. 1991).

ABS goes to great lengths in its memorandum to deny any legal duty for its failed survey and the losses that resulted, yet the evidence is to the contrary. As quoted by ABS, their own 1991 Guide for Certification of Cranes, Rule 1.7, provides that "[c]ertification is a representation by the Bureau as to the fitness of the crane for a particular use or service in accordance with its Rules, Guides and standards." (ABS Memo at 7; ABS Memo Exhibit G-5.) ABS certified the retrofitted cranes and their wire ropes aboard the M/V Leon I, *even though same were not fit for their intended use.* (*See* Hislop Report, Exhibit C.)

In addition to ABS' liability under a general negligence theory, there is also sufficient evidence to establish that ABS is liable under the Good Samaritan doctrine, which provides:

> Sec. 324A. Liability to Third Person for Negligent Performance of Undertaking. One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if:
>
> (a)   his failure to exercise reasonable care increases the risk of such harm, or
>
> (b)   he has undertaken to perform a duty owed by the other to the third person, or
>
> (c)   the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A. ABS falls squarely within this doctrine. It provided its services to Limitation Plaintiffs knowing that third-parties such as the Third-Party Plaintiffs rely upon the classification society's registration and/or certification of vessels and their cargo gear for a variety of purposes, the most important of which is safety and the prevention of casualties such as the one here. Ships such as the M/V Leon I would not be able to trade without classification society registration and certification.

The point was clearly and unequivocally made by the President of the American Bureau of Shipping:

> At ABS, and I am sure my colleagues will confirm that the same applies within their own organizations, we are very aware of the range of our responsibilities. These encompass not only shipowners but also insurers, bankers, flag states, port states, charterers, seafarers and, particularly when it comes to protection of the environment, the general public.

The Classification Society in the Year 2000, Marine Log, Apr. 1997, at 80. The American Bureau of Shipping, Rules for Building and Classing Steel Vessels (1996 ed.) provides:

> The mission of the American Bureau of Shipping is to serve the public interest as well as the needs of our clients by promoting the security of life, property and the natural environment primarily through the development and verification of standards for the design, construction and operational maintenance of marine-related facilities.

(*See* ABS Rules, pt. 1 inside cover.)

ABS' reliance upon *Sundance Cruises Corp. v. The American Bureau of Shipping*, 799 F. Supp. 363 (S.D.N.Y. 1992), *aff'd* 7 F.3d 1077 (2nd Cir. 1993) is misplaced. In *Sundance*, the court declined to find in favor of the shipowner for indemnification against a classification society because of concern that such a ruling would transfer the shipowner's non-delegable duty to provide a seaworthy ship as to the seaman from the shipowner to the classification society. While a seaman can prevail against the shipowner under an unseaworthiness standard pursuant to the "Jones Act," 46 U.S.C. §688 *et seq*, and cargo owners can recover under the potentially no-fault standard of The U.S. Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §1300 *et seq*, Tate & Lyle is neither a seaman nor cargo owner with respect to the shipowners and ABS. The claim is for negligence. This is not a shipowner or seaman case under which there are potential no-fault standards such as unseaworthiness. While an unseaworthiness claim can impose liability on a shipowner without fault,

11

the same is not true with a claim for negligence.

The negligence claim against ABS arises out of its services provided to ESL/EC during the 1999 survey of the M/V Leon I and the retrofitting of the cranes from the scrapped vessel. There is no attempt here to impose upon ABS liability without fault, as was the concern of the Court in the *Sundance* case. This distinguishing fact makes *Sundance,* and similar cases cited by ABS in its memo, inapplicable to the Third-Party Plaintiffs' negligence claims.

The duty and breach by ABS is fully supported by the evidence in this case, as are the elements of proximate cause and damages. Marine expert Kevin Hislop concluded that the defects which caused the luffing wire on crane #4 to part existed at the shipyard in China in 1999, and were not adequately addressed at that time. (Exhibit C, Opinion 1.) The same opinion by Mr. Hislop states that "the existence of these defects caused and/or contributed to the final failure of the luffing wire of crane no. 4 on the 29th, July 2000." *Id.* Mr. Hislop's opinions corroborate those of the United States Coast Guard, set forth in detail above.

### Breach of Warranty of Workmanlike Service

The origin of the warranty of workmanlike performance is the Supreme Court decision in *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 76 S. Ct. 232 (1956). In that case, the Court found that a stevedoring company owed an injured longshoreman a warranty of workmanlike performance under the stevedoring contract with the shipowner. The Supreme Court has analogized this stevedore's warranty to that of a manufacturer, who expressly or impliedly guarantees the fitness of his product for normal use. *See Ryan,* 350 U.S. at 133 - 134, 76 S. Ct. at 237; *Crumady v. Joachim Hendrik Fisser*, 358 U.S. 423, 428 - 429, 79 S. Ct. 445, 448 (1959); and *Italia Societa v. Oregon Stevedoring Co.*, 376 U.S. 315, 318 - 319, 84 S. Ct. 748, 750-751 (1964).

In the context of a stevedoring contract with a shipowner, the warranty is breached if the actions of the stevedore create an unseaworthy condition on the vessel, thereby causing the shipowner to be liable to the longshoreman for his injuries, and providing for "*Ryan* indemnity" of the longshoreman's employer to the vessel.

The 1972 amendments to the Longshoremen and Harbor Workers Compensation Act (LHWCA), 33 U.S.C. § 905(b), which substituted a negligence remedy for its longshore workers instead of unseaworthiness, abolished only the vessel or shipowner's indemnification aspect of *Ryan*, so that the warranty of workmanlike performance lived on with respect to other marine service contracts. *Fairmont Shipping Corp. v. Chevron Int'l Oil Co., Inc.*, 511 F.2d 1252, 1259, 1975 A.M.C. 261 (2d Cir. 1975). Between parties to a maritime service contract, such as the contract between ABS and ESL/EC in this case, there is generally an implied warranty of workmanlike performance. *Commercial Union Ins. Co.*, 855 F. Supp. at 806-807.

The courts have applied the doctrine to a wide variety of maritime contracts to perform services without the supervision or control by the shipowner. In *Sanderlin v. Old Dominion Stevedoring Corp.*, 385 F.2d 79 (4th Cir. 1967), the warranty in the stevedoring contract was extended to maritime employees of the shipowner, and particularly a cargo checker. In *Chisholm v. UHP Projects, Inc.*, 205 F. 3d 731, 2000 A.M.C. 1050 (4th Cir. 2000), the warranty of workmanlike performance was applied to a contract between the shipowner and a company contracted to clean the ballast tanks of the vessel. It so happens in both cases that the warranty was applied in favor of an injured crewmember.

In *Royal Embassy v. Ioannis Martinos*, 1986 A.M.C. 772 (E.D.N.C. 1984), the Court applied the warranty for workmanlike performance to the services of marine surveyors who had approved the stowage of containers on the vessel which ultimately came loose at sea and were lost overboard. The Eastern District of North Carolina distinguished *Great American Ins. Co. v. Bureau Veritas*, 338 F.Supp. 999, 1972 A.M.C. 1455 (S.D.N.Y. 1972), the case on which ABS primarily relies to support its argument that the warranty of workmanlike performance is not extended to contracts with classification societies. The court in *Royal Embassy* noted that the U.S. District Court for the Southern District of New York in *Great American* had discussed at length the applicability of the doctrine of implied warranty of workmanlike services to a marine surveyor's contract and was reluctant to apply the *Ryan* theory to survey and classification of ships because of the nature of these functions. The *Royal Embassy* court noted further in its analysis that if the service involved building or placing something on board the ship, as here, such service would be considered comparable to a "product". In its analysis, the *Royal Embassy* court found the warranty would apply and quoted *Great American* as follows:

> In cases applying *Ryan*, therefore, the service has involved either building or placing something on board ship which, by implication at least, is comparable to a product. Furthermore, the service must be one that, if poorly performed, may foreseeably cause injury. For example, a stevedore in the course of its service creates the "product" of stowed cargo. It is also "foreseeable" that if a stevedore's services are improperly performed, thereby rendering the stowage unsafe, some injury may result. Yet if one assumes *arguendo* that a poorly performed survey may foreseeably cause injury, it does not follow that the activities of the society will create any condition on board a vessel even vaguely resembling a "product". This is so because the heretofore noted fact that a classification society is virtually powerless to perform any acts or create any conditions upon a vessel; it can only recommend that the owner or charterer do so.

1986 A.M.C. at 782, citing *Great American*, 338 F. Supp. at 1015. The *Royal Embassy* court distinguished the services of the marine surveyor, stating:

> In the case at bar, however, the third party plaintiff's evidence tends to show more activity on the part of the surveyors than merely observing and reporting. This evidence, although disputed, indicates that the marine surveyors actually oversaw and directed the stowage of the cargo in liaison with the stevedore and the charterer. Their conduct took on the nature of active involvement, which allegedly created an unseaworthy condition on board the vessel. Accordingly, under the *Great American* analysis, the implied warranty of workmanlike service can extend to the marine surveyors on the particular facts of this case.

*Id.*

Like the surveyors in *Royal Embassy*, Mr. Graham of ABS admits he actively oversaw and directed the rebuilding and retrofit of the cranes on the M/V Leon I in the shipyard in late1999. Indeed, that was the sole reason for his ongoing presence at the shipyard during the retrofit. His responsibilities included ensuring that the installation was in accordance with ABS plans and drawings. He inspected the wire rope and the machinery as part of the renovation of the cranes, approving the components for use with the rebuilt cranes, thus creating the unseaworthy condition which ultimately caused the damages to the Third-Party Plaintiffs. It is certainly clear that the activities of the ABS surveyor in this case were substantially similar to the activities of the surveyors in the *Royal Embassy* case. The conclusion to be drawn is inescapable — the implied warranty of workmanlike service must be applied to the contract between ABS and Eurocarriers to which Third-Party Plaintiffs were intended beneficiaries.

### Third-Party Beneficiary

The Third-Party Plaintiffs' breach of warranty of workmanlike performance and third-party beneficiary counts against ABS are related in that neither Gonzalez nor Tate & Lyle is a party to the

contract between ESL/EC and ABS, and therefore cannot take advantage of ABS' breach of the warranty of workmanlike performance in that contract unless they qualify as a third-party beneficiary. *Nathaniel Shipping Inc. v. Gen. Elec. Co.*, 920 F.2d 1256, 1263-64, 1994 A.M.C. 1520 (5th Cir. 1991).

The courts have made it clear that the warranty extends beyond the immediate contracting parties and encompasses foreseeable third parties. In *Crumady v. Joachim Hendrik Fisser*, 358 U.S. 423, 79 S. Ct. 445 (1959), even though the stevedoring contract was between the charterer and the stevedore, the shipowner was awarded indemnification on account of the warranty. The *Crumady* court essentially followed the manufacturer's warranty case of *MacPherson v. Buick Motor Co.*, 217 N.Y., 382, 111 N.E. 1050 (1916), holding that a manufacturer's warranty extends beyond the immediate purchaser to all foreseeable victims of a breach.

"To be a third-party beneficiary of a contract, one must be within the group of persons that the contract was intended to benefit. The members of this group depend on the intention of the parties to the contract." *Skibs A/S Gylfe v. Hyman-Michaels Co.*, 304 F. Supp. 1204, 1211 (E.D. Mich. 1969), *aff'd* 438 F. 2d 803 (6th Cir. 1971).

The Fourth Circuit has provided a broader definition for third-party beneficiaries to the warranty of workmanlike performance in marine service contracts. In *Sanderlin v. Old Dominion Stevedoring Corp.*, 385 F.2d 79, 81-82 (4th Cir. 1967), the court held that the stevedores' warranty extends directly to employees of the shipowner since as "foreseeable third parties" they fall within the "zone of responsibility." In *Salter Marine, Inc. v. Conte Carriers & Terminals, Inc.*, 677 F.2d 388, 390 (4th Cir. 1982), the Court found it was "unquestionably foreseeable that the owner and charterer of the tug might be injured if the stevedore performed improperly," therefore finding them

to be foreseeable third-party beneficiaries to the warranty.

As was done in *Royal Embassy*, this Court must look at the status and relationship among the parties to determine who is entitled to pursue a claim for relief based upon breach of implied warranty of workmanlike service or performance. *See also Messina v. Ocean Repair*, 1994 A.M.C. 402, 411 - 417 (S.D.N.Y. 1993).

This Court must determine whether there is legally sufficient evidence that the parties to the contract, ABS and ESL/EC, intended to confer a benefit on the third-parties directly impacted by their contract and/or whether it was foreseeable that those third-parties might be injured if ABS performed improperly. Those third-parties may include not only the Third-Party Plaintiffs, but also other charterers, shoreside property owners, marine terminals, and stevedores. Caution must be exercised when making a determination of intent to confer a benefit on third-parties as it involves a finding of fact that is rarely appropriate for summary judgment. *Resource Dev. v. The Statute of Liberty - Ellis Island Found., Inc.*, 926 F.2d 134, 141 (2d. Cir. 1991); *Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975).

Eurocarriers contracted with ABS to oversee the retrofit of the cranes on the M/V Leon I at the shipyard in China to assure they functioned properly. Functioning properly can only be interpreted as being suitable for their intended use. It was certainly foreseeable that if ABS performed improperly and the cranes did not function in accordance with standards in the industry, marine terminal facilities such as Tate & Lyle in Baltimore where the M/V Leon I would discharge cargo and foreseeably be using the crane, could be damaged if the crane failed.

ABS relies improperly on the third-party beneficiary standard set out in *Cargill Int'l, S.A. v. M/T Pavel Dybenkoi*, 991 F.2d 1012 (2d Cir. 1993) where the Court stated:

> <u>In order to enforce the agreement</u> as a third-party beneficiary, CBV must show that "the parties to that contract intended to confer a benefit on [it] when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to [it]. (emphasis supplied)

*Id.*, at 1019. The agreement referenced in *Cargill* was an arbitration agreement within the charter party to which CBV was not a party. There is clearly a different burden on a third-party to enforce a provision in the contract than the burden of showing it was a foreseeable beneficiary of that contract under the maritime doctrine of warranty of workmanlike performance. Similarly, *Atlantic & Gulf Stevedore v. Ravelle*, 750 F.2d 457 (5th Cir. 1985), discusses third-party beneficiary standards under an entirely different context, primarily dealing with agency law, again where a third-party is attempting to enforce a provision in a contract between a principle and agent. The cases cited by Third-Party Plaintiffs, *Royal Embassy*, *Sanderlin*, *Messina*, and *Salter Marine*, which set forth the standard for a foreseeable beneficiary to a contract under the maritime doctrine, are clearly more instructive to the Court in ruling on this motion.

## Conclusion

WHEREFORE, Third-Party Plaintiffs Tate & Lyle and Gonzalez pray that this Court deny, for the reasons set forth, the American Bureau of Shipping's Motion for Summary Judgment.

| | |
|---|---|
| For Third-Party Plaintiff, TATE & LYLE NORTH AMERICAN SUGARS, INC., | For Third-Party Plaintiff, JOSEFINA GONZALEZ, Individually and as Personal Representative of the Estate and Beneficiaries of Juan Gonzalez, Jr., Deceased, |
| ASPERGER ASSOCIATES LLC | BRUNKENHOEFER & ASSOCIATES, INC. |
| /s/ | /s/ |
| Jeffrey J. Asperger | R. Blake Brunkenhoefer |
| ASPERGER ASSOCIATES LLC | BRUNKENHOEFER & ASSOCIATES, INC. |
| 303 East Wacker Drive, Suite 1000 | 1770 Tower II |
| Chicago, Illinois 60601 | 555 N. Carancahua |
| (312) 856-9901 | Corpus Christi, Texas 78478 |
| | (361) 888-6655 |

## CERTIFICATE OF SERVICE

I, Jeffrey J. Asperger, do hereby certify that a true and correct copy of the above and foregoing document was served via e-mail notification from the District Court and in the manner indicated upon:

Bernard S. Sevel, Esq.
ARNOLD, SEVEL & GAY, P.A.
The B&O Building, Suite 560
2 N. Charles Street
Baltimore, Maryland 21201
*Attorneys for Claimant Robert J. Cantey*
*and Claimant William Langeville*

W. Charles Bailey, Jr., Esq.
SIMMS SHOWERS LLP
20 South Charles Street, Suite 702
Baltimore, Maryland 21201
*Attorneys for Claimant Josefina Gonzales*

James D. Skeen, Esq.
WRIGHT, CONSTABLE & SKEEN, L.L.P.
One Charles Center, 16th Floor
100 North Charles Street
Baltimore, Maryland 21201
*Attorneys for Claimant Robert J. Cantey,*
*William Langeville and*
*Tate & Lyle North American Sugars, Inc.*

M. Hamilton Whitman, Jr.
Eric M. Veit
Charles Diorio
OBER, KALER, GRIMES & SHRIVER
120 East Baltimore Street
Baltimore, MD 21202-1643
*Attorneys for Eternity Shipping*

Francis J. Gorman, P.C.
GORMAN & WILLIAMS
2 North Charles Street
Baltimore, Maryland 21201-3754
*Attorneys for*
*Louis Dreyfus Sugar Company*

James W. Bartlett, III, Esq.
Alexander M. Giles
SEMMES, BOWEN, & SEMMES, P.C.
250 West Pratt Street, 16th Floor
Baltimore, MD 21201-2423
*Attorneys for American Bureau of Shipping*

R. Blake Brunkenhoefer, Esq.
BRUNKENHOFER & REYNA, P.C.
1770 Tower II
555 N. Carancahua
Corpus Christi, Texas 78478
*Attorneys for Claimant Josefina Gonzales*

Robert G. Clyne, Esq.
James A. Saville
HILL, RIVKINS & HAYDEN LLP
45 Broadway, Suite 1500
New York, New York 10006
*Attorneys for American Bureau of Shipping*

in accordance with all applicable provisions of the Federal Rules of Civil Procedure, on this 10th day of January, 2005.

_____/s/_____
Jeffrey J. Asperger