**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)
-----------------------------X
IN THE MATTER OF THE COMPLAINT :
OF ETERNITY SHIPPING, LTD. AND :
EUROCARRIERS, S.A. FOR       : Civil Action
EXONERATION FROM OR LIMITATION : No. L01CV0250
OF LIABILITY                 :
-----------------------------X

Deposition of DAVID H. SMITH
Baltimore, Maryland
Wednesday, September 1, 2004
11:32 a.m.

Job No.: 1-41103
Pages: 1 - 155
Reported by: Beatriz D. Fefel, RPR

**Page 2**

Deposition of DAVID H. SMITH held at the law offices of:

OBER, KALER, GRIMES & SHRIVER
120 East Baltimore Street
11th Floor, Harbor Room West
Baltimore, Maryland 21202-1643
(410) 685-1120

Pursuant to agreement, before Beatriz D. Fefel, Registered Professional Reporter and Notary Public of the State of Maryland.

EXHIBIT 2

**Page 3**

APPEARANCES

ON BEHALF OF TATE & LYLE:
   JEFFREY J. ASPERGER, ESQUIRE
   ASPERGER CARAHER, L.L.C.
   303 East Wacker Drive
   Three Illinois Center
   Suite 1000
   Chicago, Illinois 60601
   (312) 856-9901

ON BEHALF OF THE LIMITATION PLAINTIFFS,
EUROCARRIERS, S.A., AND ETERNITY SHIPPING, LTD.:
   M. HAMILTON WHITMAN, JR., ESQUIRE
   OBER, KALER, GRIMES & SHRIVER
   120 East Baltimore Street
   8th Floor
   Baltimore, Maryland 21202-1643
   (410) 685-1120

**Page 4**

APPEARANCES (CONTINUED)

ON BEHALF OF AMERICAN BUREAU OF SHIPPING:
   JAMES A. SAVILLE, JR., ESQUIRE (via telephone)
   HILL, RIVKINS & HAYDEN, L.L.P.
   45 Broadway
   Suite 1500
   New York, New York 10006-3739
   (212) 669-0600

ALSO PRESENT:
   Kevin P. Hislop

77

1  into the record, please, starting at Line 10? And
2  that -- excuse me. Let me start again. Would you
3  read Mr. Cantey's answer beginning with Line 10?
4      A   "Well, the, the ship boom, when we was in
5  the hold you're not supposed to have -- the ship's
6  crew not supposed to be working when we's in the hold.
7  They're not supposed to have their boom across the
8  hold while we's working in the hold. When they work
9  in the hold, we're supposed to be out."
10     Q   Okay. I'm sorry, finish.
11     A   "When we's in the hold, they don't suppose
12 to have their boom across the hold."
13     Q   And that's the testimony to which you were
14 referring in your prior answers?
15     A   Further on you asked the question: "In
16 other words, that hatch is supposed to be clear?" And
17 then he responded: "Nobody in the hold but us."
18     Q   All right. You missed something, didn't
19 you, sir, in referencing whether he made a distinction
20 between hold and hatches? You skipped some testimony,
21 didn't you? Read the next question and answer
22 following the one that you just read that began at

78

1  Line 10 into the record, please.
2      A   You mean Line 18?
3      Q   Yes, sir.
4      A   Okay. "In other words, that hatch is
5  supposed to be clear."
6      Q   Who stated that, that hatch is supposed to
7  be clear?
8      A   That was Mr. Cantey.
9      Q   So do you draw the conclusion upon which you
10 base your opinions and conclusions in this case that
11 Mr. Cantey made a distinction between hatches and
12 holds in his testimony?
13         MR. WHITMAN: Objection to the
14 characterization upon which you base your conclusions
15 and testimony in this case.
16     A   My conclusions and testimony are not based
17 upon purely Mr. Cantey's deposition.
18     Q   And that wasn't my question. My question
19 is -- let me put it this way. To the extent that you
20 rely at all upon Mr. Cantey's testimony, is it your
21 testimony today that Mr. Cantey makes a clear
22 distinction between hatches and holds when he is

79

1  discussing this subject?
2      A   I don't believe he does.
3      Q   Thank you.
4          Do you have an understanding, Mr. Smith, of
5  why stevedores would be concerned about working in a
6  hatch over which a ship's crane and men are working?
7      A   Yes.
8      Q   What is that?
9      A   Well, for safety reasons.
10     Q   What safety reasons?
11     A   Safety reasons that if the coordination of
12 the ship's crane and the shore crane is such that no
13 coordination or that the movement of either, of either
14 crane is such that they could collide or, as in this
15 case, if one crane collapses, it could collapse on the
16 other one, it would definitely be an issue of concern
17 to me as a stevedore.
18     Q   Okay. And do any of the stevedores or, in
19 fact, any of the people who are working in the ship's
20 hatches or holds indicate that that was their concern?
21     A   The crane operator definitely was concerned,
22 Langville.

80

1      Q   That's not my question.
2          MR. WHITMAN: Listen carefully to the
3  question.
4      Q   My question was --
5          MR. WHITMAN: It's a very refined question.
6      Q   Right. Any of the personnel working within
7  the hold or within the space of the hatch who
8  expressed their concern about two cranes somehow
9  contacting one another?
10     A   No.
11     Q   Do you have any other opinion as to why
12 stevedores working in a hold or a hatch would be
13 concerned about a crane and other ship's personnel
14 working above them?
15         MR. WHITMAN: Objection. May I bring up a
16 question of definition?
17         MR. ASPERGER: Sure.
18         MR. WHITMAN: Stevedore in my understanding
19 is typically the employer. Longshoreman is typically
20 the individual person or the persons. And since you
21 have raised a distinction between ILA and Domino and
22 so forth, I don't want to get into a situation where

**Page 81**

1  the issue of whether stevedore means employer or
2  individual becomes somehow muddled.
3      MR. ASPERGER: And it was not my intention
4  to muddle it.
5      MR. WHITMAN: I know it was not.
6      MR. ASPERGER: And I believe the terms have
7  been used interchangeably throughout.
8      MR. WHITMAN: Until today they have.
9      MR. ASPERGER: That's fine. And I accept
10 your qualification. But the question -- that is not
11 really significant to my question, but I accept your
12 distinction.
13 BY MR. ASPERGER:
14   Q  The question is any personnel working in a
15 hold under a hatch opening over which the ship's crane
16 and personnel are also working, what is it in your
17 opinion that would be the concern of those personnel
18 working below the area where the ship's crane and its
19 personnel are working?
20   A  Well, I'd be concerned that if the -- if
21 there was an accident with the ship's crane, the
22 ship's crane could collapse on top of their heads.

**Page 82**

1  I'd be concerned if the ship's crane is suspending, as
2  in this case, a workbasket, the workbasket could fall
3  down, or the men working in the workbasket could drop
4  something on their heads.
5      Q  All right. Of those three concerns, upon
6  what do you base your statement that men working in a
7  hatch area over a hold would be concerned that the
8  ship's crane may collapse on their heads?
9      A  There's nothing --
10     MR. WHITMAN: Objection to the form of the
11 question. Go ahead.
12     A  There's nothing specific that I have read in
13 the testimony that talks about, as far as the
14 stevedores are concerned, in the hatch or the hold.
15     Q  So are you intending to offer the opinion
16 that any practice of not wanting to work below the
17 ship's crane and its crew, or working above, is based
18 upon the possibility that the ship's crane could
19 collapse?
20     A  Yes.
21     Q  All right. What is that?
22     A  That's my opinion based on my many years of

**Page 83**

1  experience.
2      Q  Okay. And on how many occasions in your
3  many years of experience at sea and as a consultant
4  has a crane collapsed into a hold on top of personnel
5  working in that hold or hatch?
6      A  Personally I have not been involved in a
7  case other than the one where we are currently
8  involved, where the shore conveyor boom of the
9  BARKALD, that I referred to earlier on, collapsed, and
10 it collapsed onto the dock where there were stevedores
11 and people standing directly beneath it.
12     Q  And was anyone injured there?
13     A  Fortunately, no. But the point is it's not
14 safe --
15     MR. WHITMAN: Wait until there's a question.
16     THE WITNESS: I'm sorry. I hadn't finished.
17     MR. WHITMAN: All right. If you hadn't
18 finished, go ahead and finish.
19     Q  Go ahead, finish. I want you to finish your
20 answer.
21     A  The point is it's not safe in my opinion to
22 be walking around beneath where a ship's crane is

**Page 84**

1  operating.
2      Q  And, in fact, if I read your report and your
3  opinions and conclusions correctly, the longshoremen
4  did in fact complain to the ship's officers and crew
5  when the day before the incident, July 28th, they were
6  working in Hold 6A and the ship and its crew attempted
7  to operate the crane and workbasket over their heads,
8  correct?
9      A  I'm not certain that they were working in 6A
10 the day before. I believe from the testimony they
11 were working in Hold 6. Whether it was 6, the forward
12 part of Hold 6 or the after part, I don't know.
13     Q  On the day of the incident, had the sugar
14 been discharged from the area below Hatch 6A?
15     MR. WHITMAN: Objection; vague.
16     A  I believe at the time of the incident the
17 sugar beneath where the crew were operating had been
18 removed.
19     Q  Beneath where what crew were operating?
20     A  Beneath where the ship's crew were scraping
21 and chipping the hatch coamings.
22     Q  Okay. Now, have you in the course of your

85

1 career at sea and as a consultant had the opportunity
2 to witness cargo discharge operations by shoreside
3 cranes?
4  A  Yes.
5  Q  And is it typical for, in a bulk carrier,
6 for personnel to be working within the hatch where
7 cargo is being discharged during the discharge
8 operations?
9  A  There are occasions where a crew member may
10 have to go down into a hatch while operations are
11 underway to check on the cargo, for example. So I
12 guess it means how do you define working.
13  Q  What were the personnel who were in the hold
14 of the LEON 1 on the day of the incident doing?
15  A  Scraping the hatch coamings.
16     MR. WHITMAN: You're referring to --
17     MR. ASPERGER: I'm referring --
18     MR. WHITMAN: -- the ship's personnel, or to
19 the shoreside personnel?
20     MR. ASPERGER: I'm referring to the
21 shoreside personnel.
22  A  Oh, the shoreside personnel.

86

1  Q  Yes.
2  A  I'm sorry.
3  Q  That's all right.
4  A  They were operating bulldozers and generally
5 scooping the cargo from the, what we would call the
6 wings into the center of the hatch, or the hold, so
7 that it could be accessed by the bucket, the gantry
8 bucket.
9  Q  And is that a typical operation in the
10 discharging of a bulk vessel?
11  A  Fairly typical, yes.
12  Q  Okay. And have you in the course of your
13 career witnessed those operations within the hold or
14 under the hatch while the shoreside gantry crane was
15 positioned over that hatch?
16  A  No.
17  Q  Never?
18  A  Never.
19  Q  So what is your experience in terms of what
20 occurs when the personnel in the hatch or hold are
21 moving the bulk cargo to an area where the shoreside
22 gantry crane can grab it?

87

1  A  Typically they'll be operating the bulldozer
2 to push the cargo from the wings into the center or
3 wherever it can be best accessed by the bucket.
4  Q  And what is the shoreside gantry crane doing
5 during those operations?
6  A  If the bulldozer is at a point where it
7 could be exposed to damage or risking the personnel
8 from the bucket, typically the operator of the bucket,
9 the grab would stop until the bulldozers are clear.
10  Q  And is it customary in cargo, bulk cargo
11 discharge operations that every time the bulldozers
12 push the bulk cargo into the center of the hatch area
13 so that it can be reached by the shoreside gantry
14 crane, that the gantry crane is moved down the dock
15 away from that hatch opening?
16  A  No.
17  Q  In fact, it is typical -- the opposite is
18 typical, isn't it, sir?
19  A  Usually it remains in the same location.
20  Q  It's just that they suspend operating the
21 shoreside gantry crane bucket while the men are
22 working below, correct?

88

1  A  Yes.
2  Q  And what do you believe is the reason for
3 that?
4  A  Safety.
5  Q  Safety from what?
6  A  Safety for the workers below.
7  Q  From what?
8  A  That if the operator of the bucket drops the
9 bucket on a worker or if cargo is spilled from the
10 bucket onto a worker or if there's a failure of some
11 kind of the equipment, again, you don't want to work
12 beneath a shore gantry or a shore bucket while its,
13 while it's in operation.
14  Q  But they do in fact work under the crane
15 boom while the bucket is not in operation, correct?
16     MR. WHITMAN: Objection. Which crane boom?
17     MR. ASPERGER: The shoreside gantry crane
18 boom.
19  A  It depends on what you mean under.
20 Typically you would --
21  Q  I'll define it for you.
22  A  If you're operating a bulldozer, you are

**Page 89**

1  shoving a big pile of material to the center of the
2  hatch, so the bulldozer itself may not necessarily be
3  directly beneath the gantry, it may be the forward
4  part of the blade is pushing a mound of cargo ahead of
5  it.
6     Q   And your point is what?
7     A   My point is that it isn't necessarily so
8  that the bulldozer itself is going to be directly
9  beneath the gantry at all times.
10    Q   In any event, isn't it true that during the
11 discharge of this vessel the bulldozers and the
12 personnel within the hold or under the hatch worked
13 while the shoreside gantry crane boom was over the
14 hatch opening?
15    A   Yes.
16    Q   And that is a typical scenario for the
17 discharge of bulk cargo at terminals throughout the
18 world, correct?
19    A   Yes.
20    Q   And are you aware of anyone else -- let me
21 ask this. Are you aware of any authoritative texts or
22 writings that identify some risk by having the gantry

**Page 90**

1  crane boom over the hatch opening while workmen are
2  working below to push the bulk cargo to the center of
3  the hatch?
4     A   I'm not aware of any specific regulations or
5  text, no.
6     Q   Are you aware of anyone else in the industry
7  who shares your opinion that that is a negligent
8  practice?
9         MR. WHITMAN: Objection.
10    A   Yes.
11    Q   Who?
12    A   I would say I've discussed it with
13 Mr. Cederstav and he concurs with my opinion.
14    Q   And he's an employee of yours?
15    A   Yep.
16    Q   Anyone else?
17    A   I've discussed it with various people that
18 I've come into contact with within the last year or
19 two, mariners.
20    Q   So, just so I understand the basis of your
21 opinion, the basis of your opinion is your personal
22 feeling, not any particular codes or standards,

**Page 91**

1  correct?
2     A   Correct.
3     Q   Not any authoritative texts or writings,
4  correct?
5     A   Correct.
6     Q   Not any standards or codes known to the
7  maritime industry, correct?
8     A   No.
9     Q   Now, you reference in the course of your
10 report OSHA. Is there any OSHA standard, requirement,
11 policy, or procedure governing this scenario that we
12 just discussed?
13    A   There may be. I haven't reviewed it.
14    Q   So you haven't found one, or you haven't --
15    A   I haven't searched.
16    Q   Thank you.
17    A   May I just take a moment?
18    Q   Of course. Any time.
19        (Witness reviewing documents.)
20    A   May I ask a question?
21    Q   Certainly.
22        MR. WHITMAN: No, you may speak with me, but

**Page 92**

1  you may not ask a question.
2         (Discussion off the record between the
3  witness and Mr. Whitman.)
4     Q   It's not really critical, and if you can't
5  find it you can put that in the record, if you wish.
6     A   You asked me about a reference to OSHA in my
7  report.
8     Q   I thought you made a reference, and I
9  apologize, perhaps it was -- did you look at any OSHA
10 materials in connection with this matter?
11    A   No.
12    Q   I apologize to you.
13    A   If she could just clarify that for the
14 record, that's all.
15    Q   She is.
16    A   Okay.
17    Q   I'll just represent to you that over the
18 last two weeks we've looked at dozens of reports, so I
19 apologize to you.
20        I want to be certain I understand your
21 opinions and conclusions in this case. Is it your
22 opinion that Domino had a duty to foresee the