Case 1:01-cv-00250-BEL   Document 116-6   Filed 02/04/2005   Page 1 of 5
DEPOSITION OF WILLEM SCHOONMADE, M.Sc., VOLUME 2
CONDUCTED ON FRIDAY, AUGUST 27, 2004

1 (Pages 176 to 179)

**Page 176**

VOLUME 2
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)
-------------------------------X
IN THE MATTER OF THE COMPLAINT :
OF ETERNITY SHIPPING, LTD. AND :
EUROCARRIERS, S.A. FOR         : Civil Action
EXONERATION FROM OR LIMITATION : No. L01CV0250
OF LIABILITY                   :
-------------------------------X

Continued deposition of WILLEM SCHOONMADE, M.Sc.
Baltimore, Maryland
Friday, August 27, 2004
8:30 a.m.
Job No.: 1-39310
Pages 176 - 468, Volume 2
Reported by: Beatriz D. Fefel, RPR

**Page 177**

Continued deposition of WILLEM SCHOONMADE, M.Sc., held at the law offices of:

OBER, KALER, GRIMES & SHRIVER
120 East Baltimore Street
9th Floor, Severn Room East
Baltimore, Maryland 21202-1643
Telephone: (410) 685-1120
Fax: (410) 547-0699

Pursuant to agreement, before Beatriz D. Fefel, Registered Professional Reporter and Notary Public of the State of Maryland.

**Page 178**

APPEARANCES

ON BEHALF OF TATE & LYLE:
JEFFREY J. ASPERGER, ESQUIRE
ASPERGER CARAHER, L.L.C.
303 East Wacker Drive
Three Illinois Center, Suite 1000
Chicago, Illinois 60601
Telephone: (312) 856-9901

ON BEHALF OF THE LIMITATION PLAINTIFFS,
EUROCARRIERS, S.A., AND ETERNITY SHIPPING, LTD.:
M. HAMILTON WHITMAN, JR., ESQUIRE
ERIC M. VEIT, ESQUIRE
OBER, KALER, GRIMES & SHRIVER
120 East Baltimore Street, 8th Floor
Baltimore, Maryland 21202-1643
Telephone: (410) 685-1120

**Page 179**

APPEARANCES (CONTINUED)

ON BEHALF OF AMERICAN BUREAU OF SHIPPING:
ROBERT G. CLYNE, ESQUIRE
JAMES A. SAVILLE, JR., ESQUIRE
HILL, RIVKINS & HAYDEN, L.L.P.
45 Broadway
Suite 1500
New York, New York 10006-3739
Telephone: (212) 669-0600

ALSO PRESENT: Kevin P. Hislop
Donald Sayenga

**EXHIBIT 3**

372

1   A   It does, but I do not recall them at this
2   moment in time. There is something that, that is
3   written by every manufacturer, that you should call
4   our representative, because that's just by economic --
5   out of economic purposes, but --
6   Q   What economic purposes?
7   A   Well, sending out service engineers is
8   income to a company.
9   Q   Okay. So you think that's the motivation
10  for a manufacturer sending --
11  A   That is the motivation for manufacturers to
12  put a little bit overdone recommendations in their
13  manuals, yes.
14  Q   And that's your personal opinion, correct?
15  A   That's my personal opinion, yes.
16  Q   In other words, you're not going to offer
17  any evidence at trial that that is in fact the basis
18  upon which IHI put that term --
19  A   No.
20  Q   -- in its materials?
21  A   No, no, no.
22  Q   Thank you. So that's not an engineering

373

1   opinion, that's a personal opinion?
2         MR. WHITMAN:   Objection.
3   A   Yes.
4   Q   Opinion 6: Simultaneous operation -- I'm
5   quoting. Simultaneous operation with both the deck
6   crane and the gantry unloader in one hold is in
7   general an unsafe operation. And you've cited several
8   reasons for that, correct?
9   A   Yes, correct.
10  Q   Because if, if two cranes are working in too
11  close a proximity the booms can come in contact with
12  one another, correct?
13  A   Correct.
14  Q   Loads may come in contact with one another,
15  correct?
16  A   Correct.
17  Q   Based upon your examination of this case, on
18  the morning of this occurrence do you believe the
19  ship's crew and officers knew that the Domino gantry
20  crane had been operating in hold -- or, actually, in
21  hatch 6?
22  A   The ship's crew was aware where the Domino

374

1   crane was operating, yes.
2   Q   And that was obvious to anyone --
3   A   Yeah.
4   Q   -- correct?
5   A   Yes.
6   Q   And the Domino -- is it your understanding
7   from the evidence that the Domino crane had been
8   operating in hatch 6 before the ship's crew ever began
9   its work with Crane No. 4?
10  A   Yes.
11  Q   And just from a visual standpoint of the
12  location and attitude of the two booms of these
13  cranes, with the No. 4 crane on the vessel at its
14  highest boom-up position it would not actually be
15  hanging over the Domino crane, correct?
16  A   No.
17  Q   In fact, it was located one hatch away,
18  correct?
19  A   I don't know. I don't know whether it --
20  they were operating in the same hold.
21  Q   That's not my question.
22  A   I know, I know.

375

1   Q   There was hatch 6 and hatch 6A, correct?
2   A   I know.
3   Q   And which hatch was the Domino crane
4   operating in at the time of the incident?
5   A   I do not recall at this moment. What I know
6   is that they were working in the same hold.
7   Q   Do you also recognize they were operating in
8   different hatches?
9   A   I do not know.
10  Q   Well, let me ask --
11  A   At this time I do not recall.
12  Q   Are you generally familiar with unloading
13  operations such as this? Have you ever observed them
14  before?
15  A   In student time I've even worked as a, as a,
16  what you call, longshoreman.
17  Q   Okay. And I think you indicated earlier
18  that the typical way for unloading is for the
19  shoreside crane and clamshell bucket to be taken down
20  into the center of the hatch, correct?
21  A   Correct.
22  Q   Away from any of the obstructions or

376

1 coamings or edges?
2  A  Correct.
3  Q  Because that's the safe way to operate?
4  A  Sure.
5  Q  And the prudent way, right?
6  A  (Nodding.)
7  Q  And that bulldozers, at least in this
8 instance, were used inside the hatch in order to push
9 the bulk sugar to the center so it could be picked up
10 by the clamshell bucket of the shoreside crane,
11 correct?
12  A  Correct.
13  Q  Do you have any evidence that that wasn't
14 what was happening in hatch 6 at the time of this
15 incident?
16  A  No.
17  Q  And at the time of this incident is it also
18 your understanding that Crane No. 4 was operated or
19 slewed as far aft in hatch 6A as it could possibly go?
20  A  Yes.
21  Q  So if that's the case, if that's true and if
22 the evidence and the facts and the photographs and

377

1 everything indicate that, then Crane No. 4 would have
2 been operating more than one hatch away from the
3 Domino crane?
4      MR. CLYNE: Objection.
5      MR. WHITMAN: Objection.
6  Q  Correct?
7  A  You mean center to center? Yes.
8  Q  Yes.
9  A  Yes, correct.
10  Q  Thank you.
11      All right. You say in Paragraph No. 4 under
12 Opinion 6: This type of operation violates Domino
13 policy as developed over many years of operations as
14 testified by Mr. Baker in his deposition.
15  A  Yes.
16  Q  I'd like you to point out what testimony
17 you're relying upon to make that statement.
18      MR. CLYNE: Do you have the transcript with
19 you?
20      MR. ASPERGER: I don't.
21      MR. CLYNE: No, we don't have the transcript
22 here.

378

1  A  No. Maybe I can quote a page from my notes.
2      (Witness reviewing document.)
3  Q  And while you're looking, can I ask you just
4 a clarifying question? Have you seen any written
5 Domino policy?
6  A  There's no written policy. Mr. Baker
7 testified that it was policy, but not written.
8  Q  Okay. I'd like to know --
9  A  In his deposition?
10  Q  Yeah.
11  A  No, I don't have nothing.
12  Q  Okay. Do you know for certain whether
13 Mr. Baker said that it was policy to operate one hold
14 away or one hatch away?
15  A  I have to check that in his deposition.
16  Q  All right. So you don't know?
17  A  I don't know at this moment.
18  Q  Would you agree that --
19  A  I don't recall.
20  Q  Okay. I'm sorry. I didn't know you hadn't
21 finished.
22  A  I do not recall.

379

1  Q  Fine. If Mr. Baker said one hatch away,
2 then your statement would not be correct; is that
3 true?
4      MR. CLYNE: Objection.
5  A  My opinion is based on the relative
6 position, and if that crane is working one hatch away
7 and if that means less than a boom length, it's still
8 too near and it's still basically unsafe.
9  Q  That's not my question.
10  A  No?
11  Q  You said in the basis of this opinion that
12 you're relying upon the statement or testimony of
13 Mr. Baker in his deposition; isn't that correct?
14  A  Among other things, I rely on Mr. Baker's
15 deposition.
16  Q  Where does it say in the basis for your
17 opinion "among other things"?
18  A  Basis one is the risk of an accident caused
19 by collision of the booms or other parts, and that is
20 not related to one hold, that's related --
21  Q  I'm focusing on one --
22  A  -- to the vicinity.

**380**

1  Q   I don't --
2      MR. WHITMAN: Mr. Asperger, please let him
3  finish.
4      MR. ASPERGER: I don't -- well, just a
5  second. Bob, I don't -- I don't want to fight with
6  you on this.
7  Q   I'm asking you about one sentence in your
8  report, okay? I'm only asking you about the first
9  sentence in Paragraph 4. That's the only one, not
10 about anything else in that opinion or any other
11 basis.
12     I'm simply asking you if Mr. Baker said that
13 it was the policy to operate one hatch away, this
14 statement that you made of Domino policy would not
15 accurately state their policy; is that correct?
16     MR. CLYNE: Objection.
17 A   That's correct.
18 Q   Thank you. That's all.
19     You then say: Domino should not have
20 continued their - I think you mean "its" - operation
21 under these circumstances. Did I quote that
22 accurately?

**381**

1  A   You do.
2  Q   Okay. And if Domino was operating in hatch
3  6 before the ship's crew began working Crane No. 4 at
4  the aft section of crane (sic) 6A, why would Domino
5  have the burden of discontinuing its operation?
6      MR. WHITMAN: Objection.
7  A   One thing is they did not work the whole
8  time at the aft end of hatch 6A. But apart from
9  that --
10 Q   Where did they work besides at the aft end
11 of hatch 6A on this morning?
12 A   The crane was slewed to reach another part
13 of the aft. But --
14 Q   Where is the evidence that supports that
15 statement? And, again, I'm not meaning to fight with
16 you. I just need to know, Mr. Schoonmade, exactly
17 what it is you're relying upon. I need to know
18 whether you're relying upon evidence, testimony,
19 photographs, whatever you have, I need to know that.
20 Okay?
21 A   Yes, sir.
22 Q   If you don't know, you can tell me I don't

**382**

1  know or I can't find it or I don't have it or I'm not
2  certain, whatever. Okay? That's all I'm asking for.
3  A   Okay.
4  Q   All right. My question is what evidence
5  have you relied upon in this case to make the
6  statement -- or to come to your conclusion that the
7  ship's crane was operating in other places of Hold No.
8  6A -- Hatch No. 6A on the morning of this event other
9  than the aft port side and aft corner of hatch 6A?
10     MR. CLYNE: Objection.
11     MR. WHITMAN: Different question.
12 Objection.
13 A   Sorry. I, I do not recall.
14 Q   Okay. Is it your opinion that if this was
15 an unsafe practice, that the ship's crew should have
16 ceased operating Crane No. 4 in hatch 6A?
17 A   **In general it is an unsafe operation, and if**
18 **two parties are conducting together an unsafe**
19 **operation, it is ended if one of the parties ends it.**
20 **But it is Domino policy, be it not written policy, to**
21 **not operate two cranes in one hold. So if for some**
22 **reason it's carried on, then you violate your own**

**383**

1  policy if you continue.
2  Q   Right. Here's what I want you to do, if you
3  don't mind, so we can move on. I need to have the
4  quote or testimony that you're relying upon that says
5  that it was Domino policy not to operate in the same
6  hold, okay, as opposed to the same hatch. Do you
7  understand the distinction?
8  A   Yup.
9  Q   So after the deposition today, if you would
10 provide Mr. Clyne with that evidence that you rely
11 upon so that he can send it to me and we can move on.
12 Will you do that?
13 A   **I would like to come back on what I earlier**
14 **said.**
15 Q   All right. Now, you've been handed
16 something by your attorney, correct?
17 A   Correct.
18 Q   What have you been handed?
19 A   **The Coast Guard report earlier referred to.**
20 Q   Okay. And where in the report are you
21 referring?
22 A   **I'm referring to Page EC000 --**

**384**

1  Q  I don't have those pages, so just give me --
2     MR. CLYNE: Give him the paragraph number.
3  A  Paragraph No. 8.
4  Q  Paragraph 8, toward the front of the -- is
5  it this page, sir (exhibiting)?
6  A  Yeah.
7  Q  Thank you. Okay. Paragraph 8.
8  A  On the morning of July 29th, two crew
9  members, Mr. Juan Gonzales, Jr., and Mr. Joselito
10 Burgos, were hoisted in a workbasket by Crane No. 4
11 and began scraping the sugar of the port coaming of
12 hatch 6A.
13 Q  And why are you directing my attention to
14 that paragraph?
15 A  Because five minutes ago when I said they
16 did not work only on the aft coaming, you asked me
17 where do you find that evidence. I did not recall
18 then, and I was helped by my counsel. I found it on
19 Page --
20 Q  And where does --
21 A  -- Bates No. EC000010, Paragraph No. 8 --
22 Q  Where is --

**385**

1  A  -- which I just read.
2  Q  I'm sorry. Tell me when you're finished.
3  A  When I stop. Sometimes I have to think.
4  Q  That's okay. Just -- you know, if you
5  intend to go on, just let me know and I'll wait.
6  A  Okay.
7  Q  I'm not sure every time you stop whether
8  you're finished with your thought or your testimony or
9  not, so just tell me.
10 A  Do you want me to say "full stop" when I
11 really stop?
12 Q  No.
13 A  Okay. Thank you.
14 Q  But please bear with me, then, and be
15 patient, because sometimes when you stop, then I think
16 that you've finished.
17 A  Also Mr. Balita testified that, that they
18 started scraping in the port side.
19    MR. CLYNE: Referring to --
20 A  Referring to No. 8, Exhibit No. 8.
21 Q  Does Mr. Balita say where on the port side
22 they started scraping that morning?

**386**

1  A  No.
2  Q  Does the Coast Guard report say where the
3  ship's crew began scraping on the port coaming --
4  A  No.
5  Q  -- of hatch 6A that morning?
6  A  No.
7  Q  By the way, the Coast Guard report refers to
8  hatch 6A, correct, not hold?
9  A  They refer to hatch 6A, correct.
10 Q  Is there any place, any documents, any
11 testimony that you're relying upon that identifies
12 where on the port coaming of hatch 6A these men were
13 working on the morning of July 29th, 2000?
14 A  Not that I know of now.
15 Q  And if you find something, you'll provide it
16 or give a citation to counsel to provide it to me; is
17 that fair?
18 A  That's correct.
19 Q  Thank you.
20    And if in fact this is an unsafe practice as
21 you opine that it is, that is, operating a crane in
22 hatch 6A while the Domino crane is being operated in

**387**

1  hatch 6, would there be any duty or obligation on the
2  part of the ship's crew not to engage in that
3  practice, and the ship's officers?
4  A  I would say yes. I earlier said that when
5  an unsafe operation is carried out by two parties,
6  they both have their responsibilities.
7  Q  Thank you. I just wanted to clarify that
8  point.
9     All right. You say in Opinion 7, which
10 relates to maintenance, and I quote: Proper
11 maintenance of any crane is paramount to a safe
12 working life of the crane. The IHI instruction manual
13 as on board gives clear instructions. However,
14 maintenance of the LEON 1 deck crane seems to have
15 been substandard in some aspects.
16    Would you explain what aspects you're
17 referencing?
18 A  My Basis No. 1, Mr. Warlinski is complaining
19 about spare parts and adjustments and repairs, motors
20 malfunctioning. He has a lot of electrical problems.
21 Q  All right. The second -- anything else that
22 Mr. -- did you read Mr. Warlinski's deposition?