

# HILL RIVKINS & HAYDEN LLP

45 Broadway, Suite 1500, New York, NY 10006-3739  Tel: (212) 669-0600
Fax: (212) 669-0698/0699               e-mail: thefirm@hillrivkins.com
Website: www.hillrivkinslaw.com

*Via Electronic Filing*

November 4, 2005

The Honorable Benson E. Legg
United States District Court Judge
United States District Court
for the District of Maryland
Third Floor, Room 340
101 W. Lombard Street
Baltimore, MD 21201

RE:  In the Matter of the Complaint of
     Eternity Shipping Ltd., *et al.*
     For Exoneration from or Limitation of Liability
     Civil Action No. L-01-CV-0250
     Our Ref.: 28005-RGC/JAS
     - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Dear Judge Legg:

We represent Third-Party Defendant American Bureau of Shipping ("ABS") in the captioned matter and, in accordance with Your Honor's instructions, write to address Third-Party Plaintiff Tate & Lyle North American Sugars, Inc.'s ("Tate & Lyle") recent service of the report of Mr. Donald Pellow, a newly retained expert, under the guise of a further supplemental report of Tate & Lyle's rebuttal expert, Mr. Michael Parnell.

By way of background, following the casualty and while the M/V LEON I was still at Domino's Baltimore facility, counsel for Tate & Lyle, Jeffrey Asperger, Esq., together with consultant's retained on behalf of Tate & Lyle attended on board the vessel and were among the first to have access to the wire rope. Although from that day forward Tate & Lyle had every opportunity to develop evidence regarding the condition of the wire rope, it chose not to do so. In fact, Tate & Lyle chose not to retain any expert on that very issue until the deadline for the submission of expert reports had passed.

NEW JERSEY
924 US Highway 9 South (Route 9 South)
South Amboy, NJ 08879-3313
Tel: 732 838-0300 Fax: (732) 316-2365
e-mail: thefirm@hillrivkins.com

TEXAS
712 Main Street, Suite 1515
Houston, TX 77002-3209
Tel: (713) 222-1515 Fax: (713) 222-1359
e-mail: hillrivkinstexas@hillrivkins.com

CONNECTICUT
1115 Broad Street
Bridgeport, CT 06604
Tel: (203) 367-5535 Fax: (203) 367-5536
e-mail: thefirm@hillrivkins.com

CALIFORNIA
Of Counsel:
Brown & Associates
11140 Fair Oaks Boulevard, Suite 100
Fair Oaks, CA 95628-5126
Tel: (916) 859-4910 Fax: (916) 859-4911

The Honorable Benson E. Legg
United States District Court Judge
November 4, 2005
Page Two

As Your Honor is aware, ABS initially filed its motion for summary judgment with respect to the claims of Tate & Lyle and Third-Party Plaintiff Josefina Gonzales on October 6, 2004. Because Tate & Lyle relied upon inadmissible evidence in support of its opposition to ABS' motion, new submissions were required and the entire briefing process was delayed. Following the submission of summary judgment motions, Tate & Lyle applied to re-open discovery. Thereafter, this Court re-opened discovery for the sole purpose of deposing Captain Heiner Popp and Tate & Lyle's belatedly identified rebuttal expert, Mike Parnell, regarding his criticisms of the previously submitted expert reports. (Docket No. 137). In accordance with Your Honor's Order, it was anticipated that the parties' would file supplemental briefs on October 31, 2005, solely on the basis of Mr. Parnell's testimony. Capt. Popp was deposed on October 6, and Mr. Parnell was deposed on October 7, 2005.

During their depositions, both Capt. Popp and Mr. Parnell testified that any attempt to conclude that there was damage to the wire rope at the time of ABS' 1999 survey would constitute speculation and guesswork. (Parnell Dep. p. 58; Popp Dep. pp. 87-88 [copies attached]). Nevertheless and without leave of Court, Tate & Lyle thereafter served a further "backdoor" expert report on the evening of October 26, in which Donald Pellow, based solely upon copies of photographs, rendered an opinion as to the nature and extent of certain conditions present on the wire rope. Based upon this inadmissible and otherwise questionable evidence,[1] Mr. Parnell recently submitted a further report in which he now purports to place a time frame on the existence of some alleged corrosion, a conclusion that alters his testimony under oath. Tate & Lyle offered Mr. Parnell solely as a rebuttal expert and expert discovery has been closed. *Mr. Parnell's new report does not serve to rebut or even opine upon any newly discovered facts or evidence – it only serves to change his testimony.* Therefore, ABS objects to these submissions and respectfully submits that this Court should strike and disregard any submission by Tate & Lyle that relies upon these belated and improper submissions.

During this past Tuesday's conference call, Mr. Asperger represented to the Court that the retention of Mr. Pellow and the submission of Mr. Parnell's supplemental rebuttal report were necessary to address issues regarding the wire rope raised, allegedly for the first time, during Capt. Popp's testimony. Yet, neither Mr. Parnell's supplemental report nor Mr. Pellow's report make any reference to the testimony of Capt. Popp. To the contrary, these reports merely attempt to change Mr. Parnell's testimony that any attempt by him to state



---

[1] U.S. Coast Guard casualty investigations are inadmissible pursuant to statute.

The Honorable Benson E. Legg
United States District Court Judge
November 4, 2005
Page Three

whether there was damage present at the time of ABS' survey would constitute speculation. (Parnell Dep. p. 58). Further, the photographs apparently relied upon by Mr. Pellow are copies of photographs taken by the United States Coast Guard at the time of the casualty investigation in July 2000. The U.S. Coast Guard Report was in the hands of Tate & Lyle before the lawsuit was commenced against ABS. In view of Tate & Lyle's early investigation and access to information, it had every opportunity to retain experts and render opinions within the time frame dictated by the various orders entered by this Court.

In addition, Mr. Parnell, with Mr. Hislop in attendance, conducted a microscopic examination of the wire rope in August 2004. Clearly, in August 2004, Mr. Parnell viewed the alleged conditions set forth in Capt. Popp's testimony. Tate & Lyle could have retained a metallurgist at that time, but again, chose not to do so. Capt. Popp's testimony did not add any new evidence and, as stated, Mr. Asperger and his consultants were onboard the vessel at the same time Capt. Popp was conducting his investigation immediately after the casualty. Clearly, the testimony of Capt. Popp, a *fact* witness- who could have been deposed by Tate & Lyle as a fact witness at any time- does not provide a basis for the submission of further reports by Tate & Lyle at the eleventh hour.

In sum, as the purported expert reports of Mr. Parnell and Mr. Pellow do not rebut or address any newly discovered facts or evidence and plainly prejudice ABS by depriving it of the ability to cross examine these witness regarding their new theories and the opportunity to nominate new experts, ABS respectfully submits that this Court should strike and disregard any submission by Tate & Lyle that relies upon these belated and improper submissions.

Respectfully submitted,

HILL RIVKINS & HAYDEN LLP

*Robert G. Clyne* (signature)

Robert G. Clyne

RGC/mc
28005/095LEGG



## Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
 2       FOR THE DISTRICT OF MARYLAND
 3              NORTHERN DIVISION
 4  -------------------------------x
 5  IN THE MATTER OF THE COMPLAINT  )
 6  OF ETERNITY SHIPPING, LTD AND   )
 7  EUROCARRIERS, S.A. FOR          )  Case No.:
 8  EXONERATION FROM OR LIMITATION  )  L01CV0250
 9  OF LIABILITY                    )
10  -------------------------------x
11
12
13         Deposition of R. MICHAEL PARNELL
14              Baltimore, Maryland
15            Friday, October 7, 2005
16                 9:10 a.m.
17
18
19
20  Job No.: 1-64603
21  Pages 1 - 163
22  Reported By: Sherry L. Brooks
```

## Page 2

```
 1      Deposition of R. MICHAEL PARNELL held at the law
 2  offices of:
 3
 4         OBER, KALER, GRIMES & SHRIVER
 5         120 East Baltimore Street
 6         9th Floor
 7         Baltimore, Maryland 21012
 8         (410) 347-7354
 9
10
11         Pursuant to Notice, before Sherry L. Brooks,
12  Court Reporter and Notary Public, in and for the State
13  of Maryland.
```

## Page 3

```
            APPEARANCES

ON BEHALF OF PLAINTIFFS:
   JEFFREY J. ASPERGER, ESQUIRE
   ASPERGER ASSOCIATES, LLC
   Three Illinois Center
   303 East Wacker Drive
   Suite 1000
   Chicago, Illinois 60601
   (312) 856-9901


ON BEHALF OF DEFENDANT ABS:
   ROBERT G. CLYNE, ESQUIRE
   JAMES A. SAVILLE, JR., ESQUIRE
   HILL RIVKINS
   45 Broadway
   Suite 1500
   New York, New York 10006-3739
   (212) 669-0600
```

## Page 4

```
APPEARANCES CONTINUED:

ON BEHALF OF DEFENDANT ETERNITY SHIPPING, LTD
AND EUROCARRIERS:
   M. HAMILTON WHITMAN, JR., ESQUIRE
   OBER, KALER, GRIMES & SHRIVER
   120 East Baltimore Street
   9th Floor
   Baltimore, Maryland 21202
   (410) 347-7354

ALSO PRESENT: Brent O'Connor, Paralegal
```

**Page 57**

1  types of breaks under that or separation, so broken
2  wires just indicates separations.
3      Q.  Now, you mentioned prior damage.  Can you
4  tell us what you meant by prior damage?
5      A.  Practically all of the torn wires that I saw
6  -- well, I guess I'll make -- at the top of page 2 in
7  the upper right-hand corner, I didn't find any fatigue
8  breaks or broken wires at the socket, which is from
9  vibratory activity, so it's at page 2 in the top
10 corner.
11         So fatigue breaks would be from lots of
12 cycles and vibratory fatigue can occur at a socket
13 since it's the dampening point for which the rope is
14 rusted and worries so that to the best of my
15 recollection all the breaks I found were a subject of
16 obstructional contact, tears, external stripping you
17 might say of the rope surface and the wires.
18         So at the broken wires, they were -- nearly
19 all of them contained corrosion and pitting on those
20 wires at the separation point.  Once a wire gets ripped
21 and peeled, it stands up.
22         It may not have lube on it anymore.  It may

**Page 58**

1  have lube, but over time, that lube goes away and
2  moisture and oxidation occurs and corrosion starts in,
3  rouging and corrosion moderate and heavy and you then
4  start losing chunks of steel, chunks of metal out of
5  it, so those torn wires typically -- nearly all of them
6  show corrosion and pitting in conjunction with their
7  separation point.
8      Q.  And those torn wires, did you form an
9  opinion as to how or why that happened in this case?
10     A.  Well, they appeared not to have occurred at
11 the moment of the incident because of the corrosion and
12 pitting.  They appeared to have occurred over time
13 prior to the incident.  I'm not sure if I answered the
14 question or not.
15     Q.  You can't say how much time prior, though;
16 isn't that right?
17     A.  No.  I can only make educated guesses.
18     Q.  Right.  You'd have to speculate; isn't that
19 right?
20     A.  Yes.
21     Q.  Okay.  Now, you mentioned the term pitting
22 in your notes?

**Page 59**

1      A.  Yes.
2      Q.  But when I look at your report, I don't see
3  the term pitting in there.  I see where you mention
4  gouge wires, metal loss and corrosion.  Is there a
5  reason why you left the term pitting out of your
6  report?
7      A.  Which report are you making reference to?
8      Q.  I'm right now looking at your report dated
9  June 16th, 2005 regarding the Sayenga conclusions.
10     A.  Let me get to that report.  In Mr. Sayenga's
11 -- reply to Mr. Sayenga's report, I don't see the word
12 pitting adjacent to the word corrosion, though it is in
13 Cedar Stav's reply, my reply to Cedar Stav, corrosion
14 and pitting.  Corrosion, pitting and metal loss are
15 grouped together and no intentional omission or
16 submission either.
17        Either way typically it did get into Cedar
18 Stav's and maybe it was just an innocent leaving out.
19     Q.  How serious was the pitting that you
20 observed?
21     A.  Well, even at the 8 power and even at the
22 naked eye, in many cases, I could see significant

**Page 60**

1  disturbances to the surface of the wire, gouges or
2  valleys.  And a gouge is a descriptive term of a
3  channeling or a tunneling out of material as opposed to
4  a gouge in the body of the wire that could cause a
5  separation.
6         So they're not to confuse the terms, but if
7  you could scoop out along the length of the wire with a
8  very tiny spoon and take metal away, there were long
9  and short chunks out along the wire surface.  And that
10 was reasonably visible to the naked eye in some of
11 those cases, so some were microscopically discovered.
12 Some were by eyeball.
13     Q.  Now, you appreciate that wire ropes aboard
14 vessels are subjected to a highly corrosive marine
15 environment.  Isn't that a fair statement?
16     A.  Yes.  Well, saltwater, salt air is corrosive
17 agent I guess, yes.
18     Q.  And from the minute that wire ropes are put
19 into service, they will corrode to some degree; isn't
20 that right?
21     A.  No.
22     Q.  Okay.  Well, what's wrong about that

1 (Pages 1 to 4)

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF MARYLAND
 3                       Northern Division
 4    ------------------------------X
 5    IN THE MATTER OF THE COMPLAINT  :
 6    OF ETERNITY SHIPPING, LTD., AND : Civil Action NO.:
 7    EUROCARRIERS, S.A., FOR         : L01CV0250
 8    EXONERATION FROM OR LIMITATION  :
 9    OF LIABILITY                    :
10    ------------------------------X
11            Deposition of CAPTAIN HEINER POPP
12                    Baltimore, Maryland
13                  Thursday, October 6, 2005
14                        10:15 a.m.
15
16
17
18
19
20    Job No.: 1-64601
21    Pages: 1 - 93
22    Reported by: Beatriz D. Fefel, RPR
```

Page 2

```
 1         Deposition of CAPTAIN HEINER POPP held at
 2    the law offices of:
 3
 4         OBER, KALER, GRIMES & SHRIVER
 5         120 East Baltimore Street
 6         9th Floor, Severn Room East
 7         Baltimore, Maryland 21202-1643
 8         (410) 685-1120
 9
10
11
12         Pursuant to agreement, before Beatriz D.
13    Fefel, Registered Professional Reporter and Notary
14    Public of the State of Maryland.
```

Page 3

```
 1                     A P P E A R A N C E S
 2
 3    ON BEHALF OF THE LIMITATION PLAINTIFFS,
 4    EUROCARRIERS, S.A., AND ETERNITY SHIPPING, LTD.:
 5         M. HAMILTON WHITMAN, JR., ESQUIRE
 6         OBER, KALER, GRIMES & SHRIVER
 7         120 East Baltimore Street
 8         8th Floor
 9         Baltimore, Maryland 21202-1643
10         (410) 685-1120
11
12    ON BEHALF OF TATE & LYLE:
13         JEFFREY J. ASPERGER, ESQUIRE
14         ASPERGER ASSOCIATES, L.L.C.
15         303 East Wacker Drive
16         Three Illinois Center, Suite 1000
17         Chicago, Illinois 60601
18         (312) 856-9901
```

Page 4

```
 1              A P P E A R A N C E S (C O N T I N U E D)
 2
 3    ON BEHALF OF AMERICAN BUREAU OF SHIPPING:
 4         JAMES A. SAVILLE, JR., ESQUIRE
 5         HILL, RIVKINS & HAYDEN, L.L.P.
 6         45 Broadway
 7         Suite 1500
 8         New York, New York 10006-3739
 9         (212) 669-0600
10
11
12    ALSO PRESENT:
13         Mike Parnell
```



Page 85

1  A  The one on the left. This -- these are the
2  two (indicating).
3  Q  Photo 18?
4  A  Photo 18. And you have them in Picture 17
5  as well.
6  Q  And in 16 as well, right?
7  A  And 16 as well.
8  Q  And in 16 they're the ones to the left?
9  A  Yes.
10  Q  All right. My question --
11     MR. SAVILLE: Just at 16, they're the ones
12  that are to the left of the boom, not of the photo?
13     MR. ASPERGER: Correct.
14     MR. SAVILLE: Right.
15  BY MR. ASPERGER:
16  Q  And my question is did you measure the
17  clearance between the sheave and the edges of the boom
18  structure -- or the, excuse me, the mast structure?
19  A  We looked at it, and it was not possible for
20  the wire to go in there.
21  Q  Okay. Based upon your observation?
22  A  Yes. That's something we looked for at the

Page 86

1  time, that's why I had that remark in there with
2  the -- where I looked at sheaves and all that. We
3  looked at that, there was nothing that was -- and they
4  didn't need any guards because it was not the space
5  there.
6  Q  Okay. Thank you.
7     MR. ASPERGER: Captain, I think that's all I
8  have. Let me check my notes. That's all I have.
9  Thank you very much.
10     MR. SAVILLE: Captain, I've just got a
11  couple short followups.
12     EXAMINATION BY COUNSEL FOR ABS
13  BY MR. SAVILLE:
14  Q  Referring back to Exhibit 1 or 1-A, on the
15  last page, Page 5. Under the Crane Turning Radius
16  section, where the sentence reads, "Measurements were
17  taken from the center of the Crane Pedestal No. 4
18  forward. It was found that with boom raised to
19  maximum height," and then the sentence continues.
20  When you use the word "maximum height," are you
21  referring to the maximum height when it cuts out at
22  the limit, or all the way against the boom stops?

Page 87

1  A  The way it is designed by the manufacturer,
2  that is with the --
3  Q  The limit switch?
4  A  -- limit switches engaged.
5  Q  Okay. When you -- if you can go to Exhibit
6  2, when you -- on the section on the Crane Wires, and
7  Mr. Asperger was asking you questions about the number
8  of broken wires exceeding the permissible number.
9  It's on Page 4.
10  A  Okay.
11  Q  I believe you had said that the, based on
12  your observation, the number of broken wires to which
13  you refer were something that was existing on the wire
14  prior to the incident, correct, not something that
15  happened as a result of the incident?
16  A  That's something I concluded because some of
17  the broken nests -- I don't think that all of the
18  broken nests, but some of the broken nests were still
19  on the drum, and therefore there was no strain on
20  them.
21  Q  Based on your observations, can you tell us
22  as you sit here today when those breaks in the wires

Page 88

1  that you observed took place?
2  A  No.
3  Q  Would it -- it would be pure guesswork to
4  try and determine at what point in time those breaks
5  took place, correct?
6  A  I would say yes.
7  Q  I thought I had one other thing, Captain.
8  Oh. On the sheaves at the top of the boom, when you
9  saw them were the sheaves able to rotate, or were the
10  sheaves frozen in a position?
11  A  No.
12  Q  And I'm just referring to the luffing.
13  A  No. There was one sheave that was involved
14  where the new wire was in it, I don't know if it was
15  the one, but the wire slid out.
16  Q  Right.
17  A  You could turn it.
18  Q  Okay. So based on your observations,
19  neither of the -- or the sheave that you looked at,
20  neither of them were frozen, or only one, that you
21  were able to determine?
22  A  I -- no, no. You cannot turn the sheave