1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MARYLAND

 3                    NORTHERN DIVISION

 4    -------------------------------x.

 5    IN THE MATTER OF THE COMPLAINT   )

 6    OF ETERNITY SHIPPING, LTD AND    )

 7    EUROCARRIERS, S.A. FOR           )      Case No.:

 8    EXONERATION FROM OR LIMITATION   )      L01CV0250

 9    OF LIABILITY                     )

10    -------------------------------x

11

12

13              Deposition of R. MICHAEL PARNELL

14                   Baltimore, Maryland

15                 Friday, October 7, 2005

16                       9:10 a.m.

17

18

19

20    Job No.:   1-64603

21    Pages 1 - 163

22    Reported By:  Sherry L. Brooks
```

COPY



L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

51

1   field notes are?

2       A.   Well, I guess the first place to start is I

3   have -- eight pages are marked in the lower right-hand

4   corner with Numbers 1 through 8, and so those are the

5   primary documents that I either had in my hand.  Number

6   1 is a back-at-the-office type sheet that I produced as

7   a result of 2 through 8, so it's just, so it's a

8   summary of those items.

9       Q.   Where did you record the measurements that

10  you took?

11      A.   Well, I have a measurement up at the top

12  left of 3, 27.3 to 28.5.  And I have at the top of 6 in

13  the left-hand column, I have 27.3 to 28.5 millimeters.

14  Are you on page 6?

15      Q.   Yes.  Is that the range of measurements you

16  took?

17      A.   Yes.  It appeared to me the -- what I call

18  the working section, the section of rope that gets

19  through the sheaves the most, runs through the sheaves,

20  typically has some small reduced diameter and

21  lengthening of lay.  And typically back at the drum end

22  which a portion of that rope lays on the drum

57

1    types of breaks under that or separation, so broken

2    wires just indicates separations.

3         Q.    Now, you mentioned prior damage.  Can you

4    tell us what you meant by prior damage?

5         A.    Practically all of the torn wires that I saw

6    -- well, I guess I'll make -- at the top of page 2 in

7    the upper right-hand corner, I didn't find any fatigue

8    breaks or broken wires at the socket, which is from

9    vibratory activity, so it's at page 2 in the top

10   corner.

11         So fatigue breaks would be from lots of

12   cycles and vibratory fatigue can occur at a socket

13   since it's the dampening point for which the rope is

14   rusted and worries so that to the best of my

15   recollection all the breaks I found were a subject of

16   obstructional contact, tears, external stripping you

17   might say of the rope surface and the wires.

18         So at the broken wires, they were -- nearly

19   all of them contained corrosion and pitting on those

20   wires at the separation point.  Once a wire gets ripped

21   and peeled, it stands up.

22         It may not have lube on it anymore.  It may

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

63

1    Q.    Did you see anywhere in the Coast Guard

2    report where the Coast Guard made an observation -- the

3    Coast Guard investigating officer made an observation

4    that there was corrosion and pitting in the break area

5    of the wire rope?

6    A.    I believe I did.  Do you want me to find it,

7    see if I can find it?

8    Q.    Yes.  It's in your binder.

9    A.    I have a Coast Guard insert in the very

10   back.

11   Q.    I'll direct your attention to the bottom of

12   your written page 12 circled.  It talks about, quote,

13   the luffing wire had preexisting damage?

14   A.    Right.

15   Q.    And it talks about -- it goes on to talk

16   about three of the six strands appear to have been

17   pinched or cut.  Do you see that?

18   A.    Yes.

19   Q.    Maybe you saw it somewhere else, but I

20   haven't, so I'm really looking to see if there's an

21   area that you relied on that said that there was

22   corrosion and pitting in the break area.

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

64

1          MR. ASPERGER:  The document speaks for

2    itself.  Is this just a test of his memory or where are

3    you going with this?

4          MR. CLYNE:  That's fair.

5    BY MR. CLYNE:

6      Q.    I'm -- I guess my question is, other than

7    what you saw, are you relying on anything else to

8    support your conclusions about pitting and corrosion?

9      A.    Other than my own observations -- well, I

10   guess to answer that, I would need to go back and

11   research at least the three other experts on their

12   reports to see if they've made active comments because

13   I don't have an immediate recall of every statement by

14   every expert on the other side here.

15          I think Pop -- I believe Pop said yesterday

16   that he saw corrosion.  It's just not a secret.

17     Q.    Did he say that he saw pitting?

18     A.    I don't recall.  I guess we'd have to look

19   at the transcript.

20     Q.    Okay.

21     A.    But I'm not answering yes or no.  I just

22   have to go back through the other expert reports and

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

65

1   see if any corrosion was remarked by those gentlemen.

2        Q.    Let's go back to your inspection.  Did you

3   do the measurements first?

4        A.    Diameter measurements.

5        Q.    Did you?

6        A.    Yes.

7        Q.    Okay.  And what did you do next?

8        A.    Well, I went sample by sample starting from

9   A to F and looked at the physical condition, estimated

10  the approximate length of those rope sections and

11  recorded those to the best of my ability and noted the

12  damage as I came upon damage.

13           Sometimes I would clean or rub grease away

14  with a rag.  Sometimes I would spray on some degreasing

15  agent to get down to as bare wire as possible and then

16  I get to what -- to the failure point.

17           I spent considerable time looking at the

18  north looking south and south looking north on those

19  two separation points for physical damage, external

20  damage, metal loss, gouging, all the things that --

21  because the failure as I noted initially had not

22  occurred from fatigue breaks from lots of cycle bending

66

1    or at the socket connection, so what else could

2    contribute to this rope failing.

3           I noticed that the failure was somewhat

4    staggered in the immediate area.  A cluster of strands

5    -- wires make up strands.  Strands make up the ropes,

6    so a cluster of strands as a group had failed in

7    sequence and in series.

8           One in particular had given up last and that

9    appeared to have almost all tensile breaks.  There were

10   cup and cone and sheer type tensile failures, so

11   whatever had happened to the rope body, it appeared

12   that that strand gave up last just from pure load

13   tension.  And then moving down the rope continued to

14   remark about any other damage that I found.

15   Q.    Did you record in your notes exactly where

16   you found the corrosion and the pitting?

17   A.    They were almost all associated with the

18   individual wires that I found either by feel or by --

19   that were sticking up and I cleaned those off and

20   that's where I found the corrosion and pitting most

21   generally.

22          And then on some adjacent wires that were

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

67

1   laying by those torn wires that were not torn, cleaned

2   that rope section off 2, 3 or 4 inches either way and

3   looked at those and there was some slight corrosion and

4   pitting against those as well.

5        Q.    So you degreased the wire --

6        A.    You have to to do the inspection.

7        Q.    -- and then saw it?  And you saw some wires

8   sticking up; is that right?

9        A.    Yes.

10       Q.    And that's where you found the corrosion?

11       A.    There was sometimes corrosion adjacent to

12  those torn wires on adjacent wires.

13       Q.    Did you review the testimony of any of the

14  Eurocarriers' personnel that were in this shipyard in

15  1999 when the cranes were refitted to the Leon I?

16       A.    No, I did not.

17       Q.    So you don't know what the details are with

18  respect to the removal of the wire ropes from the

19  vessel the Yannis K and the inspections that were done

20  at that time; is that right?

21       A.    Correct.  All I was able to review was Roy

22  Graham's phone testimony, deposition.

70

1      Q.    I'd like to focus now on your letter dated

2   June 16th, 2005 regarding the Sayenga conclusions and

3   I'm going to work backwards.  I want to go to the end

4   of the report, paragraph C.  Do you see that?

5      A.    Yes, sir.

6      Q.    Is that your opinion of the probable cause

7   of this accident?

8      A.    Let me read it.

9      Q.    Sure.

10      A.    Yes.

11      Q.    When you say that the Leon I's crane Number

12   4 had been boomed up to this extreme high angle, what

13   do you mean by that?

14      A.    The extreme high boom angle, that was stated

15   throughout the case.

16      Q.    You'll agree with me that that's a dangerous

17   practice, isn't it?

18      A.    Well, describe the practice to me if you

19   wouldn't mind.  Give me a little more information so I

20   can see if I can agree with you or not.

21      Q.    Well, that's what I'm doing.  I'm probing

22   extreme high angle and what that means.

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

71

1      A.     Well, you can have an approved extreme high

2  angle and there's cautions with that.  You can have an

3  unapproved extreme high angle and there would be other

4  problems with that, so if that -- I'm not looking to be

5  argumentative.  If I'm going to agree to something, I

6  want to understand what you're trying to say.

7      Q.     Fair enough.  Well, you're saying that it

8  makes complete sense that the crane Number 4 had been

9  boomed up to an extreme high angle at some other time

10 in its recent life span, right?

11     A.     Yes.

12     Q.     What do you mean there by recent life span?

13     A.     That wires at the failure point displayed

14 corrosion and pitting and flattening -- extreme

15 flattening on some wires with pitting in the flattened

16 areas.  That was all damage and they were in the

17 immediate failure area of those strand wires.

18            They had been impacted prior to the day of

19 the incident.  They had already been scrubbed, gouged,

20 cut and degreased to a point by some combination of

21 events, washing, rain and wiping, etc., scrubbing that

22 can do that and exposed to air.

72

1          So we have physical and mechanical damage

2     and we also have environmental damage prior to the day

3     of the failure.  In addition to that, there were some

4     wires that looked fresh -- that had fresh shearing and

5     then we had a whole other bundle strand that had pure

6     tensile breaks.

7          So what I saw that it had been done in its

8     recent life span, the rope that failed -- the rope

9     section that failed here had been significantly damaged

10    prior to this date of the accident to July 29th, 2000.

11    Q.     Okay.  By recent life span, are you saying

12    --

13    A.     That's an undefined time.

14    Q.     You don't have any idea what kind of time

15    frame you put on that?

16    A.     Well, I understand that -- from reading Mr.

17    Graham's document, it looked like that -- I thought

18    that these were less than five-year-old ropes at a

19    point in time at the refit, 5 1/2 years, so I don't

20    know -- within that life span, I can't give you the

21    date and time.

22          I mean, it's -- it could have been on the

73

1    second day it was installed and then it was -- you

2    know, from its very first usage, it could have been

3    that.

4        Q.    Installed on the Leon I?

5        A.    No.  Installed on that crane because that

6    rope sits and works with that --

7        Q.    Installed on what crane?

8        A.    Number 4.

9        Q.    Okay.  So you're -- you're talking about

10   recent life span.  You're talking about for the period

11   of time that these wire ropes were installed on the

12   Leon I; isn't that right?

13       A.    No, because the crane came from another

14   vessel.  It's in its entire life span.

15       Q.    So recent life span means entire life span?

16       A.    Well, yes.  I wouldn't want to make too much

17   out of recent.

18       Q.    These are your words, sir.  It's not mine.

19       A.    Yes.

20       Q.    And you can't -- all right.  And you can't

21   define that any further; is that right?

22       A.    Correct.

75

1  identification and was attached to the deposition.)

2  BY MR. CLYNE:

3      Q.    Just for the record, we've marked as Parnell

4  Number 5 a sketch that Mr. Parnell has made.  Can you

5  tell us what's being depicted there?

6      A.    It's the -- it's just a characterization of

7  the top of the mast where the wire ropes for the main

8  hoist and luffing wire, the boom hoists, come out and

9  work -- go either top of the boom and read through the

10  system.

11          The dotted line simulates the luffing wire

12  coming off the drum, which is down below in the lower

13  portion of the pedestal apparently from the depositions

14  and it's existing right up through and it's passing

15  very close in this high boom angle position.  It passes

16  very close to a sheave guard, which is a curved steel

17  plate over the top.

18          You'll see the notches right here and those

19  are designed in effect to try to have as much weather

20  protection as keeping the rope in the sheave.

21          There's -- all cranes are required to have a

22  means for retaining the rope and a slat condition in

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

76

1    the sheave that they're carried in, so it's either done

2    by tie bars, tiepins or a steel plating is covered to

3    keep close to the sheave rim for a certain portion to

4    keep the rope in the track.

5            When you boom up too high, I sincerely

6    believe that's what cut the rope and that sheave notch

7    -- that guard notch right there is easy to get into.

8    It's only cut to a minimum gap or spacing for normal

9    boom operations would be generally the idea because you

10   want to keep the weather and the water and all the

11   other stuff -- you want to keep it to a minimum and

12   keep the rope in.

13           So that notch does not go down over the top

14   and back of the mast so that it's well up on the --

15   it's well up on the sheave rim, so I believe when they

16   boomed up previously they had incurred some contact,

17   caused some scrubbing, caused some damage --

18       Q.    Caused some contact with what?

19       A.    The rope scrubbed the steel plate.  That's a

20   curved steel plate right there at the top and it curves

21   right up and it separates and there's two -- the plate

22   continues to run across and the sheaves sit right

77

1   between them.  When you boom up too high, your rope can

2   hit the back end of that notch.

3       Q.    All right.  And that would be true no matter

4   what diameter the rope was, right?

5       A.    Well, if this crane was made for 26

6   millimeter rope and it had 28 millimeter in it, the

7   rope would not be sitting in the bottom of the tread of

8   the sheave as it should be.  It would be riding higher

9   in the sheave.

10          So whatever angle problem we would have here

11  and potential contact would be amplified because I

12  think we had a mismatch rope.

13      Q.    But -- well, you've never seen the rope

14  certificate, have you, for this particular wire?

15      A.    I believe the Coast Guard called out that

16  the rope required for this crane was 26 millimeter and

17  it gave a rope description, so that's the information I

18  went on that that was supposed to be the diameter and

19  then hence the sheaves that IHI installed here should

20  have been to the 26 millimeter as well.

21          When you put a fat rope in that, it won't

22  sit and it rides too high or rides high.  And any kind

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

78

1    of booming up like this that rope is already high out

2    of the sheave and it would be more inclined to contact

3    that plate guard than a 26 millimeter would by tiny

4    fractions, so I believe that contributed to it.

5         Q.    But you don't know how -- what the actual

6    diameter of the sheave was, do you?

7         A.    The diameter as being 18 inches or 24 inch

8    diameter and so on?

9         Q.    Yes.

10        A.    The diameter of the tread is the OD.   The

11   tread contour?

12        Q.    Yes, the tread contour.

13        A.    No, I don't.

14        Q.    And you don't know based on the -- when

15   sheaves like that are used, doesn't that contour sort

16   of flatten by virtue of the rope being -- or actually

17   widen a bit because of the friction with the wire rope

18   running through it?

19        A.    Technically what happens in a soft sheave,

20   meaning it's not flame hardened, a sheave that's

21   somewhat softer than the rope, as the rope gets longer

22   and narrower, you would typically cut a narrower

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

96

1   today?

2       A.    I think -- well, the evidence that I saw in

3   the rope, the damage, even the gouging marks appeared

4   to be -- the wires were gouged in the direction along

5   the steel surface in that the ropes being pulled into

6   it and you pushed back the steel and you slice through.

7           And that was very consistent with other cut

8   failures that I've seen, so that even the metal

9   movement was very consistent.  So the evidence that I

10  saw tells me that we have a problem, which would arise

11  from this question 3 that we would likely have contact

12  there.

13      Q.    But you don't know what the actual boom

14  angles that were utilized while this vessel was in

15  service prior to the casualty, do you?

16      A.    I'm sorry, sir?

17      Q.    You don't know or you don't have any

18  evidence that prior to the casualty -- and I'm not

19  talking about the day of the casualty, but prior to --

20  that this crane Number 4 on the Leon I was being

21  operated at 78 degrees or higher?

22      A.    There was severe chafing and scrubbing,

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

97

1    metal displacement and loss with embedded corrosion and

2    pitting in the wires that were in the immediate --

3    within millimeters of the ends of the failures at the

4    separation point.

5            That wire had been severely chafed and cut,

6    certain wires had been chafed and cut prior to the day

7    of the accident.  How long before, I don't know, but

8    there was immediate -- immediate is locational --

9    damage in that region.

10       Q.    If we look at -- I'm going to flip just a

11   couple pages ahead.  There's a whole bunch of questions

12   that start with the title metal loss and corrosion.

13   And there's a -- if you turn to the second page about

14   three-quarters of the way down the page there is a

15   title wire rope diameter.  Do you see that?

16       A.    Yes.

17       Q.    Now, I take it that these are questions that

18   you were assisting Mr. Asperger with when he was

19   questioning other experts; is that right?

20       A.    Yes, sir.

21       Q.    Okay.  I'm looking specifically at Number 2,

22   which states, quote, once a wire rope relaxes without

103

1  criteria based on diameter and number of diameters and

2  the construction of the rope.

3      Q.    Well, let me ask you this:  Are you

4  suggesting there that ABS during its inspection in the

5  shipyard in China in November and December of 1999

6  should have been able to identify the existing damage?

7      A.    I don't know if the damage was existing on

8  that day in China.

9      Q.    You can't say one way or the other; is that

10  right?

11     A     I can't say, correct.

12     Q.    So if I were to tell you that Mr. Hislop

13  rendered an opinion that there was preexisting damage

14  on the wire rope while the vessel was in China, you

15  would disagree with that statement that he could make

16  that --

17     A.    No, I wouldn't disagree with that.

18     Q.    Why wouldn't you disagree with it?

19     A.    That's Mr. Hislop's opinion.

20     Q.    But you can't say one way or the other

21  whether it was preexisting damage; isn't that right?

22     A.    The corrosion that I saw and the damage I

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

104

1    saw was accruable between the day of the accident

2    backwards to the day it left China.  It could have

3    happened anywhere in there especially with the

4    corrosion and pitting that was there in a six month

5    window and it could have happened before, that as well,

6    so I don't have a window to say.

7        Q.    But to say it did happen before that would

8    be speculating, wouldn't it?

9        A.    Mr. Hislop's assumption may be based on some

10   things he saw that I didn't see for some reason, and I

11   have to go to that place whereever you were quoting

12   from and sort of try to understand what his statement

13   really is.

14            MR. CLYNE:  I'm going to pass the

15   questioning to Mr. Whitman at this time.

16            MR. WHITMAN:  Let's take 45 minutes.

17            (Luncheon recess.)

18        EXAMINATION BY COUNSEL FOR DEFENDANT

19        ETERNITY SHIPPING, LTD AND EUROCARRIERS

20   BY MR. WHITMAN:

21        Q.    Mr. Parnell, my name is Tony Whitman.  We

22   met earlier and I represent the owners and managers of

113

1    do you use the term meat hook?

2         A.    No.

3         Q.    What term do you use to describe that

4    condition?

5         A.    Well, the wires are gouged and peeled and

6    the wires are splayed.  I've used that word before, the

7    wires are turned, and I have used fishhook, so they're

8    all giving a mental image of the wire lifting up or

9    it's off the surface of the rope and bending some

10   direction.

11        Q.    You were here yesterday for the deposition

12   of Captain Pop; is that right?

13        A.    Yes, sir.

14        Q.    What, if anything, did Captain Pop's

15   testimony add to the bases of any opinions that you

16   have in this case?

17        A.    What did he say that would add to my

18   opinion?

19        Q.    Yes, sir, or would support any opinions that

20   you have in this case.

21        A.    I think the strongest piece of information

22   that I heard was that he felt strongly that there were

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

114

1   -- there was prior damage to the rope before the

2   accident based on what -- he also saw corrosion and

3   other physical damage.

4        He did not feel like that it had happened at

5   the moment and instant of the incident with the boom

6   falling and all this damage occurred over at one

7   instant time.  I got the general gist of it was he felt

8   it had occurred at some time in the past and was there

9   on the day of the accident.  Does that answer your

10  question?

11       Q.    Is there anything else that he said that you

12  believe supported your opinion?

13       A.    Yes.  Actually, he said that there was

14  relatively no clearance between the side of the sheave

15  and the sidewall in which the sheave rests and would be

16  nearly no -- well, in his fact, the rope could not come

17  off the sheave sideways and go down along the wall and

18  then sheer across the sheave panel, which was -- would

19  be the natural event.

20       He indicated there was no way based on his

21  inspection -- and he was on that ship numerous days

22  after the accident from what he said, and he looked at

115

1    a number of the pictures.

2           And he said that there was no way that the

3    rope could have come off sideways off the sheave.  And

4    in my remarks to Mr. Sayenga and some of the other

5    experts, there was a continuing -- at least in Mr.

6    Sayenga's, I believe, there's a continuing concept that

7    the rope could have possibly failed in his opinion

8    around a small radius failure.

9           And I didn't think the rope physically

10   represented that kind of failure and Mr. Pop or Captain

11   Pop confirmed that in his opinion the rope couldn't

12   have come off sideways and performed in that way and

13   failed in that way.

14        Q.    Did you have occasion to look at the

15   photographs that Captain Pop had with him yesterday?

16        A.    I don't know if I saw all of them, I mean,

17   to be real frank with you.

18        Q.    Let me see if I can put in my own words your

19   theory of how this happened.  We have here Parnell

20   Exhibit 5 which shows, as I understand it, the housing

21   at the top of the actual crane cab itself on the Leon

22   I; is that right?

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

120

1   the wire rope would have contacted the sheave guard or

2   the sheave guard in the configuration as you've

3   described it?

4        A.    Yes, sir.

5        Q.    You've done calculations?

6        A.    Yes, sir, for length.

7        Q.    And for length of the wire rope?

8        A.    Yes, sir.

9        Q.    And where are those calculations?

10       A.    Well, there's some simple calculations here

11  on the side, but at a boom -- at -- because there's no

12  exact boom length on this drawing.  There are radiuses

13  identified and angles, but between a -- with a 56-foot

14  boom, I estimated based on the scale here to 60-foot

15  boom length.

16            That gave me somewhere between about 112 to

17  120 foot of rope was a target area that we might have

18  this contact.  The reeving appears to me that the

19  luffing hoist socket dead ends back at the mast end.

20  How far it's in or how much extra rope is taken up by

21  wherever it's connected it is to be not --

22       Q.    You don't know?

121

1    A.    I don't know the exact footage, but it's

2    really close when you come from the mast area and you

3    -- with a dead end socket, you go out to the boom point

4    for your run and come back.

5         At the first entry point right there, you're

6    very close to the footage that Captain Pop came up with

7    as -- 115 foot 9 plus 11 feet would be 126, 127 feet,

8    and that 127 is to the failure point and I just

9    eyeballing it came up within maybe 120 foot.

10        And I don't know how much rope is taken to

11   make that socket attachment at the base of that mast,

12   so I'm within very few feet of that rope section that

13   failed being right at that top mast point at the moment

14   of failure and at the contact point.

15        Additionally, the Coast Guard by their

16   evidence suggested there were rope -- shreds of rope,

17   fiber rope core still around that immediate sheave mast

18   area, and I believe Captain Pop in one of his reports

19   indicated the same piece of information.

20        It drove me back that I started to

21   understand where the failure occurred based on the

22   footage mark and the attachment of the reeving system

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

122

1    and that top mast sheave area looked like the exact

2    failure point to me.

3        Q.    Okay.  Other than these length calculations,

4    did you do any calculations of angle to determine

5    whether in fact the wire rope would rub against the

6    sheave guard?

7        A.    I -- on this chart, on this drawing --

8            MR. ASPERGER:  For the record, can we

9    identify the dates?

10           MR. WHITMAN:  We did.

11           THE WITNESS:  There is some angle noted here

12   and it appears to be as a copy of a copy of a copy --

13   it says ABT 70 something degrees.  Whether that's 78

14   degrees -- and ABT, I don't know if that's about 78

15   degrees, but I have no protractor scale or arranged

16   diagram which is technically what should reflect the

17   exact boom angle.

18           This is a very simple schematic and the boom

19   stops are not shown or located such that how much --

20   and how much compression can the boom stops take, which

21   means you can continue -- you may be able to continue

22   to boom up -- you know, it's --

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

125

1    condition?

2        A.    Pop saw corrosion at the failure point.  I

3    saw corrosion and pitting at the failure point and

4    scrubbing -- old scrub, old metal loss and it could not

5    have occurred in a single event on that same day.

6        Q.    Would the scrubbing cause corrosion?

7        A.    The scrubbing removes lubricant and once we

8    had bare steel exposed will likely -- well, we will

9    attract corrosion, oxidation on the surface and then it

10   will start eating into the steel.

11            It's the removal of lubricant that's the

12   problem, as well as the metal loss which is

13   structurally a problem,  but the lubricant going away

14   is -- the corrosion action starts up.

15       Q.    Okay.  You were referring to notes which

16   appear to have been made by you on a copy of -- your

17   copy of the Cedar Stav Deposition Exhibit 3, which is

18   Captain Pop's October 15 report.  These notes are notes

19   which you took during Captain Pop's deposition

20   yesterday?

21       A.    Yes, sir.

22       Q.    And in preparation for today's deposition?

143

1    and then go to those hot spots first of all because

2    that's likely where you're going to have the greatest

3    amount of views and degreasing those specific areas.

4    Take a look at those wires at the surface.

5              We're also checking for fatigue breaks and

6    for cycle loading, so there's lots of things you have

7    to get down and bear wire to identify.

8         Q.    The area where you believe the failure

9    occurred, would that be one of the hot spots in a crane

10   like the Leon I?

11        A.    In that case, it's not a production crane.

12   It's a utility crane, so it has to be able to reach all

13   over the hold, and you would -- you would inspect

14   sections of that rope at intermittent intervals.

15              In my opinion, I wouldn't -- there wouldn't

16   be any -- besides the infittings, there's no hot spot

17   in that rope since the boom has to have full range of

18   motion and work in its entire throw, so that would be

19   an overall rope inspection.

20        Q.    Based on your observation of the wire rope

21   and assuming that wire rope was in a condition -- in

22   relatively the same condition just prior to the

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

144

1  casualty, is it your position that the monthly

2  inspections done by the crew of the Leon I should have

3  revealed that that wire rope needed to be replaced?

4          MR. ASPERGER:   That presumes facts not in

5  evidence.   Presumes that there were in fact monthly

6  inspections by the Leon crew, so I'll object to it on

7  that basis.

8  BY MR. CLYNE:

9      Q.   Well, had there been an inspection say one

10  month before the casualty, is it your opinion that that

11  wire rope would have needed to be replaced?

12     A.   Yes, sir.

13     Q.   And what's the basis for that opinion?

14     A.   If what the Coast Guard provided in their

15  report is a reasonable basis for performing a rope

16  inspection on shipboard cranes, they indicate all

17  running wire ropes are to be visually inspected at each

18  annual and retesting survey.

19          The crane owner or operator is to examine

20  the wire rope, including the inconnections, at frequent

21  intervals between surveys.

22          Item B, wire rope is not to be used in any

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

145

1    length of 10 diameters, the total number of -- if any

2    -- if in any length of 10 diameters, the total number

3    of visible broken wires exceeds 5 percent of the total

4    number of wires if there is more than one broken wire

5    immediately adjacent to an infitting, if the broken

6    wires are concentrated in one area or one strand, or if

7    the rope shows signs of excessive wear, corrosion,

8    flattening, kinks, separation of the strands or wires,

9    core failures or other defect which renders it unfit

10   for use.

11          And based on that, I would say that the rope

12   -- I think that comes from ABS's 1991 guide for

13   certification of cranes notice Number 1, Section 7.11,

14   inspection of rope -- of wire rope.

15          Based on that information or instruction to

16   inspect, which is at frequent intervals between

17   surveys, there were numerous places along the rope body

18   that certainly exceeded the minimum requirements called

19   out here and would have been rejectable.

20          And the lubricant on this rope was very

21   heavy.  When they lubbed it, I don't know, but the last

22   guy that lubbed it should have -- he probably had a --

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

146

1    I would assume he had a dry enough rope to lube.

2              Even if it would still have some film, that

3    looked like hand-applied lubricant to me, not

4    machine-applied lubricant.  Even in the hand

5    application of lubricant he likely would -- or could

6    easily have snagged his glove or lubrication applier on

7    the broken wires that were sticking up out of the rope.

8              So I think they should have been caught,

9    yes, by a couple of parties, even the inspector,

10   whoever that might have been, and the lubricator,

11   whoever that might have been, if they were different

12   people.

13       Q.    You're talking now about monthly inspections

14   and the inspector designated aboard the vessel,

15   correct?

16       A.    Correct.

17       Q.    And are you aware of the fact that that very

18   process that you described of holding the wire rope

19   with gloves occurred when the wire ropes were removed

20   from the prior vessel, the Yannis K?

21       A.    No, sir.

22       Q.    You're not aware of that?

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

156

1    case.  That's what he's asking.

2                THE WITNESS:  Yes.

3    BY MR. CLYNE:

4        Q.    And is it your testimony that even though

5    you don't know the clearance that a 1 millimeter

6    difference in diameter of the wire rope would make --

7    would make a difference in your -- strike that.  Let me

8    start over again.

9                Did you ever find any measurements of 29

10   millimeters in the diameter of the wire rope when you

11   measured it?

12       A.    No, I did not.

13               MR. CLYNE:  No further questions.

14           EXAMINATION BY COUNSEL FOR DEFENDANT

15           ETERNITY SHIPPING, LTD AND EUROCARRIERS

16   BY MR. WHITMAN:

17       Q.    Let me follow up on one point.  With regard

18   to the size of the wire rope, the size of the sheave, I

19   believe your earlier testimony had been to the effect

20   that an oversized wire rope would ride on only two

21   points in the sheave; is that right?

22       A.    Yes.

157

1    Q.    And that that would result in scrubbing of

2    the wire rope; is that right?

3    A.    It may -- there may be some over time and

4    number of cycles -- there may be some damage accrued on

5    those two bearing lines on the rope body.  A lot has to

6    do with cycles of lifts and load applied.

7         One time or two times may not -- in light

8    loads may not leave any remarkable impression or

9    flatten any wires off or do anything serious to the

10   sheave, but over time if the sheave is not heat

11   treated, it may wear into the sheave.  If the sheave is

12   harder than the rope, we may end up with metal loss on

13   the rope as a result, so all of them are relative to

14   activity going on.

15   Q.    Let's assume for the moment that the sheave

16   here was harder than the rope.  What sort of physical

17   evidence then would you expect to see on the wire rope

18   that had been going over that sheave?

19   A.    With very light loads and very little use,

20   almost none.  The naked eye probably couldn't detect

21   the peening to the wire surfaces in the two tracks.

22   You might actually pick up more indication by disturb

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

163

1  CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2      I, Sherry L. Brooks, Notary Public, the officer

3  before whom the foregoing deposition was taken, do

4  hereby certify that the foregoing transcript is a true

5  and correct record of the testimony given; that said

6  testimony was taken by me stenographically and

7  thereafter reduced to typewriting under my direction

8  and that I am neither counsel for, related to, nor

9  employed by any of the parties to this case and have no

10  interest, financial or otherwise, in its outcome.

11      IN WITNESS WHEREOF, I have hereunto set my hand

12  and affixed my notarial seal this 11th day of October

13  2005.

14

15  My commission expires:

16  June 1, 2007

17

18

19  NOTARY PUBLIC IN AND FOR

20  THE STATE OF MARYLAND

21

22