```
                                                              1
 1              C O N F I D E N T I A L

 2                     V O L U M E  1

 3         IN THE UNITED STATES DISTRICT COURT

 4            FOR THE DISTRICT OF MARYLAND

 5                   (Northern Division)

 6   IN THE MATTER OF              *
                                        ORIGINAL
 7   THE COMPLAINT OF              *

 8   ETERNITY SHIPPING, LTD. AND   * Civil Action No.

 9   EUROCARRIERS, S.A.            * L01CV0250

10   FOR EXONERATION FROM OR       *
                                        CONFIDENTIAL
11   LIMITATION OF LIABILITY       *

12                        ----------

13            Deposition of KEVIN HISLOP

14              Baltimore, Maryland

15             Monday, August 9, 2004

16                    10:06 a.m.

17   Job No.:  1-39302

18   Pages:   1 - 238

19   Reported By:  Dawn M. Hart, Notary Public, RPR/RMR

20

21

22
```



L.A.D. REPORTING & DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

CONFIDENTIAL DEPOSTION OF KEVIN HISLOP - VOLUME 1
CONDUCTED ON MONDAY, AUGUST 9, 2004

105

1  A   It's common sense. Common sense, fiber is
2  weaker than a wire. I mean what -- can I just refer
3  to this for a moment?
4       (Retrieving.)
5       Breaking load, 44 tons.
6  Q   Well, what does that mean?
7  A   Well, the wire was put under test I
8  understand and it broke at considerably lower than
9  44 tons; is that not correct?
10 Q   You mean -- are you talking about the
11 destructive testing that was done by the Coast Guard?
12 A   Yes, yes.
13 Q   Anything else that you can add to that?
14 A   Only what is described in -- may I -- yes,
15 some of the research.
16      (Reviewing.)
17 Q   Let me move on. We're going to go through
18 your report anyway, sir.
19 A   Okay.
20 Q   This particular crane was rated for 20 tons;
21 is that correct?
22 A   At the time of manufacture in 1971, or at

106

1  the time of testing?

2    Q    The LEON 1 cranes, at the time of the

3  retrofit.

4    A    Okay. The LEON 1 cranes that were taken

5  from the YANNIS K, they were constructed in 1971, were

6  D rated, downrated to 20 tons --

7    Q    Correct.

8    A    -- from 25.

9    Q    And in fact, when the Coast Guard directed

10  that the destructive testing of the cranes be

11  performed, what was the conclusion from that

12  destructive testing?

13    MR. ASPERGER: Destructive testing of the

14  cranes?

15    Q    I'm sorry, the wire rope.

16    A    Excuse me.

17    Q    Go ahead.

18    A    (Reviewing.)

19    The safe working load of a crane and the

20  strength of the wires are not really related because

21  in this instance, I mean there was no load on the

22  crane when it failed. Two men in a basket doesn't

114

1    A    I spoke to a gentleman at Lloyd's Register.

2    Q    What's his name?

3    A    Nick Tinsley.

4    Q    And what is his position at Lloyd's?

5    A    Senior surveyor in the Miami office of
6    Lloyd's Register.

7    Q    Any other surveyors?

8    A    Oh, there's a guy at DMV, but I cannot
9    recollect, I can't remember his name because he's
10   Norwegian, he's got an unusual name, Norwegian, but I
11   can possibly get it.

12   Q    What was the sum and substance of your
13   discussion with Mr. Tinsley?

14   A    I described the fact that these cranes were
15   taken off a scrapped vessel, and he shared my opinion
16   that when you take a scrapped vessel, the entire
17   vessel is considered as scrap and it's -- a prudent
18   shipowner wouldn't just take the cranes from a scrap
19   vessel and put them onto another vessel without doing
20   some significant overhauling because they're deemed as
21   scrap. And he shared my opinion that -- and so many
22   others have -- that a prudent shipowner/ship operator

123

1  BY MR. CLYNE:

2      Q   Mr. Hislop, I'd like to turn to your report
3  now, and in particular Opinion No. 1.  Is it a fair
4  summary of Opinion No. 1 that you believe that there
5  were material defects on the wire rope that failed at
6  the time of the survey in China in 1999?

7      A   Yes.

8      Q   Is it -- okay.

9      A   Yes.

10     Q   And is it also fair to say that these
11 defects were not adequately addressed at the time of
12 the survey?

13     A   No, no, no, no, that's -- these defects were
14 not established because of the type of survey and the
15 specifications carried out.  ABS doesn't call for
16 internal examination, but every -- nearly every other
17 wire inspection authority does.  And perhaps if ABS
18 included an internal examination of their wires, then
19 we wouldn't be sitting here today and these two
20 gentlemen would be alive.

21     Q   Are you saying that if an internal
22 examination was done, the wire ropes would have been

130

1   the recognized and correct procedures, does it also
2   include the ABS procedures?
3       A    Well, no, no, I would say not, because the
4   ABS procedures are lacking. If he had internally
5   examined -- sorry, if the wire rope for luffing -- the
6   luffing wire rope for Crane No. 4 had been internally
7   examined, there might have been damage detected.
8       Q    Might have been.
9       A    There might have been. But certainly it
10  would have been detected it had a fiber core that was
11  unsuitable for use on that crane as per the
12  recommendations. So it was -- it would have found the
13  wire, the core and said, this is not suitable because
14  there's only one, only one.
15      Q    The casualty did not occur because the wire
16  rope had a fiber core, did it, sir?
17      A    Yes, it could have been a contributory
18  factor.
19      Q    How so?
20      A    Because it's not recommended by the
21  manufacturer.
22      Q    It's not recommended?

CONFIDENTIAL DEPOSTION OF KEVIN HISLOP - VOLUME 1
CONDUCTED ON MONDAY, AUGUST 9, 2004

131

1  A    Not recommended by the manufacturer's
2  specification of wire rope, luffing wire rope.
3  Q    Sir, I'm asking you to go a little further
4  and tell me --
5  A    Sorry.
6  Q    -- how I'm going to take -- I'm going to
7  accept what you say, that it's not recommended by the
8  manufacturer. Now I'm going to ask you how, based on
9  your experience and with your technical proficiency, I
10 want to know how the fact that the wire rope had a
11 fiber core contributed to the casualty.
12 A    Can I answer that question by quoting once
13 again the U.S. Coast Guard April 2001 --
14 Q    If that's what you relied on.
15 A    No, no, I don't rely on it. I'm just going
16 to quote this before I answer the question.
17       In comparison to the crane manufacturer's
18 recommendations, the diameter of the rope -- referring
19 to Crane No. 4 luffing wire -- was two to three
20 millimeters too large. And in lieu of a fiber core,
21 the rope should have had an independent wire rope
22 core. The fact that a larger diameter wire rope was

222

1      MR. CLYNE: I know, and he's given me an
2 answer. I accept the answer. Now I'm trying to find
3 out whether it relates to the casualty or not.
4      A    It doesn't relate to the casualty.
5      Q    Let's move on. What's the next thing you
6 disagree with?
7      A    Okay. Okay, the whole conversion project
8 was executed under constant survey. How does he know
9 that the owner's technical representatives, two
10 superintendents, Mr. Graham were there constantly.
11     Q    You're questioning that?
12     A    Yes. How does he know that? You asked me
13 if I disagreed with that, if I had an opinion as to
14 his opinions.
15          Okay. Moving on, Operation of Cranes,
16 Opinion 2. The fact that the YANNIS K and LEON 1 are
17 different in arrangement, construction, dimensions is
18 immaterial. I disagree with that. If the YANNIS K
19 and the LEON 1, in my opinion, if they were sister
20 ships we would not be sitting here today.
21     Q    Why is that?
22     A    Because then the, it would have been

CONFIDENTIAL DEPOSTION OF KEVIN HISLOP - VOLUME 1
CONDUCTED ON MONDAY, AUGUST 9, 2004

236

1  CERTIFICATE OF SHORTHAND REPORTER/NOTARY PUBLIC
2       I, Dawn M. Hart, Registered Professional
3  Reporter, the officer before whom the foregoing
4  proceedings were taken, do hereby certify that the
5  foregoing transcript is a true and correct record of
6  the proceedings; that said proceedings were taken by
7  me stenographically and thereafter reduced to
8  typewriting under my supervision; and that I am
9  neither counsel for, related to, nor employed by any
10 of the parties to this case and have no interest,
11 financial or otherwise, in its outcome.
12      IN WITNESS WHEREOF, I have hereunto set my hand
13 and affixed my notarial seal this 21st day of August
14 2004.
15 My Commission Expires:
16 January 1, 2005
17
18
19 _____
20 NOTARY PUBLIC IN AND FOR THE
21 STATE OF MARYLAND
22

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664