## Page 1

```
                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
                        (NORTHERN DIVISION)
                   Civil Action No. L-01-CV-0250


       IN THE MATTER OF THE COMPLAINT
       OF ETERNITY SHIPPING, LTD.           Deposition of:
       AND EUROCARRIERS, S.A. FOR
       EXONERATION FROM OR LIMITATION       ROY GRAHAM
       OF LIABILITY


           T R A N S C R I P T of testimony taken
       stenographically by and before MARY JO MONTELEONE,
       a Certified Shorthand Reporter and Notary Public
       of the State of New Jersey, at the offices of
       HILL, RIVKINS & HAYDEN, ESQUIRES, 45 Broadway,
       Suite 1500, New York, New York, on Wednesday, June
       25, 2003, commencing at approximately 10:00 a.m.




                      A. BACCARO ASSOCIATES
                    Certified Shorthand Reporters
                         120 Morris Avenue
                     Springfield, New Jersey 07081
                 Phone: (973) 467-7890  Fax: (973) 467-8822
                 E-Mail: reporters@abaccaroassociates.com


               A. BACCARO ASSOCIATES  (973) 467-7890
```

## Page 2

APPEARANCES:

ASPERGER, CARAHER, ESQUIRES
Three Illinois Center
303 East Wacker Drive, Suite 1000
Chicago, Illinois 60601
Telephone (312) 856-9901
By: JEFFREY J. ASPERGER, ESQUIRE
Appearing on behalf of the Claimants,
Robert J. Cantey, William Langeville and Tate &
Lyle North American Sugars, Inc.

OBER KALER, ESQUIRES
120 E Baltimore Street
Baltimore, Maryland 21202-1643
Telephone (410) 547-0699
By: M. HAMILTON WHITMAN, JR., ESQUIRE
    ERIC M. VEIT, ESQUIRE
Appearing on behalf of Limitation Plaintiff(s),
Eternity Shipping LTD. And Eurocarriers, S.A.

HILL, RIVKINS & HAYDEN, ESQUIRES
45 Broadway, Suite 1500
New York, New York 10006-3739
Telephone (212) 669-0600
By: ROBERT G. CLYNE, ESQUIRE
Appearing on behalf of the Third-Party Defendant,
American Bureau of Shipping

BRUNKENHOEFER & ASSOCIATES
1770 Tower II
555 N. Carancahua
Corpus Christi, Texas 78478
Telephone (361) 888-6655
By: R. BLAKE BRUNKENHOEFER, ESQUIRE
Appearing by Telephone on behalf of Claimant,
Josefina Gonzales

## Page 3

### INDEX

| WITNESS NAME | PAGE |
|---|---|
| ROY GRAHAM: | |
| By Mr. Whitman | 5, 120 |
| By Mr. Asperger | 72 |
| By Mr. Clyne | 112 |

### EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Graham-1 | Notice of Deposition of Roy Graham | 4 |
| Graham-2 | Interoffice Correspondence dated 11-26-00 (00042) | 36 |
| Graham-3 | Correspondence to Graham from Adamopoulos (00393-00401) | 36 |
| Graham-4 | Letter dated 11-26-99 to Kekridis from ABS Europe (00026) | 40 |
| Graham-5 | Guide for Certification of Cranes 1991 (01573-01648) | 42 |
| Graham-6 | ABS Cargo Gear Register Book for Leon-I (00001, 00003, 00064-00135) | 50 |
| Graham-7 | ABS Register of Cargo Gear for Leon-I (000061-000128) | 51 |
| Graham-8 | Lifting Load Test Report dated 12-20-99 (001677) | 55 |
| Graham-9 | Process Instructions (01325-01531) | 56 |
| Graham-10 | Register of Lifting Appliances dated 12-20-99 (001419-001433) | 56 |

## Page 4

| | | |
|---|---|---|
| Graham-11 | SQ-5356-B Report dated 12-20-99 (00240-00245, 00252) | 59 |
| Graham-12 | SQ-5356-B Report dated 12-20-99 ((00237-00238) | 63 |
| Graham-13 | Transcript from Interview of 9-25-00 (000163-000179) | 67 |

### REQUESTS FOR INFORMATION

PAGE     LINE

(None)

## Page 17

```
1    Q.   Let's go back, then again, to late
2  1999. What is the first you do recall, at this
3  point, Mr. Graham, of your involvement with the
4  Leon I?
5    A.   I don't really recall much as far as
6  the beginning of the job. I mean I was assigned
7  the job, obviously. I don't know if I was already
8  assigned to that shipyard and maybe I had another
9  job that was finishing up and they just assigned
10 me to that job because I was still there or
11 whatever.
12       I believe the shipyard was on an
13 island off of Shanghai where it involved taking a
14 ferry -- I remember to go there you had to take a
15 ferry. It was one of the more difficult shipyards
16 to travel to. That's probably the first thing I
17 remember about it. I don't really recall much
18 about the initial visit to the shipyard. It was
19 basically routine.
20       I would go to a shipyard, meet with
21 the owner -- owners, have what we called a kickoff
22 meeting, discuss what was going to be done, the
23 schedule, you know, go over any drawings or plans
24 and any documentation letters that had been
25 correspondence from the technical office.
```

## Page 18

```
1         In this case, they had submitted
2  drawings and had been approved for this
3  installation and modification by ABS technical in
4  Piraeus. So we were reviewing those faxes and all
5  that technical documentation. Then basically, we
6  have a kickoff meeting and decide what -- the
7  scheduling of surveys and the scheduling of the
8  repairs and the extent of the repairs. And we
9  discussed with the shipyard at the same time what
10 materials they are going to use, what procedures
11 they are going to use, the qualifications of their
12 welders, any testing that I'm going to require
13 after the job is complete.
14       So we have shipyard representatives
15 and owner representatives and myself, and we sit
16 down at a table like this and discuss, so
17 everything gets clear in the beginning of the job.
18 I don't specifically remember that meeting but I
19 know we had a meeting of that nature.
20   Q.   You've described your custom and
21 practice with regard to a kickoff meeting?
22   A.   Right.
23   Q.   You don't recall the specific kickoff
24 meeting for this vessel but you're confident that
25 such a kickoff meeting did take place?
```

A. BACCARO ASSOCIATES (973) 467-7890

## Page 19

```
1    A.   Yes.
2    Q.   Okay. Do you recall your actual
3  attendance on board or at the Leon I, during any
4  time during the course of her shipyard period?
5    A.   Yes. I was there, I would say,
6  almost every day. I can't say that I was there
7  every day. Sometimes I would go back to Shanghai.
8  It was an hour or two travel back to Shanghai, so
9  sometimes if there was a period where nothing
10 crucial was going on, or nothing that I needed to
11 see was happening in the next few days, I would go
12 back to the office and take care of stuff in the
13 office and then I would come back on the following
14 Monday or...
15       MR. CLYNE: Let's just, if I may, he
16 asked you do you recall any time attending aboard
17 the ship. The answer is yes or no, and then he'll
18 up with a question. It will move a lot faster.
19       THE WITNESS: Sorry. Yes, I do.
20   Q.   Do you recall whether this was the
21 only ship that you were attending at that time?
22   A.   I don't recall.
23   Q.   During this period of time, do you
24 have a recollection of being on board or attending
25 at any other vessel other than the Leon I?
```

## Page 20

```
1    A.   No, I don't recall.
2    Q.   Do you recall the name of any owner's
3  representative or representatives that you dealt
4  with in connection with the Leon I?
5    A.   I believe the main superintendent or
6  owner's representatives was Stoyian. I don't
7  remember his last name. It was a difficult one.
8    Q.   What the name Stoyian Terziev sound
9  familiar?
10   A.   Yes.
11   Q.   Do you recall another gentleman by
12 the name of Thomas Tampathanis?
13   A.   I know he had two assistants there.
14 I can't recall their names.
15   Q.   So Mr. Terziev had two assistants, is
16 that what you're saying?
17   A.   Yes, I believe so.
18   Q.   Do you recall whether you were in
19 attendance when the cranes that were to be loaded
20 -- were to be installed aboard the Leon I actually
21 arrived in the shipyard?
22   A.   No, I don't believe I was there at
23 the time when they arrived.
24   Q.   Do you recall whether or not they
25 actually arrived on board the Leon I?
```

1  MR. CLYNE: Object to the form. If
2  you understand the question you can answer.
3  A.  I don't believe so -- no, I don't
4  recall.
5  Q.  Okay. That's fine.
6  Is it correct that at least part of
7  your attendance for the Leon I involved ABS's
8  certification in connection with the installation
9  of the cranes?
10  A.  Yes.
11  Q.  What was your understanding at that
12  time of what your job was to be? That is to say,
13  what were you going to do in connection with the
14  certification of those cranes?
15  A.  Well, it was my understanding from
16  the faxes from the technical office that the
17  cranes were already ABS certified cranes. They
18  had an existing current -- meaning not expired --
19  cargo gear register that was valid when the cranes
20  were on another vessel.
21  So I was under the understanding that
22  the cranes were already certified, the plans had
23  already been approved and I was -- the major
24  portion of the job was going to be the
25  construction of the pedestals, foundations and any

1  components or the cranes themselves before they
2  were physically installed on the Leon I?
3  A.  Yes.
4  Q.  What do you remember of that?
5  A.  I recall the cranes were on the dock
6  somewhere -- in the shipyard somewhere and the
7  main portions of the cranes -- and they had been
8  instructed -- the shipyard had been instructed by
9  the owners to disassemble the crane, mostly the
10  moving parts of the crane, for inspection and
11  overhaul and examination by the owners and myself.
12  Q.  And what did you do yourself in terms
13  of inspection of the cranes and their components?
14  A.  During my routine visits, I was going
15  to the vessel every day to look at the steel
16  renewals. I would stop by the cranes. They were
17  kind of on the way to the vessel, and observation
18  of what stage they had gotten in the last day or
19  so, and inspect whatever parts were available for
20  inspection.
21  It was kind of an ongoing process.
22  Every day I looked at something, looked at
23  something different.
24  Q.  Do you recall looking at the cables,
25  the topping lift cables and the hoisting cables?

22
1  structural modifications that involved, you know,
2  the steel modifications involved in supporting the
3  crane structures. And then once the installation
4  was complete, that a retesting, a full retesting,
5  normal routine testing survey would be carried
6  out.
7  Q.  Tell us what you did then in
8  connection with that steelwork that you have
9  described.
10  A.  Well, that was a very involved job.
11  Like I said, we -- I went over with the shipyard
12  as far as what materials they were going to use,
13  the welder's qualifications, any welding
14  procedures and drawings, dealt mostly with the
15  shipyard and the owner at the time on how it was
16  going to be constructed and the phases of when
17  they were going to install major portions of the
18  foundations, etcetera, and the welding. And I was
19  there every day, or most of the time, doing
20  follow-up, looking at welding -- actually,
21  weldings -- and during the whole procedure of the
22  welding process.
23  Q.  All right. Let's focus then on the
24  cranes themselves. Do you remember actually
25  inspecting, physically inspecting any crane

24
1  A.  Yes.
2  Q.  Were they physically installed on the
3  cranes at that time?
4  A.  No.
5  Q.  What did you do to inspect or look at
6  those cables?
7  A.  I walked the length of them. They
8  were laid out in various locations around the dock
9  and around the shipyard and loosely coiled areas.
10  They had been taken off the spools and off the old
11  crane and taken out for inspection to see if there
12  were any problems with them.
13  Q.  What was the purpose of your
14  inspecting them?
15  A.  It was going to be part of the final
16  reinspecting survey and this was the best
17  opportunity to see them.
18  Q.  Do you recall whether you found any
19  problems with any of those cables?
20  A.  No, I didn't.
21  Q.  So your testimony is, just to make
22  sure, because my question was awkward, to the best
23  of your recollection, you found no problems with
24  any of those eight cables; is that right?
25  A.  That's correct.

113

1  EXAMINATION BY MR. CLYNE:
2      Q.   Mr. Graham, I just have a few
3  follow-up questions.
4           You gave some testimony regarding
5  your inspection or survey, if you will, of the
6  cables, and in connection with those questions
7  that were asked of you by Mr. Whitman, when he
8  mentioned cables, do you understand them to be the
9  wire ropes associated with the cranes for the Leon
10 I?
11     A.   Yes, I understood that question to be
12 wire ropes.
13     Q.   So you inspected the wire ropes for
14 all of the cranes for the Leon I; is that correct?
15     A.   Yes.
16     Q.   That's included the luffing wires as
17 well?
18     A.   Yes.
19     Q.   I believe you described that these
20 wire ropes or cables were laid out on the dock; is
21 that correct?
22     A.   Yes.
23     Q.   And if you could, for us, just
24 explain how you actually went about that.
25     A.   Well, I just -- I took the time one

114

1  day when I was walking to the vessel, stopped and
2  just began tracing the lines, walking the length
3  of the coils around and inspecting the cables from
4  one end to the other.
5      Q.   How close, in terms of distance,
6  could you visually get to the wire ropes with
7  respect to them?
8      A.   I was standing right on them.
9      Q.   You could get right up close to them;
10 is that right?
11     A.   Yes, yes.
12     Q.   With respect to other surveys that
13 you have done in which wire ropes were required to
14 be inspected, can you compare whether in this
15 particular instance the wire ropes were more
16 accessible and easier to visually inspect or were
17 they less accessible?
18     A.   Much more accessible.
19     Q.   In this particular instance, with
20 respect to the Leon I, you were able to get a
21 closer look than you normally would with respect
22 to this type of survey; is that correct?
23     A.   That's correct.
24     Q.   You found no problems with those wire
25 ropes; is that right?

A. BACCARO ASSOCIATES  (973) 467-7890

115

1      A.   That's correct.
2      Q.   Now, did there come a time after that
3  initial inspection -- let me back up and ask you
4  an initial question.
5           When, in terms of the overall survey,
6  did you inspect the wire ropes?
7      A.   I don't recall. Somewhere, I would
8  say, somewhere in the middle of -- I think the
9  vessel was there a month. Probably in the middle
10 there. Two weeks into the job.
11     Q.   These wire ropes were laid out on the
12 dock, correct?
13     A.   Yes.
14     Q.   Did there come a time that you looked
15 at the wire ropes again?
16     A.   Yes. I saw the wire ropes -- I saw
17 some of the wire ropes when they were being
18 installed on the cranes and got another look at
19 them then, and then after completion of all the
20 wire rope installations, when I did a general
21 inspection of the drums and the machinery rooms of
22 the cranes, and the pullies and the shivs and all
23 that, I did complete another survey of the working
24 gear and got another look at the wires again.
25     Q.   What did you find in connection with

116

1  that inspection or survey?
2      A.   No defects were noted.
3      Q.   What criteria did you use in terms of
4  determining whether the wire ropes were acceptable
5  or not?
6      A.   The process instructions, again, one
7  of those attachments has a very detailed
8  guidelines on inspecting wire rope.
9      Q.   Were those the guidelines that you
10 utilized?
11     A.   Yes.
12     Q.   Now, regarding the limit switches,
13 you testified that the limit switches for all of
14 the cranes were tested; is that correct?
15     A.   Yes.
16     Q.   And I think, in response to Mr.
17 Asperger's questions, you indicated that the limit
18 switches were not tested during the proof load
19 test; is that correct?
20     A.   Correct.
21     Q.   When were they tested?
22     A.   Just prior to the proof load test,
23 during the operational function test of the
24 cranes.
25     Q.   Does it make a difference as to

## Page 121

```
 1  was inherently a procedure that might have some
 2  risk on any vessel?
 3          MR. ASPERGER: Objection, form.
 4     A.   It was a general -- the general
 5  comment that most owners mention, that they don't
 6  want -- they don't want to do anything that's --
 7  has a potential when it's not required.
 8          MR. WHITMAN: That's all I have.
 9          MR. ASPERGER: No questions, thank
10  you.
11          MR. CLYNE: Blake, anything?
12          MR. BRUNKENHOEFER: No.
13          (Whereupon the deposition is then
14  concluded.)
```

## Page 122

```
 1              C E R T I F I C A T E
 2
 3     I, MARY JO MONTELEONE, a Certified Shorthand
 4  Reporter and Notary Public of the State of New
 5  Jersey, do hereby certify that prior to the
 6  commencement of the examination the witness was
 7  duly sworn.
 8
 9     I DO FURTHER CERTIFY that the foregoing is a
10  true and accurate transcript of the testimony as
11  taken stenographically by and before me at the
12  time, place and on the date hereinbefore set
13  forth.
14
15     I DO FURTHER CERTIFY that I am neither a
16  relative nor employee, nor attorney or counsel to
17  any of the parties involved; that I am neither
18  related to nor employed by such attorney or
19  counsel, and that I am not financially interested
20  in the outcome of the action.
21
22          _____
                MARY JO MONTELEONE, CSR
23              Certified Shorthand Reporter
                Of the State of New Jersey
24              License No. X101370
25
```

A. BACCARO ASSOCIATES (973) 467-7890

## Page 123

```
 1  July 10, 2003
 2  Mr. Robert G. Clyne
    Hill, Rivkins & Hayden, L.L.P
 3  45 Broadway, Suite 1500
    New York, New York 10006-3739
 4
 5  Re: In The Matter of the Complaint of Eternity
        Shipping, Ltd., et al.
 6      Deposition of Roy Graham
 7
 8  Enclosed for review is your copy of the
    above-referenced deposition, which includes an
 9  Acknowledgment of Deponent. Please have the
    deponent read the copy of the transcript and sign
10  the enclosed Acknowledgment of Deponent. Also
    enclosed is an errata sheet which the deponent
11  should use to note corrections/changes. The
    errata sheet(s) should be signed and dated by the
12  deponent.
13  Maryland Rules stipulate that the deponent has
    thirty days in which to read and sign the
14  transcript. After the deponent has reviewed the
    copy of the transcript, please return the
15  Acknowledgment of Deponent and any errata sheets
    to our office at 120 Morris Avenue, Springfield,
16  New Jersey 07081.
17  If you have any questions regarding this matter,
    please contact us.
18
```

## Page 124

```
 1  A. BACCARO ASSOCIATES
    Certified Shorthand Reporters
 2  120 MORRIS AVENUE
    SPRINGFIELD, NEW JERSEY 07081
 3  (973) 467-7890
 4              ERRATA SHEET
 5  Case Name: In The Matter of the Complaint of
 6      Eternity Shipping, Ltd., et al
 7
    Witness Name: Roy Graham
 8  Deposition Date: June 25, 2003
 9  Page No.  Line No.   Reason For Correction/Change
```

Signature _____ Date _____