IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT OF ETERNITY SHIPPING, LTD. AND EUROCARRIERS, S.A., FOR EXONERATION FROM OR LIMITATION OF LIABILITY | CIVIL ACTION NO. L01CV0250 |
| TATE & LYLE NORTH AMERICAN SUGARS, INC., | |
| Claimant and Third-Party Plaintiff | |
| v. | |
| AMERICAN BUREAU OF SHIPPING | |
| Third-Party Defendant | |

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF AMERICAN BUREAU OF SHIPPING'S MOTION FOR SUMMARY JUDGMENT

Third-Party Defendant, American Bureau of Shipping ("ABS"), by its attorneys, Robert G. Clyne and James A. Saville, Jr. of Hill Rivkins & Hayden LLP, and James M. Bartlett, III of Semmes Bowen & Semmes, P.C., submits this Supplemental Memorandum in Support of its Motion for Summary Judgment with respect to the claims of Third-Party Plaintiff, Tate & Lyle North American Sugars, Inc. ("Tate & Lyle") and Third-Party Plaintiff, Josephina Gonzales ("Gonzales") (collectively "Third-Party Plaintiffs") and states as follows:

### PRELIMINARY STATEMENT

On July 29, 2000, while crane no. 4 of the M/V Leon I was being operated by the ship's bosun in clear violation of the Shipboard Operations Manual and in excess of its safe working parameters, the luffing wire of crane no. 4 parted and the crane collapsed. Approximately six (6)

months prior to the casualty, in November/December 1999, ABS performed a survey of the cranes and issued a cargo gear certificate.

ABS initially filed its motion for summary judgment with respect to the claims of Tate & Lyle and Gonzales on October 6, 2004. As a result of Tate & Lyle's submission of inadmissible evidence in response to ABS' motion, briefing was not completed until February 5, 2005.[1] Following an application from Tate & Lyle to re-open discovery, this Court allowed Tate & Lyle to depose Captain Heiner Popp and allowed the parties to depose Tate & Lyle's belatedly identified rebuttal expert, Mike Parnell, regarding his criticisms of the previously submitted expert reports. (Docket No. 137). Capt. Popp was deposed on October 6, and Mr. Parnell was deposed on October 7, 2005. The Court's October 4, 2005, Order also set an October 31, 2005 deadline for "filing supplemental briefs based upon the deposition testimony of Capt. Popp and Mr. Mike Parnell." (Docket No. 137).

During their depositions both Capt. Popp and Mr. Parnell agreed that any attempt to conclude that there was damage to the wire rope at the time of ABS' 1999 survey would amount to speculation and guesswork. (Exhibit R p. 58; Exhibit S pp. 87-88). Following its "reactive" litigation strategy and without seeking leave of Court, Tate & Lyle thereafter served a further "backdoor" expert report on the evening of October 26, in which Donald Pellow, a newly retained expert, based solely upon copies of photographs, rendered an additional opinion as to

---

[1] Despite having knowledge that *any part* of a U.S.C.G. Marine Casualty investigation is not admissible as evidence or subject to discovery in any civil proceeding, 46 U.S.C. §6308, Tate & Lyle again intentionally ignores this statute and has submitted to this Court a copy of the U.S.C.G. interview of Roy Graham, ABS' Surveyor. (Tate & Lyle Exhibit Z). This is absolutely improper and ABS objects to its inclusion and respectfully requests that the Court strike Exhibit Z from Tate & Lyles motion and disregard any reference in Tate & Lyle's brief regarding the same. See *Falconer v. Penn Maritime, Inc.*, 2005 WL 2767144 (D. Me. 2005); *Baker Hughes Oilfield Operations, Inc. v. Seabulk Tankers, Inc.*, 2004 WL 859199 (E.D. La. 2004).

2

the nature, extent and duration of certain conditions present on the wire rope(the "Pellow Report"). Based upon this inadmissible evidence, Mr. Parnell submitted a further report (the "Supplemental Parnell Report") which now alters his testimony under oath. Limitation Plaintiffs and ABS objected to these submissions.

Following the November 1, 2005, conference call with the Court, on November 8, the Court issued an Order allowing Tate & Lyle to submit a supplemental summary judgment brief, as envisioned by the Court's October 4, 2005 Order, that also was to contain a section responding to "ABS' and Eurocarriers' letters regarding experts Parnell and Pellow." (Docket No. 142). Despite the license taken by Tate & Lyle in its 28 page submission, ABS did not understand that the Court's November 8, 2005, granted the parties carte blanche to re-hash old arguments, espouse new theories based upon old evidence, and recklessly, if not intentionally, distort and re-characterize undisputed facts in a last ditch effort to fabricate a material issue of fact where none exists.

Tate & Lyle has utterly failed to demonstrate that the recent testimony of Capt. Popp introduced any new evidence or raised issues which they otherwise were not aware of prior to his deposition.[2] Moreover, these new experts reports do not even pretend to rely on any purportedly new evidence. The essential point, however, is that Tate & Lyle has not introduced any new evidence which would support a claim against ABS. Simply put, Mr. Popp's observations pertain to the very same wire rope examined by Tate & Lyle shortly after the casualty and again examined by Tate & Lyle's expert some time ago. This hardly constitutes new evidence.

---

[2] As Mr. Parnell was designated as a rebuttal expert, one would hardly expect his deposition to generate new factual evidence.

3

Consequently, ABS respectfully submits that the Court should strike and disregard the Pellow Report and the Supplemental Parnell Report which are not admissible and otherwise amount to nothing more than a third and fourth bite at the expert apple.[3] Even if this Court were to allow these submissions, Tate & Lyle has not established any wrongdoing on the part of ABS or a causal link between the ABS survey and the casualty, as set forth herein and in greater detail in ABS Motion for Summary Judgment. Accordingly, ABS respectfully submits that it is entitled to judgment as a matter of law.

# ARGUMENT

## POINT I

### TATE & LYLE HAS NOT MET ITS BURDEN OF ESTABLISHING THAT ANY NEW EVIDENCE WAS DISCOVERED DURING THE POPP DEPOSITION WHICH NECESSITATED THE ISSUANCE OF THE PELLOW REPORT AND THE SUPPLEMENTAL PARNELL REPORT

As justification for the last minute submission of the Pellow Report and the Supplemental Parnell Report, during the November 1, 2005, telephone conference with the Court, counsel for Tate & Lyle argued that these reports were necessary to address information which was discovered for the first time during the October 6, 2005 deposition of Capt. Popp. As these reports were served without Court Order and well after the close of expert discovery, the Court indicated that Tate & Lyle had the burden of demonstrating that the Supplemental Parnell Report and Pellow Report were necessary to address issues raised for the first time during the Popp deposition. If no such showing could be made, the reports would be stricken. Despite this clear guidance, in the twelve pages dedicated to this issue in its supplemental submission to the Court, Tate & Lyle has failed to point to any specific testimony of Capt. Popp which sets forth allegedly

---

[3] Mr. Parnell's first rebuttal report was produced without leave of Court on June 23, 2005, over a year after the June 7, 2004 deadline set by the Court.

4

new information. In fact, Capt. Popp's testimony concerned his observations of the very same luffing wire inspected by Tate & Lyle's expert, Mr. Parnell, over a year before Popp's testimony and available to Tate & Lyle shortly following the casualty through the present. Consequently, as there was no new evidence discovered during the Popp deposition, ABS respectfully submits that this Court should strike and disregard the Pellow Report and Supplemental Parnell Report.

In what can only be characterized as a smear campaign to overcome a lack of factual support, the "background" provided by Tate & Lyle to this Court is littered with inaccuracies and half-truths. Having previously failed to convince Magistrate Judge Bredar of the merits of its position regarding spoliation, Tate & Lyle once again sets forth wholly irrelevant "background" information, to cast ABS in a bad light and poison the trier of fact.[4] Indeed, on its face the "background" provided Tate & Lyle is wholly irrelevant to the issue of whether the Pellow Report and Supplemental Parnell Report address newly discovered information during the Popp deposition. Despite its irrelevance, given the inaccuracies set forth by Tate & Lyle, ABS is compelled to address the most pertinent misstatements below.

1. Tate & Lyle states, as a fact, that Limitation Plaintiffs and ABS conspired to mutually conceal from Tate & Lyle three written reports of Captain Heiner Popp, the surveyor hired on behalf of the vessel owners' P&I Club and, during this conspiracy, Eurocarrier's allowed ABS'

---

[4] The majority of the substantive background information set forth by Tate & Lyle had previously been submitted by Tate & Lyle in support of its spoliation motion against ABS and Eurocarriers. The motion was denied and Tate & Lyle's arguments therein prompted comments from Magistrate Judge Bredar such as, "The Court is unaware of any precedential support for that proposition, and Claimant [Tate & Lyle] cites to none," "Claimant's bald and overheated claim of evidence spoliation is wholly unsupported . . ." and "Instead the Court is left with the impression that the claimant attempted to seize great leverage based upon not very weighty claims." (Docket No. 122 pp. 2, 3).

experts to review these reports prior to submitting their expert reports. (Tate & Lyle Supplemental Brief at p. 2).

It goes without saying that there was and is no conspiracy between Eurocarriers and ABS. In fact, ABS is pursuing a claim for indemnity against Eurocarriers and has explored the factual basis for this claim during the depositions of Eurocarriers' witnesses. Furthermore, Eurocarriers had initially asserted privilege over these reports and it defies belief that counsel for Eurocarriers, M. Hamilton Whitman, would breach his client's privilege and surreptitiously produce these reports to ABS and not Tate & Lyle. Once again, counsel for Tate & Lyle has offered no evidence to support these reckless and irresponsible accusations.

2. Tate & Lyle states that neither Capt. Popp's August 3, 2000 report nor the August 9/14, 2000 report were disclosed to them prior to Capt. Popp's deposition. (Tate & Lyle Supplemental Brief at p. 2). To the contrary, the August 3, 2000, report was produced by Eurocarriers in advance of the deposition of Carl Cederstav (Eurocarriers' liability expert) when his expert file was produced. Indeed, when questioned by counsel for Tate & Lyle, Mr. Cederstav testified that he had been provided with both reports. (Exhibit T pp. 199-200). Tate & Lyle never followed up.

3. Tate & Lyle further states to this Court without any support "Under cross examination at their depositions, ABS and Eurocarriers experts acknowledged that they had considered Popp's investigation and findings in formulating their opinions." (Tate & Lyle Supplemental Brief at p. 4, 5). To the contrary, the Popp reports were not provided to ABS' experts nor were

they used in formulating their opinion. As counsel for Tate & Lyle already knows based upon his own questioning and the prior briefs submitted in connection with the spoliation motion, ABS received Mr. Popp's survey report at the very same time as Tate & Lyle, just prior to the deposition of Mr. Carl Cederstav. This undisputed fact is confirmed in the deposition of Willem Schoonmade (ABS' crane expert):

> Q. Anything else that you requested?
> A. Yes, there is a – the report of Mr. Heiner Popp, the initial report I requested and that seemed to be some kind of – seemed to be kind of privileged information.
> Q. Privileged information?
> A. That's what I understand.
> Q. So it was not provided to you?
> A. I have not seen yet Mr. Heiner Popp's report.
> MR. CLYNE: For the record, I think Mr. Popp's report was produced with the expert reports.
> MR. WHITMAN: It was produced either with or shortly before or after, I forget which now.
> A. Well, I've requested for it in the very early stage.
> Q. All right.
> MR. WHITMAN: It was produced recently.
> Q. In any event, you do not recall having seen it yet?
> A. I have not seen it yet.

(Exhibit U pp. 44-45)

As ABS was never provided with the Popp reports, Tate & Lyle's persistently bald assertion that ABS was compelled by the rules of discovery to disclose these reports is utterly baseless.[5]

4. Tate & Lyle's assertion that it could not have deposed timely Capt. Popp because ABS asserted that his testimony was privileged is completely mystifying. (Tate & Lyle Supplemental Brief at p. 3). This statement is unsupported, illogical and false. Capt. Popp was retained by

---

[5] Tate & Lyle made these very same accusations to no avail in its spoliation motion. Where Tate & Lyle first got the notion that ABS received the Popp reports at an earlier stage of the litigation is a mystery. Tate & Lyle's persistence, however, in this baseless, malicious accusation is sanctionable.

Eurocarriers, not ABS. Thus, ABS has no standing to assert privilege. Unsurprisingly, Tate & Lyle points to no evidence to support its allegation because none exists.

Tate & Lyle spends much of the remainder of its brief distorting the record and making the flawed argument that Popp's testimony corroborates Parnell's opinion and seemingly contradicts the position of ABS' and Eurocarriers' experts. That, however, is not the issue. The issue which the Court posited to counsel is whether the Pellow Report and Supplemental Parnell Report were necessary to address newly discovered information during the deposition of Capt. Popp. Not only has Tate & Lyle failed to set forth any new evidence, but these new expert reports do not even purport to rely upon any new evidence.

In essence, Capt. Popp, who is not a wire rope expert, testified as a fact witness regarding the conditions he observed on the parted luffing wire at the time of his post-casualty inspections. Although not cited by Tate & Lyle, Capt. Popp agreed that any attempt by him to state when those conditions existed prior to the casualty would be mere "guesswork." (Exhibit S, p. 87-88). Tate & Lyle focuses on Capt. Popp's testimony regarding the purported presence of rust as the justification for the submission of the Supplemental Parnell Report. However, it is clear that this was not the first time this information was available to the parties.[6] As previously stated, Tate & Lyle had access to the luffing wire during the initial investigation of the casualty and, as discussed below, Mr. Parnell performed a microscopic examination of the wire rope – something that Capt. Popp never did.

---

[6] Despite its professed surprise following Capt. Popp's deposition, Tate & Lyle's characterization of the condition of the wire rope is nothing new. As the Court is aware from Tate & Lyle's opposition to ABS' summary judgment motion, its appointed expert, Kevin Hislop, opined, albeit without any evidentiary support, that the wire rope was not in good condition at the shipyard in December 1999. (Tate & Lyle Amended Response p. 12)

Neither the Pellow Report nor the Supplemental Parnell Report make any reference to, no less rebut, the testimony of Capt. Popp. In fact, Tate & Lyle characterizes the Supplemental Parnell Report as merely expanding and elaborating on his prior testimony – although it clearly changes it. (Tate & Lyle Supplemental Brief at p. 11). Plainly, there is no relation between the Popp deposition and the belated reports of Pellow and Parnell. Furthermore, the photographs taken by Capt. Popp which purportedly reflect the condition of the wire rope shortly after the casualty were produced to all parties by Eurocarriers years ago. (Bates Nos. EC2638-EC2700). In fact, these are the very same photographs relied upon by Pellow and Parnell as the basis for their new "opinions."

Finally and most importantly, the wire rope was accessible to Tate & Lyle from the early days of the casualty. Thereafter, Mr. Parnell himself performed a microscopic examination of the wire rope in August 2004, and during that inspection, purportedly found signs of corrosion and other damage. (Exhibit R pp. 44-46). Tate & Lyle has argued that wire rope does not deteriorate further while in storage. By its own argument, then, the wire rope inspected by Mr. Parnell was in the same condition as the day on which it was inspected by Capt. Popp. Therefore, Mr. Parnell had the same access to the wire rope and viewed the same conditions found by Capt. Popp. In view of this prior Parnell inspection, it is evident that nothing that Capt. Popp testified to was the first time any of the parties, no less Tate & Lyle, learned of it. To the contrary, not only were photographs available years before but Mr. Parnell himself inspected the wire rope. The fact that Tate & Lyle and its expert chose not to perform any further analysis or consult further resources prior to issuing his report does not serve as a basis for the submission of

9

further reports.

In sum, it is clear that Tate & Lyle has not met its burden of demonstrating that the Pellow Report and Supplemental Parnell Report were necessary to address evidence developed for the first time during the testimony of Capt. Popp. Clearly, the subject matter of Popp's testimony was otherwise available and, most certainly, available to Mr. Parnell in August 2004. Consequently, ABS respectfully submits that this Court should strike and disregard the Pellow Report and Supplemental Parnell Report.[7]

## POINT II

### EVEN IF THIS COURT ACCEPTS THE PELLOW REPORT AND SUPPLEMENTAL PARNELL REPORT, ABS IS NEVERTHELESS ENTITLED TO SUMMARY JUDGMENT

Although there is no case precedent in the Fourth Circuit, based upon the cases which have addressed the liability of classification societies, the proper cause of action against class is negligent misrepresentation rather than negligence as plead herein. *See Otto Candies LLC v. NKK Corp.*, 346 F.3d 530 (5th Cir. 2003); *Sundance Cruises Corporation v. The American Bureau of Shipping*, 799 F. Supp. 363 (S.D.N.Y. 1992) *aff'd*, 7 F.3d 1077 (2d Cir. 1993). However, regardless of whether Third-Party Plaintiffs' claims are couched in terms of

---

[7] To the extent the Court is inclined to deny summary judgment to ABS and allow the Pellow Report and Supplemental Parnell Report, ABS respectfully requests that it be permitted to not only re-depose Mr. Parnell as to the basis of his new opinions but also Mr. Pellow as to the basis for his conclusions. ABS further requests that it be permitted, to the extent necessary, to retain further experts and submit further expert reports on the issues raised by Parnell and Pellow.

negligence or, more correctly, negligent misrepresentation, Third-Party Plaintiffs have not met their burden of establishing a causal connection between ABS' survey and the casualty.

It is well settled that a party opposing a motion for summary judgment must offer, and the court may only consider, admissible evidence that raises a genuine issue of material fact. *Major v. CSX Transportation, Inc.*, 278 F.Supp.2d 597 (D. Md. 2003). Once a defendant has filed a motion for summary judgment, plaintiff has the burden of establishing every element of its case and, if they fail as to any one element, Rule 56 mandates that summary judgment be entered. *Aldridge v. Goodyear Tire & Rubber Corp.*, 34 F.Supp.2d 1010 (D. Md. 1999). Opposition based upon speculation is not enough. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). ("Genuineness means that the evidence must create a fair doubt; wholly speculative assertions will not suffice."). Furthermore, it is well established that no genuine issue of material fact is created when there are no controverted facts or, alternatively, the non-moving party resorts to conclusory statements, evidence mischaracterization and inadmissible opinion testimony. *11 James W. Moore et. al., Moore's Federal Practice* §56.13[2]-[4] (Matthew Bender, 3d ed.); *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004)(noting stark assertions are not sufficient to survive summary judgment).

In support of its claim against ABS, Tate & Lyle argues at length that the wire rope *after the casualty* showed signs of corrosion and suggests that the fact the wire rope was, at best, 2mm, or 1/16 of an inch, larger than the manufacturer's specification contributed to this casualty. Although ABS disputes these allegations, the more important point is that Tate & Lyle's theories as to how the casualty occurred –much less ABS' role in causing the crane collapse – are wholly

11

speculative, unsupported and littered with improper assumptions such that ABS is entitled to judgment as a matter of law.

In what has become a trademark of Tate & Lyle's counsel, misstatements of the facts (intentional or otherwise) underlie Tate & Lyle's argument with respect to the diameter of the wire rope. Rather than acknowledge and address the actual testimony of John Peticca of I & I sling, Tate & Lyle makes the reckless representation to the Court that "I&I Sling certified the diameter of the rope as 28-29 mm, on December 21, 2000. See Exhibit CC, I&I Sling Test Certificate." (Tate & Lyle Supplemental Brief at 23). In fact, Mr. Peticca testified to the absolute contrary:

> Q: First thing, is that the diameter, the twenty-eight to twenty-nine millimeter?
> A: Yes
> Q: And where did you obtain this information from? Were you copying it from another sheet or was it based on your own measurements?
> A: I copied that from another sheet.
> Q: Okay. Do you recall what sheet that was?
> A: I'm not quite sure.
> Q: That's fine. It came from a source other than your own measurements, then, right?
> A: Right.
> (Exhibit V pp.26-27)

Although the actual measurements of the post-casualty wire rope varied from 26-28mm and assuming the worst case scenario (i.e. the wire rope was 1/16 of an inch larger than the manufacturer's specifications) neither Tate & Lyle nor Gonzales have offered any evidence to support their claims that Mr. Graham's surveys were in violation of the 1991 Guide or were otherwise inadequate. Indeed, the undisputed and corroborated facts set forth in ABS Motion for Summary Judgment demonstrate that Mr. Graham performed the Annual Cargo Gear Survey and Retesting Cargo Gear Survey properly and in accordance with the 1991 Guide and there were no

12

defects in the wire rope, limit switches or general operation of the gear associated with crane no. 4. (*See* ABS Memorandum in Support of Motion for Summary Judgment, pp. 29-32). Notably, Mr. Parnell was not asked by Tate & Lyle, and did not render an opinion, regarding ABS' survey of the wire rope. (Ex. R, p.49).

Furthermore, Tate & Lyle's theory that the nominal increase in diameter resulted in the luffing wire riding high in the sheave which lead to "scrubbing and uneven wear" is speculative and unsupported. (Tate & Lyle Supplemental Brief at p. 23). This *might* qualify as a theory if Tate & Lyle knew the dimensions of the sheave and the diameter of the wire rope in that section of the sheave but is has not bothered to determine either. It is undisputed that Mr. Parnell has never been aboard the M/V Leon I, no less taken the actual measurements of the sheave in question. (Exhibit R pp. 46-47 ). Furthermore, Mr. Parnell has not even bothered to obtain any documentation regarding the actual aperture of the sheave in question. As a consequence, Mr. Parnell's so-called theory is a "throwaway" based solely on speculation and guesswork. There is no evidence that the size of the wire rope had anything to do with the cause of the casualty. Thus, Mr. Parnell's entire inadmissible theory on the possible cause of the loss amount to pure speculation without any evidentiary support.[8] Speculative theories cannot defeat a motion for summary judgment. *See Ross* 759 F.2d at 364.

---

[8] ABS objects to the wholesale inclusion of the Supplemental Parnell Report and Pellow Report in Tate & Lyle's Supplemental Brief. These statements are plainly hearsay, unsworn and ABS has not had the opportunity to cross-examine these witnesses as to the basis of their conclusions. For the Court to even consider the foregoing without the benefit of cross-examination by ABS is highly prejudicial. In our prior briefs, we raised the issue of improperly submitted expert evidence and cited pertinent case law; yet, Tate & Lyle continues to ignore the evidentiary restrictions thereby demonstrating contempt for this Court and the Federal Rules of Civil Procedure.

Tate & Lyle's arguments regarding the existence of corrosion and the existence of pre-existing damage likewise fail to pass muster. First, with respect to any pre-existing damage, until Mr. Parnell changed his sworn testimony, every person who has testified regarding the existence of pre-existing damage was unable to state whether the damage was present at the time of ABS' inspection or agreed that any attempt to state when that damage occurred would constitute speculation or guesswork. (Exhibit R p. 58, 103; Exhibit S pp. 87-88; Exhibit N pp. 162-63). Indeed, Mr. Parnell testified that "I do not know if the damage existed that day in China." (Exhibit R p. 103).

Such a conclusion is consistent with the undisputed facts in this matter. In particular, between December 1999, the time the vessel left the Da Dong shipyard, and July 29, 2000, the date of the casualty, the ship's cargo gear and associated wire rope were used frequently for lifting equipment. The undisputed testimony establishes that at the port of Pulupandan, Philippines, the cranes were engaged in near continuous twenty four hour a day loading operations from at least January 29, through February 14, 2000. (Exhibit J, pp 44-48, Exhibit J-3). Furthermore, as set forth in more detail in ABS' motion for summary judgment, the wire ropes were repeatedly in good condition when they were inspected on three (3) separate occasions at three (3) separate times by two (2) different people prior to the casualty. (Ex. I, pp. 40-43, 57-58; Ex. G. pp. 113-115; Ex. J, pp. 42-43, Exhibit J-2).[9] Given the regular use and interim inspections, any potential causal connection between the ABS survey and the casualty would be remote and, as admitted by Mr. Parnell, it would constitute pure speculation to opine that the damage was present at the time of ABS' survey.

---

[9] These citations refer to the exhibits submitted in support of ABS' motion for summary judgment.

Eurocarriers had an independent obligation to inspect the cargo gear including the safety devices and wire ropes during the approximate six (6) month time period when the vessel was in service between the date of Graham's survey and the casualty. According to the available maintenance records, they did so. (Exhibit K, p. 229, Exhibit K-3, §4.06; Exhibit H, pp. 92, 158-159; Exhibit I, pp. 66-67). Indeed, a shipowner has the ultimate responsibility and control of the vessel as well as the non-delegable duty to furnish a seaworthy ship. *Sundance Cruises Corp. v. The American Bureau of Shipping*, 7 F.3d 1077 (2d Cir. 1993). Plainly, the use of the cargo gear in the six (6) month period for handling cargo and moving equipment and the periodic inspections further separates any potential causal link between the ABS survey and the casualty and Mr. Parnell's report and testimony do nothing to alter this conclusion.

## CONCLUSION

For the reasons set forth herein, and in its Motion for Summary Judgment, ABS respectfully submits that it is entitled to summary judgment dismissing the third-party complaints of Third-Party Plaintiffs Tate & Lyle North American Sugars, Inc. and Josephina Gonzales.

Dated: New York, New York
November 16, 2005

/s/
Robert G. Clyne
Federal Bar No. 81037

/s/
James A. Saville
Federal Bar No. 81036
Hill Rivkins & Hayden LLP
45 Broadway, Suite 1500
New York, New York 10006
(212) 669-0600 Telephone
(212) 669-0698 Facsimile

/s/
James W. Bartlett, III
Federal Bar No. 00017
Semmes, Bowen & Semmes, P.C.
250 West Pratt Street
Baltimore, Maryland 21201-2423
(410) 539-5040 Telephone
(410) 539-5223 Facsimile

Attorneys for American Bureau of Shipping