## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

------------------------------x
IN THE MATTER OF THE COMPLAINT )
OF ETERNITY SHIPPING, LTD AND )
EUROCARRIERS, S.A. FOR ) Case No.:
EXONERATION FROM OR LIMITATION ) L01CV0250
OF LIABILITY )
------------------------------x

Deposition of R. MICHAEL PARNELL
Baltimore, Maryland
Friday, October 7, 2005
9:10 a.m.

Job No.: 1-64603
Pages 1 - 163
Reported By: Sherry L. Brooks

## Page 2

Deposition of R. MICHAEL PARNELL held at the law offices of:

OBER, KALER, GRIMES & SHRIVER
120 East Baltimore Street
9th Floor
Baltimore, Maryland 21012
(410) 347-7354

Pursuant to Notice, before Sherry L. Brooks, Court Reporter and Notary Public, in and for the State of Maryland.

## Page 3

APPEARANCES

ON BEHALF OF PLAINTIFFS:
  JEFFREY J. ASPERGER, ESQUIRE
  ASPERGER ASSOCIATES, LLC
  Three Illinois Center
  303 East Wacker Drive
  Suite 1000
  Chicago, Illinois 60601
  (312) 856-9901

ON BEHALF OF DEFENDANT ABS:
  ROBERT G. CLYNE, ESQUIRE
  JAMES A. SAVILLE, JR., ESQUIRE
  HILL RIVKINS
  45 Broadway
  Suite 1500
  New York, New York 10006-3739
  (212) 669-0600

## Page 4

APPEARANCES CONTINUED:

ON BEHALF OF DEFENDANT ETERNITY SHIPPING, LTD
AND EUROCARRIERS:
  M. HAMILTON WHITMAN, JR., ESQUIRE
  OBER, KALER, GRIMES & SHRIVER
  120 East Baltimore Street
  9th Floor
  Baltimore, Maryland 21202
  (410) 347-7354

ALSO PRESENT: Brent O'Connor, Paralegal

**41**

1  and that's where it got fouled.
2   Q. Okay. I just want to skip down now to the
3  -- your published training materials. Did any of these
4  materials that are listed here at the bottom of page 4
5  address inspections of wire ropes?
6   A. Yes.
7   Q. Which ones are those?
8   A. That would be included in rigging gear
9  inspection. There's a reference card and the wire
10 ropes there listed are on two panels. One panel
11 contains rope inspection information concerning mobile
12 cranes or boom cranes and one contains information on
13 overhead cranes inside of plants, so that --
14  Q. Is this a training material or a guide for
15 an operator of equipment?
16  A. Both.
17  Q. Both operator and what else?
18  A. You said is it training material. Yes, it's
19 training material and/or for operator, yes, it's for --
20  Q. What I'm trying to figure out is --
21  A. If I can take your attention to the top of
22 page 5, we produced five videotapes. One was solely

**42**

1  dedicated to wire rope inspection and running ropes and
2  standing ropes -- standing ropes are pendant lines and
3  things that hold a fixed position. Running ropes run
4  over drums and sheaves.
5      And other products have actually been
6  produced since then. They don't look like they're on
7  the list.
8   Q. The wire rope inspection maintenance and
9  application, does that basically cover it?
10  A. Yes.
11  Q. And you made that videotape; is that right?
12  A. Yes.
13  Q. And when you developed that videotape, what
14 criteria did you utilize in putting together the
15 presentation on the inspection part of it?
16  A. I stated them earlier. They're out of 29
17 CFR 1910. The crane related inspection items there
18 that deal with wire rope, ASME B30.2 and .5 and then
19 the Wire User's Manual. Those are all active and live
20 documents that I used in preparation for that tape.
21  Q. Now, what I was getting at before is would
22 this video -- this video would be good for somebody

**43**

1  that's operating equipment that incorporates wire
2  ropes, right?
3   A. Yes. If they're also designated to do some
4  of the inspections on a daily or monthly basis.
5   Q. That was my next question. Would it also be
6  useful for a company that their business is to perform
7  inspections?
8   A. Yes.
9   Q. I'd like to get a copy of that, if we could.
10  A. It's discontinued, but I could get you a
11 copy of it if you want. There are better videotapes
12 out there today that have made almost my tapes, you
13 know, obsolete. They're kind of talking head
14 chalkboard type videos that we all used to do a long
15 time ago, and we found other tapes that are better
16 image quality you might say.
17  Q. What would you consider to be, you know, the
18 best out there today, video, for something like this?
19  A. I'd have to -- there's a videotape by LAMCO
20 Rigging. They're out of Illinois. And there was one
21 -- there is one produced by the Associated Wire Rope
22 Fabricators, AWRF, and the wire rope manufactures went

**44**

1  together and put together a video on the manufacturing
2  and inspection of wire rope and I think that's very
3  well done, so there's a couple out there that do a good
4  job.
5   Q. Okay. Now, did there come a time -- strike
6  that. When did you first become involved in this case
7  or first hear about this case?
8   A. I just have to look at my records. I don't
9  know. '04 maybe. I think I got a call in the spring
10 maybe of last year and then I ended up coming to
11 Baltimore to look at the rope.
12  Q. Right. What were you asked to do at first,
13 to do the inspection of the rope?
14  A. Yes.
15  Q. Okay. And tell us how you went about doing
16 that.
17  A. I brought a tool bag and rags and cleaner
18 and I arrived at the site. We had submitted an
19 inspection protocol you might say or outline of what I
20 wanted to do with the rope, which would be a
21 nondestructive examination, just simply remove some
22 grease and take a look at the wires and look at the

DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005
Case 1:01-cv-00250-BEL   Document 144-2   Filed 11/16/2005   Page 3 of 7

12 (Pages 45 to 48)

45

1   failure and look at the rest of the rope.
2           And so we arrived at the site. We pulled
3   the pallets of rope out and started to lay them out and
4   I -- a couple things. I wanted to look at what best
5   identification I could get on the -- which pieces
6   matched to what area so that I could get a mental
7   picture of where they were in the boom hoist system.
8           And then I went over the sections of rope
9   starting at the socket and working my way down to the
10  other end. Of course the failure point was in the
11  middle of that or near to the socket end.
12          At each point I might find some damage. I
13  found some broken wires along the way. I found some
14  corrosion, pitting at the failure point. I inspected
15  that pretty hardly on both sides of the failure and
16  then kept working my way down the rope.
17      Q.  When you tried to get a mental picture of
18  where -- of how the wire rope fit on the cranes, how
19  did you go about doing that?
20      A.  Well, first I needed to -- I talked with the
21  people on site and some of the parties, and more or
22  less I was told that the similar type wraps or

46

1   boundings or mousing were the adjoining or mating
2   pieces, so there might be let's say two strip ties on
3   one end of a separation or a cut of one of the rope
4   samples and two strip ties on another.
5           That meant they went together. That was
6   what I was instructed, so I pieced it back together
7   that way and then the bear end of the rope at the far
8   end was at the drum end.
9           It looks like the system is set up in it
10  looked like to me based on the drawings provided that
11  looked like a six part line, so I looked at the
12  estimation of the drum height up to the mast and from
13  the mast to the boom connection point in the sheave
14  assembly and how long that is and how long it is boomed
15  up, how long it is boomed down and all of that.
16          So I just kind of worked along it and took
17  the measurements of the rope and that helped me
18  understand about where was this section of rope in that
19  reeving system. That's how I did it.
20      Q.  Did you ever go aboard the Leon I?
21      A.  No, sir.
22      Q.  So you've never inspected the crane and its

47

1   associated equipment; is that right?
2       A.  Correct.
3       Q.  You've never seen the sheaves that these --
4   this wire rope had fit into?
5       A.  Only photographs.
6       Q.  Tell us what you did then next. Did you
7   take measurements of the wire rope?
8       A.  Yes. I measured diameter, made notations.
9   There were copies made yesterday out of my field notes
10  that I suppose everybody has and so diameters.
11          I measured diameter down numerous times
12  along the sections of rope, particularly at the drum
13  end so that I could get what I hoped to be the truest
14  diameter because working through sheaves sometimes rope
15  has small -- reduces in diameter as it lengthens plus
16  it's a fiber core so it happens to physically reduce
17  even more.
18          So I came up with about 28 1/2 millimeter
19  was my -- was actual, so typically by trade you would
20  -- trade industry you'd call a 28 millimeter rope.
21  That's what I arrived at. Then I inspected it.
22          I took a rag and gloves and worked my way

48

1   along the rope to see if I could find any snags or
2   broken wires. I found a number of locations where
3   there were broken wires. Some I picked up by feel,
4   some I could pick up visually and some there were
5   numerous cut wires or broken wires in clusters.
6       Q.  Did you take photographs of those areas?
7       A.  I didn't. I was -- I did an all recorded
8   inspection, and there were -- I had received
9   photographs from Mr. Asperger and I felt like a lot of
10  these closeups of these wire ends and some of these
11  along the way whoever took them -- maybe Coast Guard or
12  other parties -- I felt that those were -- they matched
13  up with what I was seeing, so I didn't really see a big
14  sense in making a big photographic history of this.
15      Q.  You're referring to a binder and I believe
16  you're looking at color copies of photographs; isn't
17  that right?
18      A.  Yes, sir.
19          MR. CLYNE: Why don't we just mark as
20  Parnell Number 3 his binder and then we can work
21  through that?
22          (Exhibit Number 3 was marked for

Case 1:01-cv-00250-BEL   Document 144-2   Filed 11/16/2005   Page 4 of 7
DEPOSITION OF R. MICHAEL PARNELL
CONDUCTED ON FRIDAY, OCTOBER 7, 2005

13 (Pages 49 to 52)

---

49

1  identification and was attached to the deposition.)
2      (A break was taken.)
3  BY MR. CLYNE:
4      Q.  Mr. Parnell, you haven't been asked in this
5  case to give an opinion or render an opinion on the
6  adequacy of the ABS inspection of the wire rope in
7  China in 1999, have you?
8      A.  That wasn't specifically in my scope of
9  work.
10     Q.  And I'm asking the question because it
11 doesn't appear in your reports at all.
12     A.  Right.
13     Q.  And you don't feel qualified to do that
14 because you're not really exactly sure what class -- or
15 how the classification society approaches this type of
16 thing, right?
17     A.  Well, my information about the cranes and
18 the crane in question here come from the electrician
19 and some of the other depositions of other experts, Mr.
20 Pop from yesterday, those kind of things and some of
21 the photographs.
22         I have a personal general idea about those

---

50

1  things, but I don't have an idea about how I think you
2  said the ABS inspector did his job or --
3      Q.  Or was supposed to do his job.
4      A.  Yes.  I think I have his phone interview
5  with the Coast Guard, so that's just information that's
6  been provided for me to review.
7          MR. ASPERGER:  Bob, anticipating maybe where
8  you're going, we're not -- we haven't presented Mr.
9  Parnell as an expert on ABS inspections, but I think
10 you'll find as you examine him that his comments on his
11 opinions regarding the wire rope and the condition of
12 the wire rope in the period of time may reflect -- will
13 reflect on ABS's inspections.
14         MR. CLYNE:  I guess we'll have to see.
15 BY MR. CLYNE:
16     Q.  Can you tell us where in your binder your
17 field notes are for the inspection that you did of the
18 wire rope?
19     A.  Well, most of those for me are on what I
20 have tab 3.  I don't know if you have tabs or not, but
21 there are divisions or dividers.
22     Q.  Okay.  Can you show us where in tab 3 your

---

51

1  field notes are?
2      A.  Well, I guess the first place to start is I
3  have -- eight pages are marked in the lower right-hand
4  corner with Numbers 1 through 8, and so those are the
5  primary documents that I either had in my hand.  Number
6  1 is a back-at-the-office type sheet that I produced as
7  a result of 2 through 8, so it's just, so it's a
8  summary of those items.
9      Q.  Where did you record the measurements that
10 you took?
11     A.  Well, I have a measurement up at the top
12 left of 3, 27.3 to 28.5.  And I have at the top of 6 in
13 the left-hand column, I have 27.3 to 28.5 millimeters.
14 Are you on page 6?
15     Q.  Yes.  Is that the range of measurements you
16 took?
17     A.  Yes.  It appeared to me the -- what I call
18 the working section, the section of rope that gets
19 through the sheaves the most, runs through the sheaves,
20 typically has some small reduced diameter and
21 lengthening of lay.  And typically back at the drum end
22 which a portion of that rope lays on the drum

---

52

1  constantly, so it may not be experiencing much
2  reduction.
3          That's normally where you get the truest
4  diameter of the rope and that's where I came up with
5  28.5 millimeters, what I measured using additional
6  caliber.
7      Q.  Did you record where along the lengths of
8  the rope that you took these various diameters?
9      A.  No.
10     Q.  How many did you take?  How many
11 measurements?
12     A.  At least a dozen along the way.  At least.
13 Some may have been 20.  I mean, I was really --
14 ultimately what I start really to do is to make sure I
15 can refine what the diameter is along the lay of the
16 rope.
17         Sometimes ropes oval, so you want to
18 double-check and check in two directions at the same
19 area.  So once we got the rope laid out, the only thing
20 -- I believe the first thing I was really doing once I
21 got the ropes organized and which ones were which, I
22 tried to do all the caliber measurements first and then

Page 57

1 types of breaks under that or separation, so broken
2 wires just indicates separations.
3    Q.  Now, you mentioned prior damage. Can you
4 tell us what you meant by prior damage?
5    A.  Practically all of the torn wires that I saw
6 -- well, I guess I'll make -- at the top of page 2 in
7 the upper right-hand corner, I didn't find any fatigue
8 breaks or broken wires at the socket, which is from
9 vibratory activity, so it's at page 2 in the top
10 corner.
11       So fatigue breaks would be from lots of
12 cycles and vibratory fatigue can occur at a socket
13 since it's the dampening point for which the rope is
14 rusted and worries so that to the best of my
15 recollection all the breaks I found were a subject of
16 obstructional contact, tears, external stripping you
17 might say of the rope surface and the wires.
18       So at the broken wires, they were -- nearly
19 all of them contained corrosion and pitting on those
20 wires at the separation point. Once a wire gets ripped
21 and peeled, it stands up.
22       It may not have lube on it anymore. It may

Page 58

1 have lube, but over time, that lube goes away and
2 moisture and oxidation occurs and corrosion starts in,
3 rouging and corrosion moderate and heavy and you then
4 start losing chunks of steel, chunks of metal out of
5 it, so those torn wires typically -- nearly all of them
6 show corrosion and pitting in conjunction with their
7 separation point.
8    Q.  And those torn wires, did you form an
9 opinion as to how or why that happened in this case?
10    A.  Well, they appeared not to have occurred at
11 the moment of the incident because of the corrosion and
12 pitting. They appeared to have occurred over time
13 prior to the incident. I'm not sure if I answered the
14 question or not.
15    Q.  You can't say how much time prior, though;
16 isn't that right?
17    A.  No. I can only make educated guesses.
18    Q.  Right. You'd have to speculate; isn't that
19 right?
20    A.  Yes.
21    Q.  Okay. Now, you mentioned the term pitting
22 in your notes?

Page 59

1    A.  Yes.
2    Q.  But when I look at your report, I don't see
3 the term pitting in there. I see where you mention
4 gouge wires, metal loss and corrosion. Is there a
5 reason why you left the term pitting out of your
6 report?
7    A.  Which report are you making reference to?
8    Q.  I'm right now looking at your report dated
9 June 16th, 2005 regarding the Sayenga conclusions.
10    A.  Let me get to that report. In Mr. Sayenga's
11 -- reply to Mr. Sayenga's report, I don't see the word
12 pitting adjacent to the word corrosion, though it is in
13 Cedar Stav's reply, my reply to Cedar Stav, corrosion
14 and pitting. Corrosion, pitting and metal loss are
15 grouped together and no intentional omission or
16 submission either.
17       Either way typically it did get into Cedar
18 Stav's and maybe it was just an innocent leaving out.
19    Q.  How serious was the pitting that you
20 observed?
21    A.  Well, even at the 8 power and even at the
22 naked eye, in many cases, I could see significant

Page 60

1 disturbances to the surface of the wire, gouges or
2 valleys. And a gouge is a descriptive term of a
3 channeling or a tunneling out of material as opposed to
4 a gouge in the body of the wire that could cause a
5 separation.
6       So they're not to confuse the terms, but if
7 you could scoop out along the length of the wire with a
8 very tiny spoon and take metal away, there were long
9 and short chunks out along the wire surface. And that
10 was reasonably visible to the naked eye in some of
11 those cases, so some were microscopically discovered.
12 Some were by eyeball.
13    Q.  Now, you appreciate that wire ropes aboard
14 vessels are subjected to a highly corrosive marine
15 environment. Isn't that a fair statement?
16    A.  Yes. Well, saltwater, salt air is corrosive
17 agent I guess, yes.
18    Q.  And from the minute that wire ropes are put
19 into service, they will corrode to some degree; isn't
20 that right?
21    A.  No.
22    Q.  Okay. Well, what's wrong about that

101

BY MR. CLYNE:
Q. Did those notes factor into your opinion in any way?
A. My opinion hasn't changed and the -- so I have to go back and review the document, but I don't think it had any --
MR. ASPERGER: Do you want me to give it to him? I think I have it.
THE WITNESS: -- change -- it had no change in my opinion.
MR. CLYNE: Jeff, we'll grab them at the break.
BY MR. CLYNE:
Q. Let me go back to your report dated June 16th regarding Mr. Sayenga. The June 16th report is in your binder, right?
A. Yes, sir.
Q. Now, I want to focus your attention to the bottom of page 1, which is paragraph B. And you're disagreeing that the accident was not likely caused by any of the conventional factors including gross physical damage. Do you see that? I'm just asking if

102

you see it.
A. Yes.
Q. And you go on to say there was substantial and discoverable previous damage to the wires and strands at the point of failure. Do you see that?
A. Yes.
Q. Now I want to focus your attention on the next sentence which I'll read into the record. Quote, an inspector performing a normal inspection should have been able to identify the existing damage (gouged wires, metal loss and corrosion) in the area of failure. What inspector are you talking about there?
A. An inspector using standard -- assigning himself to a standard inspection criteria, an inspector should have been able to identify or locate that damage.
Q. What standard inspection criteria are you referring to?
A. Well, even -- which is in evidence here, even the Coast Guard calls -- if they apply themselves to nothing else, the Coast Guard even has -- draws attention to a broken wire standard, a broken wire

103

criteria based on diameter and number of diameters and the construction of the rope.
Q. Well, let me ask you this: Are you suggesting there that ABS during its inspection in the shipyard in China in November and December of 1999 should have been able to identify the existing damage?
A. I don't know if the damage was existing on that day in China.
Q. You can't say one way or the other; is that right?
A. I can't say, correct.
Q. So if I were to tell you that Mr. Hislop rendered an opinion that there was preexisting damage on the wire rope while the vessel was in China, you would disagree with that statement that he could make that --
A. No, I wouldn't disagree with that.
Q. Why wouldn't you disagree with it?
A. That's Mr. Hislop's opinion.
Q. But you can't say one way or the other whether it was preexisting damage; isn't that right?
A. The corrosion that I saw and the damage I

104

saw was accruable between the day of the accident backwards to the day it left China. It could have happened anywhere in there especially with the corrosion and pitting that was there in a six month window and it could have happened before, that as well, so I don't have a window to say.
Q. But to say it did happen before that would be speculating, wouldn't it?
A. Mr. Hislop's assumption may be based on some things he saw that I didn't see for some reason, and I have to go to that place whereever you were quoting from and sort of try to understand what his statement really is.
MR. CLYNE: I'm going to pass the questioning to Mr. Whitman at this time.
MR. WHITMAN: Let's take 45 minutes.
(Luncheon recess.)
EXAMINATION BY COUNSEL FOR DEFENDANT
ETERNITY SHIPPING, LTD AND EUROCARRIERS
BY MR. WHITMAN:
Q. Mr. Parnell, my name is Tony Whitman. We met earlier and I represent the owners and managers of

**157**

1  Q. And that that would result in scrubbing of
2  the wire rope; is that right?
3  A. It may -- there may be some over time and
4  number of cycles -- there may be some damage accrued on
5  those two bearing lines on the rope body. A lot has to
6  do with cycles of lifts and load applied.
7      One time or two times may not -- in light
8  loads may not leave any remarkable impression or
9  flatten any wires off or do anything serious to the
10 sheave, but over time if the sheave is not heat
11 treated, it may wear into the sheave. If the sheave is
12 harder than the rope, we may end up with metal loss on
13 the rope as a result, so all of them are relative to
14 activity going on.
15     Q. Let's assume for the moment that the sheave
16 here was harder than the rope. What sort of physical
17 evidence then would you expect to see on the wire rope
18 that had been going over that sheave?
19     A. With very light loads and very little use,
20 almost none. The naked eye probably couldn't detect
21 the peening to the wire surfaces in the two tracks.
22 You might actually pick up more indication by disturb

**158**

1  lubricant where it's pushed away. That would be a
2  leading indicator, just the movement of the lubricant.
3      With high cycles and high loads, you likely
4  would end up with peening or flattening of those wires
5  on those bearing areas. And I have seen occasions
6  where those lead almost immediately to broken wires in
7  two tracks, so long term it will long term be very
8  detrimental to the rope body and the surface life.
9      Q. The physical evidence that you just
10 described would be remarkable for the fact of the
11 straight line evidence. Would that be correct?
12     A. High loads, high cycles and a hard sheave.
13 I mean, all of those things have to be in alignment.
14     Q. And if it's not high load, high cycles and
15 hard sheave, you wouldn't have any --
16     A. You might have no remarkable results.
17     Q. You might? Is it most likely that you would
18 have none?
19     A. Most likely you will not have any remarkable
20 results or damage accrued.
21     MR. WHITMAN: That's all I have.
22     EXAMINATION BY COUNSEL FOR DEFENDANT ABS

**159**

1  BY MR. CLYNE:
2      Q. I just have one more follow-up. You said
3  you were recently given that statement from Mr.
4  Asperger of Mr. Graham of ABS, his statement to the
5  Coast Guard; is that right?
6      A. His phone conversation.
7      Q. Right. You recently received that?
8      A. I just received it last night. We had -- or
9  yesterday or two days ago his office faxed that to us.
10     Q. And I know I asked you this before, but I
11 just want to be certain about this, your opinion hasn't
12 changed as a result of reading that, has it?
13     A. No.
14     Q. So you don't have an opinion as to whether
15 Mr. Graham's inspection was adequate or not; is that
16 right?
17     A. It didn't appear that there was a lot of
18 documentation and all of those things, so it made me
19 wonder. And the way he answered the questions to the
20 Coast Guard, it made me wonder about -- but that's just
21 maybe how he talks. You know, it's hard to say.
22     Q. It was 3:00 in the morning when the Coast

**160**

1  Guard interviewed him where he was.
2      MR. ASPERGER: I object to that. That's not
3  --
4      THE WITNESS: I -- do I question his
5  thoroughness of inspection?
6  BY MR. CLYNE:
7      Q. No. Do you have an opinion? I'm asking
8  because it's not in your reports. That's why.
9      A. Well, I guess the electrician --
10     Q. Well, let me leave it at this. You weren't
11 asked to give an opinion on him, right?
12     A. Correct.
13     MR. CLYNE: All right. No further
14 questions.
15     THE REPORTER: Reading and signing?
16     MR. ASPERGER: He'll read and sign. I would
17 like a copy and we'd like it by next Friday and a disk
18 for both yesterday's and today's.
19     MR. WHITMAN: I would like a copy.
20     MR. ASPERGER: E-mail or fax me as soon as
21 possible what the bill will be for the transcripts so I
22 can process it. Okay?