IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| IN THE MATTER OF | * | |
| THE COMPLAINT OF | | |
| ETERNITY SHIPPING, LTD. AND | * | CIVIL ACTION NO. |
| EUROCARRIERS, S.A. | | |
| FOR EXONERATION FROM OR | * | L-01-CV-0250 |
| LIMITATION OF LIABILITY | | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### LIMITATION PLAINTIFFS' REPLY TO THIRD-PARTY PLAINTIFF TATE & LYLE'S SUPPLEMENTAL FILING

As permitted by the Court's Memorandum Order of November 8, 2005, Third-Party Plaintiff Tate & Lyle North American Sugars, Inc. ("Tate & Lyle") filed on November 9, 2005 a lengthy paper (Tate & Lyle's "Response and Supplement"), in connection with the supplemental opinion of its expert Mr. Michael Parnell and in further opposition to the Motion for Summary Judgment filed by the American Bureau of Shipping ("ABS"). This is the Reply of the Limitation Plaintiffs, through undersigned counsel, to the first section of Tate & Lyle's Response and Supplement, in which Tate & Lyle attempts to justify its late submission of new expert opinions.

Running true to form, Tate & Lyle's Response and Supplement attempts to demonize the conduct of the Limitation Plaintiffs and ABS in their defense of the Tate & Lyle claims. Having failed to convince Judge Bredar that the Limitation Plaintiffs or ABS acted improperly in discovery, Tate & Lyle has now tried again to poison the

Court's view of the case, especially with regard to the involvement of Captain Heiner Popp. Tate & Lyle's effort to do so is replete with the usual hyperbole.

The Court will have the opportunity to inquire thoroughly into these matters at the hearing now scheduled for Monday, November 21, 2005. In this Reply, Limitation Plaintiffs will first try to refocus the discussion onto the actual issues in the case with regard to the new expert opinions, as those issues were presented to and articulated by the Court, and will then seek to correct some of the mischaracterizations and misrepresentations contained in Tate & Lyle's Response and Supplement with regard to the involvement of Captain Popp.

### THE ISSUE AS PRESENTED TO AND ARTICULATED BY THE COURT WITH REGARD TO PARNELL'S SUPPLEMENTAL OPINION.

On October 28, 2005, Limitation Plaintiffs wrote to the Court requesting a telephone conference in connection with Tate & Lyle's service of a "supplement" to the opinions of its wire rope expert, Mr. Michael Parnell. Limitation Plaintiffs pointed out that this "supplement" actually contained, as an attachment, an opinion from an altogether new expert, and that both Mr. Parnell's "supplement" and the report from the new expert clearly violated the Court's prior Orders concerning the permitted scope of discovery.

On November 1, 2005, the Court convened a telephone conference to hear counsel on the matter. During the course of that telephone conference, the Court distilled the issue with regard to Mr. Parnell's supplemental opinion. Keeping in mind that Mr. Parnell had been proffered by Tate & Lyle solely as a rebuttal expert, the Court observed

that Tate & Lyle has the burden to show that something newly offered at Captain Popp's October 6, 2005 deposition required rebuttal by Mr. Parnell. Tate & Lyle has not, and cannot, meet that burden.

### THE SUPPLEMENTAL REPORT OF PARNELL REBUTS NOTHING, AND CERTAINLY REBUTS NOTHING NEW.

Focusing on the Court's inquiry, it can be seen that there is no reason to accept the supplemental report of Mr. Parnell, or the report of Mr. Donald Pellow upon which it relies.

On its face, the supplemental report does not purport to rebut anything. Instead, the report itself begins: "The following is in answer to inquiries" raised by counsel for ABS and counsel for Tate & Lyle at Mr. Parnell's deposition. The supplemental report never refers to, let alone rebuts, anything offered at Captain Popp's deposition.

Mr. Parnell recites the bases for his supplemental opinion as follows:

> Based on the visual examination of the boom hoist rope, the photos provided throughout this case, and with the consultation of Mr. Don Pellow, a noted wire rope expert….

(Tate & Lyle Response and Supplement, Ex. R.) The Court need go no further, because absolutely nothing to which Mr. Parnell refers (other than consultation with his own new sub-expert) is new.

Mr. Parnell's "visual examination of the boom hoist rope" took place more than a year earlier, in August of 2004, and was part of the basis for his original report. Mr. Parnell has not made any other visual examination of the wire rope, so there can be nothing new there upon which he bases his opinion. Similarly, the photographs to which

3

Mr. Parnell refers are all photographs which were produced literally years ago in discovery. There can be nothing about those photographs that is new, requiring rebuttal by Mr. Parnell.

The only other information upon which Mr. Parnell bases his opinion is the October 25, 2005 report of Mr. Pellow, whom Mr. Parnell described as "a noted wire rope expert." This is the heart of the matter: Tate & Lyle wants to use, and put before the trier of fact, a new report by a newly engaged expert. Even Mr. Pellow, however, relies only on old photographs, so there is no reason to accept his report out of time.

Moreover, there was (and could have been) no expert opinion given by Captain Popp which required rebuttal by Mr. Parnell or Mr. Pellow. Captain Popp's involvement in the case is discussed in greater detail in the following section of this Reply. At this point, it need only be emphasized that Captain Popp's deposition was permitted (by the Court's Memorandum Order of September 22, 2005) as a fact witness, not as an expert. No expert opinions were rendered by Captain Popp at his deposition, and surely therefore no expert opinion of Captain Popp required rebuttal by Mr. Parnell or Mr. Pellow. It is telling that neither Mr. Parnell's nor Mr. Pellow's reports refer to Captain Popp, or to any information provided by Captain Popp.

What really occurred is that Mr. Parnell gave an answer at his own deposition that counsel for Tate & Lyle, who had engaged Mr. Parnell to testify as an expert, deemed unsatisfactory. Tate & Lyle then found a new expert, who provided a "better" opinion to Mr. Parnell, who then parroted that new opinion in his supplemental report.

The Court has placed a burden on Tate & Lyle to show that Mr. Parnell's supplemental report is necessary to rebut something newly addressed at the deposition of Captain Popp. The supplemental report never mentions Captain Popp, or anything developed at Captain Popp's deposition. Tate & Lyle has failed to carry the burden imposed on it by the Court, and its new expert reports should be rejected.

## CAPTAIN POPP'S ROLE IN THE CASE IS ABOVE REPROACH.

The continued vilification by Tate & Lyle of Captain Popp's role in this case is a total red herring, which has absolutely no relevance to the merits of the case or of the summary judgment motions. Nevertheless, it does require some response.

1. Captain Popp's Involvement as an Expert Was Well Known to Tate & Lyle from Day One.

Within just a few hours after the casualty on the morning of July 29, 2000, counsel and consultants for Tate & Lyle and for the ship had converged on the scene. The U.S. Coast Guard inspected the accident scene and interviewed numerous ship's witnesses as part of its marine casualty investigation. The presence of Captain Popp on board the ship, as a marine surveyor acting for the vessel interests, was well known to Tate & Lyle. Consultants for Tate & Lyle were also on the scene, including representatives from Reading Crane Company and others.

Tate & Lyle concedes, in its Response and Supplement, that it was fully aware of the involvement of Captain Popp, and of the role he played:

> T&L did know that Popp had been retained by Eurocarriers and served a notice for his deposition on November 25, 2002. In response to this deposition notice, counsel for Eurocarriers claimed that Popp was retained solely as a consultant and that

5

his investigation was protected by the work product privilege. Eurocarriers consistently maintained this claim of privilege as to Popp throughout fact discovery and asserted it again on May 3, 2004, in its response to T&L's interrogatories:

> Limitation Plaintiffs retained their own marine surveyor, Captain Heiner Popp, to investigate this incident on their behalf, and Captain Popp attended on board and began his investigation within hours of the incident on the morning of July 29, 2000. At the present time, Limitation Plaintiffs assert that Captain Popp's reports are not subject to discovery due to attorney-client privilege and attorney-work product protection.

(Tate & Lyle's Response and Supplement, at 3.)

This is a perfectly accurate description of the perfectly appropriate role which Captain Popp played in the case. Contrary to the charges leveled by Tate & Lyle, Limitation Plaintiffs are guilty of no violation of Rule 26 with regard to Captain Popp's involvement.

It should be noted that Tate & Lyle had earlier raised these same complaints about alleged "concealment" of Captain Popp (and about alleged spoliation of evidence) in a motion seeking discovery sanctions. That motion was speedily denied by Judge Bredar. In his Memorandum and Order dated February 24, 2005, Judge Bredar concluded that Tate & Lyle's "bald and overheated claim of evidence spoliation is wholly unsupported" and that no violation of any rule had occurred. Judge Bredar likewise found no precedential support for Tate & Lyle's claim that Captain Popp's presence during aspects of the investigation into the casualty somehow violated the work product shield that attaches to the work of expert consultants.

2. Captain Popp's Relevance as a Fact Witness Arose in Connection with a Testimonial Expert.

Contrary to Tate & Lyle's protestations, therefore, Captain Popp was never concealed or hidden from Tate & Lyle. As discovery developed further, Limitation Plaintiffs identified and put forward various experts for the purpose of testifying at trial. Among others, these included Mr. Carl Cederstav, an expert marine consultant with experience in vessel technical operations, development and application of Safety Management Systems under the International Ship Management Code, and investigation of marine casualties.

Captain Popp, as a generalist marine surveyor, was not identified by Limitation Plaintiffs as a testimonial expert. As a non-testifying expert, Captain Popp's work product was not required to be produced to Tate & Lyle, and in order to obtain its production Tate & Lyle would have had the burden under Rule 26 (b)(4)(B) of showing that it could not obtain that information elsewhere. Since Tate & Lyle's own consultants were on the vessel immediately after the casualty, and Tate & Lyle later had the opportunity to examine the vessel and the wire rope to the same extent as experts for the other parties, Tate & Lyle never even bothered to try to argue such exceptional circumstances.

Captain Popp became relevant to the case as a fact witness only because his reports were considered by Mr. Cederstav, a fact which made those reports discoverable under Rule 26(a)(2)(B). Two reports of Captain Popp, dated August 3, 2000 and October 15, 2003, were in Mr. Cederstav's file and were considered by Mr. Cederstav in forming

his opinions. Contrary to Tate & Lyle's allegations, these reports were produced to counsel for Tate & Lyle on August 5, 2004, pursuant to a fax from counsel for Limitation Plaintiffs. (Exhibit A hereto.)

Tate & Lyle has argued in its Response and Supplement that Captain Popp's reports were all withheld, and that they were first delivered to Tate & Lyle on October 6, 2005. (Response and Supplement, at 5.) That is, quite simply, not true. Tate & Lyle received both the August 3, 2000 report and the October 15, 2003 report on August 5, 2004.

At his deposition on August 11, 2004, Mr. Cederstav was asked by counsel for Tate & Lyle about his, Mr. Cederstav's, familiarity with Captain Popp and the reports:

> Q. Have you had the opportunity to work with Heiner Popp on any occasions other than this?
> A. I met Heiner Popp four or five times. Have I had a job together with him? No.
> Q. And did you meet him four or five times in conjunction with this matter or various matters?
> A. Not with this matter.
> Q. Have you ever met him in connection with this matter?
> A. No. I've seen his reports though.
>
> \*     \*     \*
>
> Q. I'm showing you Exhibit 3. This is Heiner Popp's report to which you were referring, correct, sir?
> A. Yeah. He has two reports though. I don't know if you've picked the right one. This is the one which he did of the wire.

(Cederstav Deposition, at 99, 199–200, Exhibit B hereto.) Given this colloquy, and the fact that counsel for Tate & Lyle chose to mark one (but not the other) of Captain Popp's reports as an exhibit to the August 11, 2004 deposition of Mr. Cederstav, it is hard to

understand how Tate & Lyle can now argue that it never saw those reports until October 6, 2005.

Mr. Cederstav did not rely upon any other materials from or gathered by Captain Popp (with the exception of his photographs, which had been long ago produced to all parties).[1] Tate & Lyle, at most, was entitled to inquire at deposition into the facts as set forth in Captain Popp's two reports, not because Captain Popp had been concealed from Tate & Lyle but just the opposite, because those reports had been considered by Mr. Cederstav and were among the materials produced in Mr. Cederstav's file. Consistent with this approach, this Court directed that Tate & Lyle be entitled to depose Captain Popp as a fact witness.

Contrary to the arguments of Tate & Lyle, there was nothing sinister about Captain Popp's status as a non-testifying expert under Rule 26, or about the change in his status when it developed that Mr. Cederstav had considered Captain Popp's report in forming his own opinions. Captain Popp's reports then became relevant, but only because they had been considered by Mr. Cederstav. That change in Captain Popp's status was apparent in July of 2004, when Mr. Cederstav's expert report was served on all counsel, and it was able to be fully explored in August of 2004, when Tate & Lyle took the deposition of Mr. Cederstav. That change in status was not something hidden, or

---

[1] At his deposition on October 6, 2005, Captain Popp produced a computer printout of an additional, draft survey report, bearing a face page dated August 9 and subsequent pages dated August 14, 2000. (Popp Deposition, at 11-12, Exhibit C hereto.) This later report had not previously been provided by Captain Popp to Limitation Plaintiffs, had not been considered by Mr. Cederstav, and therefore was not relevant to Tate & Lyle's inquiry into the bases for Mr. Cederstav's opinion. Neither the Parnell supplemental report nor the Pellow report make any reference to this August 9/14 draft report, so it is apparent that neither Parnell nor Pellow was rebutting anything in the August 9/14 draft report.

9

which surprised Tate & Lyle when they deposed Captain Popp in October of this year: Tate & Lyle had known about it for more than twelve months.

3. Tate & Lyle Has Once Again Submitted Improper Evidence.

The involvement and attendance of Captain Popp were acknowledged in the Coast Guard Marine Casualty Investigation Report. All parties, including Tate & Lyle, have had copies of the Coast Guard Report since very early in the discovery process. Tate & Lyle is quite familiar with the Coast Guard Report, and indeed Tate & Lyle's original opposition to ABS's Motion for Summary Judgment freely quoted from and contained extracts from that Report, in violation of 46 U.S.C. § 6308. Tate & Lyle was compelled to admit that this was improper, as no part of such a report is admissible in evidence, and was required to resubmit its opposition papers to exclude this improper evidence.

Remarkably, Tate & Lyle's Response and Supplement again contains, as an exhibit, an excerpt from the Coast Guard Report. This time it is the transcript of an interview which the Coast Guard investigating officer took, by telephone, of ABS surveyor Mr. Roy Graham. This is, of course, precisely the kind of hearsay evidence which the statute is intended to preclude from consideration by the trier of fact. For the record, Limitation Plaintiffs strongly object to the use of this transcript by Tate & Lyle in their motion papers. The Court should strike Exhibit Z to the Response and Supplement, should not consider the transcript as evidence, and should not consider any argument of Tate & Lyle that refers to or relies upon this transcript.

## **CONCLUSION**

For all the foregoing reasons, the Court should reject the effort by Tate & Lyle to introduce the new opinions of Mr. Parnell and Mr. Pellow, and the Court should decline to consider those opinions in connection with the pending summary judgment motions. With or without those opinions, however, the Court should proceed to grant the motion of ABS for summary judgment against Tate & Lyle and Mrs. Gonzales.

_____
M. Hamilton Whitman, Jr.
Carla N. Bailey
Ober, Kaler, Grimes & Shriver
A Professional Corporation
120 E. Baltimore Street
Baltimore, Maryland 21202
(410) 685-1120

Attorneys for Limitation Plaintiffs Eternity Shipping, Ltd. and Eurocarriers, S.A.