IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

IN THE MATTER OF                 *
THE COMPLAINT OF
ETERNITY SHIPPING, LTD. AND      *     Civil Action No.: L01CV0250
EUROCARRIERS, S.A.
FOR EXONERATION FROM OR       *
LIMITATION OF LIABILITY
                                 *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**CLAIMANT-JOSEFINA GONZALES' MEMORANDUM
REGARDING "P.O.E.A. CONTRACT" ISSUES**

NOW COMES Claimant-Josefina Gonzales ("Claimant"), appearing by and through her attorneys-of-record, R. Blake Brunkenhoefer of Brunkenhoefer & Nielsen, P.C. and W. Charles Bailey, Jr. of Simms Showers, L.L.P., and makes and files this her "Memorandum Regarding 'P.O.E.A.' Contract Issues" raised by the Court in its November 21, 2005 hearing of (and subsequent November 22, 2005 and December 8, 2005 Memorandum Orders concerning) Limitation Plaintiffs' Motion for Summary Judgment with respect to Claimant's First Amended Claim for Damages[1].

**I.
BACKGROUND OF MEMORANDUM**

As the Court will recall, in opposing Limitation Plaintiffs' Motion for Summary Judgment, Claimant provided the Court with several arguments against eliminating her right to recover in the United States for the death of her son. Claimant has attempted to show the Court that she is entitled to a "Jones Act" negligence and General Maritime Law "unseaworthiness" claim on behalf of her deceased son; the Philippines has determined that she may proceed with her claims in this Court; the

---

[1] In the interest of economy and efficiency, Claimant respectfully requests the Court take notice of the existence and contents of its file, such that it will not be necessary to reproduce previously-filed materials as attachments hereto. *Fed. R. Evid. 201.*

law encourages providing Claimant with a tort remedy in the United States; and, the United States

is well-served by Claimant's success in this case.

At the end of the Court's November 21, 2005 hearing of Limitation Plaintiff's Motion for

Summary Judgment, the Court issued a November 22, 2005 Memorandum Order directing Claimant

to address certain issues.  In response thereto, on December 5, 2005, Claimant filed copies of the

Filipino law referenced in her "timeline"; Limitation Plaintiffs filed a joint letter accurately

describing Claimant's denial of the applicability of the version of the "Standard Terms & Conditions

Governing the Employment of Filipino Seafarers On-Board Ocean-Going Vessels" (hereinafter,

"Standard Terms & Conditions") filed by Limitation Plaintiffs; and, Claimant filed a

"Memorandum" concerning the Court's resolution of "limitation actions."   Claimant also

respectfully reiterated her request for additional time to address the remaining "contract" issues, and

the Court kindly obliged Claimant's request.

Now, in response to this Court's November 21, 2005 and December 8, 2005 Memorandum

Orders, Claimant will address certain issues pertaining to the "contract" and "terms and conditions"

under which her son was employed when he died.

## II.
## WHICH CONTRACT DID THE SEAMAN SIGN?

In short, Claimant believes the Court can and should take the Limitation Plaintiffs "at their

word" (or, at least, their original "word" on the subject).

The version of the "Standard Terms & Conditions" which was in effect when Claimant's son

signed aboard the relevant vessel on January 14, 2000 is the version Limitation Plaintiffs attached

as Exhibit F-3 to their Motion for Summary Judgment, as verified by Limitation Plaintiffs' Filipino

legal expert, Mr. Ruben T. Del Rosario, in his original (October 5, 2004) Affidavit. In pertinent, part, the version that was in effect does not contain §20(G) or §29. [NOTE: Although Claimant feels the presence of §29 is of no significance to this Court's determination of the relevant issues, apparently, Limitation Plaintiffs will allege that this (non-existent) paragraph is somehow significant. For this reason, and to help streamline the issues before the Court, Claimant has contested the version submitted of late by Limitation Plaintiffs.]

After the Claimant produced her "timeline" at the November 21, 2005 hearing, Limitation Plaintiffs obviously contacted Mr. Del Rosario and, thereafter, they were supplied a version of the "Standard Terms & Conditions" which is different from the version Claimant's counsel found attached as "Annex A" to the "Standard Terms & Conditions" of the relevant period. See, *P.O.E.A. "Memorandum Circular No. 055-96"* [previously produced by Claimant on December 5, 2005].

Putting it kindly, Claimant contends that Mr. Del Rosario's December 5, 2005 "Supplemental Affidavit"[2] (i.e., wherein he avers that he was mistaken on October 5, 2004 when he swore to the accuracy of an "incomplete copy" of the governing "Standard Terms & Conditions") is a convenient response and not an accurate statement of fact. Claimant believes that the version of the "Standard Terms & Conditions" that she provided to the Court on December 5, 2005 (i.e., entitled "P.O.E.A. Memorandum Circular No. 055-96") is the applicable version and, to the best of her knowledge, it

---

[2] Although Limitation Plaintiffs produced the version of the "Standard Terms & Conditions" referenced by Mr. Del Rosario in his "Supplemental Affidavit," Claimant did not see that said affidavit was included in Limitation Plaintiffs' December 5, 2005 letter response to this Court's November 22, 2005 Memorandum Order requesting a copy of the "applicable terms and conditions." Therefore, Claimant now attaches a copy of Mr. Del Rosario's "Supplemental Affidavit," which Limitation Plaintiffs produced to Claimant's counsel on the morning of December 5, 2005. *Exhibit 1 hereto*.

mirrors the version originally submitted and verified by Mr. Del Rosario.[3]  Claimant believes it is

within this Court's power and authority to reasonably conclude that Mr. Del Rosario's second

affidavit--given after Claimant's "timeline" was presented and better than a year after his original

affidavit–is self-serving and unreliable.

**III.**
**CAN CLAIMANT PURSUE HER TORT CLAIMS IN THIS COURT?**

**A.    Generally**

There are several reasons why this Court can and should permit Claimant's cause of action

to proceed.  Most of Claimant's arguments have been detailed in her lengthy Opposition to

Limitation Plaintiff's Motion for Summary Judgment and, thus, it is not Claimant's intention to

repeat all of her arguments here.  However, where necessary to provide a background for her answers

to this Court's current inquiries, Claimant will revisit her prior filing.

**B.    REASON 1: *Res judicata*.**

The judgment entered by the Republic of the Philippines National Labor Relations

Commission ("NLRC") explicitly permits Claimant to pursue her pending claims before this Court.

In other words, the Philippines have spoken in this case and it is their opinion that, upon

consideration of its own interests, the United States should afford Claimant and her dead son

whatever rights and remedies it deems appropriate.

Limitation Plaintiffs, appearing by and through their designated attorneys, argued to the

---

[3] Interestingly, the fact that Limitation Plaintiffs have been able to procure so many versions of the "Standard Terms & Conditions" is proof in and of itself that the Filipino government was regularly revisiting the rights and remedies of its citizen-seamen.  This does not mean to say that the Filipino government necessarily satisfied its obligations to its seamen, but rather merely illustrates that, when the Filipino authorities believed the contract needed to be revised, it was.  This seems particularly relevant to determining whether Section 20(G) was in effect when Claimant's son was killed.  Apparently, it was not.

4

NLRC and its duly-appointed arbitrator precisely that which they are now urging to this Court: That

is, Claimant was precluded from pursuing her claims in the United States because Filipino law

provided the exclusive remedy and that remedy was limited to the contractual death benefits set forth

in the Standard Employment Contract for Filipino seafarers.  See, *Claimant's "Opposition to*

*Limitation Plaintiffs' Motion for Summary Judgment," EXHIBIT 7 ("Decision") at p. 6-15.*

The Executive Labor Arbiter found that the Respondents' offer of US $60,000.00 was US

$10,000.00 over and above that due to Complainant (i.e., the $1,000.00 burial expense having

already been timely paid to the decedent's designated allottee, his sister).  *Id.* at p. 16.

The ruling of the Executive Labor Arbiter continued as follows:

> "The offer of the extra US $10,000.00 was not fostered by
> pure benevolence on the part of the respondent, although at first
> glance it would seem so, for it was offered with strings attached.  The
> additional amount was an enticement to complainant to execute a
> general waiver and quitclaim in favor of respondents.  And when she
> refused to do so, payment of compensation benefits was totally
> withheld or withdrawn from her.
>
> Payment of compensation benefits for the death of a seaman
> is not subject to any terms or conditions. [citations omitted]
>
> This ruling can be applied corollarily to the instant case.
> More so, where the death of an able-bodied seaman occurred while
> in the performance of his duties or functions, caused by an accident
> which could have been avoided or averted if there was proper
> maintenance and supervision of respondents' vessel.
>
> Complainant's entitlement to the compensation benefits
> vested and accrued upon the death of her son.  The amount of US
> $50,000.00 should have been immediately and unconditionally
> released to her.  But such was not the case.  In spite of the repeated
> demands, respondents remained adamant in their refusal.
> Complainant had no other recourse but to file the instant case for the
> collection of said compensation benefits.

> Respondents are now crying foul, charging complainant of having violated the provisions against forum shopping, double recovery/compensation, and multiplicity of suits.
>
> . . . Thus, the complaint filed by the deceased seaman's mother, for torts and damages in foreign jurisdiction is not proscribed by the provision relied upon by respondents. . . . All that the complainant is asking for is the payment of compensation benefits as the compulsory heir of the deceased seaman that is withheld from her by respondents." *Id.* at p. 16-20.

Rather than pay the death benefits due and owing to Claimant, the Limitation Plaintiffs appealed the arbitrator's ruling. See, *Claimant's "Opposition to Limitation Plaintiffs' Motion for Summary Judgment," EXHIBIT 8* (*"Decision"*).

In *Gonzales v. Bright Maritime Corporation, et al.*, the Fourth Division of the National Labor Relations Committee of the Republic of the Philippines held that the Claimant herein could yet maintain a tort action in this United States District Court though she was also attempting to collect contractual death benefits under the NLRC. *Gonzales v. Bright Maritime Corporation, et al.*, NLRC Case No. V-000036-2001/SRAB Case No. OFW(M)01-03-0014, p.2-3 (Fourth Division of the National Labor Relations Committee of the Republic of the Philippines). *Id. ("Decision")* at pp. 2-3.

In other words, the Republic of the Philippines has determined that Filipino workers' compensation law would limit the seaman's recovery to the stated contractual death benefits.[4] However, the Filipino appellate court further determined that the law of the Philippines does not bar this Court from providing Claimant with a tort remedy.

---

[4] Of course, American maritime law has no such prohibition: Since the decedent was a seaman, the payment of workers' compensation benefits is not a bar to a tort recovery as the shipowner merely receives a credit against its "maintenance and cure" obligations; the shipowners' payment of maintenance does not offset its obligations with respect to payment of damages for lost wages; etc.. See, e.g., *Freeman v. Norfolk & Western Railway Co.*, 596 F.2d 1205, 1207, 1980 AMC 1366 (4th Cir.1979).

The Limitation Plaintiffs filed the instant limitation action with this Honorable District Court. Then they "tried to pull a fast one" by having the NLRC of the Philippines rule on the seaman's death claims.[5]   However, much to the Limitation Plaintiffs' chagrin, the Philippines have ruled against them and, indeed, declared that the United States can apply its law to provide this deceased seaman with a tort remedy.

As the issue has been resolved by the forum from which Limitation Plaintiffs originally sought relief, the doctrine or *res judicata* should be applied to preclude Limitation Plaintiffs from relitigating the issue in this American Court

**C.     <u>REASON 2: Filipino law has *now* been revised to preclude tort claims like these.</u>**

As illustrated by Claimant's "timeline," and fully supported by the Filipino law of the D.O.L.E. and the P.O.E.A. (i.e., which was produced by Claimant on December 5, 2005), the "Standard Terms & Conditions" were revised on June 14, 2000 to include the following, relevant language:

> "The seafarer or his successor in interest, acknowledges that payment for injury, illness, incapacity, disability or death of the seafarer under this contract shall cover all claims arising from or in relation with or in the course of the seafarer's employment, including but not limited to damages arising from the contract, tort, fault or negligence under the laws of the Philippines or any other country."
>
> *"P.O.E.A. Memorandum Circular No. 09-00, 'Annex A' (revised "Standard Terms & Conditions"), Section 20 "Compensation and Benefits," Subpart G.*

---

[5] QUERY: What else would it have been?  Why else did the shipowner seek a general release, unless it <u>knew</u> it was otherwise exposed to Claimant's tort claims in the United States?  If they only owed $51,000.00 under the clear rules of the NLRC, why did Limitation Plaintiffs ask Claimant for a counter-offer when she refused their September 25, 2000 offer of $60,000.00 in exchange for a release?  Why would the Limitation Plaintiffs <u>negotiate</u> when the contractual benefits due and owing were known, from the moment of Juan Gonzales' death, unless Limitation Plaintiffs knew they could legally be made to pay more money?

Shortly thereafter, litigation was initiated in the Philippines and the "implementation of Section 20(E) and (G) of the Revised Terms and Conditions" was suspended. *"P.O.E.A. Memorandum Circular No. 011-00."*

With respect to the question of whether §20(G), being effective for a time in the summer of 2002 and prior to the death of Claimant's son, would work to eviscerate Claimant's right to file this lawsuit, Claimant would simply refer the Court to the <u>undisputed</u> language of the P.O.E.A. Memorandum Circular in effect when Claimant signed aboard the vessel:

> 1.      . . .
>
> It is reiterated that the terms and conditions provided in this revised employment contract are the minimum requirements acceptable to POEA for the overseas employment of a Filipino seafarer. The parties to an employment of a seafarer may therefore improve on these minimum terms and conditions provided such improvements shall be made in writing and appended to this contract and submitted to POEA for processing and approval. Moreover, such improvements **should have prospective application**.
>
> 2.      **The new schedule of benefits shall apply to any Filipino seafarer that will be deployed on or after the effectivity of this Circular**.
>      . . .
>
> P.O.E.A. *"Memorandum Circular No. 055-96"* [emphasis added].

In short, there is no doubt but that any contract revisions made by the employer or the government itself were to have prospective application upon new seafarers, rather than retroactive application. This makes sense, given the fact that the Filipino seamen are put to sea under a contract which (in theory) the seamen read and the terms of which they become apprised. The seamen are then gone for a specified period of months before repatriating.

In this case, the deceased seaman signed aboard the vessel under a contract which specified

nine (9) months service, and which could be extended by an additional three (3) months if both parties consented. See, *Limitation Plaintiffs' December 5, 2005 letter, EXHIBIT A ("Contract of Employment")*. There is no evidence that the deceased seamen was approached by the employer, advised that his rights had been reduced such that he would no longer be able to pursue tort actions against the employer, and the deceased seaman willingly accepted the "new" terms of his employment. Moreover, even in the highly unlikely event that precisely such an absurd conversation occurred (and the seaman was somehow in a position to leave the vessel if he did not like what he was hearing), the law of Philippines explicitly forbids the reduction of the seaman's rights. *Id.*

Obviously, the insertion of Section 20(G) into the "Standard Terms & Conditions" can be interpreted two ways: Either (1) the Philippines always intended to preclude the seaman from pursuing tort claims in (for example) the United States, and the contract amendment was merely meant to make it explicit, or (2) prior to the amendment, such suits were proper. Limitation Plaintiffs may be expected to make the first argument, but it fails for couple of reasons.

First, as seen hereinabove, Limitation Plaintiffs have litigated this issue, they lost the argument, and the doctrine of *res judicata* precludes them from raising this issue at this time.

Second, if Limitation Plaintiffs can somehow argue that *res judicata* does not apply to this situation, the essential question becomes "How do Filipino courts interpret contracts that lack Section 20(G)?" Well, we have the decision in this case to tell us that they do not infer the applicability of Section 20(G) to bar suit. The Filipino tribunals have declared that Claimant may file and pursue this case to conclusion, as long as American law permits her to.

The "Jones Act" provides that

"Any seaman who shall suffer personal injury in the course of his

employment may, at his election, maintain an action for damages at law, . . . and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law . . . ." *46 U.S.C. §688.*

The U.S. Supreme Court has determined that a foreign seaman may maintain an action under the Jones Act and the general maritime law. *Romero vs. Int'l Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468 (1959).

The events made the basis of this lawsuit have had wide-ranging ramifications, including a vast economic and social impact on the geographic region in which it occurred. This, coupled with the Court's obligation to faithfully defend and protect seamen as "wards of the Court" (see, *Harden v. Gordon*, 11 F. Cas. 480, 485 (C.C.D. Me. 1823) (No. 6047)), militates in favor of providing Claimant with an American remedy.

As for those courts which have denied the Filipino seaman an American remedy (see, e.g., *Marinechance Shipping Ltd. v. Sebastian*, 143 F.3d 216 (5th Cir.1998), cert. denied, 525 U.S. 1055 (1998)), it is clear that the decisional process was misguided by a belief that Filipino law precludes such lawsuits. Again, as we have seen in this very case, the Philippines do not say any such thing. *Marinechance* is wrong, both in its gross distortion of Filipino law and, perhaps more significantly, its direlection of its duty to seaman.

**D.      REASON 3: The contract, by its own language, only precluded claims "arising out of or by virtue of" this contract,  Claimant's claim does not arise under the contract, and The Republic of the Philippines *cannot* resolve Claimant's tort claims.**

In both the Claimants' and the Limitation Plaintiff's versions of the applicable "Standard Terms & Conditions," the P.O.E.A. and/or the N.L.R.C. reserve "original and exclusive jurisdiction over any all disputes or controversies arising out of or by virtue of this Contract." *Standard Terms*

*& Conditions, Section 28 ("Jurisdiction").*

This is a maritime claim sounding in tort. It is axiomatic that tort and contract claims are completely different "animals." Claimant has brought, *inter alia*, tort claims under the Jones Act, 46 U.S.C. App. § 688. Under Limitation Plaintiffs' interpretation of the relevant employment contract, these claims must be submitted to labor arbitration in the Philippines. If this were so, the Court would have to throw out years of "black letter law" holding these causes to be separate and distinct. Moreover, the Court would have to disregard the law of the Philippines itself.

The Philippine Supreme Court has affirmatively stated that the country's labor arbitrators have no jurisdiction over tort claims such as those at issue in this case. The Philippine Supreme Court recently clarified that the jurisdiction of labor arbitrators in the Philippines is limited, under Philippine Labor Code Article 217, to disputes "arising from employer-employee relations." The labor arbitrators' jurisdiction does not include disputes arising from a "quasi delict," or tort. *Tolosa v. National Labor Relations Commission*, G.R. No. 149578, April 10, 2003. In *Tolosa*, the Court upheld the National Labor Relations Commission's dismissal, for lack of jurisdiction, of a seaman's widow's claim for damages and lost earnings after her husband died in the course of duty on board his employer's vessel. The Court held that these claims arose not from the "employee-employer relation," but from "a different source of obligation, such as a tort." Therefore, the Court held, the labor arbitrators had no jurisdiction over the claims.

The Philippine Supreme Court has previously made an identical finding in a case where the only alleged negligence was on the part of an employer. In *Ocheda v. Court of Appeals*, G.R. No. 85517, October 16, 1992, the Philippine Supreme Court was faced with the question of whether the courts or labor arbitrators had jurisdiction over an action for damages arising from an employer's

negligence, which resulted in the death of an employee. The employee, Mr. Santos, was employed

as a painter by a sub-contracting company. While painting the wall of an elevator shaft, Santos called

to the worker operating the elevator to bring the elevator down to the first floor. The worker

mistakenly brought the elevator to the top floor instead. Santos lost his balance, fell, and was pinned

between the shaft and the elevator. He died soon after he was freed from the shaft. *Ocheda* at 631.

The Philippine Supreme Court upheld the trial court's finding that the accident had been the

fault of the employer, the owner of the sub-contracting company, since he had ordered Santos to

paint the elevator shaft while standing on the top of the elevator. The principal contractor was also

found liable, since that company was "in full control of the building" at the time of the accident.

*Ocheda* at 634.

The Court then held that there was no jurisdiction for labor arbitrators to hear this case, since

the case did not arise out of an "employee-employer relationship" and therefore was not included in

the category of cases for which labor arbitrators have jurisdiction under Article 217 of the Labor

Code. Instead, the Court found that "the source of the obligation upon which the private respondents'

cause of action is based is a quasi-delict or tort." *Ocheda* at 642. Further clarifying the distinction,

the court pointed out that "[i]t would have been entirely different if the claim for damages arose out

of, for instance, the illegal dismissal of Eduardo, in which case the Labor Arbiter would have

exclusive jurisdiction thereon." *Id.*

*Ocheda* makes clear that the difference between claims arising out of an "employer-employee

relationship" – over which labor arbitrators have jurisdiction – and claims arising out of a quasi-

delict – over which the courts have jurisdiction – is not tied to the existence of an employee-

employer relationship between the plaintiff and the defendant in a particular case. Instead, the

difference is in the nature of the claims and the damages sought. Employment claims, such as wrongful termination, arise out of the employer-employee relationship and are under the jurisdiction of the arbitrators. Tort claims, even if they arise out of the alleged negligence of an employer, are outside the arbitrators' jurisdiction. This helps to explain the *Tolosa* court's finding, in support of its jurisdictional holding, that damages for "loss of earning capacity . . . [is] not to be equated with wages, overtime compensation or separation pay, and other labor benefits that are generally cognized in labor disputes," but instead is "a relief or claim resulting from a quasi delict or a similar cause within the realm of civil law."

In the instant case, Claimant's claims clearly fall under the heading of "quasi delict" or tort, as it is understood by the Philippine Supreme Court in *Ocheda* and *Tolosa*. The claims are based on the alleged negligence of an employer, which resulted in the death or disability of seamen working for that employer.  Claimant seeks damages under the Jones Act for, among other things, her son's pre-death pain and suffering, her own loss of household services, etc..  Both the nature of the claims and the nature of the damages point to the fact that this case falls outside the jurisdiction of labor arbitration in the Philippines.  Interpreting the arbitration clause as suggested by Limitation Plaintiffs will therefore result in Claimant falling into a black hole, unable to find *any* forum in which to air her claims.[6]

### E.    <u>REASON 4: The value of human life, coupled with the deceased's status as a seaman, warrant all "close calls" to be resolved in Claimant's favor.</u>

As previously detailed in Claimant's Opposition to Limitation Plaintiffs' Motion for

---

[6] Again, this is a limited situation.  The inclusion of Section 20(G) in the "Standard Terms & Conditions" eliminates this argument for all "new contract" signatories.  Claimant's claims simply predate the "case-killing" amendment.

13

Summary Judgment, for as long as we have been a country, the courts of the United States have taken the view that they are obliged to protect seamen, even where the seamen have signed articles, agreements or contracts limiting the value of their lives to but a pittance.

Limitation Plaintiffs have a hidden agenda which is repugnant to this Court: Limitation Plaintiffs want this Court to affirm that the value of a human life is limited to Fifty Thousand Dollars ($50,000.00). Contract or no contract, this is a repulsive, abhorrent and immoral position. Limitation Plaintiffs seek to explicitly reduce the seaman's life to no more than an entry on a balance sheet. If Limitation Plaintiffs prevail, they will continue to decide that, based upon the simple economics of the situation, it is cheaper to kill a man than to properly train their crews or maintain their vessels in a seaworthy condition.

New and safe cranes simply cost more than $50,000.00.[7] Proper manning and oversight of vessel operations apparently costs more than $50,000.00. Therefore, if Limitation Plaintiffs are obliged to pay no more than $50,000.00 for Claimant's loss of her son under egregious circumstances, there will be no economic reason for Limitation Plaintiffs to make their ships and crews safer. Regardless of whether the vessel was a "sugar ship" (which it obviously was), the fact remains that the Limitation Plaintiffs propose to value the life of the deceased seaman as less than the value of the sugar he was helping to transport[8].

Limitation Plaintiffs are asking the Court to approve their callous disregard for the safety of

---

[7] The deposition testimony of the "Greek" witnesses shows that the vessel was not originally equipped with cranes, and that old cranes of the decommissioned YANNIS K were installed on the LEON I simply so the vessel could command a higher rate. In short, the wrong cranes were put aboard the wrong vessel so Limitation Plaintiffs could make more money, but Limitation Plaintiffs do not want to pay the damages resulting from that short-sighted business decision.

[8] The Court will recall that two men died here, but one of which is represented here by Claimant.

those who help them ply the world's waters for profit. This callousness is seen in the way Limitation Plaintiffs ran their operations: For example, Limitation Plaintiffs say "don't hang a man in a basket," but they did it anyway. Limitation Plaintiffs admit the scraping operation being performed by the seaman at the time of his death required the crane to be operated above its upper limit, but they did it anyway. Limitation Plaintiffs were warned by the Dominos employees to not operate the ship's crane when the shore crane was operating in the same hold, but the vessel did it anyway. Limitation Plaintiffs admit that the sugar could have been cleaned off with high pressure water, but they opted to suspend men in a personnel basket instead. Limitation Plaintiffs say the crane operator operated the crane in an unsafe way, but they let him do it anyway.

Why did all this occur? Because Limitation Plaintiffs thought a seaman's life was only worth $50,000.00, they had no economic incentive to ensure the seaman's safety, and the Limitation Plaintiffs' conduct reveals this subtle, yet insidious fact. In other words, Limitation Plaintiffs felt they could ignore their own safety rules with impunity because Filipino life is cheap.

Our law says that, while you may value the life of a man at $50,000.00 in your country, if you bring your ship into our ports, and enjoy the benefits of doing business with our shores, and walk away with our money, you will also follow our rules and be bound by our view of the value of human life. In the United States, that number has always been more than a simple entry on a balance sheet, so it should be here, and the Filipino government does not say we should do otherwise.

## PRAYER

WHEREFORE, Claimant-Gonzales respectfully requests that the Court deny the relief requested by Limitation Plaintiffs herein, and in all respects deny summary judgment.

Respectfully submitted,


          /s/

R. Blake Brunkenhoefer (S.D.Tex. #15559)*
BRUNKENHOEFER & ASSOCIATES, P.C.
1770 Tower II
555 N. Carancahua
Corpus Christi, Texas 78478
(361) 888-6655
Fax (361) 888-5855
bbrunk@gulfattorneys.com
(* Admitted Pro Hac Vice)


          /s/

W. Charles Bailey, Jr. (#23580)
SIMMS SHOWERS, LLP
Suite 702
20 South Charles Street
Baltimore, Maryland 21201
(410) 783-5795
Fax (410) 783-1368
wcbailey@simmsshowers.com

## CERTIFICATE OF SERVICE

I, R. Blake Brunkenhoefer, do hereby certify that a true and correct copy of the above and foregoing document was served via e-mail notification from the District Court upon:

M. Hamilton Whitman, Jr.
OBER, KALER, GRIMES
& SHRIVER, P.C.
120 E. Baltimore Street
Baltimore, MD 21202
**(VIA E-MAIL &/OR FAX)**

James D. Skeen
SKEEN & KAUFFMAN
& SKEEN, L.L.P.
800 N. Charles Street
Baltimore, MD 21201
**(VIA E-MAIL &/OR FAX)**

Jeffrey J. Asperger
Erin Walz
ASPERGER CARAHER, L.L.C.
Three Illinois Center
303 East Wacker Drive, Suite 1000
Chicago, Illinois 60601
**(VIA E-MAIL &/OR FAX)**

Bernard J. Sevel
ARNOLD, SEVEL & GAY, P.A.
Two N. Charles Street, Suite 560
Baltimore, MD 21201
**(VIA E-MAIL &/OR FAX)**

Robert G. Clyne
HILL, RIVKINS & HAYDEN, L.L.P.
45 Broadway, Suite 1500
New York, NY 10006-3739
**(VIA E-MAIL &/OR FAX)**

James W. Bartlett, III
SEMMES, BOWEN & SEMMES
250 W. Pratt Street, 16th Floor
Baltimore, MD 21201-2423
**(VIA E-MAIL &/OR FAX)**

Francis J. Gorman
GORMAN & WILLIAMS
Two N. Charles Street, Suite 750
Baltimore, MD 21201
**(VIA E-MAIL &/OR FAX)**

W. Charles Bailey, Jr.
SIMMS SHOWERS, L.L.P.
20 S. Charles St., Suite 702
Baltimore, MD 21201-3291
**(VIA E-MAIL &/OR FAX)**

in accordance with all applicable provisions of the Federal Rules of Civil Procedure, on this the 12th day of December, 2005.

_____/s/_____

R. Blake Brunkenhoefer