IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

In the Matter of the Complaint          :
of Eternity Shipping, Ltd. and          :        Civil Action No. L-01-250
Eurocarriers, S.A. for Exoneration      :
from or Limitation of Liability         :

## MEMORANDUM

Pending are the following motions[1]:

(i)     **American Bureau of Shipping's** ("ABS") Motion For Summary Judgment
        (Docket No. 76);

(ii)    **Limitation Plaintiffs'** Motion For Summary Judgment On First Amended Claim
        For Damages Of Josefina Gonzales (Docket No. 74); and

(iii)   **Claimant Tate & Lyle North American Sugars, Inc.'s** ("Tate & Lyle" or
        "T&L") FRCP 56 Motion For Summary Judgment As To Claimant Josefina
        Gonzales (Docket No. 73).[2]

After extensive briefing, the Court held two hearings on the motions. For the reasons set

forth herein, the Court will, by separate Order: (i) GRANT ABS's motion, (ii) GRANT

Limitation Plaintiffs' motion, and (iii) GRANT T&L's motion.

## I.      Brief Description of the Case

This case arises from the collapse of a crane aboard the M/V Leon I, a vessel owned by

Eternity Shipping, Ltd., and managed by Eurocarriers, S.A. (collectively the "Limitation

---

[1] On October 17, 2005, the parties moved to re-open their summary judgment
motions. The Court hereby GRANTS the parties' motion to re-open (Docket No. 139).

[2] T&L's Motion (Docket No. 73) was later amended to exclude mention of an
inadmissible Coast Guard report. (See T&L's Amended Memorandum, Docket No. 108.)
In reviewing the summary judgment papers, the Court relied upon Docket No. 108, not
the original papers filed as Docket No. 73.

Plaintiffs").[3]  On July 29, 2000, the vessel was berthed at T&L's Domino Sugar wharf in

Baltimore.[4]  T&L was using shore cranes to unload bulk raw sugar from the vessel.  At the same

time, a crew member of the M/V Leon I was operating one of the ship's cranes to hoist a work

basket containing two crew members, Juan Gonzales, Jr, and Joselito Burgos, who were scraping

caked sugar off the hatch coaming of one of the vessel's holds.[5]  A wire rope on the ship's crane

broke, causing the jib (also known as the boom)[6] to fall.  When the jib fell, the work bucket hit

the hatch cover and other parts of the ship, and Seamen Gonzales and Burgos sustained fatal

injuries.  In addition, the ship's crane hit and damaged one of T&L's shore cranes.

---

[3]  Eternity Shipping, Ltd. ("Eternity"), a Maltese shipping company, was at all relevant times the registered owner of the M/V Leon I.  Eternity assigned the managerial and operational responsibilities of the vessel to Eurocarriers, S.A. ("Eurocarriers"), a management company organized and existing under the laws of Liberia.  As manager and owner pro hac vice, Eurocarriers was responsible for operating, maintaining, manning, and navigating the M/V Leon I.  (Docket No. 74, Ex. B.)

[4]  T&L is a domestic corporation engaged in the business of refining and selling sugar.  It operates a pier in Baltimore, where it unloads bulk sugar from ships such as the M/V Leon I.

[5]  The "hatch" is an opening in the deck of the ship that provides passage to the compartment below deck (the "hold") where cargo, such as sugar, is stored.  (See http://www.m-i-link.com/dictionary and search for "hatch" and "hold.")  The "hatch coaming" is "a raised vertical erection around each hatch," which prevents water from getting into the hold.  (See http://www.m-i-link.com/dictionary and search for "coaming.")

[6]  The "jib," or "boom," is a long pole that can be used to hoist or lower cargo.  The pivoted end is attached to the ship.  The free end extends into the air and can be swung and lifted using wire ropes, winches, and blocks.  (See http://www.m-i-link.com/dictionary and search for "boom," "jib," and "derrick.")

On January 29, 2001, Limitation Plaintiffs filed the instant "Limitation Action" seeking limitation of or exoneration from liability for damages resulting from the accident.[7]  On that same date, the Court ordered: (i) that all persons claiming damages as a result of the crane's collapse must file their respective claims with the Clerk, and (ii) that all other lawsuits relating to the accident are stayed and restrained pending a determination of the instant limitation action.[8]

The following claims were filed:[9]

_____

[7]  Under the Limitation of Vessel Owner's Liability Act ("Limitation Act"), 46 U.S.C. app. § 181, et seq., "the liability of a shipowner for any loss, damage, or injury [caused by an accident] may not exceed the amount or value of the interest of the owner in the vessel if the loss is occasioned without the privity or knowledge of the owner." Empresa Lineas Maritimas Argentinas S.A. v. United States, 730 F.2d 153, 155 (4th Cir. 1984).   Rule F of the Supplemental Rules for Certain Admiralty and Maritime Claims sets forth the procedures applicable to limitation actions.  Pursuant to Rule F, the vessel owner deposits the value of the owner's interest in the vessel and pending freight with the Court.  The Court then marshals all claims against the vessel owner by enjoining the prosecution of other actions relating to the accident and requiring all claimants to adjudicate their claims in the limitation action.

The Court then determines whether the vessel owner is liable, i.e., whether the shipowner was negligent or whether conditions of unseaworthiness caused the accident. If the claimants prove that the shipowner is liable, the burden shifts to the shipowner to show that its liability should be limited to the value of the vessel.  The shipowner may limit its liability if it lacked privity or knowledge of the cause of the accident. "Knowledge" includes both "actual knowledge" and  "knowledge of acts or events or conditions of unseaworthiness that could have been discovered through reasonable diligence." Empresa, 730 F.2d at 155.  If the Court concludes that liability is limited, the Court distributes the limited fund among the claimants in proportion to the amounts of their respective claims.  Rule F of the Suppl. Rules for Certain Admiralty and Maritime Claims; Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 448 (2001).

In the instant case, whether Limitation Plaintiffs are entitled to limit their liability is not an issue in the pending summary judgment motions.

[8] Both T&L and Josefina Gonzales, the mother of Seaman Gonzales, filed separate lawsuits concerning the accident.  See Tate & Lyle v. M/V LEON I, et al., Civil No. L-00-2348, and Gonzales v. Tate & Lyle, et al., Civil No. L-01-327.  Pursuant to the Court's Order, these lawsuits were, and remain, stayed.

[9] A number of other claims also were filed, but are not the subject of the instant summary judgment motions.  These claims include:  (i) T&L's negligence claim against

3

(i)    **T&L's and Josefina Gonzales's ("Ms. Gonzales") claims against American Bureau of Shipping ("ABS")**, the classification society[10] that inspected the M/V Leon I's cranes seven months prior to the accident and certified that they met certain safety standards.  Ms. Gonzales's son, Juan Gonzales, Jr., ("Seaman Gonzales") was one of the seamen who died as a result of the accident.   T&L and Ms. Gonzales contend that ABS conducted a substandard inspection and failed to identify alleged defects that ultimately contributed to the accident.

(ii)   **Ms. Gonzales's claim against Limitation Plaintiffs**.  Ms. Gonzales, suing under the Jones Act and general maritime law,[11] seeks damages from Limitation Plaintiffs in connection with her son's death.

(iii)  **Ms. Gonzales's claim against T&L**.  Ms. Gonzales contends that T&L was negligent by operating its shore cranes at the same time that the ship's crane was in operation.  Ms. Gonzales alleges that this negligence contributed to the accident and the subsequent death of Seaman Gonzales.

Discovery was involved and lengthy, lasting more than three years.  The parties had difficulty locating maritime witnesses, who were often at sea for months at a time.  Depositions were conducted internationally.

---

Limitation Plaintiffs to recover for the damage to its shore crane, incidental repair costs, and consequential damages (i.e., production loss and additional labor costs) flowing from the loss of the use of the shore crane, (ii) T&L's claim against Limitation Plaintiffs for the loss of bulk raw sugar that was located in the hold of the vessel and was contaminated as a result of the accident, and (iii) ABS's cross-claim against Limitation Plaintiffs for indemnification for any sums of money that may be adjudged against ABS in favor of third-party plaintiffs T&L and Ms. Gonzales.

[10] As a classification society, ABS sets safety standards for the marine industry.  Specifically, it establishes technical standards, known as "Rules" or "Guides," for ships and other marine structures, including cranes.  It then inspects the structures to determine whether they are in compliance with those standards.  (Docket No. 76, Ex. F, ¶¶ 3-5.)

[11] The Jones Act provides a civil remedy to a seaman who is injured in the course of his employment as a result of the negligence of his employer, the vessel owner, or crew members.  46 U.S.C. app. § 688; Lewis v. Lewis & Clark Marine, Inc., 531 U.S. 438, 441 (2001).  Under general maritime law, a seaman may assert an unseaworthiness claim against the owner of the vessel, claiming that the owner failed to ensure that the vessel was reasonably fit to be at sea.  Lewis, 531 U.S. at 441.

In early October 2004, the parties filed the instant motions for summary judgment. Less than a week later, they requested a settlement conference with a United States Magistrate Judge. The next day, T&L filed a motion requesting sanctions for alleged discovery violations and spoilation of evidence by Limitation Plaintiffs and ABS. The Court referred the case to Magistrate Judge James K. Bredar so that he could hold a settlement conference and decide the pending motion for sanctions. Counsel later asked Magistrate Judge Bredar to postpone the settlement conference until after the Court has ruled on the summary judgment motions.

In February 2005, Judge Bredar denied the motion for sanctions. At T&L's request, the Court allowed the parties to conduct limited additional discovery and file supplemental briefs.

In October 2005, the Court held two all-day hearings regarding the motions. As explained more fully below, the Court rules as follows:

(i)    The Court will grant ABS's motion for summary judgment against T&L and Ms. Gonzales. The limited circumstances under which courts have opened the door to classification society liability do not exist here. Even if they did, there is no admissible evidence that ABS's inspection of the cranes was faulty.

(ii)   The Court will grant Limitation Plaintiffs' motion for summary judgment against Ms. Gonzales. The forum selection clause contained in Seaman Gonzales's employment contract calls for adjudication of disputes in the Philippines. Accordingly, Ms. Gonzales is barred from pursuing her claims against Limitation Plaintiffs in the United States.

(iii)  The Court will grant T&L's motion for summary judgment against Ms. Gonzales. At the second summary judgment hearing, Ms. Gonzales's counsel conceded that T&L could not have contributed to the death of Ms. Gonzales's son.

The Court will now turn its attention to the individual motions.

## II.    Standard of Review

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>see</u> <u>also</u> <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial). Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. <u>Pulliam Inv. Co. v. Cameo Props.</u>, 810 F.2d 1282, 1286 (4th Cir. 1987).

## III.    ABS's Motion

ABS is a classification society that was established by the New York Legislature in 1862.[12] (Docket No. 76, Ex. F, ¶ 2.) As a classification society, ABS sets safety standards for the marine industry. It establishes criteria, often in the form of published "Rules" or "Guides," for the design, construction, and maintenance of ships. It determines whether a ship is in compliance with the "Rules" or "Guides" by reviewing the construction plans and specifications and by periodically surveying the vessel during construction and while the vessel is in service. (<u>Id.</u> ¶¶ 3-5.)

In addition to these traditional classification activities, ABS certifies cargo gear. (<u>Id.</u> ¶ 5.) ABS has developed standards for ship cranes, which are published in its Guide for Certification of Cranes. (Docket No. 76, Ex. G(5).) ABS surveys cranes to determine whether they are in compliance with those standards.

---

[12] ABS is a full member of the International Association of Classification Societies. (Docket No. 76, Ex. F, ¶ 2.)

Seven months prior to the accident, ABS surveyed the M/V Leon I's cranes and certified that they complied with ABS's standards. After the July 29, 2000 accident, Ms. Gonzales and T&L filed claims against ABS, contending that ABS's surveyor failed to notice, or advise the shipowner of, various defects in the cranes that contributed to the accident.

ABS moved for summary judgment. For the reasons stated below, the Court finds that the limited circumstances under which courts have opened the door to classification society liability do not exist here and, even if they did, there is no admissible evidence that ABS's surveys of the cranes were faulty. Accordingly, ABS is entitled to a grant of summary judgment.

### A.    Factual Background

#### 1.    The M/V Leon I and the Crane Retrofit

Built in 1982, the M/V Leon I was originally a gearless bulk carrier, meaning that it did not have cranes. In the spring of 1999, Eurocarriers began managing the vessel for its owner. (Docket No. 1, Ex. B; Docket No. 76, Ex. H, at 14.) To increase the vessel's market value and to facilitate the carrying of cargo, Eurocarriers decided to retrofit it with four cranes from the M/V Yannis K, another vessel managed by Eurocarriers. (Docket No. 76, Ex. H, at 13, 15, 93-94.)

On May 10, 1999, Rousalis Cargo Gear Services proof load tested all four cranes on the M/V Yannis K and certified that they withstood the load without damage.[13] (Id. at 23-24; Docket No. 76, Ex. H(2).) In the summer of 1999, in Dubai, Stoyan Terziev, a superintendent

---

[13] Rousalis Cargo Gear Services ("Rousalis") is a Greek company that, like ABS, certifies ship cranes. (Docket No. 76, Ex. H(2).) The certification process often includes a "proof load test," which consists of hoisting a load with the crane and then examining the crane's parts to determine whether they were injured or deformed as a result of lifting the load. The load is often in excess of the safe working load for the crane. For example, the safe working load for the M/V Yannis K's cranes was 25 tons. During the proof load test conducted by Rousalis, the cranes lifted 30 tons. (Id.) Rousalis certified that the cranes withstood the 30-ton load without damage. (Id.)

engineer at Eurocarriers, supervised the removal of the four cranes.  During the work, the cranes'
wire ropes were uncoiled from the drums and laid out on the deck.  To determine whether
Eurocarriers should order replacement wire ropes, Terziev personally inspected each of them as
it lay on the deck.  He found each rope to be in good condition and he did not see any pre-
existing damage or flattening of the wires.  (Docket No. 76, Ex. I, at 38-43.)  After Terziev's
inspection, the wire ropes were greased, coiled on two-meter spools, and labeled.  (Id. at 38-39,
42.)  They were then transported to the Huarong Da Dong shipyard in China for retrofit on the
M/V Leon I.

Having never previously had cranes on deck, the M/V Leon I required some work before
the cranes could be installed.  Accordingly, Eurocarriers hired a naval architectural firm,
Marutec, to design the pedestals on which the cranes would sit and the structures needed to
reinforce the ship's deck so that it could withstand the extra weight.  (Docket No. 112, Ex. B, at
29-30, 38, 41.)  Eurocarriers hired ABS to determine whether Marutec's design plans complied
with ABS's rules and standards.  (Id. at 30, 37, 41-44; see also Docket No. 143, Ex. W.)  ABS
recommended several changes regarding items such as brackets, pillars, and electric current.
Eurocarriers and Marutec made the changes, whereupon ABS approved the final design plans.
(Docket No. 112, Ex. B, at 30.)

ABS, having previously reviewed drawings of the cranes and having certified them while
they were aboard the M/V Yannis K, was familiar with the cranes.  (Id. at 44; Docket No. 112,
Ex. E, at 21-22; Docket No. 143, Ex. W.)  The cranes' certification was up-to-date.  (Docket No.
112, Ex. E, at 21-22.)  Accordingly, ABS designated the cranes as "existing cargo gear,"
meaning that, in ABS's view, it was unnecessary to re-review the cranes' drawings.  Likewise,

because the cranes had previously been certified, ABS did not deem it necessary to conduct an "initial survey," which is typically reserved for new cargo gear.  (Id. at 73-76, 79-81.)

### 2.    ABS Surveyor Roy Graham

Although ABS did not perform an initial survey, it assigned one of its surveyors, Roy Graham, to conduct three other surveys in connection with the crane retrofit.  These surveys, which took place in November and December 1999, included (i) an Installation Survey, (ii) an Annual Survey, and (iii) a Retesting Survey.

### a.    Installation Survey

During the Installation Survey, Graham verified that the construction of the pedestals and the deck structural supports conformed to the design plans drafted by Marutec.  (Docket No. 112, Ex. E, at 17-19, 21-22; Docket No. 76, Ex. G(11).)  While the pedestals and other structures were under construction, the shipowner instructed the shipyard to disassemble the moving parts of the cranes for inspection by Graham and the shipowner.  During Graham's daily visits to the shipyard, he stopped by the cranes to inspect their parts.  In determining whether there were any problems with the cranes during this pre-installation period, Graham relied upon ABS "process instructions" and "guidance notes" regarding the inspection of cranes.[14]  During this pre-installation review, Graham found bad bearings in some of the motors and some of the sheaves. He brought them to the shipowner's attention, and they were repaired or replaced.  (Id. at 22-23, 25-26.)

Although termed an "Installation Survey," the survey did not include observing or monitoring the physical installation of the cranes on the ship.  (Id. at 27-28.)  Rather, it appears

---

[14]  The parties have not provided the Court a copy of these documents.

9

to have been limited to verifying that the construction of the pedestals and deck structures conformed to the plans and inspecting the cranes while they were laid out on the dock.

### b.    Retesting and Annual Surveys

After the cranes were installed on the M/V Leon I, Graham performed an Annual Survey and a Retesting Survey.  First, the Court will briefly describe each survey and what tests and inspections are required for each.  Then, the Court will discuss the tests and inspections that Graham performed on the cranes.

### (1)    Requirements

ABS's Guide for Certification of Cranes (the "Guide")[15] requires the Annual and Retesting Surveys to be performed at specified intervals and lists the tests and other tasks the surveyor must perform in connection with each survey.

Annual Survey.  Each crane must "undergo an Annual Survey at intervals of 12 months." (Docket No. 76, Ex. G(5), § 7.7.)[16]  The Guide provides that an Annual Survey must include the following:

> *a* Visual inspection of the crane structure for deformation, excessive wear, corrosion, damage or fractures.  The boom is to be lowered for this examination. *b* Visual examination of crane hooks for deformation, excessive wear, or fractures.  *c* For cranes intended for transfer of personnel, non-destructive testing of crane hooks.  *d* Visual external examination and operational test of crane machinery including prime mover, clutches, brakes; hoisting, slewing and luffing machinery.  *e* Visual inspection of wire rope including end attachments. *f* Functional tests including main and auxiliary load hoisting and lowering, boom

---

[15]  The parties agree that the 1991 version of the Guide for Certification of Cranes was in effect at the time of the retrofit of the cranes aboard the M/V Leon I.  The 1991 version is contained in the record at Docket No. 76, Ex. G(5).

[16]  Section 7.7 was amended, effective May 1, 1994.  The section, as amended, is set forth in Notice No. 1 at the beginning of the Guide.

raising and lowering, slewing (swinging), safety protective (failsafe) and limiting
devices and load and boom angle or radius indicators.

(Id.)

Retesting Survey.  Every five years, a crane must also undergo a Retesting Survey, which

is essentially an Annual Survey plus a proof load test.  (Id., §§ 5.3, 7.9; Docket No. 112, Ex. E,

at 99-100.)

Wire Rope Inspection.  At each Annual and Retesting Survey, the surveyor is required to

visually inspect all "running wire ropes."  (Docket No. 76, Ex. G(5), § 7.11.)  The Guide states

that,

> [w]ire rope is not to be used if in any length of ten diameters, the total number of
> visible broken wires exceeds 5 percent of the total number of wires, if there is
> more than one broken wire immediately adjacent to an end fitting, if the broken
> wires are concentrated in one area or one strand, or if the rope shows signs of
> excessive wear, corrosion, flattening, kinks, separation of the strands or wires,
> core failures or other defect which renders it unfit for use.

(Id.)

### (2)     Tests and Inspections Performed by Graham

Graham testified during his deposition that he performed the tests and inspections

required by the Guide, including the following:

Wire Rope Inspections.  Graham visually inspected the cranes' wire ropes on three

different occasions,[17] and he did not find any problems.[18]  (Docket No. 112, Ex. E, at 23-24;

---

[17]  Graham testified during his deposition that during his inspections of the wire
ropes, he was guided by "process instructions," which provide additional guidelines for
inspecting wire ropes.  (Docket No. 76, Ex. G, at 116.)  The parties, however, have not
placed the "process instructions" in the Court record.

[18]  Terziev, the Eurocarriers superintendent engineer who inspected the ropes
when they were first removed from the M/V Yannis K, also looked at the ropes at the
shipyard in China, concluding that they were in satisfactory condition.  (Docket No. 76,

Docket No. 76, Ex. G, at 113-16.)  First, after they arrived at the shipyard, the ropes were un-

spooled and laid out on the dock.  Prior to their re-installation on the cranes, Graham walked the

length of each rope and inspected it from one end to the other.  He testified that he was "standing

right on them," which was unusual because most Annual and Retesting Surveys are conducted

while the ropes are in place on the cranes and, therefore, not as accessible.  As a result, Graham

felt that he was able to get a closer look than normal at these wire ropes.

Then, Graham looked at some of the wire ropes as they were being installed on the

cranes.  (Docket No. 76, Ex. G, at 115.)  Finally, after all the wire ropes had been installed,

Graham inspected the working gear of each crane (including the drums, pulleys, and sheaves)

and was able to look at the ropes during that inspection.

Operational Test.  Graham did not find any problems with the cranes during the

operational test, and each crane passed the test on the first try.  (Docket No. 112, Ex. E, at 35.)

During the test, under Graham's supervision, an operator ran each of the four cranes (unloaded)

through its paces, including slewing (rotating the jib from side to side), luffing (moving the jib

up and down), and hoisting (lifting).[19]  (Docket No. 112, Ex. E, at 29.)  Graham personally went

into each cab so that he could observe the operator using the controls.  (Id. at 34.)

Graham tested the jib limit switches, which prevent the jib from being lowered too far

down (which could cause the crane to become overloaded) or raised too high (which could cause

damage to the wires by placing them under additional stress and causing them to rub against

machinery they ordinarily do not touch).  (Docket No. 76, Ex. I, at 29-32.)  The cranes were

---

Ex. I, at 57-59.)

[19] See http://www.m-i-link.com/dictionary and search for "slewing" and
"luffing."

designed to operate between a minimum angle of 25 degrees and a maximum angle of 78 degrees (as measured from the jib to the ship's deck). (Docket No. 76, Ex. H, at 45-46; Docket No. 76, Ex. H(5).) When the angle approaches one of these limits, the switch activates and stops the jib from moving any farther.

To test the limit switches, Graham instructed the crane operator to lower the jib until it was stopped by the limit switch. He then checked the jib angle indicator, which displays the angle of the jib, to see whether the limit switch stopped the jib at 25 degrees. He then directed the crane operator to raise the jib to determine whether the switch would stop the jib at 78 degrees. Graham found that the switches on all of the cranes stopped the jibs at the designated angles and prevented the cranes from exceeding their limits.[20] (Docket No. 112, Ex. E, at 29, 32-33.) He inspected the mechanical components of the limit switches and observed no problems. (Id. at 34-35.)

Proof Load Test. Each crane also passed a proof load test. (Id. at 35.) During the test, each crane lifted a 25-ton test weight[21] and held it for five minutes. (Id. at 30, 104, 106.) The operator then (i) hoisted and lowered the weight as far as possible, (ii) raised and lowered the jib a few degrees, and (iii) swung the weight as far to the left and to the right as possible. (Id. at 30, 105-09.)

_____

[20]  Terziev also observed the testing of the limit switches and found that the limit switches were functioning properly. (Docket No. 76, Ex. I, at 60-61.)

[21]  When the cranes were retrofitted onto the M/V Leon I, their safe working loads were downgraded from 25 tons to 20 tons in order to account for differences in the electrical frequency between the M/V Yannis K and the M/V Leon I. (Docket No. 76, Ex. I, at 61-63.) According to the Guide, a crane with a safe working load of 20 tons should be proof tested with a load of 25 tons. (Docket No. 76, Ex. G(5), § 5.3.1; Docket No. 112, Ex. E, at 104-05.)

13

After the lifting portion of the test, Graham visually inspected the cranes, including their hooks, pulleys, and other components, to see if they had suffered any damage.  (Id. at 71.) During this inspection, he was able to see various portions of the wire ropes.  (Id. at 71-72.)

Graham testified at deposition that the above-described maneuvers and inspections were typical of the proof load tests that he had performed in the past on other ships, and that the tests fulfilled ABS's requirements for proof load testing.  (Id. at 29-31, 71-72.)

### c.    Graham Certifies that the Cranes are in Compliance with the ABS Guide

By the end of December 1999, the cranes had been installed and Graham had completed his surveys.  Graham certified in writing[22] that he had performed the annual and retesting surveys in compliance with the Guide and that he had found the cranes to be in satisfactory condition.[23] (Docket No. 76, Ex. G(11).)  He also completed a "Cargo Gear Annual and Retesting Survey Check Sheet," which generally describes the tasks that he completed during the surveys.  (Id.)

In addition, Graham prepared a "Summary Report of Statutory Surveys," which states that he performed the Installation, Annual, and Retesting Surveys and that he issued the required written certificates.  The document also states that the shipyard had constructed the crane pedestals and deck reinforcements in accordance with the ABS-approved design plans.  (Id.)

---

[22]  Graham issued the following two certificates: (i) Certificate of Test and Examination of Cranes or Hoists and Their Accessory Gear: Before Being Taken Into Use.  Retesting Surveys, and Tests Associated with Repairs (also known as the CHG-3 certification), and (ii) Certificate of Annual Thorough Examination of Gear Which Does Not Require to be Periodically Heat Treated, and for Annual Inspection of Cargo Gear or Cranes (also known as the CHG-7 certification).  (Docket No. 76, Ex. G(11).)

[23]  Although Graham wrote notes in a small notebook that he kept while performing his surveys, the notebook has since been disposed of in the normal course of business.  Accordingly, Graham's contemporaneous inspection notes no longer exist. (Docket No. 112, Ex. E, at 26.)

Graham also wrote a narrative report, which describes the various tasks performed by the shipyard during the construction and installation of the pedestals and the deck reinforcements. (Id.)

### 3.    Post-Certification Activity

In January 2000, the M/V Leon I dropped anchor at an off-shore loading area in the Philippines.  From January 29th until February 14th, the ship's cranes were used to load cargo onto the M/V Leon I.  (Docket No. 76, Ex. J, at 46-47; Docket No. 76, Ex. J(3).)  There is no record of any problems with the cranes during that time.  (Docket No. 76, Ex. J, at 46.)  In March 2000, Eurocarriers superintendent engineer Thomas Tampathanis inspected the M/V Leon I and observed that the wire ropes were "still in good working condition."  (Id. at 42-43; Docket No. 76, Ex. J(2), at 16.)

### 4.    The July 29, 2000 Accident

On or about July 21, 2000, the M/V Leon I berthed at T&L's Domino Sugar refinery in Baltimore to discharge a cargo of raw sugar.  During the morning of July 29, 2000, T&L was using two shore cranes to discharge sugar from hatch 6.  At the same time, the ship's bosun,[24] Rolando Bolita, began operating ship crane #4 as part of an effort to clean caked sugar from the aft[25] coaming of the adjacent hatch, 6A.  Bosun Bolita suspended Seamen Gonzales and Burgos from the crane in a work basket so that they could chip away the sugar.  While the men were suspended, the luffing wire broke and the jib fell.  The work basket struck the hatch cover,

---

[24] A "bosun" is the supervisor of the ship's seamen.  See http://www.m-i-link.com/dictionary and search for "bosun."

[25] "Aft" means towards the stern (or rear) of the ship.  See http://www.m-i-link.com/dictionary and search for "aft."

causing the two men to sustain fatal injuries.  Crane #4's jib struck and damaged one of T&L's shore cranes.

The details regarding the sugar-chipping operation and the events that led to the failure of the rope and the collapse of the jib are not altogether clear from the record.  The record does not contain any deposition testimony from Bosun Bolita.  The deponents who discussed the accident were, for the most part, speculating or repeating what they had heard from crew members who had witnessed the incident.[26]  The parties have not provided the Court with any first-hand testimony regarding the accident.

Nevertheless, as was evident during the summary judgment hearings, the parties generally agree on the following: The crane's jib limit switches were designed to prevent the jib from being raised higher than 78 degrees.  At that angle, however, the work bucket hung approximately two meters away from the coaming where the men could not reach caked sugar.  To move the work basket closer to the coaming, Bosun Bolita raised the jib higher than 78 degrees.  Several of the ship's crew used ropes to pull the basket the rest of the way.  This is when the luffing rope parted and the jib collapsed.

The parties disagree, however, as to how Bosun Bolita was able to raise the jib higher than the 78 degrees allowed by the limit switch.  Limitation Plaintiffs believe that Bosun Bolita turned off the limit switch that morning.  As the crane operator, he had a key that enabled him to neutralize the limit switch system so that the jib could be lowered to zero degrees and secured when the ship was at sea.  The key turns off both the upper and lower switches, and Limitation Plaintiffs believe that Bosun Bolita purposefully turned off the system so that he could raise the

_____

[26] See Docket No. 76, Ex. H, at 172-74; Docket No. 76, Ex. I, at 33-38; Docket No. 76, Ex. J, at 64.

jib higher than permitted so that the work basket would hang closer to the coaming.[27]  (Docket No. 76, Ex. I, at 36-38.)  Ms. Gonzales and T&L, on the other hand, theorize that someone else had disengaged the system prior to the day of the accident.

### B.    Claims Against ABS

Ms. Gonzales and T&L filed claims against ABS, alleging that during Graham's surveys of the cranes, he failed to notice various defects that ultimately contributed to the July 29, 2000 accident.  The parties dispute the extent to which a classification society may be held liable in connection with its survey and certification work, and the jurisprudence on the issue is not a model of clarity.  Overall, the courts have trod carefully in this arena, hesitant to open the liability door too far given the limited nature of the classification society's undertaking, which is to conduct a specified inspection of a ship for the owner and only the owner.  Courts have also worried that imposing general liability on societies would drive them out of business or impair their usefulness to the maritime industry.[28]

---

[27]  There is, however, no evidence in the summary judgment record that Bosun Bolita turned off the limit switch system.

[28]  As the Fifth Circuit explained in Otto Candies, L.L.C. v. Nippon Kaiji Kyokai Corp., 346 F.3d 530 (5th Cir. 2003):

Imposition of undue liability on classification societies could be harmful in several ways.  The societies could be deterred by the prospect of liability from performing work on old or damaged vessels that most need their advice.  The spreading of liability could diminish owners' sense of responsibility for vessel safety even as it complicates liability determinations.  Ultimately, broader imposition of liability upon classification societies would increase their risk management costs and rebound in higher fees charged to the societies' clients throughout the maritime industry.  Whether such risk-spreading is cost-efficient in an industry with well-developed legal duties and insurance requirements is doubtful.  The distinctions articulated in caselaw to date recognize the care with

In surveying a ship or marine equipment such as cranes, a classification society does not guarantee that the vessel is seaworthy.[29]  Rather, the society determines whether the ship or equipment conforms to certain published rules or standards issued by the society itself,[30] and the resulting certificate allows the shipowner to take advantage of lower insurance rates available to certified or classed vessels.[31]  The ultimate responsibility for the vessel's seaworthiness rests on

---

which claims against classification societies must be studied.

Id. at 535.

[29]  Otto Candies, 346 F.3d at 538 ("The [classification society's] certificate or survey in no way guarantees a vessel's seaworthiness."); Sundance Cruises Corp. v. American Bureau of Shipping, 7 F.3d 1077, 1084 (2d Cir. 1993) (stating that the "shipowner, not ABS, is ultimately responsible for and in control of the activities aboard ship" and that "ABS can not be said to have taken over [the shipowner's] obligations in this regard by agreeing to inspect and issue a classification certificate");  Cargill Inc. v. Bureau Veritas, 902 F. Supp. 49, 52 (S.D.N.Y. 1995) (stating that a classification society is not liable to a shipowner or to third parties as an insurer of a vessel's seaworthiness); Great American Ins. Co. v. Bureau Veritas, 338 F. Supp. 999, 1012 (S.D.N.Y. 1972) (stating that making the classification society "an absolute insurer of any vessel it surveys and certifies" would not be "commensurate with the amount of control that a classification society has over a vessel" and is "not in accord with the intent of the parties, the fees charged or the service performed"), aff'd, 478 F.2d 235 (2d Cir. 1973).

[30]  Otto Candies, 346 F.3d at 537-38 (stating that a classification society determines whether the vessel complies with the society's rules and standards, and that the certificate or survey does not guarantee the vessel's seaworthiness, but "extends only as far as the nature of the survey performed");  Great American, 338 F. Supp. at 1010 ("In agreeing to classify [the ship], Bureau Veritas undertook, no more than to make a statement that the condition of the ship either was or was not in conformity with certain published standards established by the society.").

[31]  Sundance, 7 F.3d at 1084 ("Put simply, the purpose of the classification certificate is not to guarantee safety, but merely to permit [the shipowner] to take advantage of the insurance rates available to a classed vessel.").  During one of the summary judgment hearings before this Court, the parties generally agreed that the certification of the M/V Leon I's cranes was an important condition for the ship to obtain insurance.

the shoulders of the shipowner, and the shipowner cannot delegate this duty to a classification society or to any other entity.[32]

Case law has recognized that when surveying and classing or certifying a vessel, a classification society undertakes two duties: (i) "to survey and classify [the vessel] in accordance with rules and standards established and promulgated by the society for that purpose," and (ii) "the reasonable duty of detecting all perceptible defects of the vessel encountered during the survey and notifying the owner and/or charterer thereof."[33]  Courts have refused to hold a classification society liable for breach of the first duty because it is ultimately the shipowner's non-delegable responsibility to maintain a seaworthy vessel and to transfer that responsibility to the classification society would not be commensurate with the surveyor's limited contact with the vessel and the fee paid to the society.[34]  Regarding the second duty, some courts have stated that a classification society may be held accountable to the owner when it fails to detect perceptible defects during its survey or fails to notify the owner of those defects.[35]

Ms. Gonzales and T&L (hereinafter the "Third-Party Plaintiffs") assert two theories of recovery against ABS for Graham's allegedly faulty surveys: (i) negligence, and (ii) breach of the implied warranty of workmanlike performance that ABS allegedly owed to the shipowner

---

[32] Great American, 338 F. Supp. at 1012 (discussing the "long-standing policy or rule that the owner of a ship has a non-delegable duty to maintain a seaworthy vessel").

[33] Id. at 1011-13; see also Royal Embassy of Saudi Arabia & Ins. Co. of North Am. v. Ioannis Martinos, 1986 A.M.C. 769, 785-86 (E.D.N.C. 1984) (discussing the two duties of care).

[34] Great American, 338 F. Supp. at 1012; Royal Embassy, 1986 A.M.C. at 786.

[35] Great American, 338 F. Supp. at 1012-13; Royal Embassy, 1986 A.M.C. at 786.

and to which Ms. Gonzales and T&L are alleged third-party beneficiaries.[36]  (Docket Nos. 25, 30.)  As the Court will discuss in Section III.C. of this Memorandum, there is no evidence from which a conscientious fact-finder could conclude that Graham conducted faulty surveys.  Putting that issue aside, however, Third-Party Plaintiffs' theories of recovery fail as a matter of law.

####    1.    Negligence

Third-Party Plaintiffs have shifted ground on this issue.  In opposing ABS's summary judgment motion, they expressly stated that they were not alleging a negligent misrepresentation claim.  (See Docket No. 112, at 9.)  Instead, they argued, albeit without any ostensible legal support, that ABS may be held liable for common-law negligence.  When pressed during the summary judgment hearing to identify authority recognizing a negligence claim by third parties against a classification society, the Third-Party Plaintiffs were unable to offer any.  Rather, they turned to the tort of negligent misrepresentation, producing a law review article that states that "an injured third party, in seeking recovery from a classification society, essentially is alleging the long-known and well-established tort of negligent misrepresentation."[37]  At that point, Third-Party Plaintiffs effectively conceded that negligent misrepresentation is the mode of analysis.[38]

_____

[36]  In their Complaints, Ms. Gonzales and T&L plead breach of implied warranty of workmanlike performance and third-party beneficiary as two separate counts.   In their summary judgment brief and during the summary judgment hearing, their counsel explained that they claim to be third-party beneficiaries of the implied warranty of workmanlike performance that ABS allegedly owed to the shipowner.  The two counts, therefore, essentially merge into one.

[37]  Machale A. Miller, Liability of Classification Societies from the Perspective of United States Law, 22 Tul. Mar. L.J. 75, 101 (1997).

[38]  During the hearing, Third-Party Plaintiffs' counsel placed emphasis on a statement in the law review article that "claims of injured third parties against classification societies fit the Restatement's concept of negligent misrepresentation like a glove."  Id. at 104.

Courts evaluating a negligent misrepresentation claim in the context of a maritime case have looked to Section 522 of the Restatement (Second) of Torts, which lays out the elements. To prevail on a negligent misrepresentation claim, Third-Party Plaintiffs must prove that: (i) at Third-Party Plaintiffs' request, ABS provided them with information for their guidance, (ii) ABS failed to use reasonable care in supplying the information, (iii) ABS knew Third-Party Plaintiffs would rely on the information for a certain purpose, and (iv) Third-Party Plaintiffs relied on the information and suffered pecuniary loss as a result.[39]

Third-Party Plaintiffs' negligent misrepresentation claim fails as a matter of law. Even assuming that they could satisfy the other elements, there is absolutely no evidence that Third-Party Plaintiffs relied on ABS's certification.[40] There is no evidence that they were even aware at the time of the accident that ABS had surveyed and certified the cranes seven months earlier.[41] Ms. Gonzales admitted in her deposition that she had never heard of, and her son had never mentioned, ABS.[42] It was not until after this lawsuit was filed that Ms. Gonzales and T&L

---

[39] See Otto Candies, 346 F.3d at 535; Cargill, 902 F. Supp. at 53; Sundance Cruises Corp. v. American Bureau of Shipping, 799 F. Supp. 363, 381-82 (S.D.N.Y. 1992), aff'd, 7 F.3d 1077 (2d Cir. 1993); Somarelf v. American Bureau of Shipping, 704 F. Supp. 59, 64 (D.N.J. 1988); Royal Embassy, 1986 A.M.C. at 786-87.

[40] Third-Party Plaintiffs made no effort to show reliance on ABS's certification. In fact, in their summary judgment papers, they stated that they were not making a negligent misrepresentation claim. They characterized as rhetoric ABS's argument that they could not satisfy the reliance element. As mentioned, they performed an about-face at the summary judgment hearing, conceding that negligent misrepresentation was the correct cause of action. Even then, they offered no evidence that they had, indeed, relied upon ABS's surveys and certification.

[41] See Cargill, 902 F. Supp. at 53 (stating that because the record was devoid of any evidence that the plaintiffs had consulted the ship's classification, the court determined that plaintiffs could not establish reliance on the classification).

[42] See Docket No. 76, Ex. P, at 57.

21

became aware that the deck cranes had been moved from the M/V Yannis K to the M/V Leon I
and that Graham had surveyed the cranes.[43]  Without reliance, the claim must fail.

In another attempt to hold ABS responsible for Graham's allegedly defective survey,
Third-Party Plaintiffs raise the Good Samaritan Doctrine.  According to that doctrine,

> One who undertakes, gratuitously or for consideration, to render services to
> another which he should recognize as necessary for the protection of a third
> person or his things, is subject to liability to the third person for physical harm
> resulting from his failure to exercise reasonable care to protect his undertaking, if
> (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he
> has undertaken to perform a duty owed by the other to the third person, or (c) the
> harm is suffered because of reliance of the other or the third person upon the
> undertaking.[44]

Even assuming that Graham failed to exercise reasonable care during his surveys (an issue which
the Court will discuss in further detail in Section III.C.), the Good Samaritan Doctrine does not
apply in this case.  Third-Party Plaintiffs have not argued that Graham's allegedly defective
surveys increased the risk of harm or that ABS undertook to perform a duty owed by the
shipowner to Third-Party Plaintiffs.  Rather, they focus on the third factor, urging the Court to
find that they relied upon ABS's surveys.  As previously discussed, they have offered no
evidence that they, in fact, relied upon those surveys or ABS's certification of the cranes.[45]

---

[43]  See Docket No. 25, ¶¶ 11-14; Docket No. 30, ¶¶ 10-13.

[44]  Shipe v. Chesapeake Bay Fishing Parties, Inc., 940 F. Supp. 130, 133-34 (D.
Md. 1996) (quoting Restatement (Second) of Torts § 324A).

[45]  Third-Party Plaintiffs argue that ABS provided its services to Limitation
Plaintiffs "knowing that third-parties such as the Third-Party Plaintiffs rely upon the
classification society's registration and/or certification of vessels and their cargo gear for
a variety of purposes, the most important of which is safety and the prevention of
casualties such as the one here."  (Docket No. 112, at 10.)  The general statement that
third-parties often rely on certification and classification information is insufficient to
prove that the specific parties in this case relied upon the specific certification at issue.
T&L has not offered any evidence, in the form of testimony by T&L personnel or

### 2.    Implied Warranty of Workmanlike Performance

Third-Party Plaintiffs next contend that ABS owed Limitation Plaintiffs an implied warranty of workmanlike performance regarding its surveys of the cranes and that Third-Party Plaintiffs are third-party beneficiaries of that warranty.  In 1956, the Supreme Court applied the implied warranty in the context of the maritime industry.  The Supreme Court held that when a stevedoring contractor agrees to provide a service, implicit in the contract is a warranty that the contractor will provide the service in a workmanlike manner.[46]  As discussed below, the Court finds that by agreeing to survey and certify the M/V Leon I's cranes, ABS did not give an implied warranty of workmanlike performance to the shipowner.  Accordingly, there is no implied warranty of which Third-Party Plaintiffs could be third-party beneficiaries, and their claim fails as a matter of law.

Generally, courts have refused to extend the implied warranty of workmanlike performance to classification societies.[47]  This is for several sound reasons: (i) unlike the work of a stevedoring company or other maritime contractor (e.g., ship cleaner, repair yard, or towing company), the services of a classification society typically do not create defects or dangers on a ship; rather, the classification society is on board only to inspect the vessel for defects created by

---

otherwise, regarding how a ship's crane certification affects its business.  For example, there is no evidence that before T&L will allow a ship to dock at its port, the ship must show that its cranes are certified.  The Court cannot assume, as Third-Party Plaintiffs ask it to do, that the reliance element is met in this case.

[46] Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 133-35 (1956).

[47] See Sundance Cruises, 799 F. Supp. at 385-86; Great American, 338 F. Supp. at 1013-15.

others, and (ii) if a classification society notices a defect, it can only report the defect to the owner; it lacks the authority or capability to repair the defect itself.[48]  As previously discussed, the burden of maintaining a seaworthy vessel ultimately rests with the shipowner.  In light of a classification society's limited role on board, that burden should not be shifted to a classification society by implying that a warranty of workmanlike performance exists in the society's contract with the shipowner.[49]

Third-Party Plaintiffs attempt to distinguish Graham's work aboard the M/V Leon I from the traditional inspection and reporting tasks of a classification society.  Specifically, they argue that Graham actively oversaw and directed the rebuilding and retrofitting of the cranes and, therefore, created the unseaworthy condition that caused the accident.  ABS's expanded role interlineated an implied warranty of workmanlike performance into the contract between ABS and Limitation Plaintiffs, Third-Party Plaintiffs contend.  The Court disagrees.

Third-Party Plaintiffs acknowledge the case law that refuses to recognize an implied warranty of workmanlike performance between the shipowner and the classification society. They point, however, to a case in which the court allowed claims to proceed against marine surveyors under theories of negligent misrepresentation and breach of the implied warranty.  See Royal Embassy of Saudi Arabia and Insurance Company of North America v. Steamship Ioannis Martinos, 1986 A.M.C. 769 (E.D.N.C. 1984).  In Royal Embassy, the plaintiff owned cargo and hired the defendants to load it onto a ship and transport it.  Plaintiff filed suit when the cargo was

---

[48]  See Sundance Cruises, 799 F. Supp. at 385-86; Great American, 338 F. Supp. at 1013-15.

[49]  See Great American, 338 F. Supp. at 1015.

lost at sea, and the court allowed the defendants to pursue third-party claims against marine surveyors who had certified the stowage of the cargo.

The <u>Royal Embassy</u> case is distinguishable because the marine surveyors supervised and directed the loading and securing of the cargo and, therefore, they were actively involved in the stowage activities.[50]   The court, recognizing that other courts have been reluctant to extend the implied warranty to classification societies, explained,

> In the case at bar, however, the . . . evidence tends to show more activity on the part of the surveyors than merely observing and reporting.  This evidence, although disputed, indicates that the marine surveyors actually oversaw and directed the stowage of the cargo . . . .  Their conduct took on the nature of active involvement, which allegedly created an unseaworthy condition on board the vessel.[51]

In the instant case, Graham was not in charge of the crane installation.  He was not hired to plan or supervise the installation, and he lacked authority to instruct the welders and other workmen how to perform their jobs.  Graham's job was to understand Marutec's plans,  which he  did not draft,[52] and, when inspecting, to inform the shipowner of any variance between the plans and construction.  He had no power, other than withholding certification, to compel the construction to be carried out in any particular way.

In conclusion, Graham's passive role as an inspector is distinguishable from the active, supervisory role played by the surveyors in <u>Royal Embassy</u>.  There is no basis, therefore, for

---

[50]  <u>Royal Embassy</u>, 1986 A.M.C. at 775-82.

[51]  <u>Id.</u> at 782.

[52]  ABS did not draw the plans.  Rather, it reviewed them and verified that they met ABS's own standards.  (<u>See</u> Docket No. 143, Ex. W.)  When it noticed something in the draft plans that did not meet its standards, it brought it to the attention of Eurocarriers and Marutec, which made the correction.

recognizing an implied warranty of workmanlike performance within the four corners of the contract between ABS and Eurocarriers.

### C.    No Admissible Evidence that Graham's Surveys Were Flawed

Even if Third-Party Plaintiffs were able to clear the hurdles described above, the Court finds that there is no admissible evidence that Graham's surveys were flawed.  Third-Party Plaintiffs allege five defects that they claim Graham should have noticed and reported to Eurocarriers.  Before the Court turns to the alleged defects, it must address two flaws at the core of ABS's argument.

Third-Party Plaintiffs argue that Graham should have performed the tests and inspections necessary to find the alleged defects and other problems, even if the Guide did not so require. They provide no support for this proposition, however.  To the contrary, case law suggests that a surveyor's duties extend no farther than performing the inspections and tests called for by the classification society's own rules and regulations and notifying the owner of any defects noted.[53] Requiring a classification society to look for all possible defects aboard a ship, beyond those contemplated by its own rules and regulations, would burden it with a duty to ensure the

---

[53]  See Otto Candies, 346 F.3d at 538 ("The certificate or survey in no way guarantees a vessel's seaworthiness, however, but extends only as far as the nature of the survey performed." (emphasis added)); Great American, 338 F. Supp. at 1013 ("[A] ship's surveyor or classification society should be charged in law with the reasonable duty of detecting all perceptible defects of the vessel encountered during the survey and notifying the owner and/or charterer thereof." (emphasis added)).

seaworthiness of the vessel, a result the courts have rejected.  Accordingly, Graham was required to perform no tasks beyond those specified in the Guide.[54]

Moreover, in arguing that the alleged defects existed when Graham performed his surveys, Third-Party Plaintiffs rely, in large part, on the following inadmissible evidence: (i) an expert report by Kevin P. Hislop of London Offshore Consultants, Inc. (see Docket No. 112, Ex. C), and (ii) a transcript of Graham's interview with the Coast Guard after the accident (see Docket No. 112, Ex. J; Docket No 143, Ex. Z).  Hislop's report is unsworn and, therefore, inadmissible in a summary judgment proceeding.[55]  By statute, the transcript of Graham's interview, which is an excerpt to the Coast Guard's report regarding the accident, is likewise inadmissible.[56]

---

[54]  Although the parties discuss "process instructions" and other documents that assist a surveyor during his inspections of cranes and wire ropes, the parties have not provided those documents to the Court, nor have they discussed their contents. Accordingly, the Guide is the only document in the Court record that describes the tasks that Graham was required to complete during his surveys.

[55]  See Turner v. Human Genome Sciences, Inc., 292 F. Supp. 2d 738, 743 (D. Md. 2003) (stating that "unsworn statements or expert reports do not qualify as affidavits and are not proper for consideration by the court when ruling on a motion for summary judgment"); Solis v. Prince George's County, 153 F. Supp. 2d 793, 799 (D. Md. 2001) (explaining that the court will not consider unsworn expert reports on summary judgment).

[56]  After the accident, the United States Coast Guard conducted an investigation and issued a report.  That report is inadmissible in a civil lawsuit.  See 46 U.S.C. § 6308(a) ("[N]o part of a report of a [U.S. Coast Guard] marine casualty investigation . . . , including findings of fact, opinions, recommendations, deliberations, or conclusions, shall be admissible as evidence . . . in any civil or administrative proceedings, other than an administrative proceeding initiated by the United States."). The parties agree that the report is inadmissible, and, in fact, revised the summary judgment briefs to omit any reference to the report.
The parties disagree, however, regarding whether the transcript of Graham's interview with the Coast Guard, an exhibit to the report, is likewise inadmissible. Arguing that the transcript does not state the "findings of fact, opinions,

With this in mind, the Court turns its attention to the specific defects alleged by Third-

Party Plaintiffs, which are as follows:

(i)     The cranes were not appropriate for the size and deck layout of the M/V Leon I because the jib of crane #4 was not able to reach all areas of the hatch. This design defect necessitated the practice of hoisting crewmen in a basket to clean the hatch coaming.

(ii)    The jib angle indicator and jib limit switches were not working properly, and the crane operator was unable to view the angle of the jib during all angles of operation.

(iii)   Contrary to the crane manufacturer's recommendation that the luffing wire ropes should contain a metal core, the luffing wire rope on crane #4 (which broke at the time of the accident) contained a weaker, fiber core.

(iv)   The luffing wire rope on crane #4 was oversized for its sheave and, therefore, was subjected to unnatural strains as it rode awkwardly in its sheave.

---

recommendations, deliberations, or conclusions" of the Coast Guard, T&L contends that it is not included within the reach of the statute. The Court disagrees.

First, the statute expressly states that "no part of a report" is admissible. Although the statute specifies that findings of fact, opinions, and conclusions are inadmissible, that list is not exclusive. See Falconer v. Penn Maritime, Inc., 397 F. Supp. 2d 68, 70 (D. Me. 2005) (noting that "the language of the statute is clear and must control" and that "the list of specifically excluded contents is 'illustrative and not conclusive,'" and finding that the statute renders all contents of a Coast Guard report, including notes and Coast Guard photos, inadmissible (internal citations omitted)); Baker Hughes Oilfield Operations, Inc. v. Seabulk Tankers, Inc., 2004 WL 859199, at *1 (E.D. La. Apr. 20, 2004) ("Certainly, the Coast Guard report or any portion is inadmissible as a general rule." (emphasis added)); but see In re Danos & Curole Marine Contractors, Inc., 278 F. Supp. 2d 783, 785 (E.D. La. 2003) (concluding that statute seeks to exclude only "conclusory items"). Whether or not the transcript mentions the findings of fact, opinions, or conclusions reached by the Coast Guard, it is inadmissible.

Second, during the interview of Graham, the Coast Guard investigator shared with Graham (i) things that he had noticed during his own inspection of the cranes, and (ii) some of his thoughts regarding the cause of the accident. (See generally Docket No. 112, Ex. J.) The transcript, therefore, contains facts and opinions, which the statute explicitly seeks to exclude.

For these reasons, the transcript is inadmissible.

(v)    The luffing wire rope had been damaged from riding improperly in its sheave while on board the M/V Yannis K, and this damage was present, and noticeable, during Graham's surveys.[57]

As will be seen, Third-Party Plaintiffs cannot sustain their claims, either (i) because of insufficient evidence that the defect existed when Graham performed his inspections, (ii) because ABS's protocol did not require Graham to test for the alleged defect, or (iii) because their argument regarding how the alleged defect contributed to the accident is based solely on conjecture.

### 1.    Reach of Crane #4

Crane #4 could not reach all areas of hatch 6.  Third-Party Plaintiffs contend that this limitation created a dangerous condition by encouraging Bosun Bolita to jury-rig an unsuitable method of cleaning the hatch coaming by lifting men in the work basket and drawing the basket close to the hatch coaming.  They fault Graham for failing to detect this problem.  This argument is unsustainable.

There is no evidence that the Guide or any other set of ABS rules or regulations required Graham to inspect the crane's reach or mandated that the jib be capable of accessing every area of the hatch and hatch coaming.  Graham testified during his deposition that the ABS

---

[57]  Citing the transcript of Graham's interview with the Coast Guard after the accident, Third-Party Plaintiffs also claim that Graham failed to perform a proper proof load test because the test weight was a few hundred pounds below the required 25 tons. (See Docket No. 143, Ex. Z, at 5.)  As discussed herein, there is no competent evidence on this point because the transcript of Graham's interview is inadmissible.  Moreover, they have put forward no theory, explanation or expert opinion as to what difference these few hundred pounds made.  The load at which the crane fell did not approach the 25-ton mark.  The work basket plus the two seamen weighed nowhere near 25 tons.  Whether the proof load was performed with a full 25 tons or several hundred pounds shy of that number has no ostensible relevance.

requirements do not address crane reach.  (Docket No. 112, Ex. E, at 77-78).  Terziev, a superintendent engineer at Eurocarriers, agreed.  (Docket No. 76, Ex. I, at 147.)

Third-Party Plaintiffs' argument assumes that cranes should be used to hoist seamen. Such is not the case.  They offer no evidence that it is customary to suspend men in a work basket to chip sugar.[58]  To the contrary, Eurocarriers' Shipboard Operations Manual specifically states that men should be raised only by hand and never by a power winch.  (Docket No. 76, Ex. K-3, § 3.1.8 ("It is not recommended to raise men in Bosuns Chair.  If necessary, only do so by hand.  Never raise men using power winch.").)  They also offer no proof that lifting men by crane was the only way to clean the coaming.  Accordingly, there is no evidence beyond speculation that Graham could have foreseen that the crane's limited reach would prompt the ship's crew to hazard a dangerous procedure.

### 2.    Jib Angle

Third-Party Plaintiffs state that the jib angle indicator and limit switch system were inoperable at the time of the accident, and they ask the Court to assume that they were also broken when Graham inspected them.  There is no evidence of this.  To the contrary, Graham testified that he tested the limit switches and jib angle indicator and found them to be working properly.  (Docket No. 112, Ex. E, at 29, 32-35.)

Citing only Hislop's expert report, Third-Party Plaintiffs claim that Graham's surveys failed to disclose that the crane operator did not have a clear, reliable view of the jib angle at all

---

[58]  Third-Party Plaintiffs cite two exhibits.  The first is Hislop's expert report.  In addition to being inadmissible, the report states nothing about the reasons why the shipowner used a work basket to perform the sugar chipping operations.  (See Docket No. 112, Ex. C, Bases for Op. 6.)  The second is a deposition transcript that does not even mention lifting men aloft in a work basket in specific or sugar chipping operations in general.  (See Docket No. 112, Ex. D, at 304-07.)

angles of operation.  This alleged defect would make no difference if Bosun Bolita himself

bypassed the limit switch, because he would have appreciated that he was exceeding the

maximum angle.  It might make a difference, however, if the switch had been bypassed earlier

and Bosun Bolita failed to realize how high the jib was raised.  Such a theory is predicated on

pure speculation.  First, there is no evidence when the limit switch was bypassed.  Second,

Hislop's report is inadmissible, and there is no other evidence in the record concerning the field

of view from the cab.  Finally, there is no evidence that ABS was required to test the crane

operator's view of the jib as part of its surveys.

### 3.    Core of the Luffing Wire Rope

Third-Party Plaintiffs contend that the crane manufacturer called for a rope with a metal

core.  During post-accident inspections of the wire rope, it was determined that the rope's core

was made of fiber, not metal.  Third-Party Plaintiffs fault Graham for failing to notice the

discrepancy during his inspections.  They argue that a metal core rope is stronger than a fiber

core rope and that a rope with a metal core may not have parted.  This argument is flawed.

First, it must be kept in mind that Graham was required to inspect only what was

mandated by the Guide.  The Guide required him to inspect the wire rope certificates, which

contain detailed information about each rope, including its core.[59]  Graham testified that he

---

[59]  The Guide states:

All wire rope is to have a certificate of test, furnished by the manufacturer or the
certificating authority, showing the breaking test load of a sample.  The certificate
is to show also size of rope, number of strands, number of wires per strand, lay,
core, quality of wires, date of test, and is to be submitted for inclusion in the
Register of Lifting Appliances.

(Docket No. 76, Ex. G(5), § 4.5 (emphasis added).)

31

reviewed the wire rope certificates.[60]  (Docket No. 112, Ex. E, at 51-52, 54 (stating that he

reviewed the cargo gear register book, which included wire rope certificates).)  According to the

wire rope certificates that Third-Party Plaintiffs placed in the record, the core of each rope was

made of fiber.[61]  Because Graham reviewed the certificates, he fulfilled his duty under the Guide.

The Guide did not require him to compare each certificate to the crane manufacturer's

recommendation.  Graham, therefore, was not charged with the responsibility of determining

whether a fiber core complied with the manufacturer's recommendation.

Third-Party Plaintiffs have also failed to provide satisfactory evidence that:

(i)    the crane manufacturer recommended a metal core;[62]

---

[60]  Third-Party Plaintiffs state, without offering any admissible proof, that the wire
rope certificates were not on board the vessel at the time of the accident.  Based on this,
they speculate, although without any evidence, that Graham is probably lying and that the
certificates were not available for Graham's inspection during the surveys.  This
speculation is insufficient to defeat a summary judgment motion.

[61]  Third-Party Plaintiffs attached "Group Exhibit F" to their opposition brief.
The exhibit is 95 pages long and contains wire rope certificates.  It is unclear which
certificate concerns the luffing wire on crane #4.  Regardless, each certificate states either
"fibre core" or "f.c."  (Docket No. 112, Ex. F.)  Each certificate also contains the other
information required by the Guide, such as the size of the rope, the number of strands,
and the number of wires per strand.

[62]  Third-Party Plaintiffs offer two exhibits in support of their claim.  First, they
cite to a one-page document produced by Eurocarriers during discovery.  (Docket No.
143, Ex. DD.)  The document lists the specifications for a hoisting wire rope and a luffing
wire rope.  Regarding the luffing wire rope, it states "IWRC."  Third-Party Plaintiffs have
failed to explain what "IWRC" means.  The Court, however, assumes, based on other
documents in the record, that the abbreviation stands for "independent wire rope core."
Nowhere does the document state, however, that it concerns the specific cranes that were
installed on the M/V Leon I.  Second, Third-Party Plaintiffs cite to deposition testimony
from their expert, Kevin Hislop.  (Docket No. 112, Ex. K, at 130-31.)  Quoting the Coast
Guard's report on the accident, Hislop says: "And in lieu of a fiber core, the rope should
have had an independent wire rope core."  (Id.)  Any reference to the Coast Guard's
report, however, is inadmissible by statute.  See Baker Hughes Oilfield Operations, Inc.,
2004 WL 859199, at *1 (deeming inadmissible any portion of an expert report "relating

(ii)   even if Graham had noticed the alleged discrepancy, the fiber core rope would have been unacceptable for certification under ABS's standards;[63]

(iii)   a fiber core rope had insufficient strength or was otherwise unsuitable for use on the M/V Leon I;[64] and

(iv)   if the rope had a metal core, it would not have parted.[65]

Accordingly, Third-Party Plaintiffs have failed to offer any basis for holding ABS liable.

### 4.    Size of the Luffing Wire Rope

---

to the Coast Guard report and any opinion shown to be predominantly based upon that report").

[63]   Even assuming that the manufacturer recommended a metal core, there is no evidence that it prohibited use of a fiber core. Moreover, there is nothing in the Guide stating that a surveyor must withhold certification if the core does not comply with the manufacturer's recommendation.

[64]   During the summary judgment hearing, counsel for T&L conceded that, during a post-accident test, the luffing wire had its full tensile strength of approximately 90,000 pounds, and that the work basket containing the two seamen was well under the rope's lifting capacity. Moreover, Graham performed a proof load test of the rope, and it successfully lifted 25 tons. Third-Party Plaintiffs' experts have not stated that the strength was inadequate for a luffing wire or that use of a fiber core was otherwise improper.

[65]   Third-Party Plaintiffs have offered no suitable expert opinion that the rope would not have failed had its core been made of metal. When asked during his deposition how the fact that the rope had a fiber core contributed to the casualty, Hislop quoted the Coast Guard report:  "And in lieu of a fiber core, the rope should have had an independent wire rope core." He then concluded: "So that does tend to summarize my opinion about the use of this particular rope. It was unsuitable for use, and its unsuitability was proven on July 29th, 2000." (Docket No. 112, Ex. K, at 131-32.) Hislop, therefore, simply parroted the Coast Guard report and offered no independent opinion or analysis about any potential impact that the use of a fiber, as opposed to metal, core had on the accident.

The luffing wire rope on crane #4 was too large for its sheave,[66] Third-Party Plaintiffs contend.  According to Third-Party Plaintiffs' expert, it is important to use a rope that is properly sized to the crane's sheave so that the rope lays in the sheave's groove.  (See Docket No. 143, Ex. Q, at 77.)  When a rope is oversized, he posited, it rides high in the sheave, where it is likely to rub against metal surfaces, resulting in damage to the rope.  (See id. at 77-78, 156-57.)  Third-Party Plaintiffs contend that the manufacturer of the M/V Leon I's cranes recommended a luffing wire rope with a diameter of 26 millimeters.  They also assume, although without offering any proof, that the groove of crane #4's sheave was only wide enough for a 26 millimeter rope.  Because the rope measured anywhere from 26 to 28.5 millimeters during post-accident inspections,[67] they argue that the rope was oversized for the groove and rode high in the sheave.  They fault Graham for failing to detect this alleged problem.

Third-Party Plaintiffs have offered no evidence that Graham was required to inspect how the rope rode in its sheave.  In fact, counsel for T&L admitted during the summary judgment hearing that, because the rope may have been off by only a few millimeters, any problems with how it rode in the sheave would not have been observable to the naked eye.  In addition, counsel

---

[66]  A "sheave" is a "wheel with a grooved rim in which a rope runs and changes its direction."  (See http://www.m-i-link.com/dictionary and search for "sheave.")

[67]  After the accident, various investigators and experts measured the rope and obtained measurements that ranged from 26 to 28.5 millimeters.  (Docket No. 143, Ex. K, at 18-19; Docket No. 143, Ex. Q, at 51.)  A wire rope can be smaller in some locations than others depending on where it runs through the sheaves, which may explain the discrepancies.  (Docket No. 143, Ex. K, at 18-19; Docket No. 143, Ex. Q, at 51.)  Third-Party Plaintiffs note that when the strength of the rope was tested after the accident, the company performing the test (I&I Sling Inc.) stated on the test certificate that the rope measured all the way up to 29 millimeters.  (Docket No. 143, Ex. CC.)  An employee of I&I Sling, however, testified that the company did not actually measure the rope, but obtained that measurement from an unidentified outside source.  (Docket No. 144, Ex. V, at 26-27.)

34

recognized that it would have been impossible for Graham to climb to the top of the crane while it was in operation to observe the rope as it rode through the sheave.

What Graham should have done, according to Third-Party Plaintiffs, was ascertain the diameter of the wire rope, either by measuring it or by inspecting the wire rope certificate, and compare it to the crane manufacturer's specification of 26 millimeters. Had he done so, he would have noticed the discrepancy and would have realized that the rope was too big for its sheave, they claim.

Third-Party Plaintiffs' theory of recovery suffers from the same shortcomings as does his argument about the rope's core. Nothing in the Guide required Graham to measure the wire ropes. Although the Guide required Graham to review the wire ropes' certificates of test, he did so. Graham, therefore, fulfilled his duty under the Guide. The Guide did not require him to compare each certificate to the crane manufacturer's recommendation. Graham, therefore, was not charged with the responsibility of determining whether the rope's size complied with the manufacturer's recommendation.

Moreover, Third-Party Plaintiffs fail to offer admissible evidence that:

(i)    the crane manufacturer recommended a diameter of 26 millimeters;[68]

---

[68] Third-Party Plaintiffs offer two exhibits in support of their claim. First, they cite again to the document produced by Eurocarriers that lists specifications for a hoisting wire rope and a luffing wire rope (Docket No. 143, Ex. DD.) Regarding the luffing wire rope, the number "26" appears next to "Rope - DIA." As previously noted, however, this document does not state that it concerns the cranes that were installed on the M/V Leon I. Second, Third-Party Plaintiffs rely for their argument on deposition testimony from their expert, Kevin Hislop. (Docket No. 112, Ex. K, at 131-32.) Quoting from the Coast Guard's report regarding the accident, Hislop says "In comparison to the crane manufacturer's recommendations, the diameter of the rope . . . was two to three millimeters too large." (Id.) Any reference to the Coast Guard's report, however, is inadmissible by statute. See Baker Hughes Oilfield Operations, Inc., 2004 WL 859199, at *1 (deeming inadmissible any portion of an expert report "relating to the Coast Guard

(ii)     the certificate for the luffing wire rope stated a diameter greater than 26 millimeters;[69] and

(iii)    even if the rope was larger than recommended by the crane manufacturer, it was too large for its sheave.[70]

Accordingly, Third-Party Plaintiffs' theory, which is based on pure speculation, fails.

**5.    Condition of the Luffing Wire Rope**

The remaining alleged defect focuses on the physical condition of the luffing wire rope when Graham inspected it.  Post-accident inspections of the rope revealed damage that the inspectors believe existed before the accident.  For the reasons stated below, however, the Court

---

report and any opinion shown to be predominantly based upon that report").

[69] Third-Party Plaintiffs' briefs do not mention the diameter stated in the wire rope certificate.  During the summary judgment hearing, counsel for T&L proffered that the wire rope certificate stated that the rope had a diameter of 28 millimeters.  Although Third-Party Plaintiffs cite to three exhibits in support of this claim, they fail to establish that the wire rope certificate listed a diameter of 28 millimeters.  First, they cite Hislop's inadmissible expert report.  Although the report mentions the wire rope certificates, it does not even discuss the diameter of the ropes.  (See Docket No. 112, Ex. C, Op. 1, Basis 6.)  Second, they cite Hislop's deposition testimony, which simply quotes the inadmissible Coast Guard report.  (See Docket No. 112, Ex. K, at 131-32; Baker Hughes Oilfield Operations, Inc., 2004 WL 859199, at *1 (deeming inadmissible any portion of an expert report "relating to the Coast Guard report and any opinion shown to be predominantly based upon that report").)  Moreover, the quoted reference from the Coast Guard Report does not even mention the wire rope certificates.  It merely offers the inadmissible conclusion that the rope was two to three millimeters too large.  Third, they cite to "Group Exhibit F," which contains various, inadequately identified wire rope certificates.  (See Docket No. 112, Ex. F.)  The Court reviewed all of the certificates and could not find any that state a diameter of 28 millimeters.

[70] There is nothing in the record regarding the actual measurements of the sheave.  Third-Party Plaintiffs assume that because the crane manufacturer required a 26-millimeter rope,  that was the largest-sized rope that could properly lay in the sheave groove.  There is no evidence of this, however, and none of the experts or investigators in the case measured the sheave or its groove.  Third-Party Plaintiffs' argument that the wire rope was too large for its sheave is, therefore, pure speculation.

finds that there is no admissible evidence that this damage was present when Graham inspected the wire ropes in November and December 1999.

### a.    Damage Revealed during Post-Accident Inspections

Captain Heiner Popp, an investigator hired by Limitation Plaintiffs, and Michael Parnell, T&L's expert, personally inspected the wire rope.[71] They noticed damage (including corrosion, nests of broken wires, bent wires, pitting, and flattening) that, in their view, exceeded ABS's stated requirements. (Docket No. 143, Ex. K, at 72-73; Docket No. 143, Ex. Q, at 66-67, 144-45; Docket No. 144, Ex. R, at 57-59; Docket No. 76, Ex. G(5), § 7.11.) Citing the nature of the damage and the fact that the damage existed in areas outside the section that broke, they concluded that the condition had existed for some time prior to the casualty. (Docket No. 143, Ex. K, at 73-75; Docket No. 143, Ex. Q, at 72, 96-97, 103-04, 125; Docket No. 144, Ex. R, at 57-58, 103; Docket No. 144, Ex. S, at 87.) During their respective depositions, neither could say when the damage had occurred, and they admitted that it would be pure speculation for them to

---

[71]    During the summary judgment hearing, counsel listed the following additional people who saw the rope at some point after the accident: (i) I&I Sling Inc., (ii) Carl A. Cederstav, Limitation Plaintiffs' expert, (iii) James Dolan, ABS's expert, (iv) Donald Sayenga, ABS's expert, (v) Esther Chenufski, a T&L worker at the scene of the accident, and (vi) the United States Coast Guard. Contrary to Captain Popp and Parnell, Sayenga concluded in an unsworn and, therefore, inadmissible expert report that the rope was in relatively good condition. (Docket No. 143, Ex. O.) Regarding the other individuals, the record neither includes their opinions regarding the condition of the rope, nor offers any evidence whether damage was present at the shipyard in China.

Although he did not personally inspect the rope, Hislop testified at deposition that, in his opinion, the damage to the rope was present when Graham inspected it. Hislop, however, based his opinion solely on a statement in the inadmissible Coast Guard report that there was pre-existing damage, and he admitted that he has no independent basis for his conclusion. (Docket No. 76, Ex. N, at 123-27, 163.) Moreover, in referencing the Coast Guard report, Hislop simply stated that the Coast Guard concluded there was pre-existing damage. He does not say when the damage occurred. He also does not say if the Coast Guard has any views as to when the damage occurred. His opinion is nothing more than speculation.

attempt to pinpoint a time frame.  (Docket No. 144, Ex. R, at 57-58; Docket No. 143, Ex. Q, at

72-73, 103-04; Docket No. 144, Ex. S, at 87-88.)  Neither, therefore, could opine that the

damage existed when Graham inspected the rope in late 1999.

### b.    No Admissible Evidence the Damage was Present During Graham's Surveys

In an attempt to overcome this obstacle, Third-Party Plaintiffs cite to two pieces of

evidence:  (i) a statement by Graham that he noticed flattening of the wire ropes, and

(ii) Parnell's supplemental expert report.  The Court will discuss, and reject, each in turn.

### (1)    Flattening of the Rope

Third-Party Plaintiffs claim that Graham saw flattening of the wire ropes but failed to

notify the shipowner.  (Docket No. 112, at 5, ¶ 14.)  In support, they cite to Graham's deposition

transcript, contained in the record at Docket No. 112, Exhibit E.  They do not cite to any specific

pages of Graham's transcript, however, and the Court's review of the transcript has not located

any mention of flattening.

Graham did mention flattening during his interview with the Coast Guard investigator

after the accident, which Third-Party Plaintiffs attached to their brief.  (Docket No. 112, Ex. J, at

3.)  As previously discussed, however, the transcript of this interview is inadmissible.  Even if

the Court could accept it into evidence, it does not establish that what Graham noticed violated

ABS's standards.

The Guide states that wire rope "is not to be used . . . if the rope shows signs of excessive

wear, corrosion, flattening, kinks, separation of the strands or wires, core failures or other defect

which renders it unfit for use."  (Docket No. 76, Ex. G(5), § 7.11.)  Although Graham initially

used the term "flattening," he explained to the investigator that the ropes had simply started to

show some normal wear on the exterior of the strands and that the wear was consistent with use and did not require replacement of the ropes.  (Exhibit 112, Ex. J, at 3.)  This is consistent with (i) his deposition testimony that there were no problems with the ropes, (ii) the testimony of Terziev, who inspected the ropes after they were removed from the M/V Yannis K and again before they were installed on the M/V Leon I, and concluded that they were in proper condition and exhibited no flattening, and (iii) the conclusion reached by Eurocarriers superintendent engineer Thomas Tampathanis, who inspected the M/V Leon I in March 2000, that the wire ropes were still in good condition.  No reasonable jury could conclude that what Graham observed called for replacement of the ropes under ABS's standards.

### (2)    Michael Parnell's Supplemental Expert Report

After the close of discovery and while the parties were briefing the summary judgment motions, T&L's expert, Michael Parnell, issued a supplemental expert report.  Although in his deposition Parnell had stated that he did not know how long the rope had been damaged, his supplemental report states that the damage to the wire rope (including scrubbing, chaffing, pitting, and corrosion) "was in existence at least two years before July 29, 2000."  (Docket No. 143, Ex. S.)  Parnell formed this opinion after consulting with a wire rope expert, Don Pellow, P.E.  Pellow had reviewed photographs of the wire rope and, in a three-page report, concluded that the pitting and corrosion on the rope would have been obvious for at least two years.  Parnell attached Pellow's report to his supplemental report, stating that Pellow's report "helped [him] to form a more definitive opinion about the length of time the pitting corrosion and metal loss existed before the accident."  (Id.)

Third-Party Plaintiffs claim that Parnell's supplemental report creates a dispute of fact regarding whether the damage existed during Graham's survey in late 1999. ABS objects to the late submission of Parnell's supplemental report, arguing that Third-Party Plaintiffs are attempting to introduce a new expert (Pellow) through Parnell. To address the dispute regarding Parnell's supplemental report, it is necessary for the Court to provide some background information.

### (a)     Background

Captain Heiner Popp, a marine surveyor whom Limitation Plaintiffs hired immediately after the accident, inspected the vessel within two hours after the accident. He later conducted a number of other inspections of the vessel and the broken wire rope and authored three inspection reports, dated August 3, 2000, August 9, 2000, and October 15, 2003. (Docket No. 143, Exs. L, M, and P.) Captain Popp's reports, which include a number of photographs that he took during the course of his inspections, describe damage that he observed on the luffing wire rope. (Id.)

Limitation Plaintiffs did not produce Captain Popp for deposition, claiming that he had been retained solely as a consultant and that his investigation was protected by the work product doctrine. Then, in August 2004, apparently having realized that their "testifying" expert, Carl Cederstav, had relied on Captain Popp's reports in forming his opinion, Limitation Plaintiffs produced to all parties Captain Popp's August 3, 2000 and October 15, 2003 reports.[72] Cederstav mentioned these reports during his deposition later that month. (Docket No. 144, Ex. T, at 199-201.)

---

[72] According to Limitation Plaintiffs, they were not yet aware of the existence of the August 9, 2000 report.

Fact discovery was completed in May 2004, and expert discovery closed in September 2004. By the close of expert discovery, T&L had not named any wire rope experts, although Michael Parnell, T&L's wire rope consultant, had inspected the rope in August 2004.

In the fall of 2004, while the parties were briefing the instant summary judgment motions, T&L moved for sanctions based on Limitation Plaintiffs' failure to produce Captain Popp for deposition and for failing to turn over his reports at an earlier date. T&L also alleged that experts retained by Limitation Plaintiffs and ABS had inspected the failed rope without notice to T&L and, during the inspection, had snipped a small section of the rope, thus spoiling the evidence. In February 2005, Magistrate Judge Bredar denied the motion.[73] Judge Bredar found that Limitation Plaintiffs and ABS had not engaged in any wrongdoing, and he concluded that any prejudice suffered by T&L could be cured by allowing T&L to depose Captain Popp and to name its own wire rope expert. He instructed the parties to confer and, if they wished to re-open discovery, to seek permission from the undersigned. (See Docket No. 122.)

T&L subsequently moved to re-open discovery so that it could depose Captain Popp, name its own wire rope expert, Michael Parnell, and so that ABS and Limitation Plaintiffs could depose Parnell. The Court granted the motion and also granted leave for the parties to supplement their summary judgment briefs based on the testimony of Captain Popp and Parnell.

Captain Popp was deposed on October 6, 2005. Parnell attended the deposition, during which Captain Popp produced his inspection report dated August 9, 2000. According to ABS and Limitation Plaintiffs, Captain Popp had not previously provided this report to Limitation

---

[73] At the parties' request, the Court referred the motion to Magistrate Judge Bredar. Because the motion referenced the inadmissible Coast Guard Report, the parties preferred that the undersigned, as the fact-finder in the case, not review the motion.

Plaintiffs and they were not aware of it until Captain Popp's deposition. The report detailed damage that Captain Popp had observed on the luffing wire rope. During his deposition, Captain Popp testified about that damage, stating that it must have existed prior to the accident. As previously stated, however, he was not able to identify when the damage had occurred.

On October 7, 2005, the day after Captain Popp's deposition, Limitation Plaintiffs and ABS deposed Parnell. Relying in part on Captain Popp's testimony from the previous day, Parnell testified that, in his opinion, the damage to the rope had occurred prior to the accident. (Docket No. 143, Ex. Q, at 113-14.) He engaged in the following colloquy with ABS's counsel regarding when before the accident the damage had accrued:

> Q:   And those torn wires, did you form an opinion as to how or why that happened in this case?
>
> A:   Well, they appeared not to have occurred at the moment of the incident because of the corrosion and pitting. They appeared to have occurred over time prior to the incident. I'm not sure if I answered the question or not.
>
> Q:   You can't say how much time prior, though, isn't that right?
>
> A:   No. I can only made educated guesses.
>
> Q:   Right. You'd have to speculate; isn't that right?
>
> A:   Yes.

(Docket No. 144, Ex. R, at 58.)

Later in the deposition, the discussion continued:

> Q:   Well, let me ask you this: Are you suggesting there that ABS during its inspection in the shipyard in China in November and December of 1999 should have been able to identify the existing damage?
>
> A:   I don't know if the damage was existing on that day in China.
>
> Q:   You can't say one way or the other; is that right?

A:      I can't say, correct.

        . . . .

Q:      But you can't say one way or the other whether it was preexisting damage; isn't that right?

A:      The corrosion that I saw and the damage I saw was accruable between the day of the accident backwards to the day [the vessel] left China. It could have happened anywhere in there especially with the corrosion and pitting that was there in a six month window and it could have happened before that as well, so I don't have a window to say.

(Docket No. 143, Ex. Q, at 103-04.)

On October 26, 2005, nineteen days after his deposition, Parnell issued a supplemental report. The one-page report, addressed to counsel for T&L, states:

The following is in answer to inquiries between you and Attorney Robert Clyne [counsel for ABS], about the accumulated pitting, corrosion, and abraded surfaces noted on the wires in the luffing wire (boom hoist rope) on Crane 4 aboard the M/V Leon I, involved in the accident of July 29, 2000.

Based on the visual examination of the boom hoist rope, the photos provided throughout this case, and with the consultation of Mr. Don Pellow, P.E. a noted wire rope expert who has testified in court concerning wire rope related corrosion and pitting;

1)      I am of the opinion that the condition of the abraded (scrubbed and chaffed) wires in the immediate area of the failure was in existence at least two years before July 29, 2000. . . .

2)      I am of the opinion that the pitting corrosion noted on outer and inner strand wires was in existence at least two years before July 29, 2000. . . .

Please see Mr. Pellow's attached report . . . which helped me to form a more definitive opinion about the length of time the pitting corrosion and metal loss existed before the accident.

(Docket No. 143, Ex. S.)

43

Opposing counsel immediately objected to the supplemental report, arguing that the Court had re-opened discovery solely for the depositions of Captain Popp and Parnell, and not for the submission of additional expert reports.  The Court held a telephone conference with counsel regarding whether the supplemental report should be allowed.  During that conference call and in subsequent briefing requested by the Court, counsel for T&L argued that the Court should allow the supplemental report because: (i) it simply expands upon Parnell's deposition testimony, and (ii) Parnell had only one night to digest the reports and testimony of Captain Popp.[74]  The Court rejects the proffered reasons and will not allow Parnell's supplemental report.

### (b)     Discussion

The supplemental report does not simply expand upon Parnell's deposition testimony; rather, it offers a new opinion.  During his deposition, Parnell stated that he could not offer a time frame during which the damage had occurred and that any attempt to do so would be speculation.  This is a far cry from stating, as he does in his supplemental report, that he can now identify a time frame and that the damage had accrued at least two years before the accident.

The supplemental report makes absolutely no reference to Captain Popp, his reports, or his deposition testimony.  Rather, the report identifies three things upon which Parnell bases his new opinion: (i) his visual examination of the rope, (ii) "the photos provided throughout this case," and (iii) his consultation with wire rope expert Donald Pellow, and Pellow's report.

---

[74] T&L implied that Parnell required additional time after his deposition to review Captain Popp's reports and testimony before finalizing his opinions.

(Docket No. 143, Ex. S.)  Thus, Captain Popp's reports and testimony had no bearing on Parnell's new report.[75]

Other than his consultation with Pellow, which the Court will address below, Parnell's supplemental report is based on old information, i.e., his own inspection of the wire rope and photos provided throughout the case.  Parnell conducted a microscopic inspection of the wire rope in August 2004.  (Docket No. 144, Ex. R, at 44-46, 59-60.)  Although Parnell does not state in his supplemental report exactly when the photos that he reviewed first became available, he identified them in his report as photos "provided throughout this case."  ABS and Limitation Plaintiffs proffer that they are photos taken by Captain Popp that were produced to all parties years ago.  T&L does not dispute this, nor does it contend that the photos only became available after Parnell's deposition.

The only new information, therefore, that Parnell relied upon is Pellow's report.  Pellow has never been identified as an expert in this case, and T&L is essentially trying to "backdoor" Pellow's opinions by incorporating them into Parnell's "supplemental" report.  This cannot be done at this late stage.  Expert discovery closed long ago, in September 2004.  The Court re-opened discovery for the limited purpose of  permitting T&L to depose Captain Popp and to designate its own wire rope expert.  T&L deposed Captain Popp.  It also designated Parnell, who

_____

[75]  T&L spends a considerable portion of its brief re-hashing its argument that Limitation Plaintiffs improperly withheld Captain Popp's reports and failed to produce him for deposition.  In denying T&L's motion for sanctions, Judge Bredar rejected these arguments.  Moreover, with the exception of the August 9, 2000 report, all of Captain Popp's reports were produced to all parties in August 2004, well before Parnell's deposition.  Although T&L claims that Captain Popp's August 9, 2000 report (and his view that the damage was pre-existing) were not revealed until Popp's deposition, nowhere does Parnell state that he relied upon that information in forming his new opinion.

produced a report.  Limitation Plaintiffs deposed Parnell.  At that point, the period of expanded

discovery, as allowed for a limited purpose, ended.  The Court will not further extend the

discovery deadline for a new round of reports and depositions regarding the age of the damage.

This decision is not unjust, as T&L has offered no satisfactory explanation why Pellow could not

have been disclosed during the regular or even the extended discovery period.  Accordingly, the

Court will not allow T&L to introduce Pellow's opinions under the guise of a "supplemental"

report by Parnell.

Finally, the Court notes that Parnell's and Pellow's reports are both unsworn.   (See

Docket No. 143, Ex. S.)  As previously discussed, an unsworn expert report is inadmissible in a

summary judgment proceeding.

### D.    Conclusion

For these reasons, T&L's and Ms. Gonzales's claims against ABS fail as a matter of law.

Accordingly, the Court will GRANT ABS's motion for summary judgment.

## IV.    Limitation Plaintiffs' Motion

In addition to suing ABS, Ms. Gonzales filed a claim against Limitation Plaintiffs,

seeking damages in connection with her son's death.   Limitation Plaintiffs moved for summary

judgment, arguing that Ms. Gonzales is barred from pursuing her claims in the United States.

The Court agrees.

A.    **Background**

1.    **The POEA**

The Philippines supply many of the world's seafarers.  The Philippine government establishes an agency, the Philippine Overseas Employment Administration ("POEA"),[76] to regulate the employment of Filipino seamen.  When a shipowner hires a seaman from the Philippines, it is required by law to sign a one-page POEA Contract of Employment, which identifies the seaman, the shipowner, the vessel, and the specific terms of employment (i.e., the seaman's position, salary, hours, and length of service).  (Docket No. 74, Ex. A.)  Each contract must be approved by the POEA.  (Docket No. 74, Ex. F, ¶ 3.)

The one-page Contract of Employment incorporates a lengthier document, the "Standard Terms and Conditions Governing the Employment of Filipino Seafarers On-Board Ocean-Going Vessels" (hereinafter "Standard Terms").  (Id.)  The document sets forth various rules that apply to all seaman/employer relationships.  For example, it discusses the duties of the employer and seafarer, termination of employment, holidays and overtime pay, disciplinary procedures, and compensation to be paid if the seaman dies or suffers an injury or illness during his employment. (Docket No. 153, Ex. B; Docket No. 163, Ex. A.)  The Standard Terms is the work of a committee, the Seabased Tripartite Technical and Consultative Committee ("Committee"), that the POEA convened to draft the Standard Terms.  The Committee includes representatives from the Filipino government, employers' interest groups, and seamen's interest groups.  (Docket No. 74, Ex. F, ¶ 2.)

---

[76] The POEA is an agency under the Department of Labor and Employment of the Republic of the Philippines.  (See Docket No. 74, Ex. F, ¶ 2.)

Through this carefully crafted and regulated system, the Philippine government protects its seamen by mandating employment terms that it considers to be fair and reasonable. The system also benefits shipowners, and helps create a market for Philippine seamen, by bringing certainty and predictability to the employment relationship.

## 2.    The Gonzales Contract

On January 14, 2000, Juan M. Gonzales, Jr., a resident of the Philippines, contracted with Eternity[77] to work on the M/V Leon I as an able-bodied seaman for a nine-month period, plus an additional three months, if both parties consented. (Docket No. 74, Ex. A.) The one-page employment contract ("Gonzales Contract") states: "The [Standard Terms] shall be strictly and faithfully deserved [sic]." The Standard Terms that were in effect in January 2000 and, therefore, were incorporated into Seaman Gonzales's contract, include the following provisions:

(i) Section 20(A): In the event of the death of a seaman during the term of his contract, the employer must pay his beneficiary $50,000, plus $1,000 for burial expenses,[78] and

---

[77] The contract was actually signed by Bright Maritime Corporation, a Philippine crewing company acting on behalf of Eternity. The parties have not argued that this fact has any bearing on the instant motion.

[78] Section 20(A) of the Standard Terms states:

In case of death of the seafarer during the term of his contract, the employer shall pay his beneficiaries the Philippine Currency equivalent to the amount of Fifty Thousand US dollars (US$50,000) and an additional amount of Seven Thousand US dollars (US$7,000) to each child under the age of twenty-one (21) but not exceeding four (4) children, at the exchange rate prevailing during the time of payment. . . . The employer shall pay the beneficiaries of the seafarer the Philippine currency equivalent to the amount of One Thousand US dollars (US$1,000) for burial expenses at the exchange rate prevailing during the time of payment.

(Docket No. 153, Ex. B; Docket No. 163, Ex. A.)

(ii)  Section 28:  The POEA or the National Labor Relations Commission ("NLRC")

"shall have original and exclusive jurisdiction over any and all disputes or controversies arising

out of or by virtue of this Contract."  (Docket No. 153, Ex. B; Docket No. 163, Ex. A.)[79]

### 3.    Subsequent Amendments to the Standard Terms

In May 2000, while Seaman Gonzales was aboard the M/V Leon I, the POEA amended

the Standard Terms.  The new language, which was designated Section 20(G), states:

> The seafarer or his successor in interest, acknowledges that payment for injury,
> illness, incapacity, disability or death of the seafarer under this contract shall
> cover all claims arising from or in relation with or in the course of the seafarer's
> employment, including but not limited to damages arising from the contract, tort,
> fault or negligence under the laws of the Philippines or any other country.

(Docket No. 154, Ex. 3.)

Seaman Gonzales died in July 2000.  Some months later, in mid-September of that year,

in response to a lawsuit filed by labor representatives, the Republic of the Philippines Supreme

Court issued an order restraining the implementation of Section 20(G).  More than a year later, in

Spring 2002, the suit was dismissed, the restraining order was lifted, and Section 20(G) went into

effect.  (Docket No. 154, Exs. 5, 6.)

### 4.    Gonzales's Mother Files Two Suits in Connection with Her Son's Death

In August 2000, Eternity paid $1,000 to cover the expenses for Gonzales's burial.

(Docket No. 97, Ex. 7, at 16.)   In November 2000, Gonzales's mother, his sole beneficiary,

---

[79]  The parties disagree as to whether another section, Section 29, was included in
the Standard Terms that were in effect when Seaman Gonzales signed his contract.  (See
Docket No. 153.)  Section 29, titled "Applicable Law," states: "All rights and obligations
of the parties to this Contract, including the annexes thereof, shall be governed by the
laws of the Republic of the Philippines, international conventions, treaties and covenants
where the Philippines is a signatory."  (Docket No. 153, Ex. B.)

demanded payment of the $50,000 death benefit to which she was entitled under the Standard Terms.[80]  Bright Maritime and Eternity offered Ms. Gonzales $60,000 (the $50,000 plus an additional $10,000) on the condition that she execute a general waiver and quitclaim in their favor.  (Id. at 3.)  Ms. Gonzales refused the offer, not wanting to waive any rights that she may have to pursue a tort claim under foreign law.  (Id. at 4.)  Bright Maritime and Eternity then withheld the $50,000 death benefit from Ms. Gonzales. (Id. at 16.)

Ms. Gonzales then filed two complaints, one in the United States and one in the Philippines.  On February 5, 2001, she filed a lawsuit in this Court against Bright Maritime, Eurocarriers, and others (Civil No. L-01-327).  On March 16, 2001, Ms. Gonzales filed a Complaint against Eternity and Bright Maritime with the Republic of the Philippines Department of Labor and Employment National Labor Relations Commission ("NLRC") (Docket No. 97, Ex. 7).

### a.    Philippines Case

Ms. Gonzales's suit with the NLRC, an arbitral body, requested the contractual $50,000 death benefit.  In a decision dated August 30, 2001, the Executive Labor Arbiter of the NLRC ruled that Ms. Gonzales's entitlement to the death benefit vested upon the death of her son. Accordingly, Eternity and Bright Maritime should have paid her the $50,000 death benefit immediately and without any conditions attached.  (Docket No. 97, Ex. 7, at 18.)  The Executive

---

[80]  In a November 17, 2000 letter to Bright Maritime, Ms. Gonzales's attorney demanded $51,000 in benefits to which "she [was] entitled based on the laws of the Philippines and Contract of Employment which formed an integral part of Standard Employment Contract (SEC) for seaferers [sic]."  (Docket No. 97, Ex. 3.)  The letter does not mention that the $1,000 for burial expenses had already been paid.

Labor Arbiter, therefore, ordered Eternity and Bright Maritime to pay Ms. Gonzales $50,000, plus attorneys' fees. (Id. at 20.)

Eternity and Bright Maritime appealed the Executive Labor Arbiter's decision to the Commissioners of the NLRC. The Commissioners affirmed the Executive Labor Arbiter's ruling, stating that Eternity and Bright Maritime were "legally bound to give [Ms. Gonzales] the amount of US $50,000 without requiring her to execute a waiver and quitclaim." (See Docket No. 97, Ex. 8, at 2.)

The Commissioners also considered the effect that the Executive Labor Arbiter's judgment in Ms. Gonzales's favor would have on her ability to pursue a separate legal action in the Philippines or in a foreign country, such as the United States. The Commissioners ruled that the judgment precludes Ms. Gonzales from filing a claim in the Philippines, stating that Ms. Gonzales is "necessarily . . . barred from instituting a separate legal action here in our country based on the same incident because of our law against double recourse from a single wrong (Art. 2177, Civil Code)." (Id.)

The Commissioners, however, found that they were not in a position to state whether Ms. Gonzales was barred from pursuing a claim in the United States, preferring to leave that decision to the American courts:

> If however, the separate legal action is instituted in the foreign country as it is now, we are not in a position to hold that complainant is barred thereby. To institute is one thing, for the action to prosper is another. The foreign forum has the jurisdiction to determine whether the second suit before it will prosper or not given the fact that a suit is pending here before us. It is not for us to preempt the ruling of that foreign court.

We agreed that under RA 8042,[81] the NLRC has original and exclusive jurisdiction over claims arising out of employer-employee relationship or contract involving overseas Filipino workers.  However, as in any other Philippine laws, the conferment of jurisdiction to a particular court, body or tribunal is in relation to the other courts, bodies or tribunals in the Philippines.  To say that the same is intended to bind foreign courts is, to our mind, an act of interference or usurpation.  Hence, we are also not in a position to say that the foreign court is barred from taking cognizance of the second suit.

(Id. at 2-3.)

In June 2002, Ms. Gonzales was paid $55,000 (the $50,000 death benefit plus attorneys' fees) in satisfaction of the judgment of the NLRC.  Accordingly, the NLRC closed the case in September 2002.  (Docket No. 74, Exs. F(6), (7).)

### b.    United States Case

When Limitation Plaintiffs filed the instant limitation action, the Court stayed the lawsuit that Ms. Gonzales filed in this Court and ordered all persons claiming damages arising from the M/V Leon I accident to file a claim in the limitation action.  On April 26, 2001, Ms. Gonzales filed a claim against Limitation Plaintiffs, seeking damages under

46 U.S.C. § 688, et seq. (a.k.a., the "Jones Act"), the general maritime law, and any and all other state, federal, or international codified or common law as governs the Decedent's and/or Claimant's rights to recover for the death, injuries and damages sustained as [a] result of the incident.

---

[81] RA 8042 is Republic Act No. 8042, otherwise known as the "Migrant Workers and Overseas Filipinos Act of 1995."  Section 10 of that law provides: "Notwithstanding any provision of law to the contrary, the Labor Arbiters of the National Labor Relations Commission (NLRC) shall have the original and exclusive jurisdiction to hear and decide, within ninety (90) calendar days after filing of the complaint, the claims arising out of an employer-employee relationship or by virtue of any law or contract involving Filipino workers for overseas deployment including claims for actual, moral, exemplary and other forms of damages."  (See http://www.poea.gov.ph/rules/ra8042.html.)

(Docket No. 9, at 1.)  Limitation Plaintiffs moved for summary judgment, arguing that Ms. Gonzales is barred from prosecuting her claim in the United States.

**B.    Analysis**

Whether Ms. Gonzales may pursue her claim in the United States depends upon the effect of the forum selection clause contained in her son's employment contract.  That contract provides that the NLRC in the Philippines "shall have original and exclusive jurisdiction over any and all disputes or controversies arising out of or by virtue of this Contract."  (Docket No. 153, Ex. B; Docket No. 163, Ex. A.)  For the following reasons, the Court concludes that the forum selection clause is enforceable and encompasses the tort claims that Ms. Gonzales seeks to pursue in this Court.

The United States Supreme Court has held that a forum selection clause in an admiralty case is presumptively valid and should be enforced absent a strong showing that it is unreasonable.[82]  This presumption is especially strong in the international context in light of "concerns of international comity, respect for the capacities of foreign and transnational

---

[82]  See M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972) ("[I]n the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside."); see also Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 589 (1991) (citing Bremen for proposition that forum selection clauses are presumptively valid.).  In the Fourth Circuit, forum selection clauses may be deemed unreasonable if:

(1) their formation was induced by fraud or overreaching; (2) the complaining party "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) their enforcement would contravene a strong public policy of the forum state.

Allen v. Lloyd's of London, 94 F.3d 923, 928 (4th Cir. 1996) (citing Carnival Cruise Lines, 499 U.S. at 595; The Bremen, 407 U.S. at 12-13, 15, 18).

tribunals, and sensitivity to the need of the international commercial system for predictability in the resolution of disputes."[83]  Applying this presumption, federal courts have upheld the exact forum selection clause contained in Seaman Gonzales's contract, concluding that the clause encompasses tort causes of action and requires the seaman to litigate his negligence and unseaworthiness claims before the NLRC in the Philippines.[84]

---

[83] Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 629 (1985); see also The Bremen, 407 U.S. at 13-14 ("Manifestly much uncertainty and possibly great inconvenience to both parties could arise if a suit could be maintained in any jurisdiction in which an accident might occur or if jurisdiction were left to any place where [the vessel] might happen to be found.  The elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting.") Marinechance Shipping, Ltd. v. Sebastian, 143 F.3d 216, 220 (5th Cir. 1998) ("Forum selection clauses are important in international cases such as the instant case because there is much uncertainty regarding the resolution of disputes.  Ocean-going vessels travel through many jurisdictions, and could become subject to the laws of a particular jurisdiction based solely upon the fortuitous event of an accident.").

[84] See Marinechance, 143 F.3d at 219-23 (affirming the district court's decision to enforce a POEA forum selection clause identical to the clause in the instant case and stating that the clause "includes tort causes of action arising during the course of employment between the seamen and [the shipowner]"); Acosta v. Norweigan Cruise Line, Ltd., 303 F. Supp. 2d 1327, 1330-32 (S.D. Fla. 2003) (enforcing POEA forum selection clause identical to clause in instant case); De Joseph v. Odfjell Tankers (USA), Inc., 196 F. Supp. 2d 476, 481 (S.D. Tex. 2002) (stating that because the "instant POEA forum selection clause [which is identical to the one in the instant case]. . . is mandatory" the court held that the injured seaman must adjudicate his negligence and unseaworthiness claims in a Filipino venue).
    Recognizing that the NLRC is a body of labor arbiters, the Acosta court termed the POEA clause an arbitration agreement, which is essentially a specialized forum selection clause.  Acosta, 303 F. Supp. 2d at 1330.  Ms. Gonzales and Limitation Plaintiffs agree that the clause in the instant case is an arbitration agreement.  They do not, however, contend that the clause's status as an arbitration agreement versus a run-of-the-mill forum selection clause affects the Court's analysis.  Although Ms. Gonzales mentions that the arbitration clause deprives her of her right to a jury trial, neither she nor any other party in this limitation proceeding has demanded a jury trial.  Accordingly, this discussion is largely rhetorical.

Ms. Gonzales does not attempt to distinguish these cases from her own. Rather, despite the fact that she has already submitted to the jurisdiction of the NLRC by suing for the $50,000 death benefit, she contends that the forum selection clause is unenforceable for the following reasons: (i) the NLRC held that Ms. Gonzales could maintain a tort action in the United States, (ii) the clause violates the public policy of the United States, and (iii) she sought only contractual benefits from the NLRC, which lacks jurisdiction to hear the tort claims she is now pursuing.[85] The Court will address each argument in turn.

### 1. NLRC's Comments Regarding Ms. Gonzales's Ability to Maintain a Tort Action in the United States

According to Ms. Gonzales, the NLRC ruled in its appellate decision that although she had obtained a judgment in the Philippines, she could maintain a tort action in the United States. Such was not the NLRC's ruling. When pressed to decide whether Ms. Gonzales could pursue her foreign tort claims, the NLRC declined to rule, stating that this was an issue for the American courts. Accordingly, the Philippines has not expressed an opinion.

### 2. Public Policy of the United States

In urging an American forum for her tort claims, Ms. Gonzales argues that, (i) the United States has a substantial interest in the case, and (ii) Congress and the judiciary have historically

---

[85] At the very end of the Court's summary judgment hearing, Ms. Gonzales's counsel mentioned a new argument why the Court should allow her claims to proceed. Specifically, counsel argued that when Ms. Gonzales initially filed her lawsuit (which is now stayed) in this Court, she included an in rem claim against the vessel itself. Because Seaman Gonzales's contract was with the employer, not the vessel, the forum selection clause does not apply to her claims against the vessel, counsel argued. This was the first time counsel had raised this argument, and Limitation Plaintiffs, therefore, had no proper opportunity to respond. Although the Court invited briefing from Ms. Gonzales's counsel regarding this new argument, counsel has not filed a brief. Accordingly, counsel has abandoned this argument.

given special protection to seamen as "wards of the admiralty." The Court disagrees; enforcing the forum selection clause would not violate a strong public policy of the United States.

### a. American Interest in the Case

The United States has a substantial interest in the case, Ms. Gonzales contends, because the accident that killed her son also injured American dockworkers, damaged American property, and prompted a large investigation by American law enforcement and investigative authorities. It is not necessary, however, for the Court to adjudicate Ms. Gonzales's claims in order to remedy the harm to American dockworkers and property. The dockworkers who were injured as a result of the collapse have filed separate claims in this action, and T&L has filed a claim against Limitation Plaintiffs. Accordingly, the American interest will be protected whether or not the Court allows Ms. Gonzales to pursue her own claim. Moreover, it is unlikely that the Supreme Court intended that the presumption in favor of enforcing a forum selection clause should be overcome whenever an accident occurs in American waters.

Ms. Gonzales also boldly asserts that the crane that collapsed was being operated in violation of American law. She offers absolutely no evidence of such a violation, however, and does not even mention what laws were allegedly violated.

### b. Seamen as "Wards of the Admiralty"

Historically, seamen have been considered "wards of the admiralty." The conditions that led Congress and the courts to provide special protection to seamen included oppressive employment contracts, the seamen's unequal bargaining position, and the perils faced at sea.[86] Congress enacted the Jones Act, which enlarged the protection afforded to seamen under general

---

[86] See Ms. Gonzales's discussion of "wards of the admiralty" and the case law cited therein. (Docket No. 97, at 28-31.)

maritime law by allowing them to sue their employers for negligence,[87] and the judiciary has generally opened the courthouse doors to seamen's claims.   Ms. Gonzales argues that enforcement of the POEA forum selection clause would violate this country's strong public policy of protecting seamen.

Seamen Gonzales's contract, however, is not typical of those that prompted the United States to assign seamen "wards of the admiralty" status.  The Filipino government, through the POEA, has taken steps to protect its seamen.[88]   The POEA requires any shipowner seeking to

---

[87]  See 46 U.S.C. app. § 688 ("Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable.").

[88]  Four cases merit mentioning:
        (i)  Marinechance, 143 F.3d at 221, n. 25 ("The effect of POEA intervention in employment contracts is to shift the balance of power slightly in favor of the employee in much the same way that a labor union or legislative enactment of minimum work standards increases the level of protection for employees in the United States.");
        (ii)  Acosta, 303 F. Supp. 2d at 1331 ("Plaintiff's claim that Philippine seamen lack bargaining power is weakened by the fact that POEA's Standard Terms were negotiated by a Tripartite Working Group, which consisted of three groups of negotiators, one of which represented the interests of Philippine seamen.");
        (iii)  Bautista v. Star Cruises & Norwegian Cruise Line, Ltd., 286 F. Supp. 2d 1352, 1362-63 (S.D. Fla. 2003) ("[B]ecause the standard employment contract that each Plaintiff signed was approved by the POEA, an agency of the Philippine government, Plaintiffs lack a factual basis for the assertion that [the shipowner] took advantage of them in negotiating the language and terms of the contract.  Plaintiffs' employment contracts, with the incorporated Standard Terms, were in the form and language that their own government required to protect its own citizens.  In fact, Philippine law prohibits foreign employers from hiring Philippine workers for overseas employment except through the POEA.  Where the Philippine government has acted, through the POEA, to protect its citizens and advance their employment opportunities

hire a Filipino seaman to enter into a POEA-approved contract.  This contract is comprehensive

and governs a seaman's working conditions, including his hours, overtime pay, and leave.  It

establishes a specific procedure for the ship's master to follow in disciplining a seaman and lists

the penalties to be imposed for specific offenses.  It also recognizes the many perils that seamen

face at sea, specifying the compensation that a shipowner must pay a seaman if he is injured or

falls ill during his employment or if his personal effects are damaged on board.[89]  When a dispute

arises, the contract requires adjudication in the Philippines, thus ensuring a homeland forum.[90]

This is not, therefore, a case in which the United States must intervene to protect an oppressed

seaman.  To the contrary, imposing the Jones Act on the Gonzales Contract would upset the

---

with foreign employers, it is not the role of this Court to second-guess such actions."),
aff'd, 396 F.3d 1289 (11th Cir. 2005); and

            (iv) Amon v. Norweigan Cruise Lines, Ltd., 2002 WL 32851545, at *2
(S.D. Fla. Sept. 26, 2002) (although recognizing that United States courts have
traditionally been protective of seamen's rights, the court enforced the POEA arbitration
agreement, concluding that the Filipino seaman's interests were ably represented by the
Tripartite Technical Working Group and that the POEA Standard Terms are "ultimately
the product of the POEA," which "has the obligation to protect the interests of Philippine
workers, including seamen, in their employment relationships with foreign employers.").

    [89]  See POEA Standard Terms (Docket No. 153, Ex. B; Docket No. 163, Ex. A.)

    [90]  Marinechance, 143 F.3d at 221, n. 24 ("[The forum selection] clause was
included under the POEA's authority to protect Philippine seamen.  Nevertheless, the
vessel owner, who was forced to accept this provision before hiring a Philippine seaman,
may rely upon that provision.  Nothing in the [POEA contract] make its provisions
enforceable at the whim of the seaman."); De Joseph, 196 F. Supp. 2d at 481-82 ("[The
court] realizes that the POEA forum selection clause was designed to protect Filipino
seamen working aboard international vessels.  That vessel owners, who are also obliged
to accept the POEA terms, rather than Filipino seamen, have thus far been the parties
seeking to enforce these clauses, does not in any way diminish the beneficient and liberal
purposes behind the enactment.").

balance between management and labor that the Filipino government carefully crafted for its own citizens.[91]

### 3.    NLRC's Jurisdiction to Hear Ms. Gonzales's Tort Claims

A forum selection clause or arbitration agreement that operates as a waiver of a party's right to pursue statutory remedies is generally unenforceable.[92]  Ms. Gonzales argues that she

---

[91]  Ms. Gonzales contends that under the Jones Act, she has the right to sue in any forum she pleases, and that the arbitration agreement in her son's contract violates public policy because it denies her of that right.  Although several courts have refused to enforce a forum selection clause against a Jones Act seaman, those cases each involved a domestic seaman who did not have an employment contract that was drafted by his own government and designed for his protection.  Accordingly, those cases did not involve the unique circumstances and aspects of international law that are present in the instant case.  See Boutte v. Cenac Towing, Inc., 346 F. Supp. 2d 922, 928-29 (S.D. Tex. 2004) (distinguishing the Marinechance case, which involved a clause identical to that in Seaman Gonzales's contract, and noting that there is "an international flavor present in Marinechance that is absent in this case" and emphasizing that the "seamen in Marinechance were Filipino[,] the Filipino government negotiated their employment contracts on their behalf," and the "[POEA] forum selection clause . . . had the imprimatur of the Filipino government");  Nunez v. American Seafoods, 52 P.3d 720, 723 (Alaska 2002) (distinguishing Marinechance and its progeny because they "involve foreign sailors who were employed by foreign shippers, served on foreign flagged vessels, and were employed under contracts that called for resolution of their legal disputes in other nations" and stating that "these cases address problems of uniformity and comity that are unique to their international settings").

Moreover, the Supreme Court has recognized that there may be times when it is appropriate to enforce an international forum selection clause even when "a contrary result would be forthcoming in a domestic context."  Mitsubishi Motors, 473 U.S. at 629. In the one case the Court has located that involved a Filipino seaman who raised the same argument that Ms. Gonzales has asserted, the court, noting the presumption in favor of enforcing foreign forum selection clauses, held that the clause was valid under United States law despite the Jones Act.  See Acosta, 303 F. Supp. 2d at 1331.

[92]  See Mitsubishi Motors, 473 U.S. at 637 & n. 19 (stating that "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function" and that in the event that a choice of forum clause operated "as a prospective waiver of a party's right to pursue statutory remedies . . . , we would have little hesitation in condemning the agreement as against public policy").

sought only contractual benefits from the NLRC and that the NLRC lacks jurisdiction to hear the tort claims she is now pursuing. Accordingly, if this Court refuses to hear her claims, she will not have any forum in which to litigate them, Ms. Gonzales contends.

In support of her argument, Ms. Gonzales cites to the following two cases from the Republic of the Philippines Supreme Court which, she claims, hold that labor arbitrators in the Philippines lack jurisdiction to hear tort claims: (i) Tolosa v. National Labor Relations Comm'n, G.R. No. 149578 (S.C. Apr. 10, 2003), and (ii) Ocheda v. Court of Appeals, G.R. No. 85517 (S.C. Oct. 16, 1992).[93] These cases are inapposite, however. First, they are factually distinct. Tolosa was a maritime case in which the plaintiff was the widow of the master of an overseas vessel. The case involved the potential liability of fellow employees and not the shipowner, however.[94] The second case, Ocheda, involved claims by painters, not seamen. Neither case, therefore, decided that a seaman's negligence claim against a shipowner was outside the jurisdiction of the NLRC.

Second, neither case cited nor addressed the Migrant Workers and Overseas Filipinos Act of 1995 ("MWOFA"). That statute gives the NLRC exclusive jurisdiction over all damages claims by an overseas Filipino worker. The statute provides:

---

[93] The Tolosa and Ocheda cases are contained in the record at Docket No. 116, Exs. 1A and 1B, respectively, and can also be found at http://www.supremecourt.gov.ph/.

[94] See Acosta, 303 F. Supp. 2d at 1332 (noting significant distinctions between Tolosa and the instant case); Bautista, 286 F. Supp. 2d at 1366 ("The Tolosa decision, therefore, was premised on the fact that Tolosa's death stemmed from the negligent acts of his shipmates, who had no contractual employer-employee relationship with Tolosa. Because the instant cases relate directly to the contractual employer-employee relationship between Plaintiffs and [their employers], the Court does not interpret Tolosa as precluding Plaintiffs' claims before the NLRC and thereby preventing Plaintiffs 'any meaningful relief' through arbitration.").

> Notwithstanding any provision of law to the contrary, the Labor Arbiters of the National Labor Relations Commission (NLRC) shall have the original and exclusive jurisdiction to hear and decide, within ninety (90) calendar days after filing of the complaint, the claims arising out of an employer-employee relationship or by virtue of any law or contract involving Filipino workers for overseas deployment including claims for actual, moral, exemplary and other forms of damages.

(Section 10 of the Migrant Workers and Overseas Filipinos Act of 1995, http://www.poea.gov.ph/rules/ra8042.html.)[95]  In its decision in Ms. Gonzales's case, the NLRC cited the MWOFA with approval.[96]  Nothing in its decision suggests that the NLRC lacks jurisdiction over tort claims or that a tort/contract dichotomy exists.

In fact, the NLRC's decision is the clearest proof that Ms. Gonzales's argument is wrong. The Commissioners held that because the arbitrator had awarded Ms. Gonzales the $50,000 death benefit, she was "barred from instituting a separate legal action here in our country based on the same incident because of our law against double recourse from a single wrong (Art. 2177, Civil Code)."  (Id. at 2.)  It is clear that Ms. Gonzales is suing under the Jones Act based on her son's death, which is the "same incident" that formed the basis of her NLRC claim.

The NLRC referenced Article 2177 of the Philippines Civil Code, which concerns responsibility for fault or negligence and states, in relevant part: "But the plaintiff cannot recover

---

[95]  Although she cites to Filipino case law, Ms. Gonzales argues that the Court previously struck Limitation Plaintiffs' Rule 44.1 Notice and should not consider the effect of Filipino law on this case.  In an Order dated September 22, 2005, however, the Court ruled that a Rule 44.1 Notice was not necessary because all parties have been aware since the beginning of the case that the Court must decide the effect that Ms. Gonzales's case in the Philippines has on the instant lawsuit.  (See Docket No. 134.)

[96]  The NLRC stated: "We agreed that under [the MWOFA], the NLRC has original and exclusive jurisdiction over claims arising out of employer-employee relationship or contract involving overseas Filipino workers."  (Docket No. 97, Ex. 8, at 3.)

damages twice for the same act or omission of the defendant."[97]  Relying on this statutory rule, the NLRC held that Ms. Gonzales could not pursue a separate legal action in the Philippines outside of the case that she had filed with the NLRC.  The Court queries why, if the NLRC lacked jurisdiction to award damages for Ms. Gonzales's tort claims, the NLRC referred to Article 2177 and held that she is prohibited from filing a separate tort action, or any other action for that matter, in the Philippines.  If the NLRC lacked jurisdiction to award Ms. Gonzales damages for negligence, then a tort action, whether filed in the Philippines or in the United States under the Jones Act, would not result in a double recovery.  Accordingly, the Court interprets the NLRC's decision as signifying that the NLRC has jurisdiction over Ms. Gonzales's tort claims, and any damages for her tort claims are included in the $50,000 death benefit.[98]  Any

---

[97]  Article 2177 states in its entirety: "Responsibility for fault or negligence under [Article 2176] is entirely separate and distinct from the civil liability arising from negligence under the Penal Code. But the plaintiff cannot recover damages twice for the same act or omission of the defendant."  See Article 2177 of the Civil Code of the Philippines, http://www.chanrobles.com/civilcodeofthephilippinesbook4.htm.  Article 2176, to which Article 2177 refers, states in part: "Whoever by act or omission causes damage to another, there being fault or negligence, is obliged to pay for the damage done."  See Article 2176 of the Civil Code of the Philippines, http://www.chanrobles.com/civilcodeofthephilippinesbook4.htm.

[98]  Ms. Gonzales argues that it was not until 2002, when Section 20(G) of the Standard Terms went into effect, that a Filipino seaman was prohibited from filing a separate tort claim against his employer.  Section 20(G) provides:

> The seafarer or his successor in interest, acknowledges that payment for injury, illness, incapacity, disability or death of the seafarer under this contract shall cover all claims arising from or in relation with or in the course of the seafarer's employment, including but not limited to damages arising from the contract, tort, fault or negligence under the laws of the Philippines or any other country.

(Docket No. 154, Ex. 3.)  The Court disagrees, and concludes for the following reasons that Section 20(G) did not change the state of the law.

First, although Section 20(G) was not in Seaman Gonzales's contract, the NLRC ruled that Ms. Gonzales was prohibited from filing any separate legal action in the

other interpretation of the NLRC's decision would render its concern about double recovery a

nullity.  Accordingly, Ms. Gonzales's recovery in the Philippines encompasses any tort claims

that she may have.  She, therefore, has not been denied a forum in which to recover damages for

Limitation Plaintiffs' alleged negligence.

The analysis does not change merely because Ms. Gonzales might recover more than the

contractually stipulated $50,000 in a Jones Act suit.   The Court will not second-guess the

---

Philippines.

      Second, in <u>Linsangan v. Hon. Laguesma</u>, G.R. No. 143476 (S.C. Sept. 10, 2001), the Filipino Supreme Court discussed the factual background of Section 20(G) and explained that, in the face of the Standard Terms, seamen were filing claims in foreign courts under foreign law for additional compensation.  The Supreme Court explained that the Filipino government added Section 20(G) in order to stop this practice and to reinforce what the Standard Terms already provided:

> The Philippines has been a major source of seafarers deployed for work in vessels navigating international waters.  To protect our seafarers, the POEA adopted and approved in 1989, revised in 1996, the [Standard Terms].  Meanwhile, as more and more Filipino seamen became aware of their rights, they filed cases for "tortious damages" mostly in foreign jurisdictions where the vessels of the principals could be attached, much to the discontent of their foreign employers. Because of the tort claims, our seafarers were perceived as "Filipinos who complain too much."  In fact, foreign employers were no longer willing to hire Filipino seafarers in large scale unless the [Standard Terms] is amended in order that better terms and conditions in favor of employers' sector are inserted into the [Standard Terms].  Thus, the Labor Secretary was constrained to [add Section 20(G)].

<u>Linsangan v. Hon. Laguesma</u>, G.R. No. 143476 (S.C. Sept. 10, 2001).

      Third, the amount of the death benefit did not increase when Section 20(G) was enacted, thereby signifying that Section 20(G) did not alter the balance between management and labor that had previously been struck.

      Accordingly, the Court concludes that Section 20(G) simply reinforced the existing rule.

Filipino government's determination as to what sum is appropriate,[99] and it will not disrupt a system that the Filipino government has taken pains to craft.

Ms. Gonzales, therefore, has failed to make a strong showing that enforcing the forum selection clause would be unreasonable. The Court will enforce the forum selection clause and dismiss Ms. Gonzales's claims.

## V.    T&L's Motion

Ms. Gonzales filed a claim against T&L, contending that T&L was negligent by operating its shore cranes to unload sugar from the vessel while the ship's crew was using a crane for maintenance operations in the neighboring hatch. Because T&L's cranes and the ship's crane were operating in close proximity, when the jib of the ship's crane fell, it hit one of T&L's shore cranes. Ms. Gonzales theorized that the impact of the ship's crane hitting T&L's crane may have increased the force with which Seaman Gonzales's work basket was whipped against the ship's hatch cover.

T&L moved for summary judgment, arguing that there is no evidence (i) that T&L owed any duty to Seaman Gonzales, and (ii) that T&L's use of its shore cranes was a proximate cause

---

[99] Bautista, 286 F. Supp. 2d at 1363 ("Where the Philippine government has acted, through the POEA, to protect its citizens and advance their employment opportunities with foreign employers, it is not the role of this Court to second-guess such actions."); Prado v. Sloman Neptun Schiffahrts, A.G., 611 So. 2d 691, 703 (La. Ct. App. 1992) (stating that it would be "presumptuous to assume that the procedures for the handling of this case established by the friendly foreign government of the Philippines in pursuit of the welfare of its citizens does not provide a reasonable alternative to those available in this Court"); see also Damigos v. Flanders Compania Naviera, S.A.-Panama, 716 F. Supp. 104, 109 (S.D.N.Y. 1989) (stating, in the context of forum non conveniens motion, that "[d]istrict courts should not consider differences in remedy between forums unless 'the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all'" (quoting Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 (1981))).

of the accident and the resulting death of Seaman Gonzales.  During the summary judgment hearing, Ms. Gonzales's counsel conceded that T&L did not cause or contribute to the death of Seaman Gonzales.  Ms. Gonzales, therefore, withdrew her opposition to T&L's motion.  Accordingly, the Court will, by separate Order, GRANT T&L's motion.

**VI.     Conclusion**

For the foregoing reasons, the Court will, by separate Order, (i) GRANT ABS's motion, (ii) GRANT Limitation Plaintiffs' motion, and (iii) GRANT T&L's motion.  On or before August 24, 2006, the parties shall CONFER and NOTIFY the Court in writing whether they consent to referral of the case to a Magistrate Judge for a settlement conference regarding the remaining claims.

Dated this 3rd day of August, 2006.

_____/s/_____
Benson Everett Legg
Chief Judge